> **THIS DISCLOSURE STATEMENT IS SUBJECT TO THE APPROVAL OF THE BANKRUPTCY COURT AND IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN. ACCEPTANCES OR REJECTIONS OF THE PLAN MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| WELLMAN, INC., *et al.*,[1] | ) | Case No. 08-10595 (SMB) |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | |

### DEBTORS' THIRD AMENDED DISCLOSURE STATEMENT PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022-4611
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Jonathan S. Henes (JH 1979)
Michael A. Cohen (MC 1277)

Attorneys to the Debtors and Debtors in Possession

---

[1]   The debtors in these cases include: Wellman, Inc.; Wellman Fibres Ltd.; MRF, Inc.; Prince, Inc.; Warehouse Associates Inc.; Carpet Recycling of Georgia Inc.; Wellman of Mississippi, Inc.; Fiber Industries, Inc.; ALG, Inc.; Josdav, Inc.; PTA Resources LLC; and MED Resins, Inc.

# TABLE OF CONTENTS

Page

Important Information About This Disclosure Statement ................................................ 4

Questions and Answers Regarding this Disclosure Statement and the Plan .................... 6

Our History and Our Chapter 11 Cases ........................................................................ 12

Treatment of Claims Against and Equity Interests in Wellman .................................... 29

Management of the Company ........................................................................................ 31

Composition of New Board of Directors ....................................................................... 31

Trading Restrictions to Preserve Wellman's Net Operating Loss Income Attributes ......... 32

Financial Performance During Bankruptcy .................................................................... 32

Pension Plans ............................................................................................................... 33

The Distribution Trust .................................................................................................. 34

The Rights Offering ...................................................................................................... 35

Our Business Upon Emergence ..................................................................................... 36

Our Capitalization After Emergence ............................................................................. 38

Description of Capital Stock ......................................................................................... 38

Summary of Legal Proceedings ..................................................................................... 40

Projected Financial Information ..................................................................................... 43

Risk Factors .................................................................................................................. 44

Confirmation Of The Plan ............................................................................................ 50

Effect Of Confirmation Of The Plan ............................................................................ 55

Important Securities Law Disclosure ............................................................................ 58

Voting Instructions ....................................................................................................... 59

Certain U.S. Federal Income Tax Consequences Of The Plan ...................................... 61

Recommendation .......................................................................................................... 72

## EXHIBITS

EXHIBIT A      Plan of Reorganization

EXHIBIT B      Disclosure Statement Order

EXHIBIT C      Reorganized Debtors' Projections

EXHIBIT D      Reorganized Debtors' Valuation

EXHIBIT E      Liquidation Analysis

EXHIBIT F      Reconciliation of EBITDA, as defined to GAAP Net Income

EXHIBIT G      August 5, 2008 Bankruptcy Court Decision

**Important Information About This Disclosure Statement**

This Disclosure Statement provides information regarding the Plan of Reorganization that Wellman, Inc. is seeking to have confirmed by the Bankruptcy Court. Wellman believes that the Plan is in the best interests of all creditors. Wellman urges all creditors entitled to vote on the Plan to vote in favor of the Plan.

**References to "New Common Stock" in this Disclosure Statement are to the new common stock that we will issue upon emergence as described in this Disclosure Statement and in accordance with the Plan.**

**References to the "Plan" and the "Plan of Reorganization" are to the Plan of Reorganization attached as Exhibit A hereto. All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Plan.**

**References to the "Bankruptcy Court" are to the United States Bankruptcy Court for the Southern District of New York, the court in which Wellman, Inc. and its subsidiaries indicated on the cover of this Disclosure Statement (collectively, the "Debtors") filed voluntary petitions seeking reorganization relief under the provisions of chapter 11 of the Bankruptcy Code. References to the "Petition Date" are to February 22, 2008.**

**Unless the context requires otherwise, reference to "Wellman," "our," and "us" are to Wellman, Inc. and its subsidiaries.**

The confirmation of the Plan and effectiveness of the Plan are subject to certain material conditions precedent described herein. There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions required to be satisfied will be satisfied or waived.

You are encouraged to read this Disclosure Statement in its entirety, including without limitation, the Plan, which is annexed as Exhibit A hereto, and the section entitled "Risk Factors," prior to submitting your ballot to vote on the Plan.

**The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee of the accuracy or completeness of the information contained herein or an endorsement of the merits of the Plan by the Bankruptcy Court.**

Summaries of the Plan and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan, the exhibits and schedules attached to the Plan and this Disclosure Statement and the Plan Supplement. The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there is no assurance that the statements contained herein will be correct at any time after such date. Except as otherwise provided in the Plan or in accordance with applicable law, Wellman is under no duty to update or supplement this Disclosure Statement.

The information contained in this Disclosure Statement is included for purposes of soliciting acceptances to, and confirmation of, the Plan and may not be relied on for any other purpose. Wellman believes that the summary of certain provisions of the Plan and certain other documents and financial information contained or referenced in this Disclosure Statement is fair and accurate. The summaries of the financial information and the documents annexed to this Disclosure Statement, including, but not limited to, the Plan, the Plan Documents, or otherwise incorporated herein by reference, are qualified in their entirety by reference to those documents. In the event of any inconsistency between the Disclosure Statement and the Plan, the relevant provision of the Plan, as it relates to such inconsistency, shall govern.

No representations concerning Wellman or the value of Wellman's property have been authorized by Wellman other than as set forth in this Disclosure Statement. Any information, representations or inducements made to obtain acceptance of the Plan, which are other than or inconsistent with the information contained in this Disclosure Statement and in the Plan, should not be relied on by any creditor entitled to vote on the Plan.

4

This Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission ("SEC") or any similar federal, state, local or foreign regulatory agency, nor has the SEC or any other such agency passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement.

Wellman has sought to ensure the accuracy of the financial information provided in this Disclosure Statement, but the financial information contained in, or incorporated by reference into, this Disclosure Statement has not been and will not be audited or reviewed by Wellman's independent auditors unless explicitly provided otherwise.

Some of the shares of the new common stock described in this Disclosure Statement will be issued without registration under the Securities Act of 1933, as amended (the "Securities Act"), or similar federal, state, local or foreign laws, in reliance on the exemption set forth in section 1145 of the Bankruptcy Code. Other shares of the new common stock may be issued pursuant to other applicable exemptions under the federal securities laws. To the extent exemptions from registration other than section 1145 apply, such securities may not be offered or sold except pursuant to a valid exemption or on registration under the Securities Act.

Wellman makes statements in this Disclosure Statement that are considered forward-looking statements under the federal securities laws. Wellman considers all statements regarding anticipated or future matters, including the following, to be forward-looking statements:

- any future effects as a result of the pendency of the Chapter 11 Cases;
- Wellman's expected future financial position, liquidity, results of operations, profitability and cash flows;
- projected dividends;
- financing plans;
- competitive position;
- business strategy;
- budgets;
- projected cost reductions;
- projected and estimated liability costs, including pension, retiree, tort and environmental costs and costs of environmental remediation;
- results of litigation;
- disruption of operations;
- plans and objectives of management for future operations;
- contractual obligations;
- off-balance sheet arrangements;
- growth opportunities for existing products and services;
- projected price increases;
- projected general market conditions;
- benefits from new technology; and
- effect of changes in accounting due to recently issued accounting standards.

Statements concerning these and other matters are not guarantees of Wellman's future performance. Such statements represent Wellman's estimates and assumptions only as of the date such statements were made. There are risks, uncertainties and other important factors that could cause the Debtors' actual performance or achievements to be materially different from those they may project and Wellman undertakes no obligation to update any such statement. These risks, uncertainties and factors include:

- Wellman's ability to develop, confirm and consummate the Plan;

- Wellman's ability to reduce its overall financial leverage;

- the potential adverse impact of the Chapter 11 Cases on Wellman's operations, management and employees, and the risks associated with operating businesses in the Chapter 11 Cases;

- the applicable Debtors' ability to comply with the terms of the debtor-in-possession credit facility;

- customer response to the Chapter 11 Cases;

- inability to have claims discharged/settled during the chapter 11 proceedings;

- general economic, business and market conditions;

- currency fluctuations;

- interest rate fluctuations;

- price increases or shortages of raw materials and energy;

- Asian raw material costs being lower than U.S. raw material costs;

- exposure to product liability and other litigation, environmental remediation obligations and other environmental liabilities;

- lower prices for Wellman's products or a decline in Wellman's market share due to competition or price pressure by customers;

- ability to implement cost reduction initiatives in a timely manner;

- ability to divest existing businesses or assets;

- efficacy of new technology and facilities;

- financial conditions of our customers;

- adverse tax changes;

- limited access to capital resources;

- changes in domestic and foreign laws and regulations;

- general market conditions;

- trade balance;

- natural disasters and

- geopolitical instability.

### Questions and Answers Regarding this Disclosure Statement and the Plan

**Why is Wellman sending me this Disclosure Statement?**

Wellman is seeking to obtain Bankruptcy Court approval for its Plan. Prior to soliciting acceptances of the proposed Plan, section 1125 of the Bankruptcy Code requires a debtor to prepare a Disclosure Statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan. This Disclosure Statement is being submitted in accordance with such requirements.

**Am I entitled to vote on the Plan? What will I receive from Wellman if the Plan is consummated?**

Your ability to vote and your distribution, if any, depend on what kind of claim or interest you hold. The classes of claims and interests and their respective voting statuses and anticipated recoveries are as follows:

| Class | Claims and Interests | Status | Voting Rights | Recovery Under the Plan[2] | Recovery in a Liquidation |
|---|---|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100.0% | N/A |
| 2 | First Lien Term Loan Claims | Impaired | Entitled to Vote | 34.4% | 16.7% |
| 3 | Second Lien Term Loan Claims | Impaired | Entitled to Vote | 9.3%[3] | 5.5% |
| 4 | General Unsecured Claims | Impaired | Entitled to Vote | N/A[4] | 0.0% |
| 5 | Old Preferred Interests | Impaired | Not Entitled to Vote (Deemed to Reject) | 0.0% | N/A |
| 6 | Old Common Interests | Impaired | Not Entitled to Vote (Deemed to Reject) | 0.0% | N/A |
| 7 | Intercompany Interests | Unimpaired | Not Entitled to Vote (Deemed to Accept) | N/A | N/A |

For more information about the treatment of claims and interests see "Treatment of Claims Against and Equity Interests in Wellman," which begins on page 29.

**What happens to my recovery if the Plan is not confirmed, or does not go effective?**

        **Please note that if Class 2 or Class 3 votes to reject this Plan, the Debtors will immediately proceed with a liquidation of their assets in conjunction with the DIP Lenders as Wellman will be in default under the DIP Facility.** In the event that the Plan is not confirmed, Wellman will be forced to go out of business. As a result, Wellman will be required to liquidate all of the working capital related to the Pearl River Facility and use the proceeds to pay the amounts outstanding under the DIP Facility. It is likely that operations at the Pearl River Facility would be shut down as part of this process. After the DIP Facility is fully satisfied, the remaining proceeds would be distributed to the Second Lien Lenders and the Pearl River PP&E would be transferred to the First Lien Lenders without the benefit of any of the intellectual property or intangible assets associated with such plants. There would not be a recovery for holders of general unsecured claims and the recovery for the First Lien Lenders and Second Lien Lenders would be significantly reduced compared to the recoveries shown on page 7. For a more detailed description of the consequences of a liquidation scenario, see "Best Interests of Creditors" beginning on page 51 and the Liquidation Analysis attached as Exhibit "E" to this Disclosure Statement.

---

[2]    Recoveries are calculated on an as-converted basis for the Convertible Notes.

[3]    Recovery does not take into account any potential recovery from the Distribution Trust, the value of their rights in the Rights Offering and excludes any proceeds from intellectual property and intangibles from the polyester fiber business at Palmetto. The value of the equity that Class 3 will receive assumes that Reorganized Wellman receives credit terms with respect to accounts payable upon emergence.

[4]    The sole source of potential recoveries for Holders of General Unsecured Claims in Class 4 is their pro rata share of the Distribution Trust which will include certain Causes of Action and the proceeds, if any, from the Eastman Litigation. For a further discussion of the Distribution Trust see "The Distribution Trust" which begins on page 34. In addition, for a complete description of the Eastman Litigation see "Pending Legal Proceedings Outside the Bankruptcy Court" beginning on page 41.

**If the Plan provides that I get a distribution, do I get it upon confirmation or when the Plan goes effective, and what do you mean when you refer to "confirmation," "effective date" and "consummation?"**

Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can be consummated and go effective. References to the "effective date" mean the date that the Plan has been fully consummated and that all conditions to the Plan have been satisfied or waived. Distributions will only be made after consummation of the Plan. See "Confirmation of the Plan," which begins on page 50, for a discussion of the conditions to consummation.

**What is the Distribution Trust?[5]**

The Distribution Trust will hold certain causes of action and be entitled to the proceeds of such causes of action. For the avoidance of doubt, the Eastman Litigation shall remain with Wellman and shall not be held by the Distribution Trust. However, the Distribution Trust shall be entitled to receive the proceeds of the Eastman Litigation, if any, net of related costs and taxes. The Distribution Trust will issue beneficial interests in the trust to the Second Lien Lenders and General Unsecured Creditors. The proceeds from the Distribution Trust will be allocated as follows:

- General Unsecured Creditors would receive 25% of the first $1 million in aggregate proceeds, if any, and 20% of the aggregate proceeds, in excess of $1 million, if any; and

- Second Lien Lenders would receive 75% of the first $1 million in aggregate proceeds, if any, and 80% of the aggregate proceeds, in excess of $1 million, if any.

For additional information on the Distribution Trust, see "The Distribution Trust," which begins on page 34.

**Will the interests in the Distribution Trust be freely transferable?**

No, the interests in the Distribution Trust are not freely transferable. Instead, the beneficial interests of the distribution trust will only be transferable in limited circumstances. See "The Distribution Trust," which begins on page 34.

**Where is the cash required to fund the Plan coming from?**

Wellman will obtain the Cash required to fund the Plan from the Rights Offering. Specifically, $90 million in cash proceeds will be raised through the issuance of notes under the Rights Offering that will be convertible into Wellman's New Common Stock. Pursuant to the Rights Offering Procedures, eligible First Lien Lenders and Second Lien Lenders (i.e. "accredited investors") will have the opportunity to purchase their pro rata share of Convertible Notes. In addition, the Backstop Parties will agree to purchase any remaining Convertible Notes, to ensure that the Rights Offering is fully funded. See "Our Capitalization After Emergence - Convertible Notes" which begins on page 38 and "Rights Offering," which begins on page 35.

**Are there risks to owning an interest in Wellman or in the Distribution Trust upon emergence from bankruptcy?**

---

[5]    The Debtors reserve the right, subject to the consent of the Informal Second Lien Lender Group, to utilize an alternative means of distributing the certain Causes of Action, or proceeds thereof and the proceeds of the Eastman Litigation to Holders of Claims in Classes 3 and 4, provided, however, that the method of distribution utilized shall not have a material adverse impact on the amount of consideration, if any, provided to such Holders when compared to a trust structure.

Yes, please see "Risk Factors," which begins on page 44.

**Is there potential litigation related to the Plan?**

Yes, in the event it becomes necessary to confirm the Plan over the rejection of Class 4, Wellman does anticipate litigation being necessary, but Wellman does not anticipate such litigation being significant. If, however, Class 2 or Class 3 votes to reject the Plan, Wellman cannot seek to confirm the Plan over such rejection and will proceed immediately to a liquidation.

**What are the contents of the solicitation packages to be sent to creditors who are eligible to vote on the Plan?**

In accordance with the terms of the Bankruptcy Court order approving this Disclosure Statement, all parties in interest will receive the notice of the hearing on the confirmation of the Plan. Additionally, creditors who are eligible to vote on the Plan will receive appropriate solicitation materials including, as applicable, ballots, rights offering procedures and related subscription forms.

The notices sent to parties in interest will indicate that this Disclosure Statement, the Plan and all of the exhibits thereto are (and, in the future, the Plan Supplement will be) available for viewing by any party at: www.kccllc.net/wellman.

**Will Wellman continue filing reports with the SEC?**

Wellman does not expect to be filing reports with the SEC upon emergence as it does not expect to be subject to the public reporting requirements of the Securities Exchange Act of 1934, as amended, or the regulations promulgated thereunder upon emergence.

**What rights will Wellman's new stockholders have?**

Each holder of new common stock issued under the Plan will be entitled to one vote per share of new common stock on all matters subject to a vote of common stockholders under applicable state law and will be entitled to a pro-rata share of any dividends that are declared by Wellman's board of directors. The new common stock shall be the sole class of voting stock of Wellman Holdings.

In addition, the holders of the Convertible Notes will be able to vote on all matters on an as-converted basis. See "Our Capitalization After Emergence - Convertible Notes," which begins on page 38.

Holders who own in excess of 5% of the New Common Stock and the Convertible Notes (on an as-converted basis) of Wellman may be parties to a shareholders agreement, if any. It is anticipated that if the parties agree to a shareholders agreement, such agreement may include customary provisions with respect to voting, drag-along and tag-along rights, share transfers, and information rights. On the effective date of the Plan, Wellman shall authorize and issue an amount of shares of new common stock sufficient to satisfy its obligations under the Plan.

**Will there be releases granted to parties in interest as part of the Plan?**

Yes, see "Releases," which begins on page 56.

**What is the deadline to vote on the Plan?**

5:00 p.m. (Eastern Time) on [_____], 2008

**How do I vote for or against the Plan?**

This Disclosure Statement, accompanied by a ballot or ballots to be used for voting on the Plan, is being distributed to the holders of Claims entitled to vote on the Plan. If you are a holder of Claims in the following

9

classes, you may vote for or against the Plan by completing the ballot and returning it in the envelope provided: 2, 3 and 4.

Wellman has engaged Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, CA 90245, to serve as the voting agent to answer questions, provide additional copies of all materials, and oversee the voting process. The voting agent will also process and tabulate ballots for each class entitled to vote to accept or reject the Plan.

The deadline to vote on the Plan is 5:00 p.m., (Eastern Time), on [_____], 2008.

---

**BALLOTS**

Ballots and Master Ballots must be actually received by the voting agent by the voting deadline of 5:00 p.m. (Eastern Time) on [_____], 2008 at the following address:

Wellman, Inc. Balloting
**c/o Kurtzman Carson Consultants LLC**
**2335 Alaska Avenue, El Segundo, CA 90245**

If you received an envelope addressed to your Nominee, please allow enough time when you return your ballot for your Nominee to cast your vote on a Master Ballot before the voting deadline.

If you have any questions on the procedure for voting on the Plan, please call the voting agent at the following telephone number:

888-647-1738

---

More detailed instructions regarding how to vote on the Plan are contained on the ballots distributed to holders of claims that are entitled to vote on the Plan. For your vote to be counted, your ballot must be completed, signed and received by 5:00 p.m. (Eastern Time), on [_____], 2008.

Any ballot that is properly executed by the holder of a Claim, but which does not clearly indicate an acceptance or rejection of the Plan or which indicates both an acceptance and a rejection of the Plan, shall not be counted.

Each holder of a Claim may cast only one ballot per each such Claim held. By signing and returning a ballot, each holder of a Claim in classes 2, 3, and 4 will certify to the Bankruptcy Court and Wellman that no other ballots with respect to such Claim and/or equity interest have been cast or, if any other ballots have been cast with respect to such class of Claims and/or equity interests, such earlier ballots are thereby superseded and revoked.

All ballots are accompanied by return envelopes. It is important to follow the specific instructions provided on each ballot. For information regarding voting by Nominees, see "Voting Instructions," which begins on page 59.

**Why is the Bankruptcy Court holding a confirmation hearing?**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of the Plan.

**When is the confirmation hearing set to occur?**

The Bankruptcy Court has scheduled the confirmation hearing for [_____], 2008 to take place at 10:00 a.m. (Eastern Time) before the Honorable Stuart M. Bernstein, United States Bankruptcy Judge, in the United States Bankruptcy Court for the Southern District of New York, located at Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004. The confirmation hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the confirmation hearing or any adjournment thereof.

Objections to confirmation of the Plan must be filed and served on Wellman, and certain other parties, by no later than [_____], 2008 at 5:00 p.m. (Eastern Time) in accordance with the notice of the confirmation hearing that accompanies this Disclosure Statement. Unless objections to confirmation of the Plan are timely served and filed in compliance with the Disclosure Statement Order, they may not be considered by the Bankruptcy Court.

Wellman will publish the notice of the confirmation hearing, which will contain the deadline for objections to the Plan and the date and time of the confirmation hearing, in the national edition of *The Wall Street Journal*, *USA Today*, *Sun Herald Times*, *Florence Morning News*, and *The Charlotte Observer* to provide notification to those persons who may not receive notice by mail.

**What is the purpose of the confirmation hearing?**

The consummation of a plan of reorganization is the principal objective of a chapter 11 case. The confirmation of a plan of reorganization by the Bankruptcy Court binds the debtor, any issuer of securities under the plan of reorganization, any person acquiring property under the plan of reorganization, any creditor or equity interest holder of a debtor and any other person or entity as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the Bankruptcy Court confirming a plan of reorganization discharges a debtor from any debt that arose prior to the confirmation of the plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

**What role does the Bankruptcy Court play after the confirmation hearing?**

After the Plan is confirmed, the Bankruptcy Court will still have exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan, including disputes over any claims or interests arising under the Chapter 11 cases. In addition, the Bankruptcy Court will have exclusive jurisdiction to ensure that distributions to holders of Claims against the Company are accomplished pursuant to the Plan. See "Retention of Jurisdiction by the Bankruptcy Court," which begins on page 55 for a further description of the matters over which the Bankruptcy Court will retain jurisdiction following the confirmation of the Plan.

**What is the effect of the Plan on Wellman's ongoing business?**

Wellman is reorganizing pursuant to chapter 11 of the Bankruptcy Code. As a result, the confirmation of the Plan means that Wellman will not be liquidated or forced to go out of business. As more fully described in "Our Business Upon Emergence," beginning on page 35, Wellman will continue to operate its businesses going forward utilizing only the Pearl River facility ("Pearl River"). On September 16, 2008, Wellman began the process of idling its operations at its Palmetto facility ("Palmetto") and its facility in Johnsonville, South Carolina ("Johnsonville"). On September 26, 2008, Wellman entered into an agreement to sell all of the assets related to the operations and business at Johnsonville of ("the Johnsonville Sale") to Johnsonville Acquisition Company LLC ("JAC"). JAC, now known as Wellman Plastics Recycling, will operate Johnsonville as a going concern. The Johnsonville Sale closed on October 22, 2008. As part of the Johnsonville Sale, Wellman distributed $5.75 million in proceeds (the "Johnsonville PP&E Proceeds") to the First Lien Lenders in partial satisfaction of their claims.

With respect to Palmetto, Wellman will attempt to sell Palmetto and distribute the proceeds allocated to the Palmetto PP&E, net of costs, to the First Lien Lenders in partial satisfaction of their secured claims. The portion of

the proceeds from the Palmetto Sale allocated to the Palmetto Intellectual Property & Intangibles will be used to pay down the DIP Facility, or in the event the DIP Facility is fully satisfied, paid to the Second Lien Lenders.

**Will Any Party Have Significant Influence Over the Corporate Governance and Operations of Reorganized Wellman?**

Possibly. Under the Plan, the Backstop Parties will own significant amounts of the New Common Stock and may own significant amounts of the Convertible Notes. Depending upon the outcome of the Rights Offering, the Backstop Parties have agreed to purchase all Rights not otherwise purchased by the holders of the First Lien Term Loan Claims and Second Lien Term Loan Claims in the Rights Offering. The Backstop Parties are also entitled to the Backstop Fee of $15 million in Convertible Notes. The Convertible Notes are convertible into 60% of the outstanding New Common Stock, as of the Effective Date of the Plan. In addition, and as further set forth on page 31 of this Disclosure Statement describing the composition of the New Board of Wellman Holdings, the Backstop Parties will designate four (4) of the seven (7) initial members of the New Board of Wellman Holdings. Moreover, in accordance with the Plan and the Backstop Commitment Agreement, any and all documents related to the Plan, including the Plan itself, must be acceptable to the Backstop Parties, including the Registration Rights Agreement. It is possible that the Backstop Parties will own significant amounts of the New Common Stock and Convertible Notes and thus will be able to significantly influence the management and affairs of Wellman Holdings, and all matters requiring the vote or approval of holders of any of such securities. From and after the Effective Date, the Backstop Parties may have interests that differ from those of other holders of New Common Stock and Convertible Notes. Pursuant to the proposed terms of the Convertible Notes, attached to the Backstop Commitment Agreement as Exhibit A, if the holders of at least 60% in principal amount of the Convertible Notes convert their Notes into New Common Stock, then all remaining outstanding Convertible Notes shall be automatically converted at the then-applicable conversion price. Depending upon the outcome of the Rights Offering, the Backstop Parties may be in a position to control whether this automatic conversion is triggered. In addition, the Backstop Parties' potential ownership of significant amounts of New Common Stock and Convertible Notes may have the effect of delaying, deferring, or preventing an acquisition of Wellman Holdings and/or its subsidiaries and may adversely affect the market price, if any, of such securities.

**Does the Company recommend voting in favor of the Plan?**

Yes. In the opinion of Wellman, the Plan is preferable to the alternatives described in this Disclosure Statement because Wellman believes it provides for a larger distribution to Wellman's creditors than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code. **In addition, if Class 2 or Class 3 votes to reject this Plan, the Debtors will immediately proceed with a liquidation of their assets in conjunction with the DIP Lenders as Wellman will be in default under the DIP Facility. In the event of a liquidation, recoveries for Holders of Allowed Claims will be significantly reduced, if not eliminated and no recovery is expected for Holders of General Unsecured Claims.** Confirmation of the Plan will also allow Wellman to continue to operate as a going concern, which will have the effect of preserving jobs at its Pearl River facility. Accordingly, Wellman recommends that holders of claims who are entitled to vote on the Plan support confirmation of the Plan and vote to accept the Plan.

### Our History and Our Chapter 11 Cases

*Historical Overview*

Wellman was formed in 1927. It entered the polymer and fiber industry in 1954, and has since become a leading North American producer of polyethylene terephthalate ("PET") resin and polyester staple fiber. As of the Petition Date, Wellman had the capacity to produce approximately 1.5 billion pounds of PET resin and 500 million pounds of polyester fiber annually, making it the second largest producer of such polyester products in the U.S. Moreover, since 1997, Wellman has been granted 53 U.S. patents and numerous international patents. Wellman is at the forefront of its industry.

### Wellman's Facilities

*The Pearl River Facility*

Pearl River, located at 3303 Port and Harbor Drive, Bay St. Louis, Mississippi, began operating in 1999. Pearl River is Wellman's newest facility and is located on 481.35 acres with 24 buildings. Pearl River consists of three polymer lines, or groups of manufacturing equipment, which feed amorphous chip into its own solid state polymerization line. Currently, Pearl River has an annual production capacity of 920 million pounds of PET resin. Wellman anticipates that this capacity will be increased to approximately one billion pounds when the operational restructuring is complete and the production is moved from Palmetto.

*The Palmetto Facility*

Palmetto, located at 1000 East McIver Road, Darlington, South Carolina, which began operating in 1974, is one of the largest polyester facilities in North America, and produces both PET resin and polyester staple fiber. Palmetto is situated on 768.74 acres and is comprised of 26 buildings. Palmetto consists of twelve separate polymer lines, or groups of manufacturing equipment, which turn ethylene glycol, purified terephthalic acid ("PTA") into polyester using a catalyst. Palmetto has a stated annual production capacity of 540 million pounds of PET resin and 500 million pounds of polyester staple fiber. As part of its operational restructuring, Wellman will idle the PET resin and fiber production at Palmetto and transfer the PET Resin production to its Pearl River facility. On or about September 16, 2008, Wellman began using the Palmetto PP&E to maximize the recovery of working capital collateral for the DIP Lenders by winding down its business at Palmetto and converting it from a going concern into a non-going concern facility.

Since the Debtors disclosed their intent to shut down Palmetto, the Debtors have not marketed Palmetto for sale as a going concern. The Debtors have agreed to work with the First Lien Lenders and their advisors to begin the process to market and sell Palmetto in its current state as soon as reasonably practicable, and to obtain the Bankruptcy Court's approval of procedures and protocols for the marketing and sale of Palmetto on an expedited basis.

*The Johnsonville Facility*

Johnsonville, located at 520 Kingsbury Highway, Johnsonville South Carolina, is Wellman's oldest facility and was opened in 1954. Johnsonville is a gated industrial complex consisting of sixteen buildings on 813.60 acres. Johnsonville converts recycled post-consumer carpet into nylon engineered resins and has the capacity to produce 70 million pounds of this resin annually. There are three operating plants at Johnsonville as well as number of shuttered buildings. On September 26, 2008, Wellman entered into an agreement to sell all of the assets related to the operations and business of its Johnsonville facility to JAC, who will operate the business as a going concern. The Johnsonville Sale closed on October 22, 2008.

### Wellman's Business Segments

Wellman's manufacturing operations historically were divided into two segments: polyester production (the "Chemical Segment") and nylon production (the "Recycled Segment").

*Chemical Segment*

Wellman's Chemical Segment manufactures polyester products through a chemical process in which two raw materials -- purified terephthalic acid ("PTA") and monoethylene glycol ("MEG") -- are combined in a vacuum at high temperatures to form PET resins or polyester staple fibers. These products are then shipped to end product manufacturers of plastic bottles or synthetic textiles. The Chemical Segment accounts for approximately 95% of Wellman's overall sales.

Wellman is the second largest producer of PET resin in the U.S., which it sells primarily under the PermaClear® brand. The end-users of Wellman's PET resin are manufacturers of plastic beverage bottles and other

13

food packaging. PET resin is the preferred packaging material of these manufacturers because it is unbreakable, lightweight, re-sealable, environmentally friendly, has enhanced package design opportunities and provides better taste and insulating qualities, as compared to glass and aluminum. The largest applications for PET resin are beverage bottles used for carbonated soft drinks and water. This is a growing end market, primarily due to growth in beverage consumption and increased conversion of beverage packaging away from traditional containers such as glass and aluminum.

Wellman is also the second largest producer of polyester staple fiber in the U.S., which it sells primarily under the Fortrel® brand. Polyester staple fiber is the fiber of choice for many end textile uses because it is strong, resistant to shrinkage, quick drying and resilient under pressure. Polyester staple fiber is most often found in blends with other fibers such as cotton. Common end uses include apparel (especially workwear, fleece and performance sportswear), non-wovens (*i.e.*, medical and surgical fabric), fiberfill (*i.e.*, furniture, pillows and comforters), home furnishing (*i.e.*, sheets and pillowcases) and carpeting. Wellman manufactures these polyester products at Palmetto and Pearl River. As part of its operational restructuring, Wellman will wind down its polyester fiber business at Palmetto and will not be operating this business going forward.

*Recycled Segment*

Wellman's Recycled Segment primarily involves the manufacture and marketing of nylon engineering resin through a recycling process. Nylon engineering resins sold by Wellman are most often used in injection molding for the "under-the-hood" automotive applications market. Possible applications include air intake manifolds, fans and shrouds, radiator end tanks, radiator hose quick connects, cam covers, gasket carriers, engine beauty covers and air cleaner housings. Wellman has developed a proprietary manufacturing process that recycles used carpet, a plentiful, low and relatively stable cost raw material, to produce nylon engineering resin. In 2006, nylon engineering resin accounted for approximately 5% of Wellman's overall sales. On October 22, 2008, Wellman sold the assets related to its engineering resins business at Johnsonville to JAC.

### Wellman's Prepetition Capital Structure

As of the Petition Date, Wellman's total consolidated funded debt was approximately $575 million. The debt obligations arose under a revolving credit facility, first lien term loan and a second lien term loan. Moreover, as of the Petition Date, Wellman had accumulated approximately $460 million of net operating loss carryforwards and other tax credits.

*The Prepetition Credit Agreement*

Wellman and certain of its domestic subsidiaries, including Prince, Inc., Wellman of Mississippi, Inc., Carpet Recycling of Georgia Inc., ALG, Inc., PTA Resources, LLC and Fiber Industries, Inc., are parties to that certain $225 million revolving credit facility dated May 4, 2006, as amended on October 20, 2006 (the "Prepetition Credit Agreement"), led by Deutsche Bank Trust Company Americas as Administrative Agent and Collateral Agent and other syndicate lenders. The Prepetition Credit Agreement is guaranteed by Warehouse Associates, Inc., MRF, Inc., Josdav Inc. and MED Resins, Inc.

The Prepetition Credit Agreement is secured by liens on, among other things, accounts receivables, inventory, general intangibles (but not including lease documents), goods (other than equipment and fixtures), investment property, deposit accounts, money and cash equivalents and proceeds of the foregoing. As of the Petition Date, the total principal amount outstanding under the Prepetition Credit Agreement is approximately $125 million.

*The First Lien Term Loan Credit Agreement*

Wellman's first lien debt is comprised of a $185 million term loan due February 10, 2009 (the "First Lien Term Loan Credit Agreement"), issued pursuant to that certain Credit Agreement, dated as of February 10, 2004, between Wellman, as borrower, certain lenders and issuers, and the First Lien Credit Facility Agent. As of the

14

Petition Date, the total principal amount outstanding under the First Lien Term Loan Credit Agreement is $185 million.

The First Lien Term Loan Credit Agreement is secured by first priority liens upon and security interests in collateral accounts and all monies deposited therein, equipment and fixtures, tax reduction bonds, lease documents and proceeds of the foregoing. The First Lien Term Loan Credit Agreement is guaranteed by the following U.S. subsidiaries: Prince, Inc.; Fiber Industries, Inc.; Wellman of Mississippi, Inc.; Carpet Recycling of Georgia Inc.; ALG, Inc.; Josdav Inc.; MED Resins, Inc.; Warehouse Associates Inc.; MRF, Inc.; and PTA Resources LLC (collectively, the "Term Loan Guarantors").

*The Second Lien Term Loan Credit Agreement*

Wellman's second lien term debt is comprised of a $265 million second lien term loan (the "Second Lien Term Loan Credit Agreement") due February 10, 2010, issued pursuant to that certain Credit Agreement, dated as of February 10, 2004, between Wellman, as borrower, certain lenders and issuers, and the Second Lien Credit Facility Agent. As of the Petition Date, the total principal amount outstanding under The Second Lien Term Loan Credit Agreement is $265 million.

The Second Lien Term Loan Credit Agreement is secured by second priority liens on and security interests in accounts, equipment, goods, inventory and fixtures, collateral accounts, certain investment property, general intangibles including lease documents, tax reduction bonds and proceeds of the foregoing. The accounts, goods, inventory and fixtures, investment property and general intangibles used as collateral to secure the Second Lien Term Loan Credit Agreement are not included in the First Lien Term Loan Credit Agreement collateral package. The Second Lien Term Loan Credit Agreement is guaranteed by the Term Loan Guarantors.

*Industrial Development Revenue Bonds*

As of the Petition Date, Wellman was obligated in the aggregate principal amount of approximately $400 million in aggregate principal amount in unsecured Industrial Development Revenue Bonds issued by the State of Mississippi for the benefit of Wellman of Mississippi, Inc. in connection with Wellman's construction of Pearl River and its subsequent expansion, comprised of: (a) Series 1998A bonds in the principal amount of $1 million issued pursuant to that certain Trust Indenture dated May 1, 1998, between Mississippi Business Finance Corporation, as issuer, and Chase Manhattan Trust Company, N.A., as trustee, which are currently held by Bank of America; (b) Series 1998B bonds in the principal amount of $399 million issued pursuant to certain Trust Indenture dated May 1, 1998, between Mississippi Business Finance Corporation, as issuer, and Chase Manhattan Trust Company, N.A., as trustee, which are currently held by ALG, Inc., one of the debtors in these Chapter 11 Cases; and (c) Series 2005 bonds in the principal amount of $109,055.37 issued pursuant to that certain Trust Indenture dated April 1, 2005, between Mississippi Business Finance Corporation, as issuer, and Deutsche Bank National Trust Company, as trustee, which are currently held by ALG, Inc., one of the debtors in these Chapter 11 Cases; each of which was issued also pursuant to related Loan Agreements, executed on the same date as the operative Trust Indenture, between Mississippi Business Finance Corporation, as issuer, and Wellman of Mississippi, Inc., as borrower, and Wellman, Inc. as guarantor.[6]

*Common Stock and Common Stock Derivatives*

Prior to the Petition Date, Wellman's common stock traded on the New York Stock Exchange (the "NYSE") under the ticker symbol "WLM." The NYSE suspended trading in Wellman's common stock on December 10, 2007 and delisted the securities from the exchange shortly after that date. As of July 31, 2008,

---

[6] All but $1 million of the Industrial Development Revenue Bonds are intercompany claims and will remain in place after Wellman emerges from these Chapter 11 Cases. The remaining $1 million will be treated as general unsecured claims.

Wellman had 32,836,632 shares of Class A common stock, par value $0.001 per share, issued and outstanding, no shares of Class B common stock issued and outstanding.

### *Events that Led to Bankruptcy*

#### *Raw Material Costs Have Significant Effects on Wellman*

The market in which Wellman sells its products is, in large part, a commodity market, which offers little differentiation among competitors. Thus, Wellman's financial results are determined by sales volume and raw material margins, *i.e.*, the difference between net selling price and raw material cost. Wellman's margins, in turn, are driven by raw material availability and pricing, competition, capacity utilization and customer demand. Adverse trends in each of these factors over the last decade have left Wellman, along with many of its North American competitors, with extremely tight margins.

Two raw materials, PTA and MEG, account for 75% of Wellman's total product unit costs in its polyester business. For this reason, any change in the pricing and availability of these raw materials has a correspondingly significant impact on Wellman's profitability, *i.e.*, for every two billion pounds of resin or fiber that is produced, a one-cent per pound change in Wellman's raw material margin results in an annual change of approximately $20 million in pre-tax earnings.

#### *General Trends*

Over the past few years, the market for both PTA and MEG has tightened significantly, particularly in North America, as disruptions in the supply chain and increasing raw material prices have caused supply to fall below demand levels. Consequently, the prices of PTA and MEG have increased. The primary drivers of the costs and availability of these raw materials are crude oil and natural gas prices and worldwide supply and demand. In recent years, rising oil and gas prices have yielded significant increases in the price of both of these essential raw materials. As described below, this has caused a significant increase in production costs for North American polyester producers. Moreover, foreign competitors, particularly in Asia, have not experienced similar rising raw material costs. The resulting differences in these production costs have led to a substantial increase in foreign competition in the North American market. Thus, as production costs have risen for North American producers, the increase of foreign competition has prevented the price at which the products can be sold from keeping pace with increasing raw material costs. Together, these factors have severely depressed margins among North American polyester producers, including Wellman.

#### *Specific Drivers of PTA and MEG Availability and Cost*

The cost of PTA, an essential raw material for Wellman's polyester business, represents more than 60% of Wellman's raw material costs. This cost is determined, generally speaking, by the price of gasoline. PTA production begins with the gasoline refining process, which releases a byproduct (mixed xylenes) that can be reintroduced into gasoline as an octane enhancer or further refined into paraxylene ("PX"). PX is the main ingredient in PTA. As gasoline prices increase, there is an increased demand for this raw material to be used as an octane enhancer and a corresponding increase in costs for PTA manufacturers. This is especially true in the U.S., where all mixed xylene is produced from the gasoline refining process. As gasoline prices have increased precipitously in recent years, the costs of PX and PTA in the U.S. have risen as well. Asian competitors, in contrast, rely on a significant amount of PX that is produced by chemical processes independent of gasoline production and pricing.

The cost of MEG, the second essential raw material for Wellman's polyester business, is determined by the prices of natural gas and ethylene, from which MEG is derived. The global supply of MEG has been below demand levels for several years, resulting in increased prices. Moreover, while new PX and MEG capacity is being built to mitigate these trends, all current construction is occurring outside of North America, where it is expected to be of primary benefit to Wellman's Asian competitors.

16

*Hurricane Katrina Causes Raw Material Costs to Skyrocket*

On August 29, 2005, Hurricane Katrina hit the Gulf Coast, devastating regional production of PTA and MEG. The resulting shut downs and disruptions in the supply lines caused raw material costs in North America's polyester industry to skyrocket in the fourth quarter of 2005. For example, the cost of PTA rose by more than 15 cents per pound in the U.S. in the months immediately following Hurricane Katrina. The U.S. polyester industry was unable to service domestic demand for more than three months due to raw material shortages, leaving these producers vulnerable to increased competition from foreign competitors. Additionally, as discussed below, Hurricane Katrina also had a severe impact on Wellman beyond the industry-wide impact on raw material availability and costs.

*Pressure from Foreign Competition Increases*

The volume of polyester imports into North America is directly related to the difference between the raw material cost of Asian and U.S. polyester producers. Historically, when Asian producers have a raw material cost advantage of less than six cents compared to U.S. producers, transport and other costs limit the economic justification for Asian producers to export polyester products to U.S. markets, other than to the West Coast. Thus, historically, given the proportionally high costs of transportation, Wellman's industry has been largely a regional one.

After Hurricane Katrina, the raw material cost advantage of Asian producers as compared to U.S. producers expanded to a point that yielded a significant increase in imports. Due in part to the regional character of the business, Hurricane Katrina resulted in a shortage of U.S. raw materials and the temporary loss of significant U.S. polyester production that rendered the U.S. producers unable to service the North American market. Thus, domestic consumers began to turn increasingly to polyester manufactured abroad, particularly in Asia, where cheaper and more readily available raw materials could be obtained. Specifically, in the fourth quarter of 2005, the trade balance for PET moved from a several year surplus to an annualized 1.4 billion deficit. This increase in imports significantly reduced U.S. margins for polyester production – including those of Wellman's – from 2005 through 2007.

*U.S. Bans MTBE*

By early 2006, the domestic polyester industry had started to recover from Hurricane Katrina and raw material production and costs had returned to pre-Katrina levels. This recovery was short-lived. In the summer of 2006, the U.S. government mandated the phase-out of a certain gasoline additive, methyl tertiary butyl ether ("MTBE"). In reaction, the gasoline industry's demand for other gasoline additives to be used as octane enhancements and to reduce volatility in summer gasoline blends grew. This included MX, the precursor of PX and PTA. Thus, domestic raw material costs for polyester producers again spiked, while Asian producers again suffered no corresponding increase in raw material costs. The resulting cost differential and the threat of further increases in imports into North America prevented U.S. producers from increasing prices in line with their higher costs, thus further depressing the profitability of U.S. PET resin and polyester fiber manufacturers.

*Excess Supply Has Resulted in Reduced Prices in a Flat Demand Market*

The polyester industry currently has the ability to produce substantially greater amounts of polyester than the market requires. Moreover, new capacity is anticipated in 2009. This has led facilities in the industry, especially in North America, to operate at historically low levels, which decreases revenues for two reasons. First, with available supply far exceeding current demand, buyers can and will switch suppliers to obtain the most favorable pricing terms available. Second, running a manufacturing facility at less than full capacity increases the costs per pound of production. Wellman and its competition have relatively high fixed costs, meaning that while the cost to Wellman of producing one million pounds of resin or fiber is substantial, the incremental additional cost of producing additional amounts is small. Thus, when a facility is running at less than its full capacity, the fixed costs remain, but Wellman does not obtain the benefits of producing additional volume at the low incremental costs. Accordingly, Wellman's margins decreased due to reduced sales at lower prices and increased costs per pound of production for the products still being manufactured and sold.

*PET Resin Supply Growth Continues to Outpace Demand Growth*

Global PET resin demand has been growing at a stable pace of 10% per year on average over the last decade, driven largely by new product applications for PET, conversions from other packaging materials such as aluminum and glass to PET and overall growth in beverage and food consumption. Comparable growth rates are expected in the future.

This growth, however, is not occurring at the same pace at which additional capacity is coming online, which has led the North American PET resin industry to operate at levels significantly below full capacity. Between 2000 and 2006, North American PET resin facilities ran at approximately 90% of their full capacity. Operation rates tumbled further in 2007.

Moreover, expansions and new facilities are expected; thus, this trend is expected to continue. For example, during 2007, new and expanded facilities were opened in North America with the ability to manufacture approximately 1.5 billion pounds of PET resin annually and a new PET resin facility with the ability to produce 900 million pounds annually is expected to come online in 2009. Even more significant expansion has taken place in the Asian PET resin industry, creating billions of pounds of capacity in Asia which are available to service global markets.

*Polyester Staple Fiber Supply Exceeds Demand*

The global polyester staple fiber industry has suffered from similar trends. Global polyester fiber demand has grown at an average rate of 6.7% per year in the last five years, although capacity still exceeds worldwide supply. This rate, however, falls well short of available supply. In 2007, for example, North American polyester staple fiber facilities operated at approximately 10% below their full capacity levels, due in large part to new and expanded facilities coming online in Asia.

Moreover, while demand for polyester staple fiber consumption domestically has remained relatively flat in recent years -- approximately 2.4 billion pounds per year from 2002 to 2007 -- these levels are significantly lower than demand levels in the 1990s. This overall trend is due to a decrease in demand of certain end use products of polyester fiber in favor of Asia because of the lower labor costs. U.S. polyester staple fiber manufacturers thus have been forced to contend with decreased domestic demand for these products over the last five years.

### **Unusual Cash Outlays By Wellman**

In 2005, Wellman experienced sizable cash outlays stemming from two unexpected events: a Department of Justice ("DOJ") investigation into certain price fixing allegations in the polyester fiber industry, which led Wellman to enter into certain settlements with class action plaintiffs to avoid the risks of litigation and further disruptions to its business, and Hurricane Katrina, which forced a shutdown of Pearl River in Hancock County, Mississippi.

*DOJ Investigation*

In 2001, Wellman received a document subpoena from the DOJ in connection with a federal grand jury investigation of pricing practices in the U.S. polyester staple fiber industry between 1999 and 2001. The DOJ contacted all major U.S. makers of polyester staple in the course of this investigation, including Wellman, KoSa, Nan Ya, DuPont and DAK Americas. Wellman was never indicted and the investigation eventually closed; nonetheless, Wellman incurred significant costs as a result of this investigation stemming from the costs of complying with the DOJ's information requests.

Additionally, following the public disclosure of the investigation in September 2002, Wellman was named along with numerous competitors in various civil actions asserting claims based on alleged price fixing and market allocation in the polyester staple industry. These suits were eventually settled by Wellman and its competitors. As disclosed in the September 8, 2005 Form 8-K, Wellman incurred a total of $20.8 million (after taxes) in costs related to the investigation and settlements, which Wellman believed to be "prudent given the high costs of litigation and

18

the elimination of risk" and would allow Wellman to focus on improving its business and recovering from Hurricane Katrina. Wellman estimates that the total cash cost of this investigation, including legal representation, settlement costs, and other costs was approximately $50 million.

*Direct Damage from Hurricane Katrina*

On August 29, 2005, the eye of Hurricane Katrina passed directly over Pearl River, forcing a complete shutdown of the plant. The storm surge hit the site and the facility was inundated with salt water. The surrounding area suffered tremendous damage. As a result, one production line at the facility was shut down for two months, another was shut down for three months and an ongoing expansion of the facility was delayed by approximately six months. These shutdowns and delays resulted in significant lost profits for Wellman. Wellman also suffered significant costs due to the damage to the plant site, inventory spoilage during the shut down and other direct costs. As disclosed in the 2006 Form 10-K, Wellman reported cash costs of $32.0 million arising from Hurricane Katrina as of December 31, 2006 -- excluding lost profits. Wellman estimates that the total costs, including lost profits, incurred by Wellman as a result of Hurricane Katrina were approximately $68.7 million.

*Intellectual Property Infringement Suit Against Eastman Chemical Company*

In 2007, Eastman Chemical Company ("Eastman"), the largest U.S. supplier of PET resin, introduced two new PET resin brands to the market: ParaStar 4000 and ParaStar 7000.

After, in Wellman's view, a thorough investigation of Eastman's new resins, Wellman concluded that these new resins infringed upon Wellman's patented slow-crystallizing PET resin technology. Wellman believes that its patented slow-crystallizing PET resin enables bottle manufacturers to use less PET resin per bottle while operating their injection molding machinery at a faster rate. Thus, Wellman believes that this PET resin provides Wellman with significant advantages in the market over its competitors.

Accordingly, Wellman believes that Eastman's sale of its ParaStar brand resin during 2007, at a price below Wellman's own manufacturing costs associated with its patented PET resin, diverted significant and valuable business away from Wellman. Wellman concluded that it incurred substantial lost sales volumes and margins during 2007 as a result, and, in September 2007, filed a patent infringement lawsuit against Eastman in the United States District Court for the District of Delaware. In this suit, Wellman states that the alleged patent infringement by Eastman caused an annualized loss of profits of at least $15 million (based on certain lost and price impacted volumes) to as much as $60 million or more because of other lost market share and price. These lost profits have been attributed by Wellman to past infringement by Eastman and do not reflect an assigned value of the litigation as a whole by Wellman. Indeed, at this time, given the speculative monetary value of this litigation, and the uncertainty of patent litigation in general, it is possible that this litigation may result in no recovery. As described on page 42 herein, Eastman disputes, among other things, (i) the infringement alleged by Wellman and (ii) the validity and amount of damages asserted by Wellman relating to such alleged infringement, and has countersued.

On June 26, 2008, the Delaware Court heard oral arguments on Wellman's Motion for a Preliminary Injunction, including Eastman's response to Wellman's Reply Brief in Support of its Motion for Preliminary Injunction. On October 3, 2008, the Delaware Court entered an order denying Wellman's Motion for a Preliminary Injunction. (*Wellman, Inc. v. Eastman Chemical Co.*, No. 07-585 (D. Del. October 3, 2008)), a copy of which may be viewed at www.kccllc.net/wellman.

*Sensitivity to Raw Material Prices*

The effects of Hurricane Katrina and the ban of MTBE were particularly harmful to Wellman as compared to its North American competitors because of Wellman's reliance on its major suppliers. Currently, over 40% of North American PET capacity is integrated, meaning that the manufacturers have the ability to produce their own PTA. Captive raw material production gives PET resin and polyester staple fiber producers the ability to mitigate some of the impact of escalating raw material costs and decreasing availability in the market through increased reliance on their internal raw material production. Wellman, however, does not have its own raw material

production abilities. Thus, it was fully exposed to the changes in the market and remained entirely dependent on its large, market-controlling suppliers.

Wellman is, in fact, the largest buyer of PTA and MEG in the U.S. Wellman utilizes three main suppliers: BP Amoco Chemical Company ("BP"), from which Wellman purchases all of its PTA; Lyondell Basell Industries (the parent company of Lyondell/Equistar Chemicals) and MEGlobal Americas, Inc. (a joint venture between Dow Chemical Company Co. and Kuwait Petrochemical Co.), from whom Wellman purchases MEG. In North America, BP is the largest producer and seller of PTA; it controls approximately 43% of total North American PTA capacity and 100% of the merchant market capacity in the U.S. Similarly, Lyondell Basell Industries and MEGlobal Americas together control approximately 47% of total North American MEG capacity.

As noted above, BP and Wellman's other primary suppliers enjoy healthy market shares of these raw materials. Such strength gives such suppliers the ability to sell raw materials at prices that have historically been four to six cents per pound above the prices available in the Asian market. More recently, BP's premium has risen to 8-10 cents per pound above Asian PTA costs. Given Wellman's structure and its reliance on BP for its PTA supply, Wellman is highly susceptible to the adverse effects of raw material price increases, which continues to adversely impact Wellman's profitability and cash flows.

### *Prepetition Attempts to Improve Wellman's Financial Outlook*

#### *Efforts to Streamline the Business*

In 2006 and 2007, Wellman undertook a strategy of streamlining its organization to improve its ability to deliver high-quality, value-added products to its customers and to operate with a more efficient cost structure. The key to this strategy was to focus on Wellman's domestic chemical-based PET resin and polyester staple fiber businesses, which Wellman believed would yield the best opportunities going forward.

#### *Shifting End Use Customers*

Wellman continued efforts to combat the increasing threat of imports to Wellman's ability to compete in certain end product industries, by exiting the recycled polyester fiber business and targeting its remaining chemical based polyester fiber toward domestic end uses of polyester staple fiber such as work wear, non-wovens and other performance based fibers. These products are less susceptible to imports in light of the proportionally high shipping costs and the minimal advantage provided by lower labor costs.

#### *European Asset Sales*

Additionally, in 2007, Wellman sold substantially all of its European assets. First, in the second quarter of 2007, Wellman sold its European PET resins business. This business, comprised of a facility located in the Netherlands, had been operating at a substantial loss, which triggered Wellman's decision to dispose of it. In 2006 and 2007 Wellman recorded a net loss of $30.6 million related to this business.

Then, in July 2007, Wellman sold its European polyester fibers business. This business, comprised of a recycled-based manufacturing facility located in Ireland, historically had been a valuable revenue-producer. At the time of the sale, the facility continued to generate revenue, though at a much reduced level since the European fiber industry was suffering from import effects similar to those experienced in the U.S. Wellman recognized a $2.6 million net gain from this sale.

#### *Domestic Consolidation*

Along with the disposition of its European assets, Wellman turned to its domestic operations, deciding to combine its existing chemical-based businesses into one segment with functional reporting lines. By combining its PET resin and polyester staple fiber segments into one business, Wellman sought to eliminate duplicate costs and maximize operating performance, recognizing that its polyester businesses shared many related functions. This

change was implemented in February 2007, which has resulted in over $5 million in selling, general and administrative savings.

Similarly, in an effort to lower costs, Wellman consolidated its U.S. manufacturing facilities by closing, in 2006, all of its recycled fiber production at Johnsonville, which had the ability to produce 160 million pounds of polyester staple fiber annually. With this shutdown, Wellman's U.S. polyester staple fiber production was centralized at Palmetto, thus boosting the utilization rate at that facility.

*Debt Refinancing*

Finally, as part of this strategy, in October 2006, Wellman amended its Revolving Credit Facility to, among other things, facilitate the issuance of convertible debt and provide additional flexibility with respect to the sale of Wellman's European operations.

*Efforts to Sell the Business*

Wellman's efforts to improve its business outlook throughout 2006 and the first half of 2007 were thwarted by continued adverse market trends, such as further shortages in raw material supply, increasing raw material prices, increasing competition from Asian competitors and overcapacity. Wellman's reported earnings in the third quarter of 2007 were extremely low. On October 29, 2007, when Wellman issued its quarterly report, Wellman announced that it had hired Lazard, Freres & Co., LLC ("Lazard") to assist Wellman with exploring strategic alternatives.

In the fall of 2007, Lazard commenced a marketing and sales process for all or a part of Wellman's business operations. This process involved identifying and contacting likely potential buyers of Wellman, preparing customary business information materials (such as a confidential offering memorandum) and advising management on its presentation to potential buyers. Specifically, Lazard, in consultation with Wellman, compiled a list of all likely potential bidders. The list included (a) companies that were already active participants in the polyester business and (b) investment funds that owned or had a known interest in acquiring a commodity chemical business. Wellman continued its sale efforts during its Chapter 11 Case.

*The Final Months*

Wellman's October 29, 2007 announcement of its continued financial distress, the retention of Lazard and the subsequent sales process had an adverse impact on Wellman's continued operations. The report triggered speculation among its suppliers and customers that Wellman might commence a chapter 11 case. Subsequently, in reaction to these events, certain of Wellman's significant customers ceased purchasing or reduced their purchases of Wellman's products in favor of those of its competitors, after voicing concerns about, among other things, Wellman's financial stability and the identity and market position of potential future owners of Wellman. Certain of these customers shied away from the risks that they perceived attendant to a continued business relationship with a company contemplating a financial restructuring, expressly informing Wellman that they would re-engage in business with Wellman after it reorganized.

Also at the end of 2007, MEG availability plummeted due to significant outages at plants worldwide sparked by unexpected shutdowns in the industry, including an explosion in September at one of the world's largest MEG plants, located in Saudi Arabia. As a result of these global outages and the delay in new capacity, global MEG prices increased significantly, reaching over $1,700 per ton in Asia up from $1,050 per ton in the second quarter of 2007. Domestically, the rates at which PET facilities were operating fell to new historic lows. In December 2007 and January 2008, North American facilities were operating at approximately 70% of their capacity. Coupled with Wellman's own financial difficulties caused by the loss of certain significant customers both in response to Wellman's announced financial conditions and the alleged continued infringement by Eastman of Wellman's slow-crystallizing PET resin technology, Wellman's operating rate at this time sank to approximately 60%.

With projected earnings significantly depressed, an industry full of adverse market trends and an increasingly unstable global economic forecast, Wellman's financial conditions rendered it unable to continue

21

servicing its debt load.  In an industry where profits are measured by margins, any adverse change – especially a sustained change -- in an aspect of that calculation has a significant impact.  These trends, coupled with Wellman's lack of vertical integration and significant debt leverage, have precipitated these Chapter 11 Cases.

### The Commencement of the Chapter 11 Cases

On February 22, 2008, Wellman and certain of its subsidiaries listed on the cover page to this Disclosure Statement filed voluntary petitions in the United States Bankruptcy Court for the Southern District of New York seeking reorganization relief under the provisions of chapter 11 of the Bankruptcy Code.

The Chapter 11 Cases are being jointly administered under the caption In re Wellman, Inc., et al., Case No. 08-10595 (SMB).  We continue to operate our businesses and manage our properties as debtors-in-possession under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court.

### Events During Bankruptcy

#### First Day Relief

Through a careful review of their business operations and cash requirements, Wellman entered bankruptcy with minimal impact on their day-to-day business operations.  Integral to this transition were certain "first day" orders entered by the Bankruptcy Court that provided, among other things, flexibility in cash management, the ability to use cash collateral and the ability to pay certain prepetition vendors.  In addition, Wellman engaged in an extensive communication program with vendors and customers assuring them that the transition into bankruptcy would be smooth and there would be no interruption in the purchase or supply of goods by Wellman.

Wellman sought and obtained several orders authorizing Wellman to pay various prepetition Claims.  These orders were designed to ease the strain on Wellman's relationships with employees, vendors, customers and taxing authorities as a consequence of the commencement of the Chapter 11 Cases.  Among other things, these orders authorized Wellman to: (a) honor customer prepayments for goods and services; (b) maintain business support programs; (c) make certain pass-through payments to customers received on the customers' behalf under certain arrangements; (d) honor customer and dealer Claims for prepetition refunds, rebates and adjustments, including adjustments to billing, product returns or exchanges, as well as promotional discounts and other credits; (e) maintain cash management systems; (f) use prepetition bank accounts, checks, and other business forms; (g) pay outstanding prepetition trust fund taxes; and (h) pay certain prepetition employee wage and benefit claims.

Additionally, Wellman obtained authority to pay the prepetition Claims of certain vendors and service providers.  Wellman's ability to pay the Claims of these vendors was critical to maintaining ongoing business operations due to Wellman's inability to acquire essential replacement goods and services of the same quality, reliability, cost or availability from other sources.

Finally, the Bankruptcy Court entered an interim order, which was made final on April 7, 2008, permitting Wellman to use cash collateral in accordance with an agreed budget and enter into the DIP Credit Agreement (as defined below).

#### Debtor-in-Possession Financing

A critical goal of Wellman's business stabilization efforts was to ensure that Wellman maintained sufficient liquidity to operate their businesses during the Chapter 11 Cases.  Wellman addressed their liquidity needs by securing a debtor-in-possession financing package.  On February 27, 2008, Wellman, Inc. and each of Wellman's other Debtor subsidiaries entered into a Finance Agreement with and the lenders from time to time party thereto and Deutsche Bank Trust Company Americas as administrative and collateral agent (the "DIP Credit Agreement").  The DIP Credit Agreement, as amended, provided up to $200 million in debtor-in-possession financing with a letter of credit sublimit of $40 million that was secured by substantially all of Wellman's assets (the "DIP Facility").  The DIP Facility was primarily used by Wellman to (a) pay fees and expenses related to the DIP Facility (b) support the

22

working capital and general corporate purposes of Wellman and (c) repay the aggregate principal amount outstanding, together with interest and all unpaid fees and expenses under the prepetition revolving credit facility. The maturity date of the DIP Facility is the earlier of (a) February 27, 2009, (b) the date when all of the loans made pursuant to the DIP Facility have been repaid, all letters of credit have terminated or have been cash collateralized at 105% and the commitments have been reduced to zero, or (c) the effective date of the Plan, with all of the loans to be repaid as a bullet on such date and all letters of credit to terminate or be cash collateralized at 105% on or before such date. On April 7, 2008, the Bankruptcy Court entered an order approving the DIP Facility (the "Final DIP Order"). On April 14, 2008, the Creditors' Committee filed its appeal of the Final DIP Order. On July 3, 2008, the appeal was withdrawn.

*Retention of Restructuring and Other Professionals*

To assist Wellman in carrying out their duties as debtors in possession and to represent their interests in the Chapter 11 Cases, Wellman retained, as of the Petition Date, with authorization from the Bankruptcy Court, the law firm of Kirkland & Ellis LLP ("K&E") as their lead restructuring attorneys. Additionally, with the Bankruptcy Court's approval, Wellman retained Lazard, as financial advisors and investment bankers. Moreover, on May 15, 2008, the Bankruptcy Court authorized the appointment of Michael F. Gries of Conway, Del Genio, Gries & Co., LLC as chief restructuring officer for Wellman.

In addition to these key professionals, Wellman has retained the following other professionals to assist it in managing the Chapter 11 Cases: special litigation counsel; conflicts counsel; accountants; tax service providers; corporate communication consultants; and a claims and noticing agent. Wellman also employs attorneys and other professionals to represent or assist it in a variety of situations arising in the ordinary course of Wellman's business in matters unrelated to the Chapter 11 Cases. Wellman has also retained, with the approval of the Bankruptcy Court, various experts to assist it in the valuation process.

In addition to paying the fees of their own advisors, Wellman is required to pay fees incurred by various other constituencies and their respective advisors related to the Chapter 11 Cases. On March 10, 2008, the United States Trustee for the Southern District of New York appointed the Creditors' Committee in the Chapter 11 Cases to represent the interests of all general unsecured creditors of the Debtors.

Since the formation of the above-referenced committees, Wellman has kept these committees informed about Wellman's business operations. Additionally, when it has deemed appropriate, Wellman has sought the concurrence of the committees in connection with certain actions and transactions taken by Wellman outside of the ordinary course of business.

*The Bottle Yard Sale*

After the Petition Date, Wellman analyzed its asset portfolio to determine whether certain under-performing assets should be divested so as to enhance the value of the estates. After undergoing this analysis, in March 2008, Wellman sold certain real property located at its facility in Johnsonville, South Carolina free and clear of all liens, claims and encumbrances. This sale provided Wellman's estates with $374,952 in cash (*i.e.*, the Bottle Yard Sale Proceeds) in exchange for real property that Wellman was not utilizing and did not expect to use in the near future. Upon the closing of the Johnsonville Sale, the Bottle Yard Sale Proceeds were paid to the First Lien Lenders in partial satisfaction of their secured claims.

*Efforts During these Chapter 11 Cases to Sell the Business*

As noted above, to fund the operation of its businesses during these Chapter 11 Cases, Wellman entered into the DIP Facility. Initially, the DIP Facility contemplated a sale of Wellman's businesses by the middle of August 2008 and set forth a time-table for the sale. Specifically, the DIP Facility, as amended, required that (a) a Bidding Procedures Order in form and substance satisfactory to the administrative agent and the lenders under the DIP Facility be entered by the Court by June 26, 2008 and (b) a sale order be entered by the Court by July 31, 2008. *See* Debtor-in-Possession Revolving Credit Facility, dated February 26, 2008, §§ 9.1(i)(xvi)-(xvii) (as amended

from time to time). The failure of Wellman to meet these milestones would have resulted in a default under the DIP Facility.

Due to the milestones set forth in the DIP Facility, Wellman continued the sales process. In connection with the sales process after the Petition Date, Wellman received non-binding indications of interest to purchase substantially all of its assets. Wellman, with guidance from Lazard, selected three potential purchasers from this group and invited them to submit binding offers after completing additional detailed due diligence. Wellman initially asked the three potential buyers to submit "stalking horse" bids by April 4, 2008 (the "Bid Deadline").

In the weeks leading up to the Bid Deadline, the three potential buyers were provided access to Wellman's management, financial advisors and facilities to perform due diligence with respect to Wellman's business. In response to the potential buyers' particularized information requests, Wellman and its advisors invested countless hours creating detailed, original work product on Wellman's financial and operating condition to assist potential buyers with the formulation of an informed bid for Wellman's assets.

While Wellman did not receive a binding offer for its assets from any of the three bidders by the Bid Deadline, Wellman did receive two non-binding offers. The first offer was subject to numerous closing conditions and contingencies that made the offer appear more like a purchase option than a commitment to purchase Wellman's assets, and the second offer provided too little in the form of cash consideration and contemplated including an equity interest in an as-yet formed joint venture as part of the consideration.

Notwithstanding the deficiencies associated with each of the two bids, Wellman presented both bids to the First Lien Lenders, the Second Lien Lenders and their respective advisors to obtain their input. After reviewing the bids, the First Lien Lenders and Second Lien Lenders made it clear that they would not support a sale where either bid would serve as the "stalking horse" bid. In addition, based on their view that these bids substantially undervalued Wellman's businesses, certain First Lien Lenders and Second Lien Lenders separately approached Wellman with proposals to purchase Wellman's assets or support a plan of reorganization.

From the beginning of the Chapter 11 cases, Wellman has made it clear that it would analyze the viability of a plan as an alternative to the sale. Pursuing a plan has been an iterative process for Wellman, but also one that has yielded substantial and meaningful progress. During the plan formulation and negotiation process, Wellman communicated at length with its major stakeholders, including the DIP Lenders, the Creditors' Committee, the First Lien Lenders, the Second Lien Lenders and certain key vendors regarding the benefits of a confirmable plan. Through this extensive communication process, Wellman made significant progress and received proposals from both the First Lien Lenders and the Second Lien Lenders regarding the terms of a plan. As a result of Wellman's negotiations regarding the plan process and discussions with its DIP Lenders, Wellman obtained multiple extensions of the sale related deadlines in the DIP Facility and additionally received waivers of certain minimum cumulative EBITDA covenants. These extensions/waivers provided Wellman with the additional time needed to formulate and negotiate a plan. Ultimately Wellman determined to go forward with the initial version of the Plan, which was based on the proposal submitted by certain of the Second Lien Lenders, which, in Wellman's view, would best maximize the value of Wellman's estates for the benefit of its stakeholders. To that end, on June 17, 2008, Wellman and its DIP Lenders entered into an amendment to the DIP Facility, which required that Wellman obtain approval of its Disclosure Statement by August 4, 2008. Wellman obtained waivers of certain cumulative EBITDA covenants for June and July 2008. Wellman subsequently entered into four other amendments extending the applicable deadlines under the DIP Facility. The most recent amendment was on November 4, 2008, and required that Wellman obtain a commitment for exit financing and entry of the Disclosure Statement Order on or before November 11, 2008. Wellman anticipates entering into an additional amendment to provide it with additional time to obtain an exit financing or other funding commitment. In addition, the DIP Facility currently requires that Wellman obtain entry of an order confirming the Plan on or before December 5, 2008 and emerge from bankruptcy before December 10, 2008, Wellman anticipates obtaining an extension of these deadlines to the extent necessary to confirm the Plan.

*The Johnsonville Sale*

On September 26, 2008, Wellman entered into a letter of intent agreement to sell all of the assets exclusively related to the operations and business of Johnsonville facility to JAC and JAC, now known as Wellman

Plastics Recycling, intends to operate Johnsonville as a going concern. The Johnsonville Sale closed on October 22, 2008. The proceeds of the Johnsonville Sale were distributed as follows, (i) the Johnsonville PP&E Proceeds were paid to the First Lien Lenders in partial satisfaction of their secured claims and (ii) the remainder were used to pay down the DIP Facility.

*Creditors' Committee Motions*

On April 22, 2008, the Creditors filed the Motion of the Official Committee of Unsecured Creditors for Recognition that the Automatic Stay Was Vacated by Consent on the Petition Date or, in the Alternative, to Vacate the Automatic Stay (the "Stay Motion"). On May 2, 2008, the Creditors' Committee filed the Motion of the Official Committee of Unsecured Creditors for an Order (i) Directing Oral Examinations and Production of Documents Pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure and (ii) Extending Challenge Period for Cause (the "2004 Motion" and together with the Stay Motion, the "Committee Motions"). On September 2, 2008, The Creditors' Committee withdrew the Stay Motion.

**The Plan Process**

*The Initial Plan*

To comply with the milestones set forth in the fifth amendment to the DIP Facility, on June 25, 2008, Wellman filed its initial version of the Plan (the "Initial Plan"). The Initial Plan contemplated that Wellman would retain and operate its three facilities at Palmetto, Johnsonville and Pearl River in the ordinary course of its business after emerging from chapter 11. The additional salient components of the Initial Plan were as follows:

- First Lien Lenders would receive a secured note in the principal amount of $70.827 million, maturing 15 years after the effective date and paying 11% interest per annum;

- Second Lien Lenders would convert their debt into 100% of the common stock in Reorganized Wellman, subject to dilution by the Convertible Notes;

- Second Lien Lenders would have the right to participate in an offering to purchase notes convertible into 63.75% of the common stock of Reorganized Wellman for $80 million;

- certain Second Lien Lenders would backstop the $80 million rights offering to the Second Lien Lenders;

- Second Lien Lenders would receive 90% of the proceeds, if any, from the Distribution Trust;

- General Unsecured Creditors would receive 10% of the proceeds, if any, from the Distribution Trust; and

- Reorganized Wellman would obtain an exit financing facility.

Pursuant to section 1129(b)(2) of the Bankruptcy Code, a debtor is permitted to retain collateral over the objection of a secured creditor with a lien in such collateral, if such creditor retains its liens in the collateral securing the claim and receives deferred cash payments with a present value equal to the value of the collateral. See 11 U.S.C. § 1129(b)(2)(A)(i)(II). As a result, because Wellman was retaining the First Lien Lenders' collateral (the "PP&E") under the Initial Plan, establishing the value of the First Lien Lenders' interest in the PP&E was necessary to ensure that the note, and the deferred payments made thereunder, were sufficient to comply with section 1129(b)(2)(A)(i)(II) of the Bankruptcy Code.

*The Valuation Litigation*

On July 3, 2008, Wellman filed a motion pursuant to Bankruptcy Rule 3012 (Docket No. 326) to value the PP&E at all three facilities and attached its expert report, which valued the PP&E at $70,827,000, to the motion.

Wellman's expert report was prepared by Richard E. Schmitt of AccuVal Associates Incorporated ("AccuVal"), which has been retained by Wellman in these chapter 11 cases. On July 18, 2008, the First Lien Lenders and Second Lien Lenders each filed their expert reports. The First Lien Lenders' report (Docket No. 346) was prepared by David B. Lerman of Huron Consulting Group, and on July 25, 2008, the First Lien Lenders filed a supplement to their expert report (Docket No. 382). The Second Lien Lenders' report (Docket No. 348) was prepared by Neal J. Beaton and Richard A. Hause of Grant Thornton LLP. The First Lien Lenders' revised expert report contained three separate valuations of the three facilities each premised on different assumptions with respect to Wellman's intellectual property and other intangible assets.

On August 5, 2008, after a two day hearing, the Bankruptcy Court concluded that the value of the PP&E is $140 million. A copy of the Bankruptcy Court's opinion with respect to the value of the PP&E is attached as Exhibit "G" to this Disclosure Statement.

All three of the parties valued the PP&E on a plant by plant basis, and their valuations are set forth in the chart below.

| Party Valuation of Overall PP&E | Valuation of PP&E at Each Facility and percentage allocation | Valuation Based on Bankruptcy Court's Ruling |
|---|---|---|
| **Wellman** <br> **$70,827,000** | • **Pearl River (53%)** - $37,212,000 <br> • **Palmetto (37%)** - $26,445,000 <br> • **Johnsonville (10%)** - $7,170,000 | • **Pearl River** $73,500,000 <br><br> • **Palmetto** $52,300,000 <br> • **Johnsonville** $14,200,000 |
| **First Lien Lenders** <br> **$136,810,000 to $197,000,000** <br> (based on different scenarios related to the intellectual property and intangibles) | • **Pearl River (37.3%)** - $50,980,000 to $71,800,000; <br> • **Palmetto (46.3%)** - $63,380,000 to $92,800,000 <br> • **Johnsonville (16.4%)** - $22,450,000 to $32,400,000 | • **Pearl River** $52,200,000 <br> • **Palmetto** $64,800,000 <br> • **Johnsonville** $23,000,000 |
| **Second Lien Lenders** <br> **$74,301,000** | • **Pearl River (50.1%)** - $37,203,000 <br> • **Palmetto (40.5%)** - $30,106,000 <br> • **Johnsonville (8.6%)** - $6,411,000 | • **Pearl River** $70,100,000 <br> • **Palmetto** $56,700,000 <br> • **Johnsonville** $12,100,000 |

Based on the Bankruptcy Court's ruling, Wellman determined that the Initial Plan could not be confirmed as proposed for the following three reasons:

• the $140 million valuation violated a covenant in the exit financing commitment obtained by Wellman; and

• Wellman's understanding was that the Backstop Parties were not willing to backstop the rights offering behind a $140 million secured note; and

• Reorganized Wellman did not have the debt capacity to issue a $140 million secured note.

*Operational Restructuring*

Based on the fact that the DIP Facility required that Wellman obtain the entry of an order approving the Disclosure Statement by August 15, 2008, and that the Initial Plan could not be confirmed based on the Bankruptcy Court's ruling, Wellman and DIP Lenders began discussing the process for liquidating Wellman's businesses. However, because Wellman's going concern value is significantly higher than its liquidation value, Wellman focused on developing a confirmable plan that would maximize value under the circumstances and preserve some jobs, and began negotiating with the DIP Lenders regarding the waiver of the milestones set forth in the ninth amendment to the DIP Facility and a further amendment. The DIP Lenders agreed to extend the applicable deadlines. The business plan acceptable to the DIP lenders contemplates an operational restructuring, which involves:

- exiting the polyester fiber business (Palmetto) and engineering resins business (Johnsonville) and reorganizing around Pearl River as a PET resins producer;

- idling Palmetto and Johnsonville, liquidating the related working capital at those plants and using the proceeds of the liquidation to pay down the DIP Facility; and

- increasing the PET resin production at Pearl River to account for the loss of capacity at Palmetto.

Wellman has started the process of implementing the operational restructuring and, in that regard, winding down its fiber business at Palmetto and its engineering resins business at Johnsonville, processing and selling off its inventory and working capital to collect the related accounts receivable. In connection therewith, on September 16, 2008, Wellman provided notice, pursuant to the Worker Adjustment and Retraining Notification Act, to its employees at Johnsonville, Palmetto and its Fort Mill office, informing the employees of Wellman's plans to wind down its operations, which will result in the termination of most of these employees. After commencing the operational restructuring, Wellman entered into an agreement to sell all of the assets related to the operations and business of its Johnsonville facility to JAC, who will operate the business as a going concern. The Johnsonville Sale closed on October 22, 2008.

The total cost related to transferring 100% of the Wellman's PET resin production to Pearl River is approximately $1.9 million. Of the $1.9 million, $1.2 million are costs associated with shutting down Wellman's Fort Mill facility and transferring the personnel from such facility. The remaining $700,000 in costs consist of (a) $400,000 attributed to de-bottlenecking the chip handling equipment at Pearl River (including the PTA uploading facility), (b) $200,000 to start up the third line at Pearl River and (c) $100,000 for training personnel and moving small amounts of supplies and consumables.

As a result of Wellman exiting the fibers and engineering resins businesses, Reorganized Wellman will be a smaller company going forward. Based on its projections, Reorganized Wellman will have approximately 60% less EBITDA as compared to the projections contained in the Initial Plan, which assumed Wellman continued to operate at Pearl River, Johnsonville and Palmetto.

*The Second Plan*

Simultaneously with its discussions with the DIP Lenders regarding the terms of the operational restructuring, Wellman engaged in discussions with certain of the Backstop Parties. Those Backstop Parties supported the operational restructuring and Wellman worked with such Backstop Parties to develop a confirmable plan and new backstop commitment agreement for the Rights Offering. On September 16, 2008, Wellman filed an amended version of the Initial Plan (the "Second Plan"). The Second Plan contemplated the following:

- Wellman would retain and reorganize around Pearl River;

- Second Lien Lenders would convert their pre-petition debt for the equity of Reorganized Wellman, subject to dilution by the Convertible Notes;

27

- Second Lien Lenders would have the right to participate in an offering to purchase Convertible Notes, which are convertible into New Common Stock of Reorganized Wellman;

- Second Lien Lenders would receive 90% of the proceeds, if any, from the Distribution Trust;

- To the extent the DIP Lenders' Claims are fully satisfied, the Second Lien Lenders would receive the portion of the Palmetto Sale Proceeds allocated to the Palmetto Intellectual Property & Intangibles;

- The First Lien Lenders would receive:

  - a promissory note secured by the Pearl River PP&E in the principal amount of $70.1 million, maturing 11.5 years after the Effective Date and paying 11.1% interest per annum;

  - all of the proceeds from the Palmetto Sale that are allocated to the Palmetto PP&E; and

  - at the closing of the Johnsonville Sale, $5.75 million of Johnsonville PP&E Proceeds and the Bottle Yard Sale Proceeds.

- Backstop Parties would insure that the Rights Offering is fully funded; and

- General Unsecured Creditors would receive 10% of the proceeds, if any, from the Distribution Trust.

*The New Plan*

To fund its obligations under the plan and upon emergence, both the Initial Plan and the Second Plan were conditioned upon Wellman obtaining third-party exit financing in addition to the Rights Offering. Wellman diligently explored the possibility of obtaining both debt and equity financing. Unfortunately, due to the current financial crisis and the extremely difficult credit market, Wellman was unable to obtain a workable third-party source of exit financing. Specifically, Wellman received a proposed commitment for an exit facility, but its terms were prohibitively expensive and uneconomical. In addition, Wellman reached an agreement in principle with a party willing to provide equity financing as a plan co-sponsor, but the counterparty was unable to get final internal approval for reasons unrelated to Wellman's business or future prospects (i.e., the turmoil in the credit markets).

Because Wellman believes that reorganizing as a going concern provides its stakeholders with a significantly higher recovery than what would be realized in a liquidation, Wellman continued to push forward in the face of adversity. Certain of the Backstop Parties, who continued to stand behind Wellman's reorganization, agreed to increase the amount of the Rights Offering to provide Wellman with the funding it needed to emerge from these Chapter 11 Cases. Understanding that the Backstop Parties represented the Debtors last option to avoid a default under the DIP Facility and a subsequent liquidation, and that time was of the essence, Wellman and the Backstop Parties negotiated the terms of the Backstop Parties' new funding commitment.

The new Plan contemplates the following:

- Wellman will retain and reorganize around Pearl River;

- Wellman will immediately proceed to a liquidation if either Class 2 or Class 3 votes to reject the Plan;

- First Lien Lenders and Second Lien Lenders will have the right to participate in the Rights Offering to purchase $105 million in face amount of Convertible Notes for a purchase price of $90 million, which are convertible into New Common Stock of Wellman Holdings

- First Lien Lenders will convert their pre-petition debt for 70% of the New Common Stock of Wellman Holdings[7], subject to dilution by the Convertible Notes and the Management Equity Incentive Plan;

- First Lien Lenders will receive all of the proceeds from the Palmetto Sale that are allocated to the Palmetto PP&E;

- Second Lien Lenders will convert their pre-petition debt for 30% of the equity of Wellman Holdings, subject to dilution by the Convertible Notes and the Management Equity Incentive Plan;

- Second Lien Lenders will receive 75% of the first $1 million in aggregate proceeds, if any, and 80% of the aggregate proceeds, in excess of $1 million, if any, from the Distribution Trust;

- To the extent the DIP Lenders' Claims are fully satisfied, the Second Lien Lenders would receive the portion of the Palmetto Sale Proceeds allocated to the Palmetto Intellectual Property & Intangibles;

- The total aggregate amount of Allowed General Administrative Expense Claims will not exceed $28 million;

- Backstop Parties will ensure that the Rights Offering is fully funded; and

- General Unsecured Creditors will receive 25% of the first $1 million in aggregate proceeds, if any, and 20% of the aggregate proceeds, in excess of $1 million, if any, from the Distribution Trust.

### Treatment of Claims Against and Equity Interests in Wellman

*Asserted and Scheduled Claims*

All claims and interests against Wellman, except for the DIP Facility claims, administrative claims and priority tax claims, are classified in the classes set forth in this section. The Claims are categorized into classes based upon the similarity or dissimilarity of Claims (with similarly situated Claims in the same class) as prescribed by the Bankruptcy Code.

Distributions under the Plan will be made only to holders of Allowed Claims. As more fully described in Articles I and III of the Plan, holders of Disputed Claims will receive no distributions unless and until their claims become Allowed. Accordingly, a condition to the Effective Date of the Plan is that Wellman establish a Disputed General Unsecured Claims Reserve.

The Disputed General Unsecured Claims Reserve cannot be established, and initial Distributions to Holders of Allowed General Unsecured Claims cannot be made, until all relevant unliquidated and disputed claims are estimated or fixed for distribution purposes.

---

[7]   The 70/30 allocation of the New Common Stock between the First Lien Lenders and the Second Lien Lenders in the Plan is offered as a compromise for purposes of the Plan only. In the event the Plan is not confirmed and consummated, this allocation shall not have any precedential effect or probative value with respect to a future valuation of each parties respective collateral or any other allocation of the proceeds from the disposition of the Debtors' assets.

Pursuant to the terms of the Plan, except for claims that are (a) expressly exempted from the discharge provisions of the Bankruptcy Code, or (b) specifically identified as being reinstated, all claims that arose prior to the confirmation of the Plan will be discharged.

### General Administrative Expense Claims

Unless otherwise agreed to by the Holder of a General Administrative Claim and Wellman or Reorganized Wellman, each Holder of an Allowed General Administrative Claim will receive, in full satisfaction of its General Administrative Claim, Cash equal to the amount of such Allowed General Administrative Claim either (i) on the Effective Date or as soon thereafter as reasonably practicable or (ii) if the General Administrative Claim is not Allowed as of the Effective Date, 15 days after the date on which an order allowing such General Administrative Claim becomes a Final Order; provided, however, that the aggregate amount of Cash required to pay Allowed General Administrative Claims cannot exceed $28 million.

### Class 1 Other Secured Claims

Claims in Class 1 are not impaired under the Plan and holders of claims and interests in Class 1 are conclusively presumed to have accepted the Plan and are not entitled to vote on the Plan.

Class 1 consists of any secured claim that is not a DIP Facility claim, prepetition facility claim, first lien term loan claim, or a second lien term loan claim. Unless the holder of an allowed other secured claim agrees to a less favorable treatment, in exchange for each allowed other secured claim, each holder of an allowed Class 1 Claim will receive one of the following: (i) payment in full in cash; or (ii) such other treatment so that the Class 1 Claim is made unimpaired. Treatment of the Class 1 Claims shall be in the discretion of the Debtors or the reorganized Debtors, as applicable, and with the consent of the Backstop Parties.

### Class 2 First Lien Term Loan Claims

Class 2 consists of all Claims arising under the First Lien Term Loan Credit Agreement. In the event that both Class 2 and Class 3 vote to accept the Plan, each holder of a Class 2 Claim shall receive its Pro Rata share of (i) 70% of the New Common Stock, subject to dilution on account of the Management Equity Incentive Plan and the Convertible Notes, (ii) Rights pursuant to the Rights Offering, and (iii) the portion of the Palmetto Sale Proceeds allocated to the Palmetto PP&E. In addition to the foregoing, during the pendency of the Chapter 11 Cases in partial satisfaction of their Class 2 Claims, the Holders of Allowed Claims in Class 2 have received their Pro Rata share of (i) $5.75 million in proceeds from the Johnsonville Sale and (ii) the Bottle Yard Proceeds.

### Class 3 Second Lien Term Loan Claims

Class 3 consists of all Claims arising from the Second Lien Term Loan Credit Agreement. In the event that both Class 2 and Class 3 vote to accept the Plan, each Holder of a Class 3 Claim shall receive, its Pro Rata share of (i) 30% of the New Common Stock subject to dilution on account of the Management Equity Incentive Plan and the Convertible Notes, (ii) Rights pursuant to the Rights Offering, (iii) the Second Lien Trust Interests, and (iv) to the extent the DIP Facility Claims are satisfied in full, the portion of the Palmetto Sale Proceeds allocated to the Palmetto Intellectual Property & Intangibles.

### Reduction in Recoveries in the Event Class 2 or Class 3 Votes to Reject the Plan

**If Class 2 or Class 3 votes to reject this Plan, the Debtors will immediately proceed with a liquidation of their assets in conjunction with the DIP Lenders as Wellman will be in default under the DIP Facility.** In the event the Plan is not confirmed or the Effective Date does not occur, Wellman will be forced to liquidate the working capital at the Pearl River Facility. It is likely that operations at the Pearl River Facility would be shut down as part of this process. The proceeds from this liquidation would first be used to satisfy the DIP Facility and then be distributed to the Holders of Claims in Class 3. After the liquidation is concluded, the Pearl River PP&E would be distributed to the Holders of Claims in Class 2. As a result, the recoveries for Holders of Claims in Classes 2 and 3

will be reduced significantly.  For additional information please see "Best Interests of Creditors" beginning on page 51 and the Liquidation Analysis attached as Exhibit "E" to this Disclosure Statement.

### Class 4 General Unsecured Claims

Class 4 consists of all unsecured Claims that are not otherwise classified in the Plan.  Under the Plan, holders of Class 4 Claims will receive a pro rata portion of 25% of the first $1 million in aggregate proceeds, if any, and 20% of the aggregate proceeds, in excess of $1 million, if any, from the Distribution Trust.

The Debtors estimate that the aggregate amount of General Unsecured Claims in Class 4 is $43.2 million. The Bar Date for all creditors to file Claims against the Debtors was July 29, 2008 and the Bar Date for government entities was August 21, 2008.  To date, the Debtors have received over 1,825 proofs of claim.  The Debtors estimate that there are approximately $72.3 million in unsecured claims.  The aggregate asserted value of the claims filed as General Unsecured Claims is approximately $134.0 million.  In addition, 1,113 proofs of claim were filed in unliquidated amounts.  The Debtors have begun to review and analyze the claims and will file appropriate objections in due course in an attempt to reduce the total amount of General Unsecured Claims.  There can be no assurance that the Debtors will be able to do so.  In addition, because they share pro rata in the Distribution Trust Interests, the holders of General Unsecured Claims in Class 4 could have their recoveries diluted in the event that Disputed Claims or Claims currently asserted in contingent unliquidated amounts become Allowed Claims in excess of the amounts estimated by the Debtors in calculating the estimated recoveries described herein, or Holders of General Administrative Claims consent to a reduction in the portion of such claims treated as priority claims.

### Class 5 Old Preferred Interests and Class 6 Old Common Interests

Class 5 and Class 6 consist of Old Preferred Interests and Old Common Interests respectively.  Claims in Classes 5 and 6 are impaired and shall receive no distribution under the Plan.  As a result, the holders of claims in those classes are conclusively presumed to have rejected the Plan and are not entitled to vote on the Plan.

### Class 7 Intercompany Interests

Class 7 consists of all Intercompany Interests.  Intercompany Interests will be reinstated under the Plan in full and final satisfaction, settlement, release, and discharge of and in exchange for each Intercompany Interest.

## Management of the Company

Biographical information for Mr. Mark J. Ruday and Mr. Keith R. Phillips is set forth below:

**Mark J. Ruday.**  Mr. Ruday has been Chief Executive Officer since May 2008.  From January 2008 to May 2008, he was a Vice President and Chief Operating Officer.  Prior to that, he was Vice President, Business Operations from March 2007 to January 2008. He was Vice President, Chief Accounting Officer and Controller from May 2003 to March 2007, the Business Operations Manager for the US PET Resin business from March 1998 to May 2003, and a controller in the chemical-based business from November 1995 through March 1998.

**Keith R. Phillips.**  Mr. Phillips has been Vice President and Chief Financial Officer since October 1993. He was also Treasurer from October 1993 to March 2001 and assumed the role again in March 2007. Mr. Phillips is a certified public accountant.

## Composition of New Board of Directors

Under the Plan, after the effective date of the Plan, our board of directors will be comprised of seven (7) members, four (4) of whom shall be selected by the Backstop Parties, one (1) of whom shall be selected by the Informal First Lien Lender Group, one (1) of whom shall be selected by the Informal Second Lien Lender Group,

and the final member initially shall be Mark J. Ruday the current Chief Executive Officer of Reorganized Wellman. Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose in the Plan Supplement the identity and affiliations of any Person proposed to serve on the initial board of directors or be an officer of each of the Reorganized Debtors.  To the extent any such director or officer of Wellman is an "insider" under the Bankruptcy Code, the nature and amount of any compensation to be paid to such director or officer will also be disclosed.

### Trading Restrictions to Preserve Wellman's Net Operating Loss Income Attributes

To preserve Wellman's net operating loss income attributes, on April 10, 2008, the Bankruptcy Court entered an order, which, among other things, requires: (a) certain beneficial owners of at least 1.48 million shares of common stock, 504,000 shares of preferred stock, or a combination of common stock and preferred stock that would aggregate 4.5% or more of the total outstanding shares of Wellman's equity securities (a "Substantial Owner") to notify Wellman and the Bankruptcy Court that they are Substantial Owners; (b) Substantial Owners to file a notice with Wellman and the Bankruptcy Court before any acquisition or disposition of Wellman equity securities or options to acquire or dispose of Wellman equity securities; and (c) any other person or entity to file a notice with Wellman and the Bankruptcy Court before any acquisition of Wellman equity securities, or option to acquire Wellman equity securities, that would make such person or entity a Substantial Owner.  The NOL Order allows Wellman to object in the Bankruptcy Court to any such transactions, within thirty days of receipt of notice of such transactions, if the transaction poses a material risk of adversely affecting Wellman's ability to utilize its significant balance of NOLs or other tax attributes.  Any acquisition or disposition to which Wellman objects would not become effective unless and until approved by an order of the Bankruptcy Court.

Under the NOL Order, any purchase, sale or other transfer of Wellman equity securities in violation of the restrictions in the NOL Order would be void ab initio as an act in violation of the NOL Order and would therefore confer no rights on the proposed transferee.

Based on public filings in the first quarter of 2008, Wellman believes the following persons or entities beneficially own 5% or more of the outstanding common stock of Wellman:

| Holder of Equity Interests | Shares Beneficially Owned | Percent of Class |
|---|---|---|
| Preferred Stock | | |
| Warburg Pincus | 11.3 million | 100% |
| | | |
| Common Stock | | |
| Wells Fargo & Co | 5.3 million | 16.1% |
| Merrill Lynch | 2.4 million | 7.3% |

### Financial Performance During Bankruptcy

Wellman, including its non-Debtor subsidiaries, reported, on a consolidated basis for the eight months ended August 31, 2008, net loss of $55.9 million.  This compares to net losses for the eight months ended August 31, 2007 of $51.7 million.

At August 31, 2008, Wellman reported, on a consolidated basis, approximately $468.8 million in total assets and approximately $709.0 million in total liabilities, including approximately $531.9 million of liabilities subject to compromise.

The following table reconciles losses from continuing operations to earnings before interest, taxes, depreciation and amortization ("EBITDAR"), for each month and the eight months ending August 31, 2008. EBITDAR, is calculated by adding Earnings (loss) from continuing operations, income tax expense (benefit), interest expense, non-cash charges, and non-recurring fees, cash charges, and other cash expenses made or incurred in connection with entering into the DIP Facility.

| | January 2008 | February 2008 | March 2008 | April 2008 | May 2008 | June 2008 | July 2008 | August 2008 | Year-to-Date August 2008 |
|---|---|---|---|---|---|---|---|---|---|
| Loss from Continuing Operations | $ (5,038) | $ (15,276) | $ (2,388) | $ (4,670) | $ (1,083) | $ (5,138) | $ (12,452) | $ (9,875) | $ (55,920) |
| Income Tax Expense (Benefit) | - | - | - | - | - | - | - | - | - |
| Interest Expense, Net | 4,675 | 5,505 | 925 | 903 | 999 | 1,065 | 1,166 | 1,084 | 16,322 |
| Depreciation & Amortization | 2,530 | 2,441 | 2,493 | 2,615 | 2,393 | 2,551 | 2,430 | 2,436 | 19,889 |
| Permitted Adjustments: | | | | | | | | | |
| Reorganization Items | - | 3,349 | 2,798 | 3,098 | 2,583 | 2,390 | 3,877 | 2,244 | 20,340 |
| Inventory Reserves | 310 | 802 | 27 | 1,13 | - | 27 | 3,530 | 1,666 | 7,492 |
| Claims Accrual Non-cash | - | - | - | - | 353 | - | - | - | 353 |
| Uncollectible Accounts | 144 | - | 65 | - | - | 599 | 62 | - | 870 |
| Hurricane Katrina Costs | - | 63 | - | - | - | - | - | - | 63 |
| Sale of Jville Assets | - | - | 48 | (232) | - | 19 | - | - | (163) |
| Environmental Reserve | - | - | - | - | - | 615 | - | - | 615 |
| Total permitted adjustments | 454 | 4,214 | 2,938 | 3,996 | 2,936 | 3,650 | 7,469 | 3,910 | 29,568 |
| EBITDAR, as defined | $ 2,621 | $ (3,116) | $ 3,968 | $ 2,844 | $ 5,245 | $ 2,128 | $ (1,387) | $ (2,445) | $ 9,859 |

## Pension Plans

Wellman sponsors the Wellman Industries, Inc. Hourly Employees Pension Plan (the "Wellman Plan"). Fiber Industries, Inc. ("Fiber") sponsors the Fiber Industries, Inc. Retirement Income Plan (the "Fiber Plan", and, together with the Wellman Plan, the "Pension Plans"). The Pension Plans are covered by Title IV of the Employee Retirement Income Security Act of 1974 ("ERISA").

Pursuant to the Plan, the Wellman Plan and the Fiber Plan will be continued by their respective sponsors. The Pension Plans shall be continued in accordance with their terms, and the Debtors or the Reorganized Debtors will satisfy the minimum funding standards pursuant to 26 U.S.C. § 412 and 29 U.S.C. § 1082, be liable for the payment of premiums to the Pension Benefit Guaranty Corporation ("PBGC") in accordance with 29 U.S.C. §§ 1306 and 1307 subject to any and all applicable rights and defenses of the Debtors, and administer the Pension Plans in accordance the provisions of ERISA and the Internal Revenue Code. The Fiber Plan may require additional funding pursuant to Section 4062(e) of ERISA as a result of the closure of the Palmetto facilities. Wellman intends to file with the PBGC to delay or waive any additional required funding. Notwithstanding any provision of the Plan or the Confirmation Order to the contrary, the Pension Plans shall be continued and administered in accordance with ERISA and the Internal Revenue Code.

Additionally, notwithstanding anything in the Plan, including Article VIII, no claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities whatsoever against any entity with respect to the Pension Plans shall be released, exculpated, discharged, enjoined, or otherwise effected by the Plan, nor shall the entry of the Confirmation Order constitute the approval of any release, exculpation, discharge, injunction, or other impairment of any claims, obligations, suits, judgments, damages, demands, debts, rights, cause of action or liabilities whatsoever against any entity with respect to the Pension Plans.

The PBGC is a United States government corporation, created under Title IV of ERISA, which guarantees the payment of certain pension benefits upon termination of a pension plan covered by Title IV. The PBGC has the statutory authority to seek involuntary termination of a pension plan under certain circumstances. 29 U.S.C. § 1342. In the event that the Pension Plans terminate prior to the Confirmation Date, the PBGC asserts that it will have claims against Wellman, Fiber, and each of its controlled group members, jointly and severally, in the approximate amount of $24,000,000, and that all or part of these claims may be entitled to priority as an Administrative Claim or a Priority Tax Claim, and the Debtors would have the right to object to the amount and priority of any such claims.

## The Distribution Trust [8]

The Distribution Trust is expected to be formed as a Delaware trust pursuant to a trust declaration (the "Trust Agreement") to prosecute various litigation claims originally owned by Wellman and, if any of the prosecutions are successful or are settled in a manner that derives economic benefit to the trust, to distribute to the beneficial owners of the trust the net proceeds of such litigations. The trust will retain the right to the proceeds from the Eastman Litigation (with the cause of action remaining with the Reorganized Debtors) and continue in existence for a period of three years or until all of its property is distributed, whichever occurs first, except that if the trustees determine that it is necessary to extend the duration of the trust to accomplish the trust's purposes, they may make an application to the Bankruptcy Court, not later than eight months prior to the end of the third year of the trust. The Bankruptcy Court shall retain jurisdiction regarding the trust's operations.

### Management of the Trust

The Distribution Trust will be managed by a managing trustee and three supervisory trustees. Generally, the managing trustee will have the authority to manage, dispose of and invest the assets of the trust but will be required to obtain the consent of the supervisory trustees to take certain actions, including early termination of the trust, entering into contracts in amounts greater than $25,000, borrowing of funds, and the approval of distributions. In the event of the death, resignation or removal of the managing trustee, the supervisory trustees will appoint a successor managing trustee. Upon the death, resignation or removal of a supervisory trustee, the remaining supervisory trustee or trustees, as applicable, will manage the trust.

### Trust Reporting

The Trust Agreement will require that the trust distribute quarterly and annual reports containing unaudited financial information reflecting the activities of the trust with respect to its assets and distributions.

### Assets of the Trust

The trust will be capitalized with $250,000 in cash. The trust will own the rights to certain litigation currently held by Wellman and will be entitled to the proceeds, if any, from the Eastman Litigation. As set forth in more detail on page 42, the complaint alleges that Eastman infringes Wellman's '317 patent with its ParaStar resins that are made from its IntegRex process and Eastman is inducing third parties, including its customers, to infringe Wellman's '863 patent when they make preforms using ParaStar resin. The litigation held by the trust or to which the trust is entitled to the proceeds therefrom may not be successful and there is no guarantee that the trust will ever make distributions to the beneficial owners. As described on page 42 herein, Eastman disputes, among other things, (i) the infringement alleged by Wellman and (ii) the validity and amount of damages asserted by Wellman relating to such alleged infringement, and has countersued.

### Ownership of the Trust

Ownership in the trust will be evidenced by beneficial interests, the ownership of which shall be reflected on the books and records of the trust. The interests in the trust will be non-voting and will not confer any rights to the holders as shareholders. The interests will not be transferable by a holder except: (i) to any relative, spouse, or relative of the spouse of the holder, (ii) to any trust or estate in which such holder has more than a 50% interest of the beneficial interest (excluding contingent interests), (iii) to any corporation, partnership or other organization in

---

[8]   The Debtors reserve the right, subject to the consent of the Informal Second Lien Lender Group, to utilize an alternative means of distributing the certain Causes of Action, or proceeds thereof and the proceeds of the Eastman Litigation to Holders of Claims in Classes 3 and 4, provided, however, that the method of distribution utilized shall not have a material adverse impact on the amount of consideration, if any, provided to such Holders when compared to a trust structure.

which such holder is the beneficial owner of more than 50% of the equity securities (excluding directors qualifying shares) so long as the transferor and transferee certify that there is no current intention of changing the direct and indirect ownership of the transferee, (iv) to any person or entity that holds, directly or indirectly, more than 50% of the voting securities of such holder, or (v) upon the death of such holder in accordance with the operation of law.

### The Rights Offering

Wellman intends to raise funds through the issuance of Convertible Notes by Wellman Holdings that may be converted into New Common Stock of Wellman Holdings, Inc. through the Rights Offering. The Rights Offering will be for $120 million in Convertible Notes (subject to the Backstop Fee and original issue discount). Reorganized Wellman will receive $90 million in proceeds from the Rights Offering, which shall be used to (i) fund administrative expenses and unsecured creditor recoveries, if any, under the Plan, (ii) fund the payment of any cure costs under Executory Contracts and Unexpired Leases to be assumed by Reorganized Wellman, (iii) pay down all or a portion of the obligations outstanding under the DIP facility, and (iv) fund the Distribution Trust.

The Plan provides that each holder of a First Lien Term Loan Claim or Second Lien Term Loan Claim that is an "accredited investor" shall be granted the right to subscribe for up to its pro rata share of $105 million principal amount of Convertible Notes for a purchase price of $90 million pursuant to the Rights Offering (with the difference being original issue discount or OID). Each eligible holders' pro rata share will be calculated based on the ratio of the aggregate principal amount of First Lien Term Loan Claims and Second Lien Term Loan Claims held by such holder to $450 million (the total aggregate principal amount of First Lien Term Loan Claims and Second Lien Term Loan Claims). The Rights Offering is expected to be backstopped by the Backstop Parties, as well as any additional first or second lien lender that becomes a signatory to the Backstop Commitment Agreement. In the event that any additional first or second lien lenders become a signatory to the Backstop Commitment Agreement (which, when executed, will be included in the Plan Supplement), their share of the backstop rights will need to be agreed upon by the additional Backstop Parties in accordance with the Backstop Commitment Agreement. Pursuant to the Backstop Commitment Agreement, the Backstop Parties will agree to purchase Convertible Notes that are not sold in the Rights Offering on a several, not joint, basis. The Backstop Parties will receive a fee of $15 million in principal amount of Convertible Notes. Including the Convertible Notes payable in respect of the Backstop Fee, the total principal amount of the Convertible Notes issued on the Effective Date shall be $120 million.

The Convertible Notes mature in 2018 and will be convertible into 60% of the New Common Stock outstanding on the Effective Date. Each holder of a Convertible Note will be entitled to vote on an as-converted basis on all matters on which shareholders of Wellman vote. The Convertible Notes will pay interest in cash quarterly at the rate of 10% per annum, and will be secured by a first priority lien on substantially all of Reorganized Wellman's assets; provided, however, that the liens and claims shall be subject to subordination in the event the Board of Directors votes, on a supermajority basis, to incur secured funded-debt obligations up to an aggregate amount of $50 million. Up to $50 million of the Convertible Notes are subject to optional redemption by Wellman Holdings at any time until the second anniversary of their issuance for cash at the then-outstanding principal amount plus accrued and unpaid interest and an amount equal to twenty (20) percent of the outstanding principal amounts of the Convertible Notes being redeemed. After the second anniversary of their issuance, the Convertible Notes shall be subject to redemption by Wellman Holdings for cash at the then-outstanding principal amount plus accrued and unpaid interest; provided that Wellman Holdings shall give 20 days advance written notice of its intention to effect such optional redemption to the holders of the Convertible Notes and such holders shall then have the opportunity to effect the conversion into New Common Stock. At maturity, the holders of the Convertible Notes must be paid in cash in full for any accrued and unpaid principal and interest and if the issuer is unable to fully satisfy such obligations by a cash payment, the Convertible Notes shall automatically convert to 99% of the outstanding equity of the issuer.

The proceeds of the Rights Offering will be used to (a) fund administrative expenses and unsecured creditor recoveries, if any, (b) fund the payment of any cure costs under the executory contracts or unexpired leases to be assumed by Wellman, and (c) pay down all or a portion of the obligations outstanding under the DIP Facility.

### Our Business Upon Emergence

Wellman will be principally engaged in the manufacturing and marketing of high-quality PermaClear® polyethylene terephthalate, or PET packaging resin. Wellman will be producing this product at Pearl River in Hancock County, Mississippi which has a stated annual operating capacity of approximately 1.0 billion pounds of solid-stated PET resin which is produced from purified terephtalic acid and monoethylene glycol.

Our financial results are primarily determined by our sales volume and raw material margins, which is the difference between net selling price and raw material cost. PET resin volume and raw material margins increase or decrease as a result of supply and demand factors, competitive conditions, global economic and market conditions, export and import activity, and the prices of competing materials.

### *Capital Obligations to be Satisfied or Compromised Upon Emergence*

As of the date Wellman filed the Chapter 11 Cases, Wellman reported, on a consolidated basis, approximately $575 million in aggregate long-term indebtedness, primarily consisting of the Pre-petition Credit Agreeement, the First Lien Term Loan Credit Agreement and the Second Lien Term Loan Credit Agreement. Since the filing of these Chapter 11 Cases, the Pre-petition Credit Agreement has been replaced by the DIP Facility. As set forth in the following table, Wellman plans to satisfy this indebtedness including indebtedness incurred under the DIP Facility, from the proceeds of the Rights Offering and other sources, as described in greater detail below.

| ANTICIPATED SOURCES AND USES OF CASH AT EMERGENCE ($ AMOUNT IN MILLIONS)[9] | | | |
|---|---|---|---|
| **Sources:** | | **Uses:** | |
| Rights Offering Proceeds | $90.0 | DIP Facility (Drawn) | $51.0 |
| | | Professional Fees | $8.0 |
| | | General Administrative Claims | $28.0[10] |
| | | Deferred Financing Costs | $3.0 |
| **Total Sources** | **$90.0** | **Total Uses** | **$90.0** |

### *DIP Facility & Prepetition Secured Bank Debt*

The DIP Facility served to replace Wellman's Prepetition Credit Agreement. On May 4, 2006, the Debtors entered into a $225 million revolving credit facility led by Deutsche Bank Trust Company Americas as Administrative Agent and Collateral Agent and other syndicate lenders. The Prepetition Credit Agreement is guaranteed by Warehouse Associates, Inc., MRF, Inc., Josdav Inc. and MED Resins, Inc. and is secured by liens on, among other things, accounts receivables, inventory, general intangibles (but not including lease documents), goods (other than equipment and fixtures), investment property, deposit accounts, money and cash equivalents and proceeds of the foregoing.

---

[9]   Assumes emergence occurs at the end of November 2008.

[10]   A condition precedent to the confirmation of the Plan is that General Administrative Claims cannot exceed $28 million.

On February 27, 2008, pursuant to authorization from the Bankruptcy Court, Wellman entered into the DIP Facility. The DIP Facility consists of a $225 million loan subject to a borrowing base, with a letter of credit sublimit of $40 million. The size of the facility was reduced to $200 million on June 18, 2008. The commitment was further reduced to $170 million on August 28, 2008. The proceeds of the loans under the DIP Facility are being used to, among other things, provide the Company with working capital.

### First Lien Term Loans

Wellman entered into a credit agreement, dated February 10, 2004, between the Company, as borrower, certain lenders and issuers, and Deutsche Bank Trust Company Americas, as Administrative Agent and Collateral Agent. The total principal amount outstanding under the First Lien Term Loan Credit Agreement is $185 million due February 10, 2009. The First Lien Term Loan Credit Agreement is secured by first priority liens upon and security interests in collateral accounts and all monies deposited therein, real property, equipment and fixtures, tax reduction bonds, lease documents and proceeds of the foregoing. The first lien debt is guaranteed by the following U.S. subsidiaries: Prince, Inc.; Fiber Industries, Inc.; Wellman of Mississippi, Inc.; Carpet Recycling of Georgia, Inc.; ALG, Inc.; Josdav, Inc.; MED Resins, Inc.; Warehouse Associates Inc.; MRF, Inc.; and PTA Resources LLC.

### Second Lien Term Loans

On February 10, 2004, we entered into a credit agreement with certain lenders and issuers, and Deutsche Bank Trust Company Americas as the agent for the Second Lien Term Loan Credit Agreement. The Company's Second Lien Term Loan Credit Agreement is comprised of a $265 million second lien term loan due February 10, 2010. The total principal amount outstanding under the Second Lien Term Loan Credit Agreement is $265 million. The Second Lien Term Loan Credit Agreement is secured by second priority liens on and security interests in accounts, equipment, real property, goods, inventory and fixtures, collateral accounts, certain investment property, general intangibles including lease documents, tax reduction bonds and proceeds of the foregoing. The accounts, goods, inventory and fixtures, investment property and general intangibles used as collateral to secure the Second Lien Term Loan Credit Agreement are not included in the First Lien Term Loan Credit Agreement collateral package. The Second Lien Term Loan Credit Agreement is guaranteed by the Term Loan Guarantors.

### Trade Claims and Other Unsecured Obligations

Prior to the date the Company filed the Chapter 11 Cases, Wellman incurred debt with several creditors in the ordinary course of its business. The claims related to these obligations are more fully described in the Plan, which is included as Exhibit A to this Disclosure Statement. Pursuant to the plan, the Holders of trade claims and other unsecured obligations will receive 25% of the first $1 million in aggregate proceeds, if any, and 20% of the aggregate proceeds, in excess of $1 million, if any, from the Distribution Trust.

### Preferred Stock

Pursuant to and after the effective date of the Plan, all shares of our preferred stock shall be deemed canceled and extinguished, and shall be of no further force and effect.

### Common Stock

Pursuant to and after the effective date of the Plan, all shares of our common stock shall be deemed canceled and extinguished, and shall be of no further force and effect.

### Industrial Development Reserve Bonds

As previously described, the Industrial Development Revenue Bonds are intercompany claims and will remain in place post-emergence.

## Our Capitalization After Emergence

### New Common Stock

Following Wellman's emergence from bankruptcy, Wellman expects to have 10,000,000 shares of new common stock outstanding.

### Convertible Notes

The proceeds from the Convertible Notes will be used to make cash distributions as described herein. The Convertible Notes mature in 2018 and will be convertible into 60% of the New Common Stock outstanding on the Effective Date. Each holder of a Convertible Note will be entitled to vote on an as-converted basis on all matters on which shareholders of Wellman vote. The Convertible Notes will pay interest in cash quarterly at the rate of 10% per annum, and will be secured by a first priority lien on substantially all of Reorganized Wellman's assets; provided, however, that the liens and claims shall be subject to subordination in the event the Board of Directors votes, on a supermajority basis, to incur secured funded-debt obligations up to an aggregate amount of $50 million. Up to $50 million of the Convertible Notes are subject to optional redemption by Wellman Holdings at any time until the second anniversary of their issuance for cash at the then-outstanding principal amount plus accrued and unpaid interest and an amount equal to twenty (20) percent of the outstanding principal amounts of the Convertible Notes being redeemed. After the second anniversary of their issuance, the Convertible Notes shall be subject to redemption by Wellman Holdings for cash at the then-outstanding principal amount plus accrued and unpaid interest; provided that Wellman Holdings shall give 20 days advance written notice of its intention to effect such optional redemption to the holders of the Convertible Notes and such holders shall then have the opportunity to effect the conversion into New Common Stock. At maturity, the holders of the Convertible Notes must be paid in cash in full for any accrued and unpaid principal and interest and if the issuer is unable to fully satisfy such obligations by a cash payment, the Convertible Notes shall automatically convert to 99% of the outstanding equity of the issuer. The terms of the Convertible Notes will be more fully set forth in the Convertible Notes Indenture, which will be filed as part of the Plan Supplement.

## Description of Capital Stock

*The following is a description of the material terms of Wellman's capital stock. This description also summarizes certain provisions of the Delaware General Corporation Law ("DGCL").*

### Authorized Capital Stock

Wellman will have the authority to issue a total of 30,000,000 shares of capital stock, consisting of:

- 29,800,000 shares of new common stock, par value $0.001 per share; and

- 200,000 shares of preferred stock.

### Outstanding Capital Stock

The following capital stock is expected to be issued and outstanding immediately after consummation of the Plan:

- 10,000,000 shares of new common stock; and

- no shares of preferred stock.

38

*Rights and Preferences of Wellman Capital Stock*

**New Common Stock**

*Voting Rights*

All shares of Wellman's new common stock will have identical rights and privileges. Holders of shares of our new common stock will be entitled to vote on all matters submitted to a vote of Wellman's stockholders, including the election of directors. On all matters to be voted on by holders of shares of Wellman's common stock, the holders will be entitled to one vote for each share of Wellman's new common stock held of record, and will have no cumulative voting rights.

*Dividend Rights*

Subject to limitations under Delaware law, preferences that may apply to any outstanding shares of preferred stock and contractual restrictions, holders of our new common stock are entitled to receive ratably dividends or other distributions when and if declared by Wellman's board of directors. In addition to such restriction, whether any future dividends are paid to our stockholders will depend on decisions that will be made by Wellman's board of directors and will depend on then existing conditions, including Wellman's financial condition, contractual restrictions, corporate law restrictions, capital requirements and business prospects. The ability of Wellman's board of directors to declare dividends also will be subject to the rights of any holders of outstanding shares of Wellman's preferred stock and the availability of sufficient funds under the DGCL to pay dividends. For a more complete description of the dividend rights of holders of shares of Wellman's preferred stock, see "Blank Check Preferred Stock" below.

*Blank Check Preferred Stock*

Under the terms of the amended and restated certificate of incorporation, the Wellman board of directors will be authorized to issue from time to time up to an aggregate of 200,000 shares of preferred stock in one or more series and to fix or alter the designations, preferences, rights and any qualifications, limitations or restrictions of the shares of each series, including the dividend rights, dividend rates, conversion rights, voting rights, rights and terms of redemption (including sinking fund provisions), redemption price or prices, liquidation preferences and the number of shares constituting any series. These additional shares may be used for a variety of corporate purposes, including future public offerings, to raise additional capital or to facilitate acquisitions. If Wellman's board of directors decides to issue shares to persons supportive of current management, this could render more difficult or discourage an attempt to obtain control of the company by means of a merger, tender offer, proxy contest or otherwise. Authorized but unissued shares also could be used to dilute the stock ownership of persons seeking to obtain control of Wellman.

*Liquidation Preference*

In the event of a liquidation, dissolution or winding up of Wellman, after the payment in full of all amounts owed to Wellman's creditors and, in the event that preferred stock is issued post-emergence, holders of any outstanding shares of Wellman's preferred stock, the remaining assets of Wellman will be distributed ratably to the holders of shares of new common stock. The rights, preferences and privileges of holders of shares of new common stock are subject to, and may be adversely affected by, the rights of the holders of shares of any series of preferred stock which Wellman may designate and issue in the future without stockholder approval.

**Transfer Agent and Registrar**

The transfer agent and registrar for Wellman's common stock will be determined prior to the Effective Date of the Plan.

*Limitations on Liability and Indemnification of Directors and Officers*

The DGCL authorizes corporations to limit or eliminate the personal liability of directors to corporations and their stockholders for monetary damages for breaches of directors' fiduciary duties. The New Certificate of Incorporation limits the liability of directors to the fullest extent permitted by the DGCL. In addition, the New Bylaws provide that Wellman must indemnify our directors and officers to the fullest extent permitted by the DGCL. The New Certificate of Incorporation includes a provision that eliminates the personal liability of a director to Wellman for monetary damages for breach of fiduciary duty that results in a personal benefit as a director, except for liability (i) for any breach of the director's duty of loyalty to Wellman or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the DGCL, or (iv) for any transaction from which the director derived an improper personal benefit.

The limitation of liability and indemnification provisions in the New Certificate of Incorporation and the New Bylaws may discourage stockholders from bringing a lawsuit against directors for breach of their fiduciary duty. These provisions may also have the effect of reducing the likelihood of derivative litigation against directors and officers, even though such an action, if successful, might otherwise benefit us and our stockholders. In addition, your investment may be adversely affected to the extent we pay the costs of settlement and damage awards against directors and officers pursuant to these indemnification provisions.

## Summary of Legal Proceedings

Because of the size and nature of Wellman's businesses, Wellman is party to numerous legal proceedings. Most of these legal proceedings have arisen in the ordinary course of Wellman's business and involve claims for money damages. Whether these claims are or will be liquidated or resolved in the Bankruptcy Court or in some other jurisdiction depends upon the nature of the claims and the debt arising therefrom. Generally, if the debt underlying such claims was incurred by one of the Debtors prior to the date the Plan is confirmed, such debt, in accordance with section 1141 of the Bankruptcy Code, will be discharged through bankruptcy, depending upon the nature of the relief sought, regardless of whether the claim is liquidated and resolved before or after the Effective Date. Claims arising from conduct occurring after the effective date, unless provided for under the Plan, generally are not dischargeable through bankruptcy, and will be handled by Wellman in the ordinary course of its business after emergence.

Following is a summary of Wellman's significant legal proceedings:[11]

### *Legal Proceedings in the Bankruptcy Court*

    (i)      Avoidance Actions

A number of transactions occurred prior to the Petition Date that may have given rise to claims, including preference actions, fraudulent transfer and conveyance actions, rights of setoff and other claims or causes of action under sections 510, 544, 547, 548, 549, 550 and/or 553 of the Bankruptcy Code and other applicable bankruptcy or non-bankruptcy law (collectively, the "Avoidance Actions").

---

[11]  This summary is not intended as an exhaustive description of all pending legal matters or proceedings in which Wellman or its Debtor and non-Debtor affiliates are involved. Certain legal proceedings may be subject to appeal in or outside the Bankruptcy Court. Nothing in this discussion is deemed to be an admission by Wellman or any of their Debtor or non-Debtor affiliates of any liability or wrongdoing. Please consult Wellman's Schedule of Liabilities and Statement of Financial Affairs, which were filed with the Bankruptcy Court on April 24, 2008, for additional information.

Pursuant to section 546(a) of the Bankruptcy Code, the statute of limitations with respect to the commencement of avoidance or recovery actions under sections 544, 545, 547, 548, and 553 of the Bankruptcy Code will expire on February 22, 2010, *i.e.*, two years after the Petition Date.

(ii)    Preference Actions

Under sections 547 and 550 of the Bankruptcy Code, a debtor may seek to avoid and recover certain prepetition payments and other transfers made by the debtor to or for the benefit of a creditor in respect of an antecedent debt, if such transfer (i) was made when the debtor was insolvent and (ii) enabled the creditor to receive more than it would receive in a hypothetical liquidation of the debtor under Chapter 7 of the Bankruptcy Code where the transfer had not been made. Transfers made to a creditor that was not an "insider" of the debtor are subject to these provisions generally only if the payment was made within 90 days prior to the debtor's filing of a petition under chapter 11 of the Bankruptcy Code (the "Preference Period"). Under section 547 of the Bankruptcy Code, certain defenses, in addition to the solvency of the debtor at the time of the transfer and the lack of preferential effect of the transfer, are available to a creditor from which a preference recovery is sought. Among other defenses, a debtor may not recover a payment to the extent such creditor subsequently gave new value to the debtor on account of which the debtor did not, among other things, make an otherwise unavoidable transfer to or for the benefit of the creditor. A debtor may not recover a payment to the extent such payment was part of a substantially contemporaneous exchange between the debtor and the creditor for new value given to the debtor. Further, a debtor may not recover a payment if such payment was made, and the related obligation was incurred, in the ordinary course of business of both the debtor and the creditor. The debtor has the initial burden of proof in demonstrating the existence of all the elements of a preference and is presumed to be insolvent during the Preference Period. The creditor has the initial burden of proof as to the aforementioned defenses.

(iii)    Fraudulent Transfer and Conveyance Actions

Generally, a conveyance or transfer is fraudulent if: (i) it was made with the actual intent to hinder, delay or defraud a creditor (*i.e.*, an intentional fraudulent conveyance); or (ii) reasonably equivalent value was not received by the transferee in exchange for the transfer and the debtor was insolvent at the time of the transfer, was rendered insolvent as a result of the transfer or was left with insufficient capitalization as a result of the transfer (*i.e.*, a constructive fraudulent conveyance). Two primary sources of fraudulent conveyance law exist in a chapter 11 case.

(A)    Section 548 of the Bankruptcy Code

The first source of fraudulent conveyance law in a chapter 11 case is section 548 of the Bankruptcy Code, under which a debtor in possession or bankruptcy trustee may avoid fraudulent transfers that were made or incurred on or within one year before the date that a bankruptcy case is filed.

(B)    Section 544 of the Bankruptcy Code

The second source of fraudulent conveyance law in a chapter 11 case is section 544 of the Bankruptcy Code—the so-called "strong-arm provision"—under which the debtor in possession (or creditors with Bankruptcy Court permission) may have the rights of a creditor under state law to avoid transfers as fraudulent. State fraudulent conveyance laws generally have statutes of limitations longer than one year and are applicable in a bankruptcy proceeding pursuant to section 544 of the Bankruptcy Code if the statute of limitations with respect to a transfer has not expired prior to the filing of the bankruptcy case. If such statute of limitations has not expired, the debtor in possession (or creditors with Bankruptcy Court permission) may bring the fraudulent conveyance claim within the time period permitted by section 546 of the Bankruptcy Code notwithstanding whether the state statute of limitations period expires prior to the expiration of such time.

***Pending Legal Proceedings outside the Bankruptcy Court***

(i)        The Eastman Litigation

In 2007, Eastman Chemical Company ("Eastman") introduced two new PET resin brands to the market: ParaStar 4000 and ParaStar 7000. These new resins are manufactured at Eastman's Integrex processing plant in South Carolina. In June of 2007, Wellman obtained samples of Eastman's new resins from two of Eastman's customers. Wellman analyzed these new Eastman resins and concluded that they infringed upon proprietary Wellman technology involving its slow-crystallizing PET resin.

Accordingly, on September 24, 2007, Wellman filed a patent infringement action against Eastman Chemical Company for infringement of U.S. Patent No. 7,094,863 and U.S. Patent No. 7,129,317 (the "Patents") in the United States District Court for the District of Delaware (the "Delaware Court") (C.A. No. 07-585 (SLR)). The suit specifically alleges that Eastman's new ParaStar resins and bottle preforms made from those resins infringe the Patents.

In response, along with its answer, Eastman denied infringement of the Wellman patents and asserted nine counterclaims, including claims seeking declaratory judgments that the Patents are invalid, not infringed and/or are unenforceable. Eastman also asserted counterclaims, seeking relief for alleged acts of tortious interference with contract, abuse of process and unfair competition (under both state and Federal law) for instituting, maintaining, and publicizing the litigation in bad faith and in a deceptive manner. Eastman also asserted in its Answer that Wellman instituted the litigation without proper investigation and without any reasonable basis for believing that Eastman had infringed the Wellman Patents.

Wellman filed its answer to Eastman's counterclaims on December 20, 2007. On January 2, 2008, Wellman filed a Motion for Preliminary Injunction to enjoin Eastman's manufacture and sale of products falling within the scope of the claims of the patents-in-suit. On May 28, 2008, Eastman filed a brief in opposition to Wellman's Motion for Preliminary Injunction. In their brief, Eastman asserted that Wellman did not invent slow-crystallizing catalysts for PET resins, and the inventors of the Wellman Patents admitted that certain claimed elements of the Wellman Patents were known in the prior art. In this regard, Eastman identified several prior art products including resins made by Akzo Nobel, Zimmer and Eastman itself, as well as a prior art Japanese patent to Mitsubishi. Eastman also asserted that the Wellman Patents are invalid as in-definite because they fail to specify how to test for certain claimed elements including peak crystallization temperature, luminosity and absorbance. Eastman also asserted that the Wellman Patents are invalid because they do not disclose the best mode of practicing the claimed invention and for lack of an enabling disclosure.

On June 24, 2008, Wellman filed a Reply Brief in Support of its Motion for Preliminary Injunction. In that brief, Wellman narrowed the focus of the inquiry in the preliminary injunction proceeding to the involved claims of the '863 patent (e.g., Claim 15), which are directed to the preforms for making blow molded bottles, as opposed to the resins per se. Wellman stated that bottle preforms made of ParaStar 4000 and ParaStar 7000 resins infringe at least claim 15 of the '863 Patent. Wellman also stated that the involved patent claims are not indefinite because the written specification of the Patents adequately explain how to measure each of the claimed elements including, peak crystallization temperature, luminosity and absorbance. Wellman also stated that the involved claims are not anticipated by the prior art references cited by Eastman, because none of the references disclose, either expressly or inherently, each and every element of the involved claims. Wellman also stated that the involved claims are enabled because the specifications of the Patents teach those skilled in the art how to make and use the invention without undue experimentation. Wellman also stated that if its Ti818 resin was indeed the best mode of practicing the claimed invention at the time the Patents were filed, then the specification of the Patents provide an enabling disclosure of that resin.

On June 26, 2008, the Delaware Court heard oral arguments on Wellman's Motion for a Preliminary Injunction, including Eastman's response to Wellman's Reply Brief in Support of its Motion for Preliminary Injunction. On October 3, 2008, the Delaware Court entered an order denying Wellman's Motion for a Preliminary Injunction. (*Wellman, Inc. v. Eastman Chemical Co.*, No. 07-585 (D. Del. October 3, 2008)), a copy of which may be viewed at www.kccllc.net/wellman.

42

Wellman is involved in various claims and legal actions arising in the ordinary course of business. Wellman does not believe the ultimate disposition of these ordinary course claims and legal actions will have a material adverse effect on Wellman's consolidated financial position, results of operations, or confirmation of the Plan. For additional information regarding the pending claims and legal actions see Wellman's Schedule of Liabilities and Statement of Financial Affairs, which were filed with the Bankruptcy Court on April 24, 2008.

## Projected Financial Information

Attached as Exhibit C is a projected consolidated income statement, which includes the following: (A) Wellman's consolidated historical financial statement information for the period ended December 31, 2007; and (B) consolidated projected financial statement information (the "Projections") for the period from 2008 through 2012 (the "Projection Period"). The Projections assume an effective date of November 30, 2008, and, for the year 2008, include eight months of actual results and four months of projected results for Wellman and Reorganized Wellman, as the case may be (September through December).

The projections have been prepared by Wellman's management with the assistance of Lazard, Wellman's financial advisors. Such projections were not prepared to comply with the guidelines for prospective financial statements published by the American Institute of Certified Public Accountants and the rules and regulations of the United States Securities and Exchange Commission. In assisting in the preparation, Lazard relied upon the accuracy and completeness of financial and other information furnished by Wellman's management and third parties, as well as publicly-available information, and portions of the information herein may be based upon certain statements, estimates and forecasts provided by Wellman and third parties with respect to the anticipated future performance of Reorganized Wellman. Lazard did not attempt independently to audit or verify such information. Neither Wellman nor Lazard conducted an independent investigation into any of the legal, tax or accounting matters affecting Wellman or reorganized Wellman and, therefore, neither makes any representation as to their impact on Wellman or Reorganized Wellman from a financial point of view. Further, Wellman's independent accountants have neither examined nor compiled the accompanying actual results and projections and, accordingly, do not express an opinion or any other form of assurance with respect to the projections, assume no responsibility for the projections and disclaim any association with the projections. Except for purposes of this disclosure statement, Wellman does not publish projections of its anticipated financial position or results of operations.

The projections contain certain statements that are "forward-looking statements" within the meaning of the private securities litigation reform act of 1995. These statements are subject to a number of assumptions, risks, and uncertainties, many of which are and will be beyond the control of reorganized Wellman, including the implementation of the Plan, the continuing availability of sufficient borrowing capacity or other financing to fund operations, achieving operating efficiencies, currency exchange rate fluctuations, existing and future governmental regulations and actions of government bodies, natural disasters and unusual weather conditions and other market and competitive conditions. Holders of claims are cautioned that the forward-looking statements speak as of the date made and are not guarantees of future performance. Actual results or developments may differ materially from the expectations expressed or implied in the forward-looking statements, and Wellman and reorganized Wellman undertake no obligation to update any such statements.

The projections, while presented with numerical specificity, are necessarily based on a variety of estimates and assumptions which, though considered reasonable by Wellman, may not be realized and are inherently subject to significant business, economic, competitive, industry, regulatory, market and financial uncertainties and contingencies, many of which are and will be beyond reorganized Wellman's control. Wellman cautions that no representations can be made or are made as to the accuracy of the historical financial information or the projections or to reorganized Wellman's ability to achieve the projected results. Some assumptions may prove to be inaccurate. Moreover, events and circumstances occurring subsequent to the date on which these projections were prepared may be different from those assumed, or, alternatively, may have been unanticipated, and thus the occurrence of these events may affect financial results in a materially adverse or materially beneficial manner. Wellman and reorganized Wellman do not intend and undertake no obligation to update or otherwise revise the projections to reflect events or circumstances existing or arising after the date this disclosure statement is initially filed or to reflect the occurrence of unanticipated events. The projections, therefore, may not be relied upon as a guaranty or other assurance of the actual results that will occur. In deciding whether to vote to accept or reject the Plan, holders of

claims or interests must make their own determinations as to the reasonableness of such assumptions and the reliability of the projections.

Creditors and other interested parties should see the section entitled "Risk Factors" of the Disclosure Statement for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

The projections have been prepared based on assumption that the Effective Date of the Plan is November 30, 2008 and assume the successful implementation of, Reorganized Wellman's business plan. Although Wellman presently intends to cause the Effective Date to occur as soon as practical following confirmation of the Plan, there can be no assurance as to when the Effective Date will actually occur given the conditions for the Effective Date to occur pursuant to the terms of the Plan.

The projections are based on, among other things: (a) current and projected market conditions in each of Reorganized Wellman's respective markets; (b) the ability to maintain sufficient working capital to fund operations; and (c) confirmation of the Plan.


## Risk Factors

*Holders of claims and interests should read and consider carefully the risk factors set forth below, as well as the other information set forth in this Disclosure Statement and the documents delivered together herewith, referred to or incorporated by reference herein, prior to voting to accept or reject the Plan. Although these risk factors are many, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.*

**Class 2 or Class 3 may vote to reject the Plan.**

Wellman cannot seek to confirm this plan over the rejection of either Class 2 or Class 3. Accordingly, to confirm the Plan, Wellman must satisfy section 1129(a)(7)(A)(i) of the Bankruptcy Code with respect to both Class 2 and Class 3. Pursuant to section 1126(c) of the Bankruptcy Code, section 1129(a)(7)(A)(i) of the Bankruptcy Code will be satisfied with respect to Class 2 and Class 3 if at least two-thirds in amount and more than one-half in number of the allowed claims that vote in such Class, vote to accept the Plan. There is no guarantee that Wellman will receive the necessary acceptances from holders of claims in either Class 2 or Class 3, and if Class 2 or Class 3 votes to reject the Plan, Wellman will immediately proceed with a liquidation.

**The aggregate amount of Allowed General Administrative Claims may exceed $28 million.**

A condition precedent to the confirmation of the Plan is that the aggregate amount of Cash required to pay Allowed General Administrative Claims does not exceed $28 million. Based on the asserted and scheduled claims, the Debtors current estimate of the aggregate amount of Allowed General Administrative Claims is $60,703,503. The majority of this amount is comprised of claims asserted by Wellman's two largest raw material suppliers. Specifically, BP asserted claims in the amount of $46.6 million and Equistar Chemicals, LP ("Equistar") asserted a claim in the amount of $11.4 million. Accordingly, these creditors will need to reduce the amount of their claims to enable Wellman to satisfy the $28 million threshold amount. Wellman will request the appropriate reductions with BP, Equistar, and others, but there is no guarantee that Wellman will ultimately be successful in obtaining the necessary reductions.

In addition, Wellman terminated a significant number of its employees at Palmetto and Fort Mill in connection with the operational restructuring. A number of these terminated employees sent letters to the Bankruptcy Court taking issue with modifications made to Wellman's severance plans. On October 24, 2008, the Bankruptcy Court entered the Modified Order (A) Setting Bar Date for Filing Proofs of Claim Relating to Post-Petition Severance Obligations, (B) Approving the Form and Manner for Filing Such Proofs of Claim and (C) Approving Notice Thereof (Docket No. 609), which established November 17, 2008 as the bar date for employees who were

terminated on or after September 16, 2008, to file claims for post-petition severance obligations. While Wellman believes that there is no basis for any of the terminated employees to assert a claim for additional severance amounts, to the extent such claims exist they would be General Administrative Claims. Accordingly, in the event that the Bankruptcy Court finds that any of the employees' post-petition severance claims are allowed, Wellman may not be able to satisfy the $28 million threshold amount.

**We depend on our management and employees.**

Our success is largely dependent on the skills, experience, and efforts of our people. While we believe that we have excellent depth throughout all levels of management and in all key skill levels of our employees, the loss of the services of one or more members of our senior management or of numerous employees with critical skills could have a negative effect on our business, financial condition and results of operations. If we are not able to attract talented, committed individuals to fill vacant positions when needs arise, it may adversely affect our ability to fully implement our business objectives.

**Competition could adversely affect our performance.**

Our businesses compete on a variety of factors such as price, product quality, performance or specifications, continuity of supply, customer service, and breadth of product line. Major competitors include diversified industrial companies, which are larger or have greater financial resources. Changes in a competitor's business behavior may adversely affect our financial performance.

**Reduced raw material margins could adversely affect our operating results.**

Raw material margin, which is the difference between our net selling price and the cost of our raw materials, is an extremely important factor in determining our operating results. Selling prices are influenced by competition and capacity utilization, which is the demand for product from North American Free Trade Agreement, ("NAFTA") producers divided by total NAFTA industry capacity. Demand for our product is determined principally by our end-use markets, substitution of our product for other products, economic conditions, imports, and our products' competitive cost positions. Supply is determined by worldwide capacity, which is expanding for PET resin. Any reduction of selling prices, failure to achieve announced selling price increases, or any significant expansion in capacity over demand could reduce our operating results. Any increase in raw material costs (see "Our operations are dependent on the availability and cost of our raw materials" below) without a corresponding increase in selling price would reduce our raw material margins and operating results. A material change in demand, supply, general economic conditions or uncertainties regarding future economic prospects could have a material adverse effect on our operating results.

**Our operations are dependent on the availability and cost of our raw materials.**

Our operations are substantially dependent on the availability and cost of our two primary raw materials, PTA and MEG, and to a lesser extent our recycled raw materials. We currently rely on a single producer for our domestic supply of PTA and a small number of sources for MEG. The effect of the loss of any producer, a disruption in their businesses or a failure to meet our product needs on a timely basis would depend primarily upon the length of time necessary to find a suitable alternative source. Temporary shortages in needed raw materials could have a material adverse effect on our results of operations. We cannot be sure that we would be able to secure an alternative source of supply at a competitive cost in a timely manner if any of these situations were to occur. The prices of PTA and MEG, purchased pursuant to long-term contracts, have fluctuated in the past and are expected to fluctuate in the future.

Recycled raw materials are purchased from many different suppliers. The prices of recycled raw materials are variable and determined by regional and worldwide supply and demand.

45

**Reduced sales volume could adversely affect our operating results.**

Sales volume is another important factor in determining our operating results. Our sales volume is influenced by competition and customer demand. A material change in demand, supply, or general economic conditions and uncertainties regarding our future economic viability or ownership could have a material adverse effect on our sales volume and negatively impact our unit costs and operating results.

**Risks Associated with only operating Pearl River.**

Wellman faces certain risks relating to the transfer of 100% of the Debtors' PET resin production to Pearl River. Specifically, Wellman's production and distribution of PET will be less diversified -- i.e., Wellman will not have an alternative source of PET resin supply for their customers if there is any production stoppage at Pearl River or if distribution from such facility becomes impossible or impracticable. Moreover, Pearl River also faces a higher risk of hurricane damage than Palmetto because Pearl River is located directly on the water.

**Increases in costs could adversely affect our operating results.**

Our inability to maintain our cost structure and efficiently operate our manufacturing facilities may reduce our operating results. In addition, increases in certain non-controllable costs where the expense we incur may change based on external factors may reduce our operating results. Examples of these costs are energy, insurance and taxes. Energy costs are impacted by changes in petrochemical costs and, as these increase, our cost of natural gas, electricity, and fuel oil increases and may reduce our operating results by increasing our production costs. Insurance costs change depending on the market and our experience.

**Prices and volumes of PET resin imports could adversely impact our margins.**

NAFTA manufacturers of PET resin could be severely impacted by imports of PET resins products, principally from Asian countries. Imports of PET resin have already and may continue to decrease our margins. The price and volume of imports have and could continue to significantly impact our operating results.

**The financial condition of our customers impacts our operating results.**

Our customers include manufacturers of plastic containers. One customer represented approximately 16% of our chemical-based segment's total net sales for 2007 and 15% of our total net sales for 2007. Five customers represented approximately 49% of our Chemical Segment's total net sales for 2007 and 46% of our total net sales for 2007. If our customers have financial difficulties, this could affect our operating results by decreasing our sales and/or resulting in the uncollectibility of accounts receivable.

**Additional liabilities may be proposed by tax authorities.**

We have entered into global tax planning initiatives in the normal course of our business. These initiatives are subject to normal review by tax authorities. It is possible that additional liabilities may be proposed by tax authorities as a result of these reviews and that some of the reviews could be resolved unfavorably.

**Actual costs for environmental matters may vary from the estimates.**

Actual costs and future estimated costs for identified environmental situations may change. Given the inherent uncertainties in evaluating environmental exposures due to unknown conditions, changing government regulations and legal standards regarding liability and evolving related technologies, we could have higher future environmental expenditures than we have estimated.

**Natural disasters could disrupt our business and affect our operating results.**

Natural disasters, such as hurricanes, floods, and tornadoes, have disrupted our business and our suppliers' and customers' businesses in the past and could disrupt these businesses in the future and affect our operating results.

**Transfers of our equity, or any issuances of equity in connection with our reorganization, may impair our ability to utilize our federal income tax net operating loss carry-forwards in the future.**

Under the federal income tax law, net operating loss carry-forwards can be utilized to reduce future taxable income subject to certain limitations if we were to undergo an ownership change as defined by the Internal Revenue Code. If an ownership change occurred as a result of transactions in our stock prior to our reorganization, our ability to utilize our NOL carryforwards would be significantly limited.

**The conditions precedent to the confirmation and consummation of the plan may not occur.**

As more fully set forth in Exhibit A, the occurrence of confirmation of the Plan and the effective date of the Plan are each subject to a number of conditions precedent. If the conditions precedent to confirmation are not met or waived, the Plan will not be confirmed; and if the conditions precedent to the effective date are not met or waived, the effective date will not take place.

**The valuation of Wellman may be reduced if Wellman is unable to obtain trade credit.**

The $206 million midpoint equity value of Wellman, on an as-converted basis, assumes a return of trade credit after the Effective Date. In the event that Wellman is unable to obtain any trade credit, the midpoint equity value will be reduced.

**The recovery for holders of the General Unsecured Claims against Wellman may be diluted and the ultimate amount of allowed claims against Wellman may not be finalized until after the Effective Date.**

Approximately 1,825 proofs of claim have been filed to date. The Bar Date for filing proofs of claim was July 29, 2008. The Debtors are currently in the process of analyzing and evaluating these claims, and will file objections to claims where appropriate.

Despite Wellman's efforts, its claim estimates could prove incorrect. In addition, the outcome of certain pending litigation proceedings, as further described in "Summary of Legal Proceedings," which begins on page 36 herein, may decrease the ultimate recovery for certain holders of claims. Further, if the Bankruptcy Court were to determine that certain claims may not be reclassified as Equity Interests or that certain claims that Wellman believes to be general unsecured claims are determined by the Bankruptcy Court to constitute priority claims or claims entitled to payment in full based on the Bankruptcy Court's finding of an administrative priority with respect to such claims or that a particular claim is not dischargeable, the recovery for holders of general unsecured claims could be less than estimated. In addition, to the extent that Holders of General Administrative Claims agree to have a portion of their Claims treated as General Unsecured Claims, the recovery for Holders of General Unsecured Claims could be diluted.

**Wellman may not be able to achieve its projected financial results.**

The financial projections set forth on Exhibit C to this Disclosure Statement represent Wellman management's best estimate of Wellman's future financial performance based on currently known facts and assumptions about Wellman's future operations as well as the U.S. and world economy in general and the industry segments in which Wellman operates in particular. Wellman's actual financial results may differ significantly from the projections. If Wellman does not achieve its projected financial results, the trading prices of the new common stock may be negatively affected and Wellman may lack sufficient liquidity to continue operating as planned after the effective date of the Plan.

**A liquid trading market for the New Common Stock is unlikely to develop.**

A liquid trading market for the new common stock is unlikely to develop. As of the effective date, the new common stock will not be listed for trading on any stock exchange or trading system and Reorganized Wellman will not file any reports with the SEC. Consequently, the trading liquidity of the new common stock will be limited. The future liquidity of the trading market for the new common stock will depend, among other things, upon the number of holders of new common stock, whether the stock is listed for trading on an exchange, and whether Reorganized Wellman becomes a public reporting company at some later date.

**Certain holders of First Lien Term Loan Claims or Second Lien Term Loan Claims may acquire a substantial amount of New Common Stock upon consummation of the Plan.**

During the Chapter 11 Cases, there is no limitation on the trading of claims. Accordingly, upon consummation of the Plan, certain holders of claims are likely to receive distributions of the New Common Stock representing a substantial amount of the outstanding shares of the New Common Stock. In addition, certain holders of First Lien Term Loan Claims or Second Lien Term Loan Claims may already hold a sufficiently sizeable position that they may receive a distribution of a significant percentage of the New Common Stock, and thus could be in a position to control the outcome of actions requiring stockholder approval, including, among other things, election of directors. This concentration of ownership could also facilitate or hinder a negotiated change of control of Wellman and, consequently, impact the value of the New Common Stock. Furthermore, the possibility that one or more holders of a significant number of shares of New Common Stock may sell all or a large portion of its shares of new common stock in a short period of time may adversely affect the trading prices of the New Common Stock.

**There is the potential that significant amounts of various securities will be held by the Backstop Parties.**

Under the Plan, the Backstop Parties will own significant amounts of the New Common Stock and may own significant amounts of the Convertible Notes. Depending upon the outcome of the Rights Offering, the Backstop Parties have agreed to purchase all Rights not otherwise purchased by the holders of the First Lien Term Loan Claims and Second Lien Term Loan Claims in the Rights Offering. The Backstop Parties are also entitled to the Backstop Fee of $15 million in Convertible Notes. The Convertible Notes are convertible into 60% of the outstanding New Common Stock, as of the Effective Date of the Plan. In addition, and as further set forth on page 31 of this Disclosure Statement describing the composition of the New Board of Wellman Holdings, the Backstop Parties will designate four (4) of the seven (7) initial members of the New Board of Wellman Holdings,. Moreover, in accordance with the Plan and the Backstop Commitment Agreement, any and all documents related to the Plan, including the Plan itself, must be acceptable to the Backstop Parties, including the Registration Rights Agreement. It is possible that the Backstop Parties will own significant amounts of the New Common Stock and Convertible Notes and thus will be able to significantly influence the management and affairs of Wellman Holdings, and all matters requiring the vote or approval of holders of any of such securities. From and after the Effective Date, the Backstop Parties may have interests that differ from those of other holders of New Common Stock and Convertible Notes. Pursuant to the proposed terms of the Convertible Notes, attached to the Backstop Commitment Agreement as Exhibit A, if the holders of at least 60% in principal amount of the Convertible Notes convert their Notes into New Common Stock, then all remaining outstanding Convertible Notes shall be automatically converted at the then-applicable conversion price. Depending upon the outcome of the Rights Offering, the Backstop Parties may be in a position to control whether this automatic conversion is triggered. In addition, the Backstop Parties' potential ownership of significant amounts of New Common Stock and Convertible Notes may have the effect of delaying, deferring, or preventing an acquisition of Wellman Holdings and/or its subsidiaries and may adversely affect the market price, if any, of such securities.

**Certain tax consequences of Wellman's Plan raise unsettled and complex legal issues and involve various factual determinations.**

Some of the material consequences of the Plan regarding United States federal income taxes are summarized under "Certain U.S. Federal Income Tax Consequences of the Plan." Many of these tax issues raise unsettled and complex legal issues, and also involve various factual determinations, such as valuations, that raise additional uncertainties. No ruling from the U.S. Internal Revenue Service ("IRS") has been or will be sought by Wellman or Wellman regarding the tax consequences described in this Disclosure Statement. The IRS may

challenge the various positions Wellman or Wellman has taken, or intends to take, with respect to its tax treatment, and a court may sustain such a challenge or objection by the IRS. For a more detailed discussion of risks relating to the specific positions Wellman or Wellman intends to take with respect to various tax issues, please review "Certain U.S. Federal Income Tax Consequences of the Plan.," which begins on page 61.

**The change of control produced by the restructuring of Wellman will result in a limitation on or a loss of the net operating losses.**

As further discussed in this Disclosure Statement under "Trading Restrictions to Preserve Wellman's Net Operating Loss Income Attributes," the issuance under the Plan of the new common stock, along with the cancellation of existing Equity Interests through the Plan, is expected to cause an ownership change to occur with respect to the Reorganized Debtors as of the effective date. As a result, Section 382 of the Internal Revenue Code ("IRC") will limit Wellman's use of its consolidated net operating losses after the effective date. Additionally, Wellman's ability to use any other tax benefits including tax credits may be limited. The annual limitation imposed by the particular provision of Section 382 of the IRC that Wellman expects to apply to its ownership change generally equals the product of (a) the fair market value of the net equity value of Wellman's stock at the time of the ownership change, taking into account the increase in value of the corporation as a result of the surrender or cancellation of creditor's claims in the transaction (rather than the value without taking into account such increases, as is the case under the general rule for non-bankruptcy ownership changes) multiplied by (b) the long-term tax-exempt rate in effect for the month in which the ownership change occurs. The long-term tax-exempt rate is published monthly by the IRS and is intended to reflect current interest rates on long-term tax-exempt debt obligations. Accordingly, under this rule the Section 382 limitation would generally reflect the increase in the value of Wellman's stock resulting from the conversion of debt to equity in the proceeding. Section 383 of the IRC applies a similar limitation to other tax benefits and tax credits. Although it is impossible to predict with absolute certainty the net equity value of Wellman immediately after the exchanges contemplated by the Plan, Wellman's use of its net operating losses will be substantially limited after those exchanges.

**Wellman's charter and bylaws could deter takeover attempts that some shareholder may consider desirable, which could adversely affect the price of the New Common Stock.**

Various provisions of Wellman's amended certificate of incorporation and amended and restated bylaws, and Delaware law, could make acquiring control of Wellman without the requisite support of its board of directors difficult for a third party, even if the change of control would be beneficial to a recipient of the New Common Stock. The existence of these provisions and/or an antitakeover rights plan could deprive certain recipients of the New Common Stock of an opportunity to sell their shares of New Common Stock at a premium over the prevailing market price. The potential inability of holders of New Common Stock to obtain a control premium could, in certain instances, depress any future trading prices of New Common Stock.

**One or more patent claims asserted against Eastman could be held invalid.**

As described on page 42 herein, Wellman has asserted certain claims against Eastman relating to its U.S. patents directed to slow-crystallizing PET resin and bottle performs and Eastman has raised certain affirmative defenses and counterclaims with respect to the asserted patent claims. One or more of the asserted patent claims could be held invalid based upon one or more of the defenses and/or counterclaims raised by Eastman. An invalid patent claim would not present a barrier to entry into the U.S. market with respect to Wellman's slow-crystallizing PET resin and bottle performs as set forth in said claim.

**No distributions may be made from the Distribution Trust if the Debtors are not successful in the applicable litigation.**

The causes of action held by the Distribution Trust or to which the Distribution Trust is entitled to the proceeds therefrom, including the Eastman Litigation, may not be successful and there is no guarantee that the trust will ever make distributions to the holders. Because interests in the Distribution Trust are the only consideration being distributed to holders of general unsecured claims, there is a possibility that holders of general unsecured claims will not receive any recovery. In addition, the Plan provides that the Second Lien Lenders will receive 90%

of the Distribution Trust. As a result, a portion of their recovery is also at risk if the Debtors are not successful in the assigned litigation.

**The Rights Offering may not be fully funded.**

Wellman is relying on the $90 million in proceeds received from the Rights Offering to fund its obligations under the Plan. As such, a condition precedent to the Effective Date of the Plan is that the Rights Offering is consummated and fully funded. Wellman anticipates entering into the Backstop Commitment Agreement with the Backstop Parties, which will ensure that the Rights Offering will be fully funded. In the event that (i) Wellman does not enter into the Backstop Commitment Agreement and (ii) the Rights Offering is not fully subscribed to by the Holders of First Lien Term Loan Claims and Second Lien Term Loan Claims that are "accredited investors," Wellman will not be able to fund the Plan. In such an event, Wellman would immediately to proceed to a liquidation. If the Backstop Commitment Agreement is executed, it will be included in the Plan Supplement.

## Confirmation Of The Plan

### The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan of Reorganization. Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to confirmation of the Plan of Reorganization.

The Bankruptcy Court has scheduled the confirmation hearing for [_____], 2008 at 10:00 a.m. (Eastern Time) before the Honorable Stuart M. Bernstein, United States Bankruptcy Judge, in the United States Bankruptcy Court for the Southern District of New York, located at Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004. The confirmation hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the confirmation hearing or any adjournment thereof.

### Deadline To Object To Confirmation

Objections to the Bankruptcy Court's confirmation of the Plan must be filed and served at or before 5:00 p.m. Eastern Time on [_____], 2008 in accordance with the notice of the confirmation hearing that accompanies this Disclosure Statement. **UNLESS OBJECTIONS TO CONFIRMATION ARE TIMELY SERVED AND FILED, THEY MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

### Requirements For Confirmation Of The Plan

Among the requirements for the confirmation of the Plan are that the Plan (1) is accepted by all impaired classes of claims and equity interests, or if rejected by an impaired class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such class, (2) is feasible, and (3) is in the "best interests" of holders of claims and equity interests that are impaired under the Plan.

Requirements of Section 1129(a) of the Bankruptcy Code

The following requirements must be satisfied pursuant to section 1129(a) of the Bankruptcy Code before the Bankruptcy Court may confirm a plan of reorganization:

- The plan complies with the applicable provisions of the Bankruptcy Code.

- The proponents of the plan comply with the applicable provisions of the Bankruptcy Code.

- The plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made by the proponent, by the debtor or by a person issuing securities or acquiring property under a plan, for services or for costs and expenses in or in connection with the

50

case, in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the Bankruptcy Court as reasonable.

- The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor or a successor to the debtor under the plan, and the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security Holders and with public policies.

- The proponent of the plan has disclosed the identity of any insider (as defined in section 101 of the Bankruptcy Code) that will be employed or retained by the reorganized debtor and the nature of any compensation for such insider.

- With respect to each Holder within an impaired class of claims or equity interests —

  - each such Holder (a) has accepted the plan; or (b) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such Holder would so receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code on such date; or

  - if section 1111(b)(2) of the Bankruptcy Code applies to the claims of such class due to its election to retain a lien, each Holder of a claim of such class will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the value of such Holder's interest in the Estate's interest in the property that secures such claims.

- With respect to each class of claims or equity interests, such class (i) has accepted the plan; or (ii) is not impaired under the plan (subject to the "cramdown" provisions discussed below).

- Except to the extent that the Holder of a particular claim has agreed to a different treatment of such claim, the plan provides that:

  - with respect to a claim of a kind specified in sections 507(a)(1) or 507(a)(2) of the Bankruptcy Code, on the effective date of the plan, the Holder of the claim will receive on account of such claim cash equal to the allowed amount of such claim, unless otherwise agreed;

  - with respect to a class of claim of the kind specified in sections 507(a)(3), 507(a)(4), 507(a)(5), 507(a)(6) or 507(3)(7) of the Bankruptcy Code, each Holder of a claim of such class will receive (A) if such class has accepted the plan, deferred cash payments of a value, on the effective date of the plan, equal to the allowed amount of such claim; or (B) if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim; and

  - with respect to a priority tax claim of a kind specified in section 507(a)(8) of the Bankruptcy Code, the Holder of such claim will receive on account of such claim deferred cash payments, over a period not exceeding six years after the date of assessment of such claim, of a value, as of the effective date of the plan, equal to the allowed amount of such claim.

- If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any "insider," as defined in section 101 of the Bankruptcy Code.

- Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

- All fees payable under 28 U.S.C. Section 1930, as determined by the Bankruptcy Court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan.

- The plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code, at the level established pursuant to subsection (e)(i)(B) or (g) of section 1114 of the Bankruptcy Code, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

*Best Interests of Creditors*

Notwithstanding acceptance of the Plan of Reorganization by each impaired class, to confirm the Plan of Reorganization, the Bankruptcy Court must determine that it is in the best interests of each Holder of a claim or interest in any such impaired class that has not voted to accept the Plan of Reorganization. Accordingly, if an impaired class does not unanimously accept the Plan of Reorganization, the "best interests" test requires that the Bankruptcy Court find that the Plan of Reorganization provides to each member of such impaired class a recovery on account of the member's claim or equity interest that has a value, as of the effective date of the Plan of Reorganization, at least equal to the value of the distribution that each such member would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

To estimate what members of each impaired class of claims would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code, the Bankruptcy Court must first determine the aggregate dollar amount that would be available if each of the Chapter 11 Cases were converted to a chapter 7 case under the Bankruptcy Code and each of the respective Debtor's assets were liquidated by a chapter 7 trustee (the "Liquidation Value"). The Liquidation Value of a Debtor would consist of the net proceeds from the disposition of the assets of the Debtor, augmented by any cash held by the Debtor.

The Liquidation Value available to holders of general unsecured claims or equity interests would be reduced by, among other things: (a) the claims of secured creditors to the extent of the value of their collateral; (b) the costs, fees and expenses of the liquidation, as well as other administrative expenses of the Debtors' chapter 7 cases; (c) unpaid administrative expense claims of the Chapter 11 Cases; and (d) priority claims and priority tax claims. The Debtors' costs of liquidation in chapter 7 cases would include the compensation of a chapter 7 trustee, as well as of counsel and other professionals retained by such trustee, asset disposition expenses, applicable taxes, litigation costs, claims arising from the operation of the Debtors during the chapter 7 cases, and all unpaid administrative expense claims incurred by the Debtors during the Chapter 11 Cases that are allowed in the chapter 7 cases. The liquidation itself would trigger certain priority claims, such as claims for severance pay, and would likely accelerate the payment of other priority claims and priority tax claims that would otherwise be payable in the ordinary course of business. These priority claims and priority tax claims would be paid in full out of the net liquidation proceeds, after payment of secured claims, before the balance would be made available to pay other claims or to make any distribution in respect of equity interests.

Based on the liquidation analyses set forth in Exhibit E of this Disclosure Statement, the Debtors believe that holders of claims will receive equal or greater value as of the Effective Date under the Plan than such Holders would receive in a chapter 7 liquidation. Moreover, in an actual liquidation of the Debtors, distributions to holders of claims would be made substantially later than the Effective Date designated in the Plan. This delay would materially reduce the amount determined on a present value basis available for distribution to Holders of General Unsecured Claims. The hypothetical chapter 7 liquidations of the Debtors, for purposes of determination of the Debtors' Liquidation Value, are assumed to commence on November 30, 2008.

In summary, the Debtors and their management believe that chapter 7 liquidations of the Debtors would result in substantial diminution in the value to be realized by Holders of General Unsecured Claims entitled to distribution, as compared to the distributions contemplated under the Plan, because of, among other factors:

- the increased cost and expenses of liquidation under chapter 7 arising from fees payable to the chapter 7 trustee and the attorneys and other professional advisors to such trustee;

52

- additional expenses and Claims, some of which would be entitled to priority and which would be generated during the liquidation and from the rejection of Unexpired Leases and Executory Contracts in connection with the cessation of the Debtors' operations;

- the erosion of the value of the Debtors' assets in the context of an expedited liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail;

- the adverse effects on the salability of portions of the business resulting from the possible departure of key employees and the attendant loss of customers and vendors;

- the cost and expense attributable to the time value of money resulting from a potentially more protracted chapter 7 proceeding than the estimated length of the Chapter 11 Cases; and

- the application of the rule of absolute priority under the Bankruptcy Code to distributions made in a chapter 7 liquidation.

Consequently, the Debtors and their management believe that confirmation of the Plan will provide a substantially greater return to holders of claims than would chapter 7 liquidations.

If the Plan is not confirmed, Wellman may be liquidated pursuant to the provisions of a chapter 11 liquidating plan. In liquidations under chapter 11, Wellman's assets could be sold in an orderly fashion over a more extended period of time than in liquidations under chapter 7. Thus, a chapter 11 liquidation might result in larger recoveries than in a chapter 7 liquidation, but the delay in distributions could result in lower present values received and higher administrative costs. Because a trustee's appointment is not required in a chapter 11 case, expenses for professional fees could be lower than in a chapter 7 case, in which a chapter 7 trustee must be appointed. Any distribution to holders of claims under a chapter 11 liquidation plan probably would be delayed substantially. Most importantly, Wellman believes that any distributions to creditors in a liquidation scenario would fail to capture the significant "going concern" value of their business, which is reflected in the new common stock to be distributed under the Plan. Accordingly, Wellman believes that chapter 11 liquidation would not result in distributions as favorable as those under the Plan.

*Acceptance*

Section 1126(c) of the Bankruptcy Code provides that a class of claims has accepted a plan of reorganization if such plan has been accepted by creditors that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class.

*Feasibility*

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of the plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtors, or any successor to the debtors (unless such liquidation or reorganization is proposed in the plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors have analyzed their ability to meet their respective obligations under the Plan. As part of this analysis, the Debtors have prepared the Projections, as such term is defined in Article X below. Based upon the Projections, the Debtors believe that Wellman will be a viable operation following the Chapter 11 Cases, and that the Plan will meet the feasibility requirements of the Bankruptcy Code.

*Requirements of Section 1129(b) of the Bankruptcy Code*

The Bankruptcy Code permits confirmation of a plan of reorganization even if it is not accepted by each impaired class so long as (a) the plan of reorganization otherwise satisfies the requirements for confirmation, (b) at least one impaired class of claims has accepted the plan of reorganization without taking into consideration the votes of any insiders in such class, and (c) the plan of reorganization is "fair and equitable" and does not "discriminate

unfairly" as to any impaired class that has not accepted such plan. These so-called "cramdown" provisions are set forth in section 1129(b) of the Bankruptcy Code.

(A)    "Fair and Equitable"

The Bankruptcy Code establishes different "cramdown" tests for determining whether a plan is "fair and equitable" to dissenting impaired classes of secured creditors, unsecured creditors and equity interest Holders as follows:

(B)    Secured Creditors

A plan of reorganization is fair and equitable as to an impaired class of secured claims that rejects the plan if the plan provides: (i) that each of the Holders of the secured claims included in the rejecting class (A) retains the liens securing its claim to the extent of the allowed amount of such claim, to the extent of the allowed amount of such claims, whether the property subject to those liens is retained by the debtor or transferred to another entity, and (B) receives on account of its secured claim deferred cash payments having a present value, as of the effective date of the plan of reorganization, at least equal to the value of such Holder's interest in the Estate's interest in such property; (ii) that each of the Holders of the secured claims included in the rejecting class realizes the "indubitable equivalent" of its allowed secured claim; or (iii) for the sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing the claims included in the rejecting class, free and clear of such liens, with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds in accordance with clause (i) or (ii) of this paragraph.

(C)    Unsecured Creditors

A plan of reorganization is fair and equitable as to an impaired class of unsecured claims that rejects the plan if the plan provides that: (i) each Holder of a claim included in the rejecting class receives or retains under the plan property of a value, as of the effective date of the plan of reorganization, equal to the amount of its allowed claim; or (ii) the Holders of claims and equity interests that are junior to the claims of the rejecting class will not receive or retain any property under the plan of reorganization on account of such junior claims or interests.

(D)    Holders of Equity Interests

A plan of reorganization is fair and equitable as to an impaired class of equity interests that rejects the plan if the plan provides that: (i) each Holder of an equity interest included in the rejecting class receives or retains under the plan property of a value, as of the effective date of the plan of reorganization, equal to the greatest of the allowed amount of (A) any fixed liquidation preference to which such Holder is entitled, (B) the fixed redemption price to which such Holder is entitled, or (C) the value of the equity interest; or (ii) the Holder of any equity interest that is junior to the equity interests of the rejecting class will not receive or retain any property under the plan of reorganization on account of such junior interest.

The Debtors believe the Plan is fair and equitable as to holders of claims or Interests in Classes that vote to reject the Plan, or that are deemed to reject the Plan because the Plan provides that their Allowed Claims or Interests will be either unimpaired, or they will receive their "absolute priority" entitlements under the Bankruptcy Code. The Debtors believe the Plan is fair and equitable as to Holders of Unsecured Claims and Equity Interests because holders of claims and Equity Interests junior to Unsecured Claims will not receive or retain any property under the Plan on account of such Claims or Equity Interests, and there are no Classes junior to the Holders of Equity Interests.

(E)    "Unfair Discrimination"

A plan of reorganization does not "discriminate unfairly" if a dissenting class is treated substantially equally to other classes similarly situated and no such class receives more than it is legally entitled to receive for its claims or equity interests.

The Debtors do not believe that the Plan discriminates unfairly against any impaired Class of Claims or Equity Interests. The Debtors believe that the Plan and the treatment of all Classes of Claims and Equity Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation of the Plan.

*Valuation Of Wellman*

In conjunction with formulating the Plan, the Debtors determined that it was necessary to estimate the post-confirmation going concern value of Wellman. Accordingly, such valuation is set forth in Exhibits D and G attached hereto.

*Identity Of Insiders*

Within ten days prior to the Voting Deadline, or as soon thereafter as is practicable, Wellman will file with the Bankruptcy Court a list of proposed directors of Wellman, which list shall set forth the identity of any Insiders proposed to serve as officers or directors of Wellman.

## Effect Of Confirmation Of The Plan

### Preservation of Avoidance Actions

On and after the effective date, certain Avoidance Actions shall be preserved and retained by the Debtors or in the event an Avoidance Action is transferred by the Debtors to the Distribution Trust. Wellman may offset any claim supporting an Avoidance Action against any payment due to any Holder of a claim under the Plan. In addition, if a distribution is made in error, the Debtors can bring an action pursuant to section 502(d) of the Bankruptcy Code to recoup such distribution.

### Retention of Jurisdiction by the Bankruptcy Court

After the effective date of the Plan, the Bankruptcy Court will retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan. In particular, the Bankruptcy Court will keep exclusive jurisdiction to:

- Determine any disputes regarding any claim or interest against Wellman.

- Resolve any matters related to any executory contract or unexpired lease to which Wellman is party.

- Ensure that distributions to holders of allowed claims and interests are accomplished pursuant to the provisions of the Plan;

- Adjudicate, decide, or resolve any contested or litigated matters, and any other matters, and grant or deny any applications involving Wellman that may be pending on the effective date of the Plan;

- Adjudicate, decide, or resolve any and all matters related to any causes of action, including those based in whole or in part on events occurring before or after Wellman filed for bankruptcy;

- Enter and implement such orders as may be necessary or appropriate to consummate the Plan and all documents created in connection with the Plan or this Disclosure Statement;

- Enter an order or final decree concluding or closing the Chapter 11 Cases; and

- Adjudicate any and all disputes arising from or relating to distributions under the Plan.

This list of matters over which the Bankruptcy Court will retain exclusive jurisdiction following the confirmation is not exhaustive. For a full list of the matters over which the Bankruptcy Court retains jurisdiction after the confirmation hearing, please see the Plan annexed hereto as Exhibit A.

(ii)    Term of Bankruptcy Injunction or Stays

(A)    Debtors' Injunction

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR FOR OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS OR INTERESTS THAT HAVE BEEN RELEASED PURSUANT TO ARTICLE VIII OF THE PLAN, DISCHARGED PURSUANT TO ARTICLE VIII OF THE PLAN, OR ARE SUBJECT TO EXCULPATION PURSUANT TO ARTICLE VIII ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE OF THE PLAN, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST THE DEBTORS OR THE REORGANIZED DEBTORS: (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (2) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (3) CREATING, PERFECTING, OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (4) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OR ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS UNLESS SUCH HOLDER HAS FILED A MOTION REQUESTING THE RIGHT TO PERFORM SUCH SETOFF ON OR BEFORE THE CONFIRMATION DATE, AND NOTWITHSTANDING AN INDICATION IN A PROOF OF CLAIM OR INTEREST OR OTHERWISE THAT SUCH HOLDER ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO SECTION 553 OF THE BANKRUPTCY CODE OR OTHERWISE; AND (5) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN. NOTHING IN THE PLAN OR CONFIRMATION ORDER SHALL PRECLUDE ANY ENTITY FROM PURSUING AN ACTION AGAINST ONE OR MORE OF THE DEBTORS IN A NOMINAL CAPACITY TO RECOVER INSURANCE PROCEEDS SO LONG AS THE DEBTORS OR REORGANIZED DEBTORS, AS APPLICABLE, AND ANY SUCH ENTITY AGREE IN WRITING THAT SUCH ENTITY WILL:  (1) WAIVE ALL CLAIMS AGAINST THE DEBTORS, THE REORGANIZED DEBTORS, AND THE ESTATES RELATED TO SUCH ACTION AND (2) ENFORCE ANY JUDGMENT ON ACCOUNT OF SUCH CLAIM SOLELY AGAINST APPLICABLE INSURANCE PROCEEDS, IF ANY.

(iii)    **Releases**

(A)    Releases By the Debtors

PURSUANT TO SECTION 1123(B) OF THE BANKRUPTCY CODE, AND EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN OR THE PLAN SUPPLEMENT, FOR GOOD AND VALUABLE CONSIDERATION, INCLUDING THE SERVICE OF THE RELEASED PARTIES TO FACILITATE THE EXPEDITIOUS REORGANIZATION OF THE DEBTORS AND THE IMPLEMENTATION OF THE RESTRUCTURING CONTEMPLATED BY THE PLAN, ON AND AFTER THE EFFECTIVE DATE, THE RELEASED PARTIES ARE DEEMED RELEASED AND DISCHARGED BY THE DEBTORS, THE REORGANIZED DEBTORS, AND THE ESTATES FROM ANY AND ALL CLAIMS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED ON BEHALF OF THE DEBTORS, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING

56

OR HEREINAFTER ARISING, IN LAW, EQUITY, OR OTHERWISE, THAT THE DEBTORS, THE REORGANIZED DEBTORS, THE ESTATES, OR THEIR AFFILIATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER ENTITY, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE CHAPTER 11 CASES, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE PLAN AND DISCLOSURE STATEMENT, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, OTHER THAN CLAIMS OR LIABILITIES ARISING OUT OF OR RELATING TO ANY ACT OR OMISSION OF A RELEASED PARTY THAT CONSTITUTES WILLFUL MISCONDUCT (INCLUDING FRAUD) OR GROSS NEGLIGENCE.

(B)      Releases By Holders of Claims and Equity Interests

AS OF THE EFFECTIVE DATE, EACH HOLDER OF A CLAIM OR AN INTEREST SHALL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER, RELEASED AND DISCHARGED THE DEBTORS, THE REORGANIZED DEBTORS, AND THE RELEASED PARTIES FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED ON BEHALF OF A DEBTOR, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREAFTER ARISING, IN LAW, EQUITY OR OTHERWISE, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE DEBTORS' RESTRUCTURING, THE DEBTORS' CHAPTER 11 CASES, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND INTERESTS PRIOR TO OR IN THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, OR PREPARATION OF THE PLAN AND DISCLOSURE STATEMENT, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, UPON ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE, OTHER THAN CLAIMS OR LIABILITIES ARISING OUT OF OR RELATING TO ANY ACT OR OMISSION OF A RELEASED PARTY THAT CONSTITUTES WILLFUL MISCONDUCT (INCLUDING FRAUD) OR GROSS NEGLIGENCE. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE FOREGOING, (I) THE RELEASE SET FORTH ABOVE DOES NOT RELEASE ANY OBLIGATIONS OF ANY PARTY UNDER THE PLAN OR ANY DOCUMENT, INSTRUMENT, OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT) EXECUTED TO IMPLEMENT THE PLAN.

(iv)      Exculpation and Limitation of Liability

EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THE PLAN OR PLAN SUPPLEMENT, NO EXCULPATED PARTY SHALL HAVE OR INCUR, AND EACH EXCULPATED PARTY IS HEREBY RELEASED AND EXCULPATED FROM ANY CLAIM, OBLIGATION, CAUSE OF ACTION, OR LIABILITY FOR ANY EXCULPATED CLAIM, EXCEPT FOR GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, BUT IN ALL RESPECTS SUCH ENTITIES SHALL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES PURSUANT TO THE PLAN.   THE DEBTORS AND THE REORGANIZED

57

**DEBTORS (AND EACH OF THEIR RESPECTIVE AFFILIATES, AGENTS, DIRECTORS, OFFICERS, EMPLOYEES, ADVISORS, AND ATTORNEYS) HAVE, AND UPON CONFIRMATION OF THE PLAN SHALL BE DEEMED TO HAVE, PARTICIPATED IN GOOD FAITH AND IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE WITH REGARD TO THE DISTRIBUTIONS OF THE SECURITIES PURSUANT TO THE PLAN, AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF SUCH DISTRIBUTIONS SHALL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN. NOTHING IN THIS PARAGRAPH SHALL IMPAIR THE POLICE OR REGULATORY POWERS OF THE UNITED STATES OF AMERICA OR ANY GOVERNMENTAL UNIT THEREOF. NOTHING IN THIS PARAGRAPH SHALL APPLY IN ANY ACTION BROUGHT BY THE SECURITIES AND EXCHANGE COMMISSION IN EXERCISE OF ITS POLICE AND REGULATORY POWERS.**

Nothing in the Confirmation Order or Plan shall effect a release of any claim by the United States Government or any of its agencies or any state and local authority whatsoever, including without limitation any claim arising under the Internal Revenue Code, the environmental laws, the securities laws, or any criminal laws of the United States or any state and local authority against the Released Parties. Furthermore, nothing in the Confirmation Order or Plan shall enjoin the United States or any state or local authority from bringing any claim, suit, action or other proceedings against the Released Parties for any liability whatsoever, including without limitation any claim, suit or action arising under the Internal Revenue Code, the environmental laws, the securities laws, or any criminal laws of the United States or any state or local authority. Furthermore, nothing in the Confirmation Order or Plan shall exculpate any party from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, the environmental laws, the securities laws, or any criminal laws of the United States or any state and local authority against the Released Parties.

### Important Securities Law Disclosure

***Securities Issued in Reliance on Section 1145 of the Bankruptcy Code and Pursuant to Exemptions under the Securities Act of 1933, as Amended***

Under the Plan, (i) shares of New Common Stock will be distributed to holders of First Lien Term Loan Claims and Second Lien Term Loan Claims, (ii) Convertible Notes, which will be convertible as of the Effective Date into New Common Stock, will be issued to those holders of First Lien Term Loan Claims and Second Lien Term Loan Claims that are eligible to participate and participate in the Rights Offering, and (iii) Rights to subscribe for Convertible Notes will be offered to holders of First Lien Term Loan Claims and Second Lien Term Loan Claims eligible to participate in the Rights Offering.[12]

Wellman will rely on section 1145 of the Bankruptcy Code to exempt from the registration requirements of the Securities Act the offer and distribution of the New Common Stock contemplated by sections III.B.2(b)(i) and III.B.3(b)(i) of the Plan. Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under Section 5 of the Securities Act and state laws when such securities are to be exchanged for claims or principally in exchange for claims and partly for cash. In general, securities issued under section 1145 may be resold without registration unless the recipient is an "underwriter" with respect to those securities. Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any person who:

---

[12]   Interests in the Distribution Trust will be credited to holders of Second Lien Term Loan Claims and holders of General Unsecured Claims. Wellman does not believe such interests are securities as defined under applicable securities law but to the extent that such interests were viewed to be securities for distribution purposes, then Wellman also would rely on section 1145(a)(1) of the Bankruptcy Code for the purpose of distributing the interests in the Distribution Trust.

- purchases a claim against, an interest in, or a claim for an administrative expense against the debtor, if that purchase is with a view to distributing any security received in exchange for such a claim or interest;

- offers to sell securities offered under a plan of reorganization for the holders of those securities;

- offers to buy those securities from the holders of the securities, if the offer to buy is (i) with a view to distributing those securities; and (ii) under an agreement made in connection with the plan of reorganization, the completion of the plan of reorganization, or with the offer or sale of securities under the plan of reorganization; or

- is an issuer with respect to the securities, as the term "issuer" is defined in Section 2(a)(11) of the Securities Act.

To the extent that persons who receive New Common Stock or Convertible Notes are deemed to be "underwriters," resales by those persons would not be exempted from registration under the Securities Act or other applicable law by section 1145 of the Bankruptcy Code. Those persons would, however, be permitted to sell new common stock or other securities without registration if they are able to comply with the provisions of Rule 144 under the Securities Act, as described further below.

**You should confer with your own legal advisors to help determine whether or not you are an "underwriter."**

The issuance of Rights in the Rights Offering and the underlying Convertible Notes (i) as a fee to the Backstop Parties, (ii) pursuant to their obligation to purchase Convertible Notes pursuant to their commitment to purchase notes not subscribed for in the Rights Offering, and (iii) upon the exercise of the Rights, as well as the New Common Stock issuable with respect to the Convertible Notes, will not be issued pursuant to section 1145 of the Bankruptcy Code. The issuance of the Rights, Convertible Notes, and underlying New Common Stock will be exempt from registration requirements pursuant to, without limitation, Section 4(2) of the Securities Act and therefore will not be freely tradable (by their express terms, the Rights also are not freely transferable). In accordance with the terms of a registration rights agreement to be entered into between Wellman, the Backstop Parties and certain other recipients of New Common Stock and Convertible Notes under the Plan, under certain circumstances Wellman will be required, upon a demand from the other parties to the registration rights agreement, to register the New Common Stock held by such parties and/or the Convertible Notes or the New Common Stock underlying the Convertible Notes for resale.

Under certain circumstances, holders of new common stock deemed to be "underwriters" may be entitled to resell their securities pursuant to the limited safe harbor resale provisions of Rule 144 of the Securities Act, to the extent available, and in compliance with applicable state securities laws. Generally, Rule 144 of the Securities Act provides that persons who are affiliates of an issuer who resell securities will not be deemed to be underwriters if certain conditions are met. These conditions include the requirement that current public information with respect to the issuer be available, a limitation as to the amount of securities that may be sold, the requirement that the securities be sold in a "brokers transaction" or in a transaction directly with a "market maker" and that notice of the resale be filed with the SEC. As noted in this Disclosure Statement, it is not contemplated that Wellman Holdings or Reorganized Wellman will be a public reporting company and, therefore, it is unlikely in the period initially following the Effective Date that current public information will be available to permit resales pursuant to Rule 144.

### Voting Instructions

With respect to first lien term loan claims and second lien term loan claims, Wellman will deliver ballots to Nominees (as defined in the Disclosure Statement Order annexed hereto as Exhibit B).

The nominees should deliver the ballot and other documents relating to the Plan, including this Disclosure Statement, to each Beneficial Owner (as defined in the Disclosure Statement Order annexed hereto as Exhibit B) for which they serve as Nominee.

A Nominee has two options with respect to voting. Under the first option, the Nominee will forward the solicitation package, including the ballot, procedures for participating in the rights offering and related subscription forms, to each Beneficial Owner for voting and include a return envelope provided by and addressed to the Nominee so that the Beneficial Owner may return the completed Beneficial Owner ballot to the Nominee. Upon receipt of the ballots, the Nominee will summarize the individual votes of its respective Beneficial Owners on the appropriate Master Ballot (as defined in the Disclosure Statement Order) and then return the Master Ballot to the voting agent before the voting deadline occurs at [_____], 2008.

Under the second option, if the Nominee elects to "prevalidate" ballots:

- The Nominee shall forward the solicitation package or copies thereof (including (a) the Disclosure Statement (together with the Plan annexed thereto as Exhibit A, and all other exhibits), (b) an individual ballot that has been prevalidated, as indicated in paragraph (b) below, and (c) a return envelope provided by and addressed to the voting agent) to the Beneficial Owner within three (3) business days of the receipt by such Nominee of the solicitation package;

- To "prevalidate" a ballot, the Nominee shall complete and execute the ballot and indicate on the ballot the name of the registered Holder, the amount of securities held by the Nominee for the Beneficial Owner and the account number(s) for the account(s) in which such securities are held by the Nominee; and

- The Beneficial Owner shall return the prevalidated ballot to the voting agent by the voting deadline of [_____], 2008.

If a Master Ballot is received after the voting deadline, the votes and elections on such Master Ballot will not be counted. The method of delivery of a Master Ballot to be sent to the voting agent is at the election and risk of each Nominee. Except as otherwise provided in this Disclosure Statement, such delivery will be deemed made only when the executed Master Ballot is actually received by the voting agent. Instead of effecting delivery by mail, it is recommended, though not required, that such entities use an overnight or hand delivery service. In all cases, sufficient time should be allowed to assure timely delivery. No ballot should be sent to Wellman, or Wellman's financial or legal advisors, but only to the voting agent as set forth under "How do I vote for or against the Plan?" in the section entitled "Questions and Answers Regarding this Disclosure Statement and the Plan," which begins on page 7.

Nominees must provide appropriate information for each of the items on the Master Ballot, including, without limitation, identifying the votes to accept or reject the Plan.

By returning a Master Ballot, each Nominee will be certifying to Wellman and the Bankruptcy Court, among other things, that:

- it has received a copy of the Disclosure Statement and other solicitation materials annexed to the Disclosure Statement, and it has delivered the same to the Beneficial Owners such Nominee represents;

- it has received a completed and signed ballot from each Beneficial Owner whose vote is reflected on such Master Ballot;

- it is a bank, broker or other nominee (or agent thereof) that holds the securities being voted on behalf of the Beneficial Owners identified on such Master Ballot;

- it has properly disclosed (a) the number of such Beneficial Owners, (b) the amount of securities held by each Beneficial Owner, (c) each Beneficial Owner's respective vote, if any, concerning the Plan and (d) the customer account, serial number and/or other identification number for each such Beneficial Owner;

60

- each such Beneficial Owner has certified to the Nominee that such Beneficial Owner has not submitted any other ballots for such Claims held in other accounts or other names, or, if it has submitted another ballot held in other accounts or names, that the Beneficial Owner has certified to the Nominee that such Beneficial Owner has cast the same vote for such claims, and the undersigned has identified such other accounts or owner and such other ballots;

- it has been authorized by each such Beneficial Owner to vote on the Plan; and

- it will maintain the original Beneficial Owner ballot returned by each Beneficial Owner (whether properly completed or defective) for one year after the voting deadline (or such other date as is set by subsequent Bankruptcy Court order) for disclosure to the Bankruptcy Court or the Debtor, if so ordered.

Each Master Ballot must be returned in sufficient time to allow it to be RECEIVED by the voting agent by no later than 5:00 p.m. (Eastern Time ) on [_____], 2008.

## Certain U.S. Federal Income Tax
## Consequences Of The Plan

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to Holders of Allowed Claims, Equity Interests and the Debtors. This summary is based on the Internal Revenue Code of 1986, as amended (the "IRC"), the U.S. Treasury Regulations promulgated thereunder, judicial authorities, published administrative positions of the IRS and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. No rulings or determinations of the IRS or any other taxing authorities have been sought or obtained with respect to the tax consequences discussed herein, and the discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not apply to Holders of Claims and Equity Interests that are not "U.S. persons" (as such phrase is defined in the IRC) and does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to such Holders in light of their individual circumstances. This discussion does not address tax issues with respect to such Holders subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, small business investment companies and regulated investment companies and those holding the New Common Stock or Convertible Notes as part of a hedge, straddle, conversion or constructive sale transaction). No aspect of state, local, estate, gift, or non-U.S. taxation is addressed.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF AN ALLOWED CLAIM. ALL HOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE U.S. FEDERAL, STATE, LOCAL AND NON-UNITED STATES TAX CONSEQUENCES OF THE PLAN.

**IRS CIRCULAR 230 DISCLOSURE**: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE IRC. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THE DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

*Consequences to Holders of Allowed Claims and Equity Interests*

*Consequences to Holders of Other Secured Claims*

The following discussion assumes that each Holder of an Allowed Other Secured Claim holds such claim as a "capital asset" within the meaning of Section 1221 of the IRC. Pursuant to the Plan, each Holder of such Allowed Other Secured Claim shall receive one of the following treatments, in the discretion of the Debtors or the Reorganized Debtors, with the consent of the Backstop Parties, as applicable: (i) the Debtors or the Reorganized Debtors shall pay such Allowed Other Secured Claim in full in Cash to the extent allowable under section 506(a) of the Bankruptcy Code or (ii) the Debtors or the Reorganized Debtors, with the consent of the Backstop Parties, shall otherwise treat such Allowed Other Secured Claim in any other manner such that the Allowed Other Secured Claim shall be rendered Unimpaired. If an Allowed Other Secured Claim is paid in full in Cash, the Holder should recognize capital gain or loss in an amount equal to the difference (positive or negative) between the amount of Cash received and the Holder's adjusted basis in the debt instruments underlying its Allowed Other Secured Claim. Such gain or loss should be capital in nature (subject to the "market discount" rules described below) and should be long-term capital gain or loss if the debts constituting the surrendered Allowed Other Secured Claim were held for more than one year. To the extent that a portion of the Cash received represents accrued but unpaid interest that the Holder has not already taken into income, the Holder may recognize ordinary interest income. See "Accrued Interest" below.

*Consequences to Holders of First Lien Term Loan Claims*

The following discussion assumes that (i) each Holder of an Allowed First Lien Term Loan Claim holds its Claim as a "capital asset" within the meaning of Section 1221 of the IRC and (ii) the obligation underlying each Allowed First Lien Term Loan Claim is properly treated as debt (rather than equity) for the applicable Debtor. Pursuant to the Plan, each Holder of such Allowed First Lien Term Loan Claim shall receive its Pro Rata share of (i) 70% of the New Common Stock, subject to dilution on account of the Management Equity Incentive Plan and the Convertible Notes, (ii) the Rights pursuant to the Rights Offering, and (iii) the portion of the Palmetto Sale Proceeds allocated to the Palmetto PP&E. In addition to the foregoing, during the pendency of the Chapter 11 Cases in partial satisfaction of their Class 2 Claims, the Holders of Allowed Claims in Class 2 have received their Pro Rata share of (i) $5.75 million in proceeds from the Johnsonville Sale and (ii) the Bottle Yard Proceeds.

*Exchange of Allowed First Lien Term Loan Claims for New Common Stock, Rights, Palmetto Sale Proceeds, proceeds from the Johnsonville Sale and the Bottle Yard Proceeds*

Whether a Holder of an Allowed First Lien Term Loan Claim recognizes gain or loss as a result of the exchange of its Claim for New Common Stock depends on whether (a) the exchange qualifies as either a tax-free recapitalization (which in turn depends on whether the debt underlying the Allowed First Lien Term Loan Claim surrendered is treated as a "security" for the reorganization provisions of the IRC (see "Treatment of a Debt Instrument as a 'Security'" below)) or an exchange pursuant to Section 351 of the IRC (a "Section 351 exchange"), (b) the Holder has previously included in income any accrued but unpaid interest with respect to the Allowed First Lien Term Loan Claim, (c) the Holder has claimed a bad debt deduction or worthless security deduction with respect to such Allowed First Lien Term Loan Claim and (d) the Holder uses the accrual or cash method of accounting for tax purposes.

*Treatment of a Debt Instrument as a "Security"*

Whether a debt instrument constitutes a "security" for U.S. federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for U. S. federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable or contingent, and whether such payments are made on a

current basis or accrued. Each Holder of an Allowed First Lien Term Loan Claim should consult with its own tax advisor to determine whether or not the debt underlying its Allowed First Lien Term Loan Claim is a "security" for U.S. federal income tax purposes.

*Treatment of a Holder of an Allowed First Lien Term Loan Claim if the Exchange of its Claim is Treated as a Reorganization or a Section 351 Exchange*

The exchange of a Holder's Allowed First Lien Term Loan Claim for New Common Stock, Rights, Palmetto Sale Proceeds, proceeds from the Johnsonville Sale and the Bottle Yard Proceeds should be treated as either a Section 351 exchange or, if a debt instrument constituting a surrendered Allowed First Lien Term Loan Claim is treated as a "security" for U.S. federal income tax purposes, as a recapitalization, and therefore a reorganization, under the IRC. A Holder of a surrendered Allowed First Lien Term Loan Claim will recognize gain, but not loss, on the exchange. Specifically, the Holder will recognize (a) capital gain, subject to the "market discount" rules discussed below, to the extent of the lesser of (i) the amount of gain realized from the exchange or (ii) (A) in the case of a reorganization, the amount of "other property" (i.e., property that is not a "security" for U.S. federal income tax purposes and "securities" to the extent that the principal amount of securities received exceeds the principal amount of securities surrendered) received, including the Palmetto Sale Proceeds, the Johnsonville PP&E Proceeds and the Bottle Yard Proceeds or (B) in the case of a Section 351 exchange, the amount of property other than stock received, including the Palmetto Sale Proceeds, the Johnsonville PP&E Proceeds and the Bottle Yard Proceeds, and (b) ordinary interest income to the extent that the New Common Stock, Rights, Palmetto Sale Proceeds, the Johnsonville PP&E Proceeds and the Bottle Yard Proceeds are treated as received in satisfaction of accrued but untaxed interest on the debt instrument underlying the Allowed First Lien Term Loan Claim (see "Accrued Interest" discussion below). In such case, a Holder's tax basis in its New Common Stock should be equal to the tax basis of the obligation constituting the Allowed First Lien Term Loan Claim surrendered therefor (increased by the amount of any gain recognized and decreased by the fair market value of "other property" (in the case of a reorganization) or property other than stock (in the case of a Section 351 exchange) received, including the Palmetto Sale Proceeds, proceeds from the Johnsonville Sale, the Bottle Yard Proceeds and, possibly, the Rights), and a Holder's holding period for its New Common Stock should include the holding period for the obligation constituting the surrendered Allowed First Lien Term Loan Claim; provided, however, to the extent that any New Common Stock is treated as received in satisfaction of accrued but untaxed interest the tax basis of such New Common Stock should equal the amount of such accrued but untaxed interest, and the holding period for such New Common Stock should not include the holding period of the debt instrument constituting the surrendered Allowed First Lien Term Loan Claim (see "Accrued Interest" discussion below).

*Treatment of a Holder of an Allowed First Lien Term Loan Claim if the Exchange of its Claim is not Treated as a Reorganization*

If a debt instrument constituting a surrendered Allowed First Lien Term Loan Claim is not treated as a security, and the exchange of such Claim is not treated as a Section 351 exchange, then a Holder of such a Claim should be treated as exchanging its Allowed First Lien Term Loan Claim for New Common Stock, Rights, Palmetto Sale Proceeds, proceeds from the Johnsonville Sale and the Bottle Yard Proceeds in a fully taxable exchange. A Holder of an Allowed First Lien Term Loan Claim who is subject to this treatment should recognize gain or loss equal to the difference (positive or negative) between (i) the fair market value of the shares of New Common Stock it receives, the Palmetto Sale Proceeds, proceeds from the Johnsonville Sale, the Bottle Yard Proceeds and, possibly, the value, if any, of the Rights, in each case that is not allocable to accrued interest, and (ii) the Holder's adjusted tax basis in the obligation constituting the surrendered Allowed First Lien Term Loan Claim. Such gain or loss should be capital in nature (subject to the "market discount" rules described below) and should be long-term capital gain or loss if the debts constituting the surrendered Allowed First Lien Term Loan Claim were held for more than one year. To the extent that a portion of the New Common Stock, Rights, Palmetto Sale Proceeds, proceeds from the Johnsonville Sale and/or the Bottle Yard Proceeds is allocable to accrued but untaxed interest, the Holder may recognize ordinary interest income. See "Accrued Interest" below. A Holder's tax basis in the shares of New Common Stock received on the Effective Date should equal the fair market value of the shares of New Common Stock as of the Effective Date. A Holder's holding period for the New Common Stock received on the Effective Date should begin on the day following the Effective Date.

*Accrued Interest*

To the extent that any amount received by a Holder of a surrendered Allowed Claim under the Plan is attributable to accrued but unpaid interest and such amount has not previously been included in the Holder's gross income, such amount should be taxable to the Holder as ordinary interest income. Conversely, a Holder of a surrendered Allowed Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the debt instruments constituting such Claim was previously included in the Holder's gross income but was not paid in full by the Debtors. Such loss may be ordinary, but the tax law is unclear on this point.

The extent to which the consideration received by a Holder of a surrendered Allowed Claim will be attributable to accrued interest on the debts constituting the surrendered Allowed Claim is unclear. Certain Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal. Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear. Pursuant to the Plan, distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest. However, the provisions of the Plan are not binding on the IRS or a court with respect to the appropriate tax treatment for creditors.

*Market Discount*

Under the "market discount" provisions of Sections 1276 through 1278 of the IRC, some or all of any gain realized by a Holder exchanging the debt instruments constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt constituting the surrendered Allowed Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if its holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or, (ii) in the case of a debt instrument issued with OID, its adjusted issue price, by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a Holder on the taxable disposition (determined as described above) of debts that it acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debts were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued). To the extent the surrendered debts that had been acquired with market discount are exchanged in a tax-free or other reorganization transaction for other property (as may occur here), any market discount that accrued on such debts but was not recognized by the Holder may be required to be carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption or other disposition of such property may be treated as ordinary income to the extent of the accrued but unrecognized market discount with respect to the exchanged debt instrument.

*The Rights*

The tax treatment of receipt of Rights by a Holder of an Allowed Claim is unclear. The issuance of, and the exercise of or failure to exercise, the Rights could be treated as an independent transaction for U.S. federal income tax purposes and not as a transaction that is integrated with any of the exchanges described herein. If so treated, a Holder that exercises a Right could be treated as directly exchanging the subscription price for Convertible Notes allocable to such Right in an exchange in which such Holder recognizes no gain or loss. Such Holder would then have a tax basis in the Convertible Notes received upon exercise of the Rights equal to the subscription price paid therefor. In light of the fact that the Rights are non-transferable and must be exercised, if at all, only at emergence, the Company intends to treat the issuance and exercise or failure to exercise the Rights as an independent transaction not integrated with the distributions under the Plan for U.S. federal income tax purposes.

Notwithstanding the foregoing, the issuance of the Rights could be treated for U.S. federal income tax purposes as a distribution of an independent piece of property under the Plan. If so treated, and if receipt of a Right would be treated as part of a reorganization, the U.S. federal income tax treatment of the receipt of the Right will depend on whether the Right qualifies as a "security". See "Treatment of a Debt Instrument as a 'Security'" above. The aggregate tax basis in the consideration received would equal the aggregate adjusted tax basis in the Allowed Claims surrendered in the exchange, increased by the amount of gain otherwise recognized. The holding period of the Rights would include the holding period of the surrendered Allowed Claims. If the Rights are treated as securities for tax purposes and receipt of a Right is treated as a part of a reorganization then the Holder of a Claim would not recognize gain or loss on receipt of the Right. If the Rights are not treated as securities for tax purposes, or the receipt of a Right is not treated as part of a reorganization, then the value of the Rights (if any) will be treated as other property giving rise to the tax treatment described below.

If the issuance of the Rights is treated as a distribution of an independent piece of property under the Plan but the distribution of Rights to Holders of Allowed Claims is not treated as part of a "reorganization" for U.S. federal income tax purposes, it should be treated as part of a taxable exchange. If the distribution of the Rights to Holders of Allowed Claims is treated as a taxable exchange, then each such Holder will recognize gain or loss in an amount equal to the (positive or negative) between (i) the fair market value of the Rights received by such Holder under the Plan, and (ii) the Holder's tax basis in its Claim. Any such gain will be capital gain and will be long-term capital gain if the Holder's holding period for its claim was more than one year on the date of the exchange. In such case, the aggregate tax basis of the Rights received would be the fair market value of the Rights on the date of the exchange, and the holding period for the Rights would begin on the day after the exchange.

If a Holder of Allowed Claims allows the Rights received under the Plan to expire, it should recognize capital loss equal to its basis (if any) in such expiring Rights.

*Convertible Notes*

Whether the Convertible Notes are treated as debt for federal income tax purposes is a matter that is subject to some uncertainty. The applicable case-law has held that this conclusion depends upon whether a purported "debt" instrument has characteristics that are more similar to debt or equity. The Debtors believe and intend to take the position that the Convertible Notes are debt (rather than equity) for U.S. federal income tax purposes. The following discussion assumes that the Convertible Notes are treated as debt (rather than equity) for U.S. federal income tax purposes.

*Stated Interest*

Stated interest on the Convertible Notes will generally be taxable to a holder of Convertible Notes as ordinary income at the time the interest is paid or accrues in accordance with the holder's method of accounting for U.S. federal income tax purposes.

*Original Issue Discount*

A holder of Convertible Notes generally will have to report the excess of the stated principal amount of the Convertible Notes over the issue price of the Convertible Notes as original issue discount on the Convertible Notes on a constant yield basis over the term of the Convertible Notes. If the Convertible Notes are treated as AHYDOs (see "Applicable High Yield Discount Obligations" below), to the extent that the Debtors are denied a deduction for a portion of the original issue discount, that portion may be treated as a dividend to holders of the Convertible Notes, and certain corporate Holders of the Convertible Notes may be entitled to a dividends-received deduction.

*Sale, Exchange, Redemption or Other Disposition of Convertible Notes*

Except as set forth under "Conversion of Convertible Notes" below, a holder will generally recognize capital gain or loss upon the sale, exchange, redemption or other taxable disposition of a Convertible Note equal to the difference between the amount realized (less any accrued but unpaid interest, which generally will be taxable as such) and the holder's adjusted tax basis in the note (see "The Rights" above). A noncorporate holder who has held

the note for more than one year generally will be subject to reduced rates of taxation on such gain. The ability to deduct capital losses may be limited.

*Conversion of Convertible Notes*

The Debtors intend to take the position that neither gain nor loss will be recognized by holders of Convertible Notes on the exchange of Convertible Notes solely into shares of New Common Stock upon conversion (except to the extent of cash received, if any, in lieu of a fractional share, which will be treated as described below, and except to the extent of amounts received with respect to accrued interest, which generally will be taxable as such). The amount of gain or loss recognized on the receipt of cash in lieu of a fractional share will be equal to the difference (positive or negative) between the amount of cash received in respect of the fractional share and the portion of the holder's adjusted tax basis in the Convertible Note that is allocable to the fractional share. The tax basis of the shares of New Common Stock received upon a conversion (other than New Common Stock attributable to accrued interest, the tax basis of which will equal its fair market value) will equal the adjusted tax basis of the Convertible Note that was converted (excluding the portion of the tax basis that is allocable to any fractional share). A holder's holding period for shares of New Common Stock received upon conversion of Convertible Notes will include the period during which such holder held the Convertible Notes except that the holding period of any New Common Stock received with respect to accrued interest will commence on the day after the date of receipt.

*Consequences to Holders of Second Lien Term Loan Claims*

The following discussion assumes that (i) each Holder of an Allowed Second Lien Term Loan Claim holds its Claim as a "capital asset" within the meaning of Section 1221 of the IRC and (ii) the obligation underlying each Allowed Second Lien Term Loan Claim is properly treated as debt (rather than equity) of the applicable Debtor. Pursuant to the Plan, each Holder of such Allowed Second Lien Term Loan Claim shall receive, its Pro Rata share of (i) 30% of the New Common Stock, subject to dilution on account of the Management Equity Incentive Plan and the Convertible Notes, (ii) the Rights pursuant to the Rights Offering, (iii) the Second Lien Trust Interests, and (iv) to the extent the DIP Facility Claims are satisfied in full, the portion of the Palmetto Sale Proceeds allocated to the Palmetto Intellectual Property & Intangibles

*Exchange of Allowed Second Lien Term Loan Claims for New Common Stock, Rights, Trust Interests and Palmetto Sale Proceeds*

Whether a Holder of an Allowed Second Lien Term Loan Claim recognizes gain or loss as a result of the exchange of its Claim for New Common Stock, Rights, Trust Interests and Palmetto Sale Proceeds depends on whether (a) the exchange qualifies as either a tax-free recapitalization (which in turn depends on whether the debt underlying the Allowed Second Lien Term Loan Claim surrendered is treated as a "security" for the reorganization provisions of the IRC (see "Treatment of a Debt Instrument as a 'Security'" above) or a Section 351 exchange, (b) the Holder has previously included in income any accrued but unpaid interest with respect to the Allowed Second Lien Term Loan Claim, (c) the Holder has claimed a bad debt deduction or worthless security deduction with respect to such Allowed Second Lien Term Loan Claim and (d) the Holder uses the accrual or cash method of accounting for tax purposes. Each Holder of an Allowed Second Lien Term Loan Claim should consult with its own tax advisor to determine whether or not the debt underlying its Allowed Second Lien Term Loan Claim is a "security" for U.S. federal income tax purposes.

*Treatment of a Holder of an Allowed Second Lien Term Loan Claim if the Exchange of its Claim is Treated as a Reorganization*

The exchange of a Holder's Allowed Second Lien Term Loan Claim for the shares of New Common Stock, Rights, Trust Interests and Palmetto Sale Proceeds should be treated either as a Section 351 exchange or, if a debt instrument constituting a surrendered Allowed Second Lien Term Loan Claim is treated as a "security" for U.S. federal income tax purposes, as a recapitalization, and therefore a reorganization, under the IRC. A Holder of a surrendered Allowed Second Lien Term Loan Claim may recognize gain, but not loss, on the exchange. Specifically, the Holder may recognize (a) capital gain, subject to the "market discount" rules discussed above, to the extent of the lesser of (i) (A) in the case of a reorganization, the amount of "other property" (i.e., property that is not a "security" for U.S. federal income tax purposes and "securities" to the extent that the principal amount of

securities received exceeds the principal amount of securities surrendered) received, if any, or (B) in the case of a Section 351 exchange, the amount of property other than stock received, if any, and (b) ordinary interest income to the extent that the shares of New Common Stock, Rights, Trust Interests and Palmetto Sale Proceeds are treated as received in satisfaction of accrued but untaxed interest on the debt instrument underlying the Allowed Second Lien Term Loan Claim (see "Accrued Interest" discussion above). In such case, a Holder's tax basis in its shares of New Common Stock and any securities received should be equal to the tax basis of the obligation constituting the Allowed Second Lien Term Loan Claim surrendered therefor (increased by the amount of any gain recognized and decreased by the fair market value of "other property" (in the case of a reorganization) or property other than stock (in the case of a Section 351 exchange) received, including Palmetto Sale Proceeds and, possibly, Rights and Trust Interests), and a Holder's holding period for its shares of New Common Stock not acquired through the Rights Offering should include the holding period for the obligation constituting the surrendered Allowed Second Lien Term Loan Claim; provided that the tax basis of any share of New Common Stock treated as received in satisfaction of accrued but untaxed interest should equal the amount of such accrued but untaxed interest, and the holding period for such share of New Common Stock should not include the holding period of the debt instrument constituting the surrendered Allowed Second Lien Term Loan Claim.

*Treatment of a Holder of an Allowed Second Lien Term Loan Claim if the Exchange of its Claim is not Treated as a Reorganization*

If a debt instrument constituting a surrendered Allowed Second Lien Term Loan Claim is not treated as a security, and the exchange of such Claim is not treated as a Section 351 exchange, a Holder of such a Claim should be treated as exchanging its Allowed Second Lien Term Loan Claim for the shares of New Common Stock, Rights, Trust Interests and Palmetto Sale Proceeds in a fully taxable exchange. A Holder of an Allowed Second Lien Term Loan Claim who is subject to this treatment should recognize gain or loss equal to the difference (positive or negative) between (i) the fair market value of the shares of New Common Stock and, possibly, Rights and Trust Interests received, plus the amount of Palmetto Sale Proceeds received, in each case that is not allocable to accrued interest, and (ii) the Holder's adjusted tax basis in the obligation constituting the surrendered Allowed Second Lien Term Loan Claim. Such gain or loss should be capital in nature (subject to the "market discount" rules described above) and should be long-term capital gain or loss if the debts constituting the surrendered Allowed Second Lien Term Loan Claim were held for more than one year. To the extent that a Holder also receives Cash in respect of dividends paid while such stock was held in reserve, the treatment of that Cash is unclear. To the extent that a portion of the shares of New Common Stock, Palmetto Proceeds, and, possibly, the value of the Rights and/or Trust Interests received in the exchange is allocable to accrued but untaxed interest, the Holder may recognize ordinary interest income. See "Accrued Interest" above. A Holder's tax basis in the shares of New Common Stock and, possibly, Rights and Trust Interests received on the Effective Date should equal the fair market value of such property as of the Effective Date. A Holder's holding period for its shares of New Common Stock and, possibly, Rights and Trust Interests received on the Effective Date should begin on the day following the Effective Date.

*Rights/Convertible Notes*

See "The Rights" and "Convertible Notes" above.

*Trust Interests*

Pursuant to the Plan, the Distribution Trust will be formed on the Effective Date and capitalized by Wellman with cash in the amount of $250,000. The Distribution Trust is expected to be formed as a Delaware trust to prosecute various litigation claims originally owned by Wellman, including certain Avoidance Actions, and, if any of the prosecutions are successful or are settled in a manner which derives economic benefit to the trust, to distribute to the beneficial owners of the trust the net proceeds of such litigations. Recipients of Trust Interests should consult their own tax advisors as to the tax consequences to them of receipt of Trust Interests, the contribution by Wellman to this trust and any distributions from this trust to them.

At this time, there is insufficient information about the form of the Distribution Trust to determine the U.S. federal income tax treatment of receipt by a Holder of Trust Interests. The Distribution Trust may be structured as a grantor trust of Wellman, in which case Trust Interests would not be treated as an independent piece of property, and future distributions from the trust would be treated as being made from Wellman. Alternatively, Trust Interests may

be treated as an independent piece of property, in which case the receipt of a Trust Interest would be treated as part of a taxable exchange. If the distribution of Trust Interests to Holders of Allowed Claims is treated as a taxable exchange, then each such Holder will recognize gain or loss in an amount equal to the difference (positive or negative) between (i) the fair market value of the Trust Interests received by such Holder under the Plan, and (ii) the Holder's tax basis in its Claim. Any such gain will be capital gain and will be long-term capital gain if the Holder's holding period for its claim was more than one year on the date of the exchange. In such case, the aggregate tax basis of the Trust Interests received would be the fair market value of the Trust Interests on the date of the exchange, and the holding period for the Trust Interests would begin on the day after the exchange.

*Consequences to Holders of General Unsecured Claims*

Pursuant to the Plan, each Holder of an Allowed General Unsecured Claim shall receive its Pro Rata share of the Unsecured Trust Interests. See "Trust Interests" above.

*Consequences to Holders of Old Preferred Interests and Old Common Interests*

Pursuant to the Plan, on the Effective Date, all Old Preferred Interests and all Old Common Interests shall be deemed canceled and extinguished, and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and there shall be no distribution to the Holders with respect to their Old Preferred Interests or Old Common Interests. Section 165(g) of the IRC permits a "worthless security deduction" for any security that is a capital asset that becomes worthless within the taxable year. Thus, Holders of Old Preferred Interests or Old Common Interests should be entitled to worthless security deductions. The rules governing the timing and amount of worthless security deductions place considerable emphasis on the facts and circumstances of the Holder, the issuer, and the instrument with respect to which the deduction is claimed; Holders are therefore urged to consult their tax advisors with respect to their ability to take such a deduction.

## Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors

*Cancellation of Indebtedness and Reduction of Tax Attributes*

As a result of the Plan, the Debtors' aggregate outstanding indebtedness will be substantially reduced. In general, absent an exception, a debtor will recognize cancellation of debt income ("CODI") upon discharge of its outstanding indebtedness for an amount less than its adjusted issue price. The amount of CODI, in general, is the excess of (a) the adjusted issue price of the indebtedness discharged, over (b) the sum of the issue price of any new indebtedness of the taxpayer issued, the amount of cash paid and the fair market value of any other consideration, including stock of the Debtor(s), given in exchange for such indebtedness at the time of the exchange.

A debtor is not, however, required to include any amount of CODI in gross income if such debtor is under the jurisdiction of a court in a chapter 11 bankruptcy proceeding and the discharge of debt occurs pursuant to that proceeding. Instead, as a price for the exclusion of CODI under the foregoing rule, Section 108 of the IRC requires the debtor to reduce (as of the first day of the taxable year following the year of the debt discharge) its tax attributes by the amount of CODI which it excluded from gross income. As a general rule, tax attributes will be reduced in the following order: (a) net operating losses ("NOLs"), (b) most tax credits, (c) capital loss carryovers, (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject), and (e) foreign tax credits. A debtor with CODI may elect first to reduce the basis of its depreciable assets under Section 108(b)(5) of the IRC.

The amount of CODI (and, accordingly, the amount of tax attributes required to be reduced), will depend, inter alia, on the fair market value of New Common Stock to be issued (for CODI with respect to First Lien Term Claims and Second Lien Term Loan Claims). This value cannot be known with certainty until after the Effective Date. Thus, although it is expected that a reduction of tax attributes will be required, the exact amount of such reduction cannot be predicted with certainty.

Any required reduction in tax attributes of a member of a consolidated group applies first to any tax attributes attributable to the debtor realizing the CODI at issue. To the extent the debtor reduces its tax basis in the

stock of another member of the consolidated group (which basis may not be reduced below zero), such other member is required to reduce its tax attributes by an equivalent amount.

*Limitation of Net Operating Loss Carryovers and Other Tax Attributes*

Section 382 of the IRC generally imposes an annual limitation on a corporation's use of its net operating losses ("NOLs") (and may limit a corporation's use of certain built-in losses if such built-in losses are recognized within a five-year period following an ownership change) if a corporation undergoes an "ownership change." This discussion describes the limitation determined under Section 382 of the IRC in the case of an "ownership change" as the "Section 382 Limitation." The annual Section 382 Limitation on the use of pre-change losses (the NOLs and built-in losses recognized within the five year post-ownership change period) in any "post change year" is generally equal to the product of the fair market value of the loss corporation's outstanding stock immediately before the ownership change multiplied by the long term tax-exempt rate in effect for the month in which the ownership change occurs. The long-term tax-exempt rate is published monthly by the IRS and is intended to reflect current interest rates on long-term tax-exempt debt obligations. Section 383 of the IRC applies a similar limitation to capital loss carryforward and tax credits. As discussed below, however, special rules may apply in the case of a corporation which experiences an ownership change as the result of a bankruptcy proceeding.

In general, an ownership change occurs when the percentage of the corporation's stock owned by certain "5 percent shareholders" increases by more than 50 percentage points in the aggregate over the lowest percentage owned by those shareholders at any time during the applicable "testing period" (generally, the shorter of (a) the 36-month period preceding the testing date or (b) the period of time since the most recent ownership change of the corporation). A "5 percent shareholder" for this purpose includes, generally, an individual or entity that directly or indirectly owns 5% or more of a corporation's stock during the relevant period and one or more groups of shareholders that own less than 5% of the value of the corporation's stock. Under applicable Treasury Regulations, an ownership change with respect to an affiliated group of corporations filing a consolidated return that has consolidated NOLs is generally measured by changes in stock ownership of the parent corporation of the group.

The issuance under the Plan of the New Common Stock, along with the cancellation of existing Equity Interests through the Plan, is expected to cause an ownership change to occur with respect to the Debtors' consolidated group on the Effective Date. As a result, Section 382 of the IRC will apply to limit the Debtors' use of their consolidated NOLs after the Effective Date. This limitation is independent of, and in addition to, the reduction of tax attributes described in the preceding section resulting from the exclusion of CODI. Similarly, the ability to use any remaining capital loss carryforwards and tax credits will also be limited.

Section 382(l)(5) of the IRC provides a special rule applicable in the case of a bankruptcy reorganization (the "Section 382(l)(5) Rule"). If a corporation qualifies for the Section 382(l)(5) Rule, the annual Section 382 Limitation will not apply to the corporation's NOLs on account of an ownership change occurring as a result of the bankruptcy reorganization. The Section 382(l)(5) Rule does, however, require that the corporation's NOLs and credit carryovers be computed without taking into account the aggregate amount of all interest deductions during the three prior taxable years and the portion of the current taxable year ending on the date of the ownership change in respect of debt exchanged for the corporation's stock (such interest hereinafter called "Disqualified Interest"). The corporation will qualify under the Section 382(l)(5) Rule if the corporation's pre-bankruptcy shareholders and holders of certain debt (the "Qualifying Debt") own at least 50% of the stock of the corporation after the bankruptcy reorganization, and the corporation does not elect not to apply the Section 382(l)(5) Rule. Qualifying Debt is a claim which (i) was held by the same creditor for at least 18 months prior to the bankruptcy filing or (ii) arose in the ordinary course of a corporation's trade or business and has been owned, at all times, by the same creditor. Indebtedness will be treated as arising in the ordinary course of a corporation's trade or business if such indebtedness is incurred by the corporation in connection with the normal, usual or customary conduct of the corporation's business. For the purpose of determining whether a claim constitutes Qualifying Debt, special rules may in some cases apply to treat a subsequent transferee as the transferor creditor.

If the exchanges contemplated by the Plan qualify for tax treatment under the Section 382(l)(5) Rule and the Debtors do not elect out of the Section 382(l)(5) Rule, the Debtors' NOL carryover will be available for future use without any Section 382 Limitation (after reduction of the Debtors' NOLs by Disqualified Interest). However, under the Section 382(l)(5) Rule, if there is a second ownership change during the two-year period immediately

following consummation of the Plan, the Section 382 Limitation after the second ownership change shall be zero. The determination of the application of the Section 382(l)(5) Rule is highly fact specific and dependent on circumstances that are difficult to assess accurately; however, the Debtors do not believe they will qualify for the Section 382(l)(5) Rule.

If the exchanges do not qualify for tax treatment under the Section 382(l)(5) Rule or the Debtors elect not to apply the Section 382(l)(5) Rule, the Debtors' use of NOLs to offset taxable income earned after an ownership change will be subject to the annual Section 382 Limitation. Since the Debtors are in bankruptcy, however, Section 382(l)(6) of the IRC will apply. Section 382(l)(6) of the IRC provides that, in the case of an ownership change resulting from a bankruptcy proceeding of a debtor, the value of the debtor's stock for the purpose of computing the Section 382 Limitation will generally be calculated by reference to the net equity value of debtor's stock taking into account the increase of the value of the corporation as a result of the surrender or cancellation of creditors' claims in the transaction (rather than the value without taking into account such increases, as is the case under the general rule for non-bankruptcy ownership changes). Accordingly, under this rule the Section 382 Limitation would generally reflect the increase in the value of a debtor's stock resulting from the conversion of debt to equity in the proceeding. Although it is impossible to predict what the net equity value of the Debtors will be immediately after the exchanges contemplated by the Plan, the Debtors' use of NOLs is expected to be substantially limited after those exchanges.

*Applicable High Yield Discount Obligations*

The Convertible Notes may be treated as applicable high yield discount obligations ("AHYDOs"). In general, an AHYDO is any debt instrument with "significant original issue discount," a maturity date that is more than five years from the issue date and a yield to maturity that is at least five percentage points higher than the applicable federal rate. Based on the current applicable federal rate (which is published monthly) and the current proposed interest rate on the notes, the interest rate on the Convertible Notes would exceed the applicable federal rate plus five percentage points. Since this determination is based upon the applicable federal rate on the Effective Date, it is impossible to determine with certainty at this time if the Convertible Notes will be treated as AHYDOs on the Effective Date.

If the Convertible Notes are treated as AHYDOs, then the Debtors may permanently be denied a deduction for a portion of the original issue discount on the Convertible Notes and may claim an interest deduction as to the remainder of the original issue discount only when such portion is paid. To the extent that the Debtors are denied a deduction for a portion of the original issue discount, that portion may be treated as a dividend to Holders of the Convertible Notes, and certain corporate Holders of the Convertible Notes may be entitled to a dividends-received deduction.

*Alternative Minimum Tax*

In general, an alternative minimum tax ("AMT") is imposed on a corporation's alternative minimum taxable income ("AMTI") at a 20% rate to the extent such tax exceeds the corporation's regular U. S. federal income tax for the year. AMTI is generally equal to regular taxable income with certain adjustments. For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated. For example, except for alternative tax NOLs generated in or deducted as carryforwards in taxable years ending in 2001 and 2002 which can offset 100% of a corporation's AMTI, only 90% of a corporation's AMTI may be offset by available alternative tax NOL carryforwards. Additionally, under Section 56(g)(4)(G) of the IRC, an ownership change (as discussed above) that occurs with respect to a corporation having a net unrealized built-in loss in its assets will cause, for AMT purposes, the adjusted basis of each asset of the corporation immediately after the ownership change to be equal to its proportionate share (determined on the basis of respective fair market values) of the fair market value of the assets of the corporation, as determined under Section 382(h) of the IRC, immediately before the ownership change. The Debtors do not believe they will have a net unrealized built-in loss in their assets immediately after the ownership change.

*Backup Withholding and Reporting*

Wellman will withhold all amounts required by law to be withheld from payments of interest and dividends. Wellman will comply with all applicable reporting requirements of the IRC. In general, information

reporting requirements may apply to distributions or payments made to a Holder of a Claim. Additionally, backup withholding of taxes, currently at a rate of 28%, will apply to such payments if such Holder fails to provide an accurate taxpayer identification number or otherwise fails to comply with the applicable requirements of the backup withholding rules. Any amounts withheld under the backup withholding rules will be allowed as a credit against such Holder's U.S. federal income tax liability and may entitle such Holder to a refund, provided that the required information is provided to the IRS.

THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.

**Recommendation**

In the opinion of Wellman, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for a larger distribution to Wellman's creditors than would otherwise result in a liquidation under chapter 7 of the Bankruptcy Code. In addition, any alternative other than confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims than proposed under the Plan. Accordingly, Wellman recommends that holders of Claims entitled to vote on the Plan support confirmation of the Plan and vote to accept the Plan.

Dated: November 10, 2008

Respectfully submitted,

WELLMAN, INC.
(for itself and on behalf of each of the Debtors)

By: /s/ Keith R. Phillips
    Name: Keith R. Phillips
    Title: Chief Financial Officer

Prepared by:

KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022-4611
(212) 446-4800 (telephone)

ATTORNEYS FOR DEBTORS AND DEBTORS IN POSSESSION

# **<u>EXHIBIT A</u>**

> THIS PLAN IS SUBJECT TO THE APPROVAL OF THE BANKRUPTCY COURT AND IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN. ACCEPTANCES OR REJECTIONS OF THE PLAN MAY NOT BE SOLICITED UNTIL THE DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re | Chapter 11 |
| WELLMAN, INC., *et al.*,[1] | Case No. 08-10595 (SMB) |
| | Jointly Administered |
| Debtors. | |

## DEBTORS' THIRD AMENDED JOINT PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022-4611
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Jonathan S. Henes (JH 1979)
Michael A. Cohen (MC 1277)

Attorneys to the Debtors and Debtors in Possession

Dated:    November 10, 2008

---

[1] The debtors in these cases include: Wellman, Inc.; Wellman Fibres Ltd.; MRF, Inc.; Prince, Inc.; Warehouse Associates Inc.; Carpet Recycling of Georgia Inc.; Wellman of Mississippi, Inc.; Fiber Industries, Inc.; ALG, Inc.; Josdav, Inc.; PTA Resources LLC; and MED Resins, Inc.

**TABLE OF CONTENTS**

ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND
    GOVERNING LAW ................................................................................................................ 1
    A.     Defined Terms ........................................................................................................ 1
    B.     Rules of Interpretation ......................................................................................... 12
    C.     Computation of Time ........................................................................................... 13
    D.     Governing Law ..................................................................................................... 13
    E.     Reference to Monetary Figures ........................................................................... 13
    F.     Reference to the Debtors or the Reorganized Debtors ....................................... 13

ARTICLE II. ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS ........................... 13
    A.     DIP Facility Claims .............................................................................................. 13
    B.     Administrative Claims ......................................................................................... 14
    C.     Priority Tax Claims .............................................................................................. 15
    D.     Other Priority Claims ........................................................................................... 15
    E.     Intercompany Claims ........................................................................................... 15

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ................ 15
    A.     Classification of Claims and Interests ................................................................. 15
    B.     Treatment of Claims and Interests ...................................................................... 16
    C.     Special Provision Governing Unimpaired Claims .............................................. 18
    D.     Acceptance or Rejection of the Plan .................................................................... 18
    E.     Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code ................ 18
    F.     Controversy Concerning Impairment .................................................................. 19
    G.     Subordinated Claims ............................................................................................ 19

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN ............................................... 19
    A.     Substantive Consolidation for Plan Purposes Only ........................................... 19
    B.     General Settlement of Claims .............................................................................. 20
    C.     Wellman Holdings ............................................................................................... 20
    D.     The Palmetto Sale ............................................................................................... 20
    E.     Issuance of New Common Stock ......................................................................... 20
    F.     Corporate Existence ............................................................................................. 21
    G.     Vesting of Assets in the Reorganized Debtors ................................................... 21
    H.     Cancellation of Securities and Agreements ........................................................ 21
    I.      The Rights Offering ............................................................................................. 22
    J.      The Distribution Trust .......................................................................................... 22
    K.     Restructuring Transactions .................................................................................. 24
    L.     Corporate Action ................................................................................................. 24
    M.    New Certificate of Incorporation and New By-Laws ......................................... 24
    N.     Directors and Officers of the Reorganized Debtors and Wellman Holdings .............. 25
    O.     Effectuating Documents; Further Transactions ................................................... 25
    P.     Employee and Retiree Benefits ........................................................................... 25
    Q.     D&O Liability Insurance Policies ....................................................................... 26
    R.     Sources of Consideration for Plan Distributions ................................................ 26
    S.     First Lien Credit Facility Agent and Second Lien Credit Facility Agent ............ 26

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ............ 26
    A.     Assumption and Rejection of Executory Contracts and Unexpired Leases .............. 26
    B.     Claims Based on Rejection of Executory Contracts or Unexpired Leases .............. 27
    C.     Cure of Defaults for Executory Contracts and Unexpired Leases Assumed ............ 27
    D.     Insurance Policies ................................................................................................ 27
    E.     Modifications, Amendments, Supplements, Restatements, or Other Agreements .............. 27
    F.     Reservation of Rights ........................................................................................... 28
    G.     Nonoccurrence of Effective Date ........................................................................ 28

i

H.       Contracts and Leases Entered Into After the Petition Date ...................................28

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ...................................................28
A.       Timing and Calculation of Amounts to Be Distributed ..................................28
B.       Disbursing Agent ...........................................................................................28
C.       Rights and Powers of Disbursing Agent ........................................................29
D.       Distributions on Account of Claims Allowed After the Effective Date...........29
E.       Delivery of Distributions and Undeliverable or Unclaimed Distributions.......30
F.       Compliance with Tax Requirements/Allocations .............................................30
G.       Setoffs ............................................................................................................31
H.       Recoupment .....................................................................................................31
I.       Release of Liens ..............................................................................................31
J.       Claims Paid or Payable by Third Parties ........................................................31

ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND
DISPUTED CLAIMS ............................................................................................32
A.       Prosecution of Objections to Claims..............................................................32
B.       Allowance of Claims and Interests .................................................................32
C.       No Distributions Pending Allowance .............................................................33
D.       Distributions After Allowance ........................................................................33
E.       Estimation of Claims ......................................................................................33

ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS............33
A.       Discharge of Claims and Termination of Interests .........................................33
**B.       Releases by the Debtors** ..............................................................................34
**C.       Releases by Holders of Claims and Interests** ..............................................34
**D.       Exculpation** ................................................................................................34
**E.       Injunction** ...................................................................................................35

ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE
PLAN .................................................................................................................35
A.       Conditions Precedent to Confirmation...........................................................35
B.       Conditions Precedent to the Effective Date ...................................................36
C.       Waiver of Conditions......................................................................................37
D.       Effect of Failure of Conditions ......................................................................37

ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN ..................37
A.       Modification and Amendments........................................................................37
B.       Effect of Confirmation on Modifications........................................................38

ARTICLE XI. RETENTION OF JURISDICTION..........................................................................38

ARTICLE XII. MISCELLANEOUS PROVISIONS ........................................................................39
A.       Immediate Binding Effect...............................................................................39
B.       Additional Documents ....................................................................................40
C.       Preservation of Causes of Action ...................................................................40
D.       Preservation of Avoidance Actions .................................................................40
E.       Section 1145 Exemption ................................................................................41
F.       Section 1146 Exemption .................................................................................41
G.       Payment of Statutory Fees .............................................................................41
H.       Dissolution of the Creditors' Committee ........................................................41
I.       Reservation of Rights......................................................................................41
J.       Successors and Assigns ..................................................................................41
K.       Service of Documents .....................................................................................41
L.       Term of Injunctions or Stays...........................................................................42
M.       Entire Agreement............................................................................................42

N.      Exhibits......................................................................................................................42
O.      Nonseverability of Plan Provisions..........................................................................42
P.      Votes Solicited in Good Faith....................................................................................42
Q.      Closing of Chapter 11 Cases.....................................................................................43
R.      Waiver or Estoppel ...................................................................................................43
S.      Conflicts....................................................................................................................44
T.      Post-Confirmation Reporting....................................................................................44

**TABLE OF EXHIBITS[2]**

| | |
|---|---|
| Exhibit A | Form of New Bylaws* |
| Exhibit B | Form of New Certificates of Incorporation* |
| Exhibit C | Initial Directors and Officers of Each Reorganized Debtor* |
| Exhibit D | Assumed Executory Contracts and Unexpired Lease List* |
| Exhibit E | Rights Offering Procedures |
| Exhibit F | Management Equity Incentive Plan* |
| Exhibit G | Registration Rights Agreement* |
| Exhibit H | Backstop Commitment Agreement* |
| Exhibit I | Shareholders Agreement* |
| Exhibit J | List of Retained Causes of Action* |
| Exhibit K | Convertible Notes Indenture* |

---

[2]    All documents marked with an asterisk will be filed with the Plan Supplement.

## INTRODUCTION

Wellman, Inc. and the other Debtors in the above-captioned chapter 11 cases (collectively, the "Debtors") hereby respectfully propose the following joint plan of reorganization (the "Plan") for the resolution of claims against and interests in the Debtors pursuant to title 11 of the United States Code, 11 U.S.C. §§ 101-1532. Capitalized terms used in the Plan and not otherwise defined shall have the meanings ascribed to them in Article I.A. Reference is made to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, and projections of future operations, as well as a summary and description of the Plan and certain related matters. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

**Please note that if Class 2 or Class 3 votes to reject this Plan, the Debtors will immediately proceed with a liquidation of their assets in conjunction with the DIP Lenders as Wellman will be in default under the DIP Facility. It is likely that operations at the Pearl River Facility would be shut down as part of this process. In the event of a liquidation, recoveries for Holders of Allowed Claims will be significantly reduced, if not eliminated, and Holders of General Administrative Claims, including 503(b)(9) Administrative Claims, and Holders of General Unsecured Claims will not receive a recovery.**

### ARTICLE I.
### DEFINED TERMS, RULES OF INTERPRETATION,
### COMPUTATION OF TIME, AND GOVERNING LAW

A.    *Defined Terms*

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.    *"503(b)(9) Administrative Claim"* means an Administrative Claim for the value of any goods received by the Debtors within 20 days before the date of commencement of a case under the Bankruptcy Code in which the goods have been sold to the Debtors in the ordinary course of the Debtor's business, pursuant to section 503(b)(9) of the Bankruptcy Code.

2.    *"503(b)(9) Administrative Claim Bar Date"* means July 29, 2008 at 4:30 p.m. Eastern Time.

3.    *"Accrued Professional Compensation"* means, at any given moment, all accrued fees and expenses for services rendered by all Professionals through and including the Effective Date, to the extent such fees and expenses have not been paid and regardless of whether a fee application has been Filed for such fees and expenses. To the extent there is a Final Order denying some or all of a Professional's fees or expenses, such denied amounts shall no longer be considered Accrued Professional Compensation.

4.    *"Administrative Claim"* means a Claim for costs and expenses of administration pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries, or commissions for services, and payments for goods and other services and leased premises); (b) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of the Judicial Code; and (c) all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code.

5.    *"Administrative Claim Bar Date"* means the date that is the forty-fifth (45th) day after the Effective Date.

6.    *"Affiliate"* has the meaning set forth in section 101(2) of the Bankruptcy Code.

7.    *"Allowed"* means with reference to any Claim: (a) any Claim against any Debtor which has been listed by such Debtor in the Schedules, as such Schedules may be amended by the Debtors from time to time in

accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary proof of claim has been filed; (b) any Claim as to which no objection to allowance has been interposed by the Claims Objection Deadline or such other applicable period of limitation fixed by the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or as to which any objection has been determined by a Final Order to the extent such objection is determined in favor of the respective Holder; (c) any Claim as to which, upon the lifting of the automatic stay pursuant to section 362 of the Bankruptcy Code, the liability of the Debtors and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court; or (d) any Claim expressly deemed Allowed by the Plan.

8.    *"Assumed Executory Contract and Unexpired Lease List"* means the list (as may be amended), as determined by the Debtors or Reorganized Debtors with the consent of the Backstop Parties[3] of Executory Contracts and Unexpired Leases (including any amendments or modifications thereto) that will be assumed by the Reorganized Debtors pursuant to the provisions of Article V of this Plan.

9.    *"Avoidance Actions"* means any and all actual or potential Claims to avoid a transfer of property or an obligation incurred by the Debtor pursuant to any applicable section of the Bankruptcy Code, including sections 544, 545, 547, 548, 549, 550, 551, 553(b), and 724(a) of the Bankruptcy Code.

10.    *"Backstop Commitment Agreement"* means the agreement between Wellman and the Backstop Parties pursuant to which the Backstop Parties will agree to backstop the Rights Offering, a copy of which will be included in the Plan Supplement.

11.    *"Backstop Fee"* means the aggregate fee paid, on a ratable basis to the Backstop Parties pursuant to the Backstop Commitment Agreement, consisting of $15 million principal amount of Convertible Notes.

12.    *"Backstop Parties"* means SOLA LTD, BlackRock Advisors, and/or certain affiliates, funds, or managed accounts, as well as any other Second Lien Lender or First Lien Lender that becomes a signatory to the Backstop Commitment Agreement.

13.    *"Ballot"* means the ballot upon which Holders of Impaired Claims entitled to vote shall cast their vote to accept or reject the Plan.

14.    *"Bankruptcy Code"* means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as applicable to the Chapter 11 Cases.

15.    *"Bankruptcy Court"* means the United States Bankruptcy Court for the Southern District of New York or any other court having jurisdiction over the Chapter 11 Cases.

16.    *"Bankruptcy Rules"* means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

17.    *"Bottle Yard Sale"* means the sale of certain real property located at the Debtors' Johnsonville facility in accordance with the order entered by the Bankruptcy Court, dated April 1, 2008 (Docket No. 161).

18.    *"Bottle Yard Sale Proceeds"* means the consideration net of costs and expenses (i.e., $375,942) received from the Bottle Yard Sale.

---

[3]    Any reference in this Plan to documents, conditions, or other items that require the satisfaction or consent of the First Lien Credit Facility Agent, the Informal Second Lien Lender Group, or the Backstop Parties, the taking of any affirmative action by them, or the granting of any waivers by them in respect of the provisions hereof, shall require the satisfaction, consent, or agreement to waive by (i) a majority in amount of the First Lien Term Loan Claims held by the First Lien Lenders, (ii) a majority in amount of the Second Lien Term Loan Claims held by the Informal Second Lien Lender Group, or (iii) majority of the members of the Backstop Parties, as applicable.

2

19.    "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

20.    "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

21.    "*Causes of Action*" means all actions, causes of action, liabilities, obligations, rights, suits, damages, judgments, remedies, demands, setoffs, defenses, recoupments, crossclaims, counterclaims, third-party claims, indemnity claims, contribution claims, or any other claims whatsoever, in each case held by the Debtors, whether known or unknown, matured or unmatured, fixed or contingent, liquidated or unliquidated, disputed or undisputed, suspected or unsuspected, foreseen or unforeseen, direct or indirect, choate or inchoate, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases, including through the Effective Date.

22.    "*Certificate*" means any instrument evidencing a Claim or an Interest.

23.    "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the chapter 11 case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Bankruptcy Court.

24.    "*Claim*" means any claim against a Debtor as such term is defined in section 101(5) of the Bankruptcy Code.

25.    "*Claims Objection Deadline*" means, for each Claim, the later of (a) 120 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for objecting to such Claim.

26.    "*Class*" means a class of Claims or Equity Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

27.    "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases, subject to all conditions specified in Article IX.A hereof having been: (a) satisfied; or (b) waived pursuant to Article IX.C hereof.

28.    "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

29.    "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court on Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

30.    "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

31.    "*Consummation*" means the occurrence of the Effective Date.

32.    "*Convertible Notes*" means the $120 million principal amount of convertible notes to be issued by Wellman Holdings in the Rights Offering, which shall (a) be secured by a first priority lien in all of the assets of the Reorganized Debtors (subject to the Revolver Carveout), (b) pay 10% interest per annum, and (c) mature ten (10) years after the Effective Date.  Such notes shall be convertible into New Common Stock on the terms set forth in, and governed pursuant to, the Convertible Notes Indenture.

33.    "*Convertible Notes Indenture*" means the indenture relating to the Convertible Notes, the form of which shall be acceptable to the Backstop Parties and which shall be included as part of the Plan Supplement.

3

34.    *"Creditors' Committee"* means the official statutory committee of unsecured creditors appointed by the United States Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code, as may be reconstituted from time to time.

35.    *"Cure Claim"* means a Claim based upon the Debtors' defaults on an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by the Debtors pursuant to section 365 of the Bankruptcy Code.

36.    *"D&O Liability Insurance Policies"* means all insurance policies for directors' and officers' liability maintained by the Debtors as of the Petition Date.

37.    *"Debtor"* means one of the Debtors, in its individual capacity as a debtor in these Chapter 11 Cases.

38.    *"Debtors"* means, collectively: Wellman, Inc.; Wellman Fibres Ltd.; MRF, Inc.; Prince, Inc.; Warehouse Associates Inc.; Carpet Recycling of Georgia Inc.; Wellman of Mississippi, Inc.; Fiber Industries, Inc.; ALG, Inc.; Josdav, Inc.; PTA Resources LLC; and MED Resins, Inc.

39.    *"Debtors in Possession"* means, collectively, the Debtors, as debtors in possession in these Chapter 11 Cases, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

40.    *"DIP Agent"* means Deutsche Bank Trust Company Americas, as administrative agent and collateral agent under the DIP Credit Agreement, or any successor agent appointed in accordance with such agreement.

41.    *"DIP Arranger"* means Deutsche Bank Securities, Inc., as lead arranger and bookrunner under the DIP Credit Agreement, or any successor arranger and bookrunner appointed in accordance with such agreement.

42.    *"DIP Credit Agreement"* means that certain debtor-in-possession credit agreement, dated as of February 27, 2008, among Wellman, Inc. and each of its domestic subsidiaries, as Borrowers, with Wellman, Inc. as Funds Administrator, the DIP Arranger, the DIP Agent and the banks, financial institutions and other lenders parties thereto, as the same may have been subsequently modified, amended, or supplemented together with all instruments and agreements related thereto.

43.    *"DIP Facility"* means that certain debtor-in-possession financing, as amended, in an amount up to $200 million, subject to a borrowing base, with a letter of credit sublimit of $40 million.

44.    *"DIP Facility Claim"* means any Claim arising under or related to the DIP Credit Agreement.

45.    *"DIP Lenders"* means the DIP Agent and the banks, financial institutions, and other lender parties to the DIP Credit Agreement from time to time.

46.    *"Disbursing Agent"* means the Reorganized Debtors, or the Entity or Entities selected by the Debtors or Reorganized Debtors, with the consent of the Backstop Parties, to make or facilitate distributions pursuant to the Plan.

47.    *"Disclosure Statement"* means the *Disclosure Statement for the Debtors' Third Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code*, dated November 10, 2008, as amended, supplemented, or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law.

48.    *"Disputed Claim"* means any Claim that is not yet Allowed.

4

49.    *"Disputed Claims Reserve"* means the reserve established and maintained by the Reorganized Debtors to hold Cash to be distributed, as applicable, to Holders of Allowed Claims pending resolution of Disputed Claims.

50.    *"Disputed General Unsecured Claim"* means any General Unsecured Claim that, as of the date of determination, is a Disputed Claim.

51.    *"Disputed General Unsecured Claims Reserve"* means the reserve established and maintained by the Reorganized Debtors to hold the Distribution Trust Interests to be distributed, as applicable, to Holders of Allowed General Unsecured Claims pending the resolution of Disputed General Unsecured Claims in accordance with the terms of Article VII hereof.

52.    *"Distribution Trust"*[4] means a Distribution Trust to be formed on the Effective Date and governed by the Distribution Trust Agreement, which shall contain cash in the amount of $250,000, and certain Causes of Action, or proceeds thereof, including but not limited, to the proceeds of the Eastman Litigation (but not including the Eastman Litigation itself, which will remain with the Reorganized Debtor), net of associated costs and taxes.

53.    *"Distribution Trust Agreement"* means the agreement establishing and delineating the terms and conditions of the Distribution Trust, substantially in the form set forth in the Plan Supplement.

54.    *"Distribution Trust Interests"* means the Second Lien Trust Interests and Unsecured Creditors Trust Interests, which, in their entirety, represent the beneficial interests in the Distribution Trust.

55.    *"Eastman Litigation"* means the case entitled <u>Wellman, Inc. v. Eastman Chemical Company</u>, Case No. 07-585 (SLR), pending in the United States Court for the District of Delaware, and any proceedings, causes of action, claims, or litigation related to or arising from the underlying facts and circumstances of such case.

56.    *"Effective Date"* means the date selected by the Debtors, with the consent of the Backstop Parties, that is a Business Day after the Confirmation Date on which (a) the conditions as specified in the Plan have been satisfied or waived and (b) no stay of the Confirmation Order is in effect. Unless otherwise specifically provided in the Plan, any of the documents contained in the Plan Supplement, or the DIP Credit Agreement, anything required to be done by the Debtors on the Effective Date may be done on the Effective Date or as soon as reasonably practicable thereafter.

57.    *"Entity"* means an entity as such term is defined in section 101(15) of the Bankruptcy Code.

58.    *"Equity Interests"* means any (a) Equity Security, including all issued, unissued, authorized, or outstanding shares of capital stock of the Debtors (including Old Preferred Stock and Old Common Stock) together with any warrants, options, or contractual rights to purchase or acquire such Equity Securities at any time and all rights arising with respect thereto and (b) partnership, limited liability company, or similar interest in a Debtor; provided, however, that Equity Interest does not include any Intercompany Interest.

59.    *"Equity Security"* means any equity security as defined in section 101(16) of the Bankruptcy Code in a Debtor.

60.    *"ERISA"* means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

---

[4]    The Debtors reserve the right, subject to the consent of the Informal Second Lien Lender Group, to utilize an alternative means of distributing the certain Causes of Action, or proceeds thereof and the proceeds of the Eastman Litigation to Holders of Claims in Classes 3 and 4, provided, however, that the method of distribution utilized shall not have a material adverse impact on the amount of consideration, if any, provided to such Holders when compared to a trust structure.

61.     "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

62.     "*Exchange Act*" means the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a et seq., as now in effect and hereafter amended.

63.     "*Exculpated Claim*" means any Claim related to any act or omission in connection with, relating to, or arising out of the Debtors' in or out of court restructuring efforts, the Debtors' Chapter 11 Cases, formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement or the Plan or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation, including the issuance of New Common Stock and Convertible Notes, of the Plan, the Rights Offering, and the Backstop Commitment Agreement, or the distribution of property under the Plan or any other agreement. For the avoidance of doubt, no Claim, obligation, or liability arising under the Plan or the Plan Supplement, including the Registration Rights Agreement, or the Shareholders Agreement, constitutes an Exculpated Claim.

64.     "*Exculpated Party*" means each of:  (a) the Debtors, the Reorganized Debtors, and their Affiliates; (b) the DIP Agent, the DIP Arranger, and the DIP Lenders, in each case, in their capacity as such; (c) the Second Lien Credit Facility Agent and the Second Lien Lenders, in each case, in their capacity as such; (d) the members of the Informal Second Lien Lender Group, each in their capacities as such; (e) the Backstop Parties, each in their capacities as such; (f) the Creditors' Committee and the members thereof in their capacity as such; (g) the Agent in its capacity as such; (h) the Prepetition Lenders in their capacity as such; (i) the First Lien Credit Facility Agent and the First Lien Lenders, in each case, in their capacity as such; and (j) with respect to each of the foregoing Entities in clauses (a) through (i), such Entities' subsidiaries, affiliates, managed accounts or funds, officers, directors, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals, in each case in their capacity as such.

65.     "*Executory Contract and/or Unexpired Lease*" means a contract or lease to which one or more of the Debtors is a party and that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

66.     "*Federal Judgment Rate*" means the federal judgment rate, which was in effect as of the Petition Date.

67.     "*File*" or "*Filed*" means file, filed, or filing with the Bankruptcy Court or its authorized designee in these Chapter 11 Cases.

68.     "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which the time to appeal, seek certiorari, or move for a new trial, re-argument, or rehearing has expired and no appeal, petition for certiorari, or motion for a new trial, re-argument, or rehearing has been timely filed, or as to which any appeal that has been taken, any petition for certiorari, or motion for a new trial, re-argument, or rehearing that has been or may be Filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought.

69.     "*First Lien Credit Facility Agent*" means Bank of New York, as successor administrative agent and collateral agent under the First Lien Term Loan Credit Agreement, or any successor agent appointed in accordance with such agreement.

70.     "*First Lien Lenders*" means those lenders under the First Lien Term Loan Credit Agreement and their successors and assigns.

71.     "*First Lien Term Loan Claim*" means claims arising under the First Lien Term Loan Credit Agreement.

6

72.    *"First Lien Term Loan Credit Agreement"* means the First Lien Term Loan Agreement dated as of February 10, 2004 among Wellman, Inc., as borrower, the subsidiary guarantors named therein, the Lenders (as defined therein), Bank of New York, as Administrative Agent and Collateral Agent, JP Morgan Chase Bank, as Syndication Agent, Deutsche Bank Securities Inc., as Joint Lead Arranger and joint Lead Bookrunner, J.P. Morgan Securities Inc., as Joint Lead Arranger and Joint Lead Bookrunner, and General Electric Capital Corporation and ABN AMRO Bank N.V., as Co-Documentation Agents.

73.    *"General Administrative Claim"* means any Administrative Claim, including 503(b)(9) Administrative Claims and Cure Claims, other than a Professional Fee Claim or a DIP Facility Claim, and subject to the 503(b)(9) Administrative Claim Bar Date, the Administrative Claims Bar Date or any subsequent bar date with respect to such Claims.

74.    *"General Unsecured Claim"* means any unsecured Claim not otherwise classified pursuant to this Plan.

75.    *"Governmental Unit"* means a governmental unit as defined in section 101(27) of the Bankruptcy Code.

76.    *"Holdback Amount"* means the aggregate holdback of those Professional fees billed to the Debtors during the Chapter 11 Cases that are held back pursuant to the Professional Fee Order or any other order of the Bankruptcy Court, which amount is to be deposited in the Holdback Escrow Account as of the Effective Date. The Holdback Amount shall not be considered property of the Debtors or the Reorganized Debtors.

77.    *"Holdback Escrow Account"* means the escrow account established by Reorganized Wellman into which Cash equal to the Holdback Amount shall be deposited on the Effective Date for the payment of Allowed Professional Fee Claims to the extent not previously paid or disallowed.

78.    *"Holder"* means an Entity holding a Claim or an Interest.

79.    *"Impaired"* means, with respect to a Class of Claims or Interests, a Claim or an Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

80.    *"Informal Second Lien Lender Group"* means the following informal group of unaffiliated parties that are lenders under the Second Lien Term Loan Credit Agreement: Solus L.P.; BlackRock Advisors (on behalf of managed funds or accounts); AIG Global Investment Corp.; and Deutsche Bank Securities, Inc.

81.    *"Intercompany Claim"* means any Claim held by a Debtor against another Debtor or any Claim held by an Affiliate against a Debtor.

82.    *"Intercompany Interest"* means an Equity Interest in a Debtor held by another Debtor or an Equity Interest in a Debtor held by an Affiliate of a Debtor.

83.    *"Interests"* means, collectively, Equity Interests and Intercompany Interests.

84.    *"Interim Compensation Order"* means that certain order of the Bankruptcy Court allowing Estate Professionals to seek interim compensation in accordance with the compensation procedures approved therein entered on April 2, 2008 (Docket No. 164), as may have been modified or amended.

85.    *"Johnsonville PP&E"* means the Plant, Property and Equipment owned and operated by Wellman or its subsidiaries located at 520 Kingsbury Highway, Johnsonville South Carolina.

86.    *"Johnsonville Sale"* means the sale of the Johnsonville facility owned and operated by Wellman or its subsidiaries to Johnsonville Acquisition Company LLC pursuant to § 363 of the Bankruptcy Code in accordance with the order entered by the Bankruptcy Court on October 21, 2008 (Docket No. 598).

87.    *"Judicial Code"* means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

88.    *"Lien"* means a lien as defined in section 101(37) of the Bankruptcy Code.

89.    *"Majority DIP Lenders"* means, at any time, those lenders having more than 50% of the aggregate amount of the commitments or, if the commitments shall have expired or been terminated, lenders having more than 50% of the aggregate amount of the outstanding exposure.

90.    *"Management Equity Incentive Plan"* means that certain post-Effective Date management equity incentive plan, the form of which shall be included in the Plan Supplement and shall be established and adopted by the New Board of Wellman Holdings, and shall consist of grants of equity, restricted stock, or options in an amount up to 10% of the New Common Stock, or its equivalent (including, without limitation, synthetic or phantom instruments), as of the Effective Date. The terms of the Management Equity Incentive Plan shall be set forth in the Plan Supplement and be subject to the approval of the New Board of Wellman Holdings.

91.    *"New Boards"* means the initial boards of directors of Reorganized Wellman and Wellman Holdings.

92.    *"New By-Laws"* means the form of the by-laws of each of the Reorganized Debtors and Wellman Holdings acceptable to the Backstop Parties, which form will be included in the Plan Supplement.

93.    *"New Certificate of Incorporation"* means the form of the certificates of incorporation of each of the Reorganized Debtors and Wellman Holdings, acceptable to the Backstop Parties, which form will be included in the Plan Supplement.

94.    *"New Common Stock"* means the 10,000,000 shares of common stock of Wellman Holdings issued pursuant to the Plan, par value $.001 per share, subject to dilution by the shares issued in connection with the Management Equity Incentive Plan and upon the conversion of the Convertible Notes, pursuant to the terms thereof, issued in the Rights Offering.

95.    *"Old Common Stock"* means all of the issued and outstanding shares of common stock of Wellman, Inc.

96.    *"Old Common Interests"* means all shares of Old Common Stock and all options, warrants or rights, contractual or otherwise to acquire shares of Old Common Stock.

97.    *"Old Equity Interests"* means all Old Common Interests and all Old Preferred Interests.

98.    *"Old Preferred Interests"* means all shares of Old Preferred Stock and all options, warrants or rights, contractual or otherwise, to acquire shares of Old Preferred Stock.

99.    *"Old Preferred Stock"* means all of the issued and outstanding shares of preferred stock of Wellman, Inc.

100.    *"Other Priority Claim"* means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than an Administrative Claim and a Priority Tax Claim.

101.    *"Other Secured Claim"* means any Secured Claim that is not a DIP Facility Claim, Prepetition Facility Claim, Second Lien Term Loan Claim or a First Lien Term Loan Claim.

102.    *"Palmetto Intellectual Property & Intangibles"* means certain intellectual property and intangible assets associated with the operation of the Palmetto PP&E that are subject to the DIP Lenders' and the Second Lien Lenders' liens, exclusive of any intellectual property and intangibles related to the PET resins business).

8

103.    *"Palmetto PP&E"* means the Plant, Property and Equipment owned and operated by Wellman or its subsidiaries at 1000 East McIver Road, Darlington, South Carolina.

104.    *"Palmetto Sale"* means the sale of the Palmetto PP&E (with the benefit of the Palmetto Intellectual Property & Intangibles subject to a non-competition agreement with respect to the PET resins business), which will be conducted by Wellman.

105.    *"Palmetto Sale Proceeds"* means the consideration net of costs and expenses received from the Palmetto Sale.

106.    *"PBGC"* means the Pension Benefit Guaranty Corporation.

107.    *"Pearl River PP&E"* means the Plant, Property and Equipment owned and operated by Wellman at 3303 Port and Harbor Drive, Bay St. Louis, Mississippi.

108.    *"Pension Plans"* means, collectively, the Wellman Industries, Inc. Hourly Employees Pension Plan and Fiber Industries, Inc. Retirement Income Plan.

109.    *"Petition Date"* means February 22, 2008, the date on which the Debtors commenced the Chapter 11 Cases.

110.    *"Plan"* means this *Debtors' Third Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code,* as amended, supplemented, or modified from time to time, including, without limitation, the Plan Supplement, which is incorporated herein by reference.

111.    *"Plan Documents"* mean the documents included in the Plan Supplement, as well as the Rights Offering Procedures and Backstop Commitment Agreement.

112.    *"Plan Supplement"* means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, in form and substance acceptable to the Backstop Parties, to be Filed by the Debtors no later than ten days prior to the Confirmation Hearing or such later date as may be approved by the Bankruptcy Court on notice to parties in interest, as it may thereafter be altered, amended, modified, or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and the Bankruptcy Rules, comprising of, without limitation, the following: (a) New By-Laws; (b) New Certificate of Incorporation; (c) the identity of the members of the New Boards and the nature and compensation for any member of the New Boards who is an "insider" under the Bankruptcy Code; (d) Assumed Executory Contract and Unexpired Lease List; (e) the Shareholders Agreement, if any; (f) a list of retained Causes of Action; (g) the Backstop Commitment Agreement; (h) the Distribution Trust Agreement; (i) the Convertible Notes Indenture; (j) the Registration Rights Agreement; (k) the Restructuring Transaction Memorandum; and (l) Management Equity Incentive Plan.

113.    *"Plant, Property and Equipment"* means machinery, equipment and real estate that is subject to the liens of the First Lien Lenders pursuant to the First Lien Term Loan Credit Agreement only.

114.    *"Postpetition Period"* means the period of time following the Petition Date.

115.    *"Prepetition Credit Agreement"* means that certain credit agreement, dated as of May 4, 2006, by and among Wellman, Inc. and certain of its domestic subsidiaries, as borrowers, the Agent, and certain other lenders named therein, as the same may have been subsequently modified, amended, or supplemented, together with all instruments and agreements related thereto.

116.    *"Prepetition Facility"* means that certain senior, secured credit facility entered into pursuant to the Prepetition Credit Agreement.

117.    *"Prepetition Facility Claims"* means the total amount outstanding under the Prepetition Credit Agreement as of the Effective Date.

9

118.    *"Prepetition Lenders"* means the lenders from time to time under the Prepetition Credit Agreement.

119.    *"Priority Non-Tax Claims"* means any Claim, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

120.    *"Priority Tax Claim"* means any Claim of the kind specified in section 507(a)(8) of the Bankruptcy Code.

121.    *"Pro Rata"* means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim under the Plan.

122.    *"Professional"* means an Entity: (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 363, and 331 of the Bankruptcy Code or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

123.    *"Professional Fee Claims"* means all Administrative Claims for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals (to the extent allowed under Section 328, 330, 331, 363 or 503 of the Bankruptcy Code) through the Effective Date.

124.    *"Professional Fee Order"* means that certain order of the Bankruptcy Court entered on April 1, 2008, establishing procedures for interim compensation and reimbursement of expenses of Professionals.

125.    *"Proof of Claim"* means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

126.    *"PTA and EG Contracts"* mean those contracts between Wellman and its largest suppliers of PTA and EG.

127.    *"Registration Rights Agreement"* means the Registration Rights Agreement, dated as of the Effective Date, among the Backstop Parties, certain holders of New Common Stock, certain holders of the Convertible Notes and Reorganized Wellman.

128.    *"Reinstated"* means (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the Holder of such Claim or Interest so as to leave such Claim or Interest Unimpaired or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of a Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default: (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) expressly does not require to be cured; (ii) reinstating the maturity (to the extent such maturity has not otherwise accrued by the passage of time) of such Claim or Interest as such maturity existed before such default; (iii) compensating the Holder of such Claim or Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim or Interest arises from a failure to perform a nonmonetary obligation other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensating the Holder of such Claim or Interest (other than the Debtor or an insider) for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim or Interest entitles the Holder.

129.    *"Released Party"* means each of: (a) the DIP Agent, the DIP Arranger, and the DIP Lenders in their capacity as such; (b) the Creditors' Committee and the members thereof in their capacity as such; (c) the Prepetition Lenders in their capacity as such; (d) the Backstop Parties, each in their capacities as such, (e) the First

Lien Credit Facility Agent and the First Lien Lenders, in each case, in their capacity as such; (f) the Second Lien Credit Facility Agent and the Second Lien Lenders, in each case, in their capacity as such; (g) the members of the Informal Second Lien Lender Group, each in their capacities as such; (h) with respect to each of the foregoing Entities in clauses (a) through (g), such Entities' affiliates, subsidiaries, officers, directors, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals, in each case in their capacity as such, and only if serving in such capacity; and (i) the Debtors' and the Reorganized Debtors' officers, directors, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals, in each case in their capacity as such, and only if serving in such capacity.

130.    "*Reorganized Debtors*" means the Debtors, in each case, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

131.    "*Reorganized Wellman*" means Wellman, Inc., as reorganized under and pursuant to the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

132.    "*Restructuring Transactions Memorandum*" means, subject to the consent of the Backstop Parties, the memorandum describing the restructuring transactions, including those inter-company mergers, consolidations, restructurings, transfers, conversions, dispositions, liquidations or dissolutions that the Debtors or Reorganized Debtors may determine to be necessary or appropriate to effect a restructuring of a Debtor's business or a restructuring of the overall corporate structure of the Reorganized Debtors.

133.    "*Revolver Carveout*" means the ability of the Reorganized Debtors, upon a supermajority vote (the requirements of which shall be set forth in the Convertible Notes Indenture) of the New Board of Wellman Holdings, to grant first priority liens, to secure a credit facility in an amount that shall not exceed $50 million and which shall be secured on a first priority basis by liens in certain or all of the collateral securing the Convertible Notes and which shall be senior to the Convertible Notes.

134.    "*Rights*" means the right to subscribe for and to acquire, on the Effective Date, an aggregate of $105 million in Convertible Notes to be issued by Wellman Holdings for a price of $90 million.

135.    "*Rights Offering*" means the offering of the Rights by the Debtors to Holders of First Lien Term Loan Claims and Second Lien Term Loan Claims that are "accredited investors" in accordance with the Rights Offering Procedures and the Plan.

136.    "*Rights Offering Procedures*" means those certain Rights Offering Procedures, setting forth the terms and conditions of the Rights Offering, in substantially the form annexed hereto as Exhibit F.

137.    "*Rights Subscription Exercise Form*" means that certain form distributed to each Holder of First Lien Term Loan Claims and Second Lien Term Loan Claims that is an "accredited investor," which form shall be used by such Holder for the purpose of exercising Rights.

138.    "*Second Lien Credit Facility Agent*" means Wilmington Trust Company, as successor administrative agent and collateral agent under the Second Lien Term Loan Credit Agreement, or any successor agent appointed in accordance with such agreement.

139.    "*Second Lien Lenders*" means those Lenders under the Second Lien Term Loan Credit Agreement and their successors and assigns.

140.    "*Second Lien Term Loan Claim*" means claims arising under the Second Lien Term Loan Credit Agreement.

141.    "*Second Lien Term Loan Credit Agreement*" means the Second Lien Senior Credit Agreement dated as of February 10, 2004 among Wellman, Inc., as borrower, the subsidiary guarantors named therein, the Lenders (as defined therein), Wilmington Trust Company, as Administrative Agent and Collateral Agent, JP Morgan

11

Chase Bank, as Syndication Agent, Deutsche Bank Securities Inc., as Joint Lead Arranger and Joint Lead Bookrunner, J.P. Morgan Securities Inc., as Joint Lead Arranger and Joint Lead Bookrunner, and General Electric Capital Corporation and ABN AMRO Bank N.V., as Co-Documentation Agents.

142.    *"Second Lien Trust Interests"* means the beneficial interests of the Holders of Allowed Second Lien Term Loan Claims in the Distribution Trust, the treatment of which is described Article IV.J. of this Plan.

143.    *"Secured"* means when referring to a Claim: (a) secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or (b) Allowed pursuant to the Plan as a Secured Claim.

144.    *"Securities Act"* means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a-77aa, together with the rules and regulations promulgated thereunder.

145.    *"Security"* means a security as defined in section 2(a)(1) of the Securities Act.

146.    *"Shareholders Agreement"* means the shareholders agreement, if any, dated as of the Effective Date, among the holders of 5% or more of the New Common Stock, including the Convertible Notes on an as-converted basis.

147.    *"Unexpired Lease"* means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

148.    *"Unimpaired"* means, with respect to a Class of Claims or Interests, a Claim or an Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

149.    *"Unsecured Claim"* means any Claim that is neither secured nor entitled to priority under the Bankruptcy Code or any order of the Bankruptcy Court, including any Claim arising from the rejection of an Executory Contract or Unexpired Lease under section 365 of the Bankruptcy Code.

150.    *"Unsecured Trust Interests"* means the beneficial interests of the Holders of Allowed General Unsecured Claims in the Distribution Trust, the treatment of which is described in Article IV.J. of this Plan.

151.    *"Voting Deadline"* means December [__], 2008, or such other date as determined by an order of the Bankruptcy Court for parties to vote to accept or reject the Plan.

152.    *"Wellman"* means Wellman, Inc., a Delaware corporation.

153.    *"Wellman Holdings"* means Wellman Holdings, Inc., a Delaware corporation to be formed after confirmation of the Plan but prior to the Effective Date, which, among other things, shall be the sole shareholder of Reorganized Wellman.

B.    *Rules of Interpretation*

For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, modified, or supplemented; (d) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (e) unless otherwise stated,

12

the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

C.      *Computation of Time*

        Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

D.      *Governing Law*

        Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); provided, however, that corporate governance matters relating to the Debtors or the Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation of the applicable Debtor or Reorganized Debtor, as applicable.

E.      *Reference to Monetary Figures*

        All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

F.      *Reference to the Debtors or the Reorganized Debtors*

        Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or to the Reorganized Debtors shall mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.

**ARTICLE II.**
**ADMINISTRATIVE CLAIMS AND PRIORITY TAX CLAIMS**

        **If this Plan is not confirmed, the Debtors will be forced into an immediate liquidation that will be conducted in conjunction with the DIP Lenders as Wellman will be in default under the DIP Facility. It is likely that operations at the Pearl River Facility would be shut down as part of this process. In the event of a liquidation, recoveries for Holders of Allowed Claims will be significantly reduced, if not eliminated, and Holders of General Administrative Claims, including 503(b)(9) Administrative Claims, and Holders of General Unsecured Claims will not receive a recovery.**

        In accordance with section 1123(a)(1) of the Bankruptcy Code, DIP Facility Claims, Administrative Claims, Priority Tax Claims, and Intercompany Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III.

A.      *DIP Facility Claims*

        Subject to the terms of the DIP Facility, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Facility Claim, on the Effective Date, the DIP Facility shall be repaid in Cash in full.

13

B.      *Administrative Claims*

1.    <u>General Administrative Claims</u>

Except as specified in this Article II hereof, unless otherwise agreed to by the Holder of a General Administrative Claim and Wellman or Reorganized Wellman, each Holder of an Allowed General Administrative Claim will receive, in full satisfaction of its General Administrative Claim, Cash equal to the amount of such Allowed General Administrative Claim either (i) on the Effective Date or as soon thereafter as reasonably practicable or (ii) if the General Administrative Claim is not Allowed as of the Effective Date, 15 days after the date on which an order allowing such General Administrative Claim becomes a Final Order; provided, however, that the aggregate amount of cash required to satisfy all Allowed General Administrative Claims cannot exceed $28 million.

2.    <u>Ordinary Course Liabilities</u>

Allowed General Administrative Claims based on liabilities incurred by the Debtors in the ordinary course of their business during the Postpetition Period will be paid by the Reorganized Debtors pursuant to the terms and conditions of the particular transaction giving rise to such Allowed General Administrative Claims, without any further action by the Holders of such Allowed General Administrative Claims.

3.    <u>Professional Compensation</u>

(a)      Final Fee Applications

All final requests for payment of Professional Fee Claims must be filed with the Bankruptcy Court and served on Reorganized Wellman no later than 45 days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court in the Chapter 11 Cases, the allowed amounts of such Professional Fee Claims shall be determined by the Bankruptcy Court.

(b)      Payment of Interim Amounts

Subject to the Holdback Amount, on the Effective Date, the Debtors or Reorganized Debtors shall pay all amounts owing to Professionals for all outstanding amounts payable relating to prior periods through the Effective Date. To receive payment on the Effective Date for unbilled fees and expenses incurred through such date, the Professionals shall reasonably estimate fees and expenses due for periods that will not have been billed as of the Effective Date and shall deliver such estimate to the Debtors and the United States Trustee prior to the Effective Date. The Debtors or Reorganized Debtors, as applicable, shall pay the Professionals' reasonably estimated amount of such fees and expenses as soon as reasonably practicable after receiving the estimate, but in no event prior to the Effective Date. Within forty-five (45) days after the Effective Date, a Professional receiving payment for the estimated period shall submit a detailed invoice covering such period in the manner and providing the detail as set forth in the Professional Fee Order. If the estimated payment received by any Professional exceeds the actual fees and expenses for such period, as ultimately approved by the Bankruptcy Court in connection with the relevant final fee application, such excess amount will be credited against the Holdback Amount for such Professional or, if the award of the Holdback Amount for such matter is insufficient, disgorged by such Professional within 45 days after the issuance of the Order approving the relevant final fee application. If the estimated payment received by any Professional is lower than the actual fees and expenses for such period as ultimately approved by the Bankruptcy Court in connection with the relevant final fee application, the difference between the amount approved and the estimated payment shall promptly be paid to such Professional.

(c)      Holdback Amount

On the Effective Date, the Debtors or the Reorganized Debtors shall fund the Holdback Escrow Account with Cash equal to the aggregate Holdback Amount for all Professionals. The Reorganized Debtors shall maintain the Holdback Escrow Account in trust for the Professionals with respect to whom fees have been held back pursuant to the Professional Fee Order. Such funds shall not be considered property of the Debtors, or the Reorganized

Debtors. The remaining Holdback Amount owing to each Professional shall be paid to such Professional by Reorganized Wellman from the Holdback Escrow Account when such Professional's Professional Fee Claim is finally approved by the Bankruptcy Court. When all approved Professional Fee Claims have been paid in full, amounts remaining in the Holdback Escrow Account, if any, shall be paid to the Reorganized Debtors.

(d)    Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Reorganized Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation and Consummation of the Plan incurred by the Reorganized Debtors. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

C.    *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

D.    *Other Priority Claims*

Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release and discharge offered in exchange for each Allowed Other Priority Claim, each Holder of such Allowed Other Priority Tax Claim shall be treated in accordance with section 1129(a)(9) of the Bankruptcy Code.

E.    *Intercompany Claims*

On the Effective Date, or as soon thereafter as is practicable, all Intercompany Claims will be adjusted, continued, or discharged to the extent determined appropriate by the Debtors, with the consent of the Backstop Parties.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

**If this Plan is not confirmed, the Debtors will be forced into an immediate liquidation that will be conducted in conjunction with the DIP Lenders as Wellman will be in default under the DIP Facility. It is likely that operations at the Pearl River Facility would be shut down as part of this process. In the event of a liquidation, the recoveries for Holders of all Claims described in this Article will be significantly reduced, if not eliminated.**

A.    *Classification of Claims and Interests*

All Claims and Interests, except DIP Facility Claims, Administrative Claims, Priority Tax Claims, Other Priority Claims, and Intercompany Claims are classified in the Classes set forth in this Article III. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

15

1.    Substantive Consolidation of the Debtors

Pursuant to Article IV.A, the Plan provides for the substantive consolidation of the Estates into a single Estate for all purposes associated with Confirmation and Consummation. As a result of the substantive consolidation of the Estates, each Class of Claims and Interests will be treated as against a single consolidated Estate without regard to the separate identification of the Debtors.

2.    Class Identification

The classification of Claims and Interests against the Debtors pursuant to the Plan is as follows:

| Class | Claims and Interests | Status | Voting Rights |
|-------|----------------------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| 2 | First Lien Term Loan Claims | Impaired | Entitled to Vote |
| 3 | Second Lien Term Loan Claims | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| 5 | Old Preferred Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 6 | Old Common Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 7 | Intercompany Interests | Unimpaired | Not Entitled to Vote (Deemed to Accept) |

B.    *Treatment of Claims and Interests*

1.    Class 1 - Other Secured Claims

(a)    *Classification*: Class 1 consists of all Other Secured Claims.

(b)    *Treatment*: Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Secured Claim, each Holder of such Allowed Other Secured Claims shall receive one of the following treatments, in the discretion of the Debtors or the Reorganized Debtors, with the consent of the Backstop Parties, as applicable: (i) the Debtors or the Reorganized Debtors shall pay such Allowed Other Secured Claim in full in Cash to the extent allowable under section 506(a) of the Bankruptcy Code or (ii) the Debtors or the Reorganized Debtors, with the consent of the Backstop Parties, shall otherwise treat such Allowed Other Secured Claim in any other manner such that the Allowed Other Secured Claim shall be rendered Unimpaired.

(c)    *Voting*: Class 1 is Unimpaired by the Plan. Each Holder of a Class 1 Other Secured Claim is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 1 Other Secured Claims are not entitled to vote to accept or reject the Plan.

2.    Class 2 - First Lien Term Loan Claims

(a)    *Classification*: Class 2 consists of all First Lien Term Loan Claims.

(b)    *Treatment*: In the event that both Class 2 and Class 3 vote to accept the Plan, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed First Lien Term Loan Claim, each Holder of such Allowed First Lien Term Loan Claim shall receive its Pro Rata share of (i) 70% of the New Common Stock, subject to dilution on account of the Management Equity Incentive Plan and the Convertible Notes, (ii) Rights pursuant to the Rights Offering, and (iii) the portion of the Palmetto Sale Proceeds allocated to the Palmetto PP&E. In addition to the foregoing, during the pendency of the Chapter 11 Cases in partial satisfaction of their Class 2 Claims, the Holders of Allowed

16

Claims in Class 2 have received their Pro Rata share of (i) $5.75 million in proceeds from the Johnsonville Sale and (ii) the Bottle Yard Proceeds.

(c)    *Voting*:  Class 2 is Impaired by the Plan.  Holders of Class 2 First Lien Term Loan Claims are entitled to vote to accept or reject the Plan.

3.    Class 3 - Second Lien Term Loan Claims

(a)    *Classification*:  Class 3 consists of all Second Lien Term Loan Claims.

(b)    *Treatment*:  In the event that both Class 2 and Class 3 vote to accept the Plan, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Second Lien Term Loan Claim, each Holder of such Allowed Second Lien Term Loan Claim shall receive, its Pro Rata share of (i) 30% of the New Common Stock, subject to dilution on account of the Management Equity Incentive Plan and the Convertible Notes, (ii) Rights pursuant to the Rights Offering, (iii) the Second Lien Trust Interests, and (iv) to the extent the DIP Facility Claims are satisfied in full, the portion of the Palmetto Sale Proceeds allocated to the Palmetto Intellectual Property & Intangibles.

(c)    *Voting*:  Class 3 is Impaired by the Plan.  Holders of Class 3 Second Lien Term Loan Claims are entitled to vote to accept or reject the Plan.

4.    Class 4 - General Unsecured Claims

(a)    *Classification:*  Class 4 consists of all General Unsecured Claims.

(b)    *Treatment:*  In full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed General Unsecured Claim, each Holder of such Allowed General Unsecured Claim shall receive its Pro Rata share of the Unsecured Trust Interests.

(c)    *Voting:*  Class 4 is Impaired by the Plan.  Holders of Class 4 General Unsecured Claims are entitled to accept or reject the Plan.

5.    Class 5 - Old Preferred Interests

(a)    *Classification*:  Class 5 consists of all Old Preferred Interests.

(b)    *Treatment*:  On the Effective Date, all Old Preferred Interests shall be deemed canceled and extinguished, and shall be of no further force and effect, whether surrendered for cancellation or otherwise, and there shall be no distribution to the Holders of Class 5 Old Preferred Interests.

(c)    *Voting*:  Class 5 is Impaired by the Plan.  Each Holder of a Class 5 Old Preferred Interest is conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Class 5 Old Preferred Interests are not entitled to vote to accept or reject the Plan.

6.    Class 6 - Old Common Interests

(a)    *Classification*:  Class 6 consists of all Old Common Interests.

(b)    *Treatment*:  On the Effective Date, all Old Common Interests shall be deemed canceled and extinguished, and shall be of no further force and effect, whether surrendered for

17

cancellation or otherwise, and there shall be no distribution to the Holders of Class 6 Old Common Interests.

    (c)    *Voting*: Class 6 is Impaired by the Plan. Each Holder of a Class 6 Old Common Interest is conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, Holders of Class 6 Old Common Interests are not entitled to vote to accept or reject the Plan.

7.    <u>Class 7 - Intercompany Interests</u>

    (a)    *Classification:* Class 7 consists of all Intercompany Interests.

    (b)    *Treatment:* In full and final satisfaction, settlement, release, and discharge of and in exchange for each Intercompany Interest, Intercompany Interests shall be Reinstated for the benefit of the Holders thereof.

    (c)    *Voting:* Class 7 is Unimpaired by the Plan. Each Holder of a Class 7 Intercompany Interest is conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 7 Intercompany Interests are not entitled to vote to accept or reject the Plan.

C.    *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

D.    *Acceptance or Rejection of the Plan*

1.    <u>Voting Classes</u>

Classes 2, 3, and 4 are Impaired under the Plan and are entitled to vote to accept or reject the Plan.

2.    <u>Presumed Acceptance of the Plan</u>

Classes 1 and 7 are Unimpaired under the Plan. The Holders of Claims and Interests in such Classes are conclusively presumed to have accepted the Plan and are not entitled to vote to accept or reject the Plan.

3.    <u>Presumed Rejection of Plan</u>

Classes 5 and 6 are Impaired and shall receive no distribution under the Plan. The Holders of Claims and Interests in such Classes are conclusively presumed to have rejected the Plan and are not entitled to vote to accept or reject the Plan.

E.    *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by Class 2 and Class 3. In the event that either Class 2 or Class 3 votes to reject the Plan, the Debtors will not seek to confirm the Plan over such rejection and will proceed immediately to a liquidation. If Class 2 and Class 3 vote to accept the Plan, the Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code if Class 4 votes to reject the Plan.

*F.    Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

*G.    Subordinated Claims*

The allowance, classification, and treatment of all Allowed Claims and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim in accordance with any contractual, legal, or equitable subordination relating thereto.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

*A.    Substantive Consolidation for Plan Purposes Only*

On the Effective Date, subject to the Restructuring Transactions, the Debtors shall be deemed merged into Wellman, and (i) all assets and all liabilities of the Debtors shall be deemed merged into Wellman, (ii) all guaranties of any Debtor of the payment, performance, or collection of obligations of another Debtor shall be eliminated and canceled, (iii) any obligation of any Debtor and all guaranties thereof executed by one or more of the other Debtors shall be treated as a single obligation, and such guaranties shall be deemed a single Claim against the consolidated Debtors, (iv) all joint obligations of two or more Debtors, and all multiple Claims against such entities on account of such joint obligations shall be treated and allowed only as a single Claim against the consolidated Debtors, and (v) each General Unsecured Claim filed in the Chapter 11 Cases of any Debtor shall be deemed filed against the consolidated Debtors and a single obligation of the consolidated Debtors on and after the Effective Date.

Entry of the Confirmation Order will constitute the approval, pursuant to section 105(a) of the Bankruptcy Code, effective as of the Effective Date, of the deemed substantive consolidation of the Chapter 11 Cases for purposes of voting on, confirmation of, and distribution under the Plan.

In addition, on the Effective Date each Debtor that holds an Intercompany Claim against a direct subsidiary shall contribute such Intercompany Claim to the capital of such direct subsidiary. In the event the obligor under the Intercompany Claim is an indirect subsidiary, the holder shall contribute such Intercompany Claim to the capital of the direct subsidiary through which such holder indirectly controls such obligor. Such direct subsidiary (and, to the extent applicable, each of its direct or indirect subsidiaries to which the Intercompany Claim is then contributed) shall, in turn, be treated as the holder of such Intercompany Claim and shall contribute such Intercompany Claim to the capital of its direct subsidiaries in accordance with the immediately preceding two sentences. An Intercompany Claim shall continue to be contributed to the capital of subsidiaries until it is contributed to the capital of the subsidiary that is the obligor under such Claim, thereby eliminating such Intercompany Claim. On the Effective Date, all other Intercompany Claims (including without limitation Intercompany Claims that a Debtor holds against a direct or indirect parent corporation) shall be eliminated and discharged. Notwithstanding the foregoing, at the election of Wellman, in their discretion and with the consent of the Backstop Parties, any Intercompany Claims between two Debtors may be eliminated other than through capital contributions as described above or may not be eliminated and discharged hereunder. In no event shall Distributions be made hereunder on account of any Intercompany Claims.

Notwithstanding the foregoing, the deemed consolidation and substantive consolidation (each for Plan purposes only) shall not (other than for purposes related to funding Distributions under the Plan) affect (w) the legal and organizational structure of the Debtors or the Reorganized Debtors, (x) pre- and post-Petition Date guaranties, liens, and security interests that were required to be maintained (i) in connection with Executory Contracts or Unexpired Leases that were entered into during the Chapter 11 Cases or that have been or will be assumed by the

Debtors or (ii) pursuant to the Plan, (y) distributions out of any insurance policies or proceeds of such policies, and (z) the tax treatment of the Debtors. Furthermore, notwithstanding the foregoing, the deemed consolidation and substantive consolidation (each for Plan purposes only), shall not affect the statutory obligation of each and every Debtor to pay quarterly fees to the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6) and Article XII.G of this Plan.

Additionally, notwithstanding the foregoing, the deemed consolidation and substantive consolidation (each for Plan purposes only) shall not affect any statutory joint and several liabilities arising against the Debtors or Reorganized Debtors with respect to the Pension Plans.

B.      *General Settlement of Claims*

As discussed in detail in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, Distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good faith compromise and settlement of all Claims and Equity Interests and controversies resolved pursuant to the Plan. Subject to Article VI, all Distributions made to Holders of Allowed Claims in any Class are intended to be and shall be final.

C.      *Wellman Holdings*

Prior to the Effective Date, the Debtors shall form Wellman Holdings as a Delaware corporation. On the Effective Date, the New Certificate of Incorporation for Wellman Holdings shall be filed with the Delaware Secretary of State and Wellman Holdings shall be the sole shareholder of Reorganized Wellman, the New Board of Wellman Holdings shall be established and Wellman Holdings shall adopt its New Bylaws and the Management Equity Incentive Plan. Wellman Holdings shall be authorized to adopt any other agreements, documents, and instruments and to take any other actions contemplated by the Plan as necessary or desirable to consummate the Plan.

D.      *The Palmetto Sale*

Wellman shall commence and conduct the Palmetto Sale in a commercially reasonable manner as soon as practicable. Upon the closing of the Palmetto Sale the Palmetto Sale Proceeds shall be allocated between the Palmetto PP&E and the Palmetto Intellectual Property & Intangibles. The portion of the Palmetto Sale Proceeds allocated to the Palmetto PP&E shall be distributed to the First Lien Credit Facility Agent for the benefit of Holders of Claims in Class 2. The portion of the Palmetto Sale Proceeds allocated to the Palmetto Intellectual Property and Intangibles shall be paid to the DIP Lenders, and to the extent that the DIP Facility Claims are fully satisfied, to the Holders of Claims in Class 3. In the event the Palmetto Sale is not consummated within a reasonable time period, the Reorganized Debtors shall deliver a quitclaim deed transferring the Palmetto PP&E to the First Lien Credit Facility Agent on behalf of the First Lien Lenders free and clear of all Liens, Claims, charges, or other encumbrances. Following any such transfer, the Reorganized Debtors shall not have any further obligations or liability to the First Lien Lenders with respect to the Palmetto PP&E.

E.      *Issuance of New Common Stock*

The issuance of the Convertible Notes and the New Common Stock, including options, or other equity awards, if any, reserved for the Management Equity Incentive Plan, and shares of New Common Stock reserved for issuance upon conversion of the Convertible Notes, by Wellman Holdings is authorized without the need for any further corporate action or without any further action by a Holder of Claims or Interests. The total number of shares of capital stock authorized under the New Certificate of Incorporation of Wellman Holdings shall be 30,000,000 shares. On the Effective Date, or as soon as reasonably practicable thereafter, the New Common Stock shall be issued to the Holders of the Second Lien Term Loan Claims, or reserved for issuance pursuant to the terms of the Management Equity Incentive Plan and the Convertible Notes.

All of the shares of New Common Stock issued pursuant to the Plan shall be duly authorized, validly issued, fully paid and non-assessable. Each distribution and issuance referred to in Article VI hereof shall be governed by the terms and conditions set forth herein applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

Upon the Effective Date, the Registration Rights Agreement and the Shareholders Agreement shall each be deemed to become valid, binding and enforceable in accordance with their respective terms, and each Holder of New Common Stock shall be bound thereby, in each case, without need for execution by any party thereto other than the Reorganized Debtors.

### F.    Corporate Existence

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state law).

### G.    Vesting of Assets in the Reorganized Debtors

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated therein, on the Effective Date, all property in each Estate, all Causes of Action (other than the Causes of Action in the Distribution Trust), and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens, if any, granted to secure the Convertible Notes). On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action (other than those Causes of Action that are included in the Distribution Trust) without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### H.    Cancellation of Securities and Agreements

On the Effective Date, except as otherwise specifically provided for in the Plan: (1) the obligations of the Debtors under the Prepetition Credit Agreement, First Lien Term Loan Agreement, Second Lien Term Loan Agreement, and any other Certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such Certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that are Reinstated pursuant to the Plan), shall be cancelled solely as to the Debtors, and the Reorganized Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, Certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, Certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged; provided, however, notwithstanding Confirmation or the occurrence of the Effective Date, any such indenture or agreement that governs the rights of the Holder of a Claim shall continue in effect solely for purposes of allowing Holders to receive distributions under the Plan; provided, further, however, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan, or result in any expense or liability to the Reorganized Debtors.

21

I.    The Rights Offering

The Rights Offering will consist of a $90 million Cash investment in exchange for Convertible Notes to be issued by Wellman Holdings. In the Rights Offering, Wellman Holdings will issue $105 million in principal amount of Convertible Notes (plus $15 million in principal amount of Convertible Notes issued to the Backstop Parties in payment of the Backstop Fee). The difference between the $90 million raised in the Rights Offering and the $105 million in principal amount of Convertible Notes issued to participants in the Rights Offering constitutes original issue discount or "OID". The total principal amount of the Convertible Notes shall be $120 million. The $90 million in proceeds from the Rights Offering shall be used by Reorganized Wellman to (i) fund administrative expenses and unsecured creditor recoveries, if any, under the Plan, (ii) fund the payment of any cure costs under Executory Contracts and Unexpired Leases to be assumed by Reorganized Wellman, (iii) pay down all or a portion of the obligations outstanding under the DIP facility, and (iv) fund the Distribution Trust.

1.    Rights Offering Procedures

Holders of the First Lien Term Loan Claims and Second Lien Term Loan Claims that are "accredited investors" will be entitled to exercise Rights to subscribe for and acquire 100% of the Convertible Notes (subject to the Backstop Fee and original issue discount) being offered pursuant to the Rights Offering, subject to the Backstop Commitment Agreement and in accordance with the terms of the Rights Offering Procedures.

2.    Rights Offering Backstop

In the event that the the Backstop Commitment Agreement is executed, the Backstop Parties will acquire any Convertible Notes not purchased in the Rights Offering in accordance with the terms of the Backstop Commitment Agreement and shall be entitled to receive the Backstop Fee.

J.    The Distribution Trust[5]

The Distribution Trust is expected to be formed as a Delaware trust to prosecute various causes of action originally owned by Wellman, including certain Avoidance Actions, and, if any of the prosecutions are successful or are settled in a manner that derives economic benefit to the Distribution Trust, to distribute to the holders of the Distribution Trust Interests the net proceeds of such causes of action as provided below. The Distribution Trust will continue in existence for a period of three years or until the distribution of all of its property, whichever occurs first, except that if the supervisors determine that it is necessary to extend the duration of the Distribution Trust to accomplish the Distribution Trust's purposes, they may make an application to the Bankruptcy Court prior to the expiration of the third year of the Distribution Trust. The Bankruptcy Court shall retain jurisdiction regarding the Distribution Trust's operations.

1.    Trust Distributions

The Distribution Trust shall distribute funds on account of beneficial interests in the Distribution Trusts in the following order:

(a)    FIRST, the Distribution Trust shall distribute the first $1 million in aggregate, available proceeds, net of any costs related to the litigation and exclusive of any royalties related to future sales, as follows: (1) 25% of all such payments, pro rata, to the beneficial holders of the Unsecured Creditor Trust Interests and (2) 75% of all such payments, pro rata, to the beneficial holders of the Second Lien Trust Interests;

---

[5]    The Debtors reserve the right, subject to the consent of the Informal Second Lien Lender Group, to utilize an alternative means of distributing the certain Causes of Action, or proceeds thereof and the proceeds of the Eastman Litigation to Holders of Claims in Classes 3 and 4, provided, however, that the method of distribution utilized shall not have a material adverse impact on the amount of consideration, if any, provided to such Holders when compared to a trust structure.

(b)        SECOND, the Distribution Trust shall distribute any available proceeds, net of any costs related to the litigation and exclusive of any royalties related to future sales, in excess of $1 million as follows: (1) 20% of all such payments, pro rata, to the beneficial holders of the Unsecured Creditor Trust Interests and (2) 80% of all such payments, pro rata, to the beneficial holders of the Second Lien Trust Interests; provided, however, that if the Allowed Second Lien Term Loan Claims are paid in full, but Allowed General Unsecured Claims remain unpaid, any excess proceeds from the Distribution Trust shall be distributed, pro rata, to the beneficial holders of the Unsecured Creditor Trust Interests; provided, further, that if the Allowed General Unsecured Claims are paid in full, but Allowed Second Lien Term Loan Claims remain unpaid, any excess proceeds from the Distribution Trust shall be distributed, pro rata, to the beneficial holders of the Second Lien Trust Interests; provided, further, that if the Allowed Second Lien Term Loan Claims and the Allowed General Unsecured Claims are paid in full, any excess proceeds from the Distribution Trust shall be distributed to Reorganized Wellman.

2.    Management of the Distribution Trust

The Distribution Trust will be managed by a managing trustee and three supervisors.  Two of the supervisors will be selected by the Informal Second Lien Lender Group and the third supervisor will be selected by the Creditors' Committee.  Generally, the managing trustee will have the authority to manage, dispose of, and invest the assets of the Distribution Trust but will be required to obtain the consent of the supervisors to take certain actions, including early termination of the Distribution Trust, entering into contracts in amounts greater than $25,000, borrowing of funds, and the approval of distributions.

3.    Distribution Trust Reporting

The Distribution Trust Agreement will require that the Distribution Trust distribute quarterly and annual reports containing unaudited financial information reflecting the activities of the Distribution Trust with respect to its assets and distributions, as well as current reports promptly following the occurrence of any events sufficiently material to mandate the issuance of such a report.

4.    Assets of the Distribution Trust

The Distribution Trust will be capitalized with $250,000 in Cash.  The Distribution Trust will own the rights to causes of action currently held by the Debtors, including, but not limited to, certain Avoidance Actions determined by the Debtors and the proceeds, net of costs, thereof and the proceeds, net of costs, of the Eastman Litigation, but not the Eastman Litigation itself (which the Reorganized Debtors will continue to own).  The causes of action held by the Distribution Trust may not be successful and there is no guarantee that the Distribution Trust will ever make distributions.

5.    Ownership of the Distribution Trust

Ownership in the Distribution Trust will be evidenced by book entries.  The Distribution Trust Interests will be non-voting and not confer any rights as shareholders.  The Distribution Trust Interests will not be transferable by a Holder except: (i) to any relative, spouse, or relative of the spouse of the Holder, (ii) to any trust or estate in which such Holder has more than a 50% interest of the beneficial interest (excluding contingent interests), (iii) to any corporation, partnership, or other organization in which such Holder is the beneficial owner of more than 50% of the equity securities (excluding directors qualifying shares) so long as the transferor and transferee certify that there is no current intention of changing the direct and indirect ownership of the transferee, (iv) to any person or entity that holds directly or indirectly, more than 50% of the voting securities of such Holder, or (v) upon the death of such Holder in accordance with the operation of law.  The managing trustee will take reasonable actions to prohibit the formation of an active trading market in the Distribution Trust Interests.

K.    *Restructuring Transactions*

On the Effective Date, the applicable Debtors or Reorganized Debtors shall enter into the Restructuring Transactions, including those described in the Restructuring Transactions Memorandum, and shall take any actions as may be necessary or appropriate to effect a corporate restructuring of their respective businesses or a corporate restructuring of the overall corporate structure of the Reorganized Debtors, as and to the extent provided therein. The Restructuring Transactions may include one or more inter-company mergers, consolidations, restructurings, conversions, dissolutions, transfers or liquidations as may be determined by the Debtors or the Reorganized Debtors to be necessary or appropriate. The actions to effect the Restructuring Transactions may include: (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable state law; and (4) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Restructuring Transactions.

L.    *Corporate Action*

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (i) adoption or assumption, as applicable, of the agreements with existing management, (ii) selection of the directors and officers for the Reorganized Debtors and Wellman Holdings, (iii) the distribution of the New Common Stock, (iv) the issuance of the Convertible Notes and the execution and entry into the Convertible Notes Indenture, (v) adoption of the Management Equity Incentive Plan, and (vi) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date), including the Palmetto Sale or the transfer of the Palmetto PP&E to the First Lien Credit Facility Agent on behalf of the First Lien Lenders. All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors, the Reorganized Debtors, or Wellman Holdings in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, or officers of the Debtors, the Reorganized Debtors, or Wellman Holdings. On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors, the Reorganized Debtors, or Wellman Holdings, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including (i) the Convertible Notes Indenture, (ii) documents to effect the Palmetto Sale or transfer of the Palmetto PP&E to the First Lien Credit Facility Agent on behalf of First Lien Lenders, and (iii) any and all other agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this section IV.L shall be effective notwithstanding any requirements under nonbankruptcy law. The issuance of the New Common Stock shall be exempt from the requirements of section 16(b) of the Securities Exchange Act of 1934 (pursuant to Rule 16b-3 promulgated thereunder) with respect to any acquisition of such securities by an officer or director (or a director deputized for purposes thereof) as of the Effective Date.

M.    *New Certificate of Incorporation and New By-Laws*

On or immediately prior to the Effective Date, the Reorganized Debtors will file their respective New Certificates of Incorporation with the applicable Secretaries of State and/or other applicable authorities in their respective states of incorporation in accordance with the corporate laws of the respective states of incorporation. After the Effective Date, the Reorganized Debtors may amend and restate their respective New Certificates of Incorporation and New By-Laws and other constituent documents as permitted by the laws of their respective states of incorporation and their respective New Certificates of Incorporation and New By-Laws.

N.      *Directors and Officers of the Reorganized Debtors and Wellman Holdings*

As of the Effective Date, the term of the current members of the board of directors of Wellman shall expire, and the initial boards of directors, including the New Boards, and the officers of each of the Reorganized Debtors shall be appointed in accordance with the respective New Certificates of Incorporation and New By-laws. The New Board of Wellman Holdings shall consist of seven (7) members. One member shall be the Chief Executive Officer of Reorganized Wellman, Mark J. Ruday. With respect to the remaining six (6) members, four (4) members shall be selected by the Backstop Parties, one member shall be selected by the First Lien Credit Facility Agent, and one member shall be selected by the Informal Second Lien Lender Group. Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose in the Plan Supplement the identity and affiliations of any Person proposed to serve on the initial board of directors or be an officer of each of the Reorganized Debtors and Wellman Holdings. To the extent any such director or officer of Reorganized Wellman or Wellman Holdings is an "insider" under the Bankruptcy Code, the nature and amount of any compensation to be paid to such director or officer will also be disclosed. Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the New Certificates of Incorporation, New By-laws, and other constituent documents of the Reorganized Debtors or Wellman Holdings.

O.      *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Reorganized Debtors and Wellman Holdings, and the officers and members of the boards of directors thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors and Wellman Holdings, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

P.      *Employee and Retiree Benefits*

Subject to the consent of the Backstop Parties, all employment, retirement, indemnification, and other agreements or arrangements in place as of the Effective Date with the Debtors' officers, directors, or employees, who will continue in such capacities or similar capacities after the Effective Date, or retirement income plans and welfare benefit plans for such persons, or indemnification arrangements with directors of non-Debtor subsidiaries, shall remain in place after the Effective Date, and the Reorganized Debtors will continue to honor such agreements, arrangements, programs, and plans; *provided, however,* that the foregoing shall not apply to any stock-based compensation or incentive plan, agreement, or arrangement existing as of the Petition Date. Nothing in the Plan shall limit, diminish, or otherwise alter the Reorganized Debtors' defenses, claims, Causes of Action, or other rights with respect to any such contracts, agreements, policies, programs, and plans. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, on and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid in accordance with applicable law.

Pursuant to the Plan, Wellman shall continue the Wellman Plan and Fiber Industries, Inc. shall continue the Fiber Plan Industries, Inc. Retirement Income Plan. The Pension Plans shall be continued in accordance with their terms, and the Debtors or the Reorganized Debtors shall satisfy the minimum funding standards pursuant to 26 U.S.C. § 412 and 29 U.S.C. § 1082, be liable for the payment of PBGC premiums in accordance with 29 U.S.C. §§ 1306 and 1307 subject to any and all applicable rights and defenses of the Debtors, and administer the Pension Plans in accordance with the provisions of ERISA and the Internal Revenue Code. Notwithstanding any provision of the Plan or the Confirmation Order to the contrary, the Pension Plans shall be continued and administered in accordance with ERISA and the Internal Revenue Code.

Additionally, notwithstanding anything in the Plan, including Article VIII, no claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities whatsoever against any entity with respect to the Pension Plans shall be released, exculpated, discharged, enjoined, or otherwise effected by the Plan, nor shall the entry of the Confirmation Order constitute the approval of any release, exculpation, discharge, injunction, or

25

other impairment of any claims obligations, suits, judgments, damages, demands, debts, rights, cause of action or liabilities whatsoever against any entity with respect to the Pension Plans.

*Q.      D&O Liability Insurance Policies*

Wellman has obtained reasonably sufficient tail coverage under a directors and officers' liability insurance policy for the current and former directors and officers of the Debtors. As of the Effective Date, the Reorganized Debtors shall assume all of the D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained herein, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed.

*R.      Sources of Consideration for Plan Distributions*

All consideration necessary for the Reorganized Debtors to make payments or distributions pursuant hereto shall be obtained from the Rights Offering or other Cash from the Debtors, including Cash from business operations. Further, the Debtors and the Reorganized Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Reorganized Debtors to satisfy their obligations under the Plan. Except as set forth herein, any changes in intercompany account balances resulting from such transfers will be accounted for and settled in accordance with the Debtors' historical intercompany account settlement practices and will not violate the terms of the Plan.

*S.      First Lien Credit Facility Agent and Second Lien Credit Facility Agent*

The First Lien Credit Facility Agent and Second Lien Credit Facility Agent, respectively, shall be deemed to be the holder of all First Lien Term Loan Claims or Second Lien Term Loan Claims for purposes of distributions to be made hereunder, and all distributions on account of such claims shall be made to or on behalf of the First Lien Credit Facility Agent and Second Lien Credit Facility Agent, as applicable. The First Lien Credit Facility Agent shall hold or direct such distributions for the benefit of the holders of Allowed First Lien Term Loan Claims, while the Second Lien Credit Facility Agent shall hold or direct such distribution for the benefit of the holders of Allowed Second Lien Term Loan Claims. The First Lien Credit Facility Agent and Second Lien Credit Facility Agent shall arrange to deliver such distributions to or on behalf of their respective claimants.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

*A.      Assumption and Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided herein, all Executory Contracts or Unexpired Leases, not previously assumed or rejected pursuant to an order of the Bankruptcy Court, will be deemed rejected, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, other than those Executory Contracts or Unexpired Leases that are (1) to be assumed pursuant to the terms of this Article V hereof, (2) identified on the Assumed Executory Contract and Unexpired Lease List, (3) the subject of a motion to assume Executory Contracts or Unexpired Leases that is pending on the Effective Date, or (4) subject to a motion to reject an Executory Contract or Unexpired Lease pursuant to which the requested effective date of such rejection is after the Effective Date. Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such rejections and the assumption of the Executory Contracts or Unexpired Leases listed on the Assumed Executory Contract and Unexpired Lease List pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order. Each Executory Contract and Unexpired Lease assumed pursuant to this Section V.A. or by any order of the Bankruptcy Court, which has not been assigned to a third party prior to the Effective Date, shall revest in and be fully enforceable by the Reorganized Debtors in

accordance with its terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law.

B.     *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

All proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be filed with the Bankruptcy Court within thirty days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, their Estates, or their property without the need for any objection by the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court. All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.B.4 of this Plan.

C.     *Cure of Defaults for Executory Contracts and Unexpired Leases Assumed*

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree, provided, however, that Cure Claims shall constitute General Administrative Claims and the aggregate amount of Cash required to satisfy all Allowed General Administrative Claims cannot exceed $28 million. In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or (3) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption. At least 15 days prior to the Confirmation Hearing, the Debtors, subject to the consent of the Backstop Parties, shall provide for notices of proposed assumption and proposed cure amounts to be sent to applicable third parties and for procedures for objecting thereto and resolution of disputes by the Bankruptcy Court. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount must be filed, served, and actually received by the Debtors at least 3 days prior to the Confirmation Hearing. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or cure amount.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time prior to the effective date of assumption. Any Proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

D.     *Insurance Policies*

All of the Debtors' insurance policies and any agreements, documents or instruments relating thereto, are treated as Executory Contracts under the Plan. On the Effective Date, the Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all Insured Claims.

E.     *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if

27

any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

F.      *Reservation of Rights*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Assumed Executory Contract and Unexpired Lease List, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized Debtors, as applicable, shall have thirty days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

G.      *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any consensual request to extend the deadline for assuming or rejecting unexpired leases pursuant to section 365(d)(4) of the Bankruptcy Code.

H.      *Contracts and Leases Entered Into After the Petition Date*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the Debtor or Reorganized Debtor liable thereunder in the ordinary course of its business.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim against the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII hereof.  Except as otherwise provided herein, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date.

B.      *Disbursing Agent*

All distributions under the Plan shall be made by the Reorganized Debtors as Disbursing Agent or such other Entity designated by the Debtors or Reorganized Debtors, with the consent of the Backstop Parties, as a Disbursing Agent on the Effective Date.  A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in

the event that a Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

C.    *Rights and Powers of Disbursing Agent*

    1.    <u>Powers of the Disbursing Agent</u>

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

    2.    <u>Expenses Incurred On or After the Effective Date</u>

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

D.    *Distributions on Account of Claims Allowed After the Effective Date*

    1.    <u>Payments and Distributions on Disputed Claims</u>

Notwithstanding any other provision of the Plan, no distributions shall be made under the Plan on account of any Disputed Claim, unless and until such Claim becomes an Allowed Claim. Distributions made after the Effective Date to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

    2.    <u>Special Rules for Distributions to Holders of Disputed Claims</u>

Notwithstanding any provision otherwise in the Plan and except as otherwise agreed to by the relevant parties: (a) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order; and (b) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order and the Disputed Claims have been Allowed.

    3.    <u>Disputed General Unsecured Claims Reserve</u>

        (a)    Deposit of Distribution Trust Interests on the Effective Date

On the Effective Date (or as soon thereafter as is reasonably practicable), Reorganized Wellman shall deposit from the Distribution Trust into the Disputed General Unsecured Claims Reserve the Distribution Trust Interests that would have been distributed to the Holders of Disputed General Unsecured Claims if such Disputed General Unsecured Claims had been Allowed General Unsecured Claims on the Effective Date to ensure that the Holders of Allowed General Unsecured Claims receive the same percentage recovery from the Distribution Trust on account of their individual Claims at all times. The amount of Distribution Trust Interests to be deposited in the Disputed General Unsecured Claims Reserve will be determined based on the lesser of (a) the asserted amount of the Disputed General Unsecured Claim filed with the Bankruptcy Court or (if no proof of such Claim was filed) scheduled by the Debtors, (b) the amount, if any, estimated by the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code, or (c) the amount otherwise agreed to by the Debtors and the Holder of such Disputed General Unsecured Claims.

        (b)    Distributions After Allowance

Reorganized Wellman shall distribute from the Disputed General Unsecured Claims Reserve to the Holder of any Disputed General Unsecured Claim that has become an Allowed General Unsecured Claim, no later than the fifth (5th) Business Day after the end of the calendar month in which such Disputed General Unsecured Claim becomes an Allowed General Unsecured Claim, Distribution Trust Interests in an amount equal to the Pro Rata share of the beneficial interests in the Distribution Trust that such Holder would have received on account of such Claim if such Claim had been an Allowed General Unsecured Claim on the Effective Date.

(c)      Distributions After Disallowance

If a Disputed General Unsecured Claim is disallowed, in whole or in part, Reorganized Wellman shall on a quarterly basis (and in no event later than the fifth (5th) Business Day after the end of each calendar quarter) distribute the Distribution Trust Interests, reserved in respect of such disallowed Disputed General Unsecured Claim from the Distribution Trust to Holders of Allowed General Unsecured Claims in a manner designed to ensure that the Holders of Allowed General Unsecured Claims receive the same Pro Rata share of beneficial interests in the Distribution Trust.

E.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

1.      Delivery of Distributions in General

Except as otherwise provided herein, the Reorganized Debtors shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the Debtors' records as of the date of any such distribution; provided, however, that the manner of such distributions shall be determined at the discretion of the Reorganized Debtors; and provided further, that the address for each Holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that Holder.

2.      Minimum Distributions

No fractional shares of New Common Stock, Convertible Notes, or Distribution Trust Interests shall be distributed and no Cash shall be distributed in lieu of such fractional amounts. When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of a number of shares of New Common Stock, Convertible Notes, or Distribution Trust Interests that is not a whole number, the actual distribution of shares of New Common Stock, Convertible Notes, or Distribution Trust Interests shall be rounded as follows: (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment therefore. The total number of authorized shares of New Common Stock and number of Convertible Notes, and Distribution Trust Interests to be distributed to holders of Allowed Claims shall be adjusted as necessary to account for the foregoing rounding.

3.      Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; provided, however, such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further Order by the Bankruptcy Court (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be discharged and forever barred.

F.      *Compliance with Tax Requirements/Allocations*

In connection with the Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any governmental unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Disbursing Agent shall be authorized to take all actions necessary

30

or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens and encumbrances.

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

G.    Setoffs

The Debtors and the Reorganized Debtors may withhold (but not setoff except as set forth below) from the distributions called for under the Plan on account of any Allowed Claim (other than a Class 1 Claim, a DIP Facility Claim, or Class 3 Claim) an amount equal to any claims, equity interests, rights, and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim. In the event that any such claims, equity interests, rights, and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim are adjudicated by Final Order or otherwise resolved, the Debtors may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant hereto on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim) the amount of any adjudicated or resolved claims, equity interests, rights, and Causes of Action of any nature that the Debtors or the Reorganized Debtors may hold against the Holder of any such Allowed Claim, but only to the extent of such adjudicated or resolved amount. Neither the failure to effect such a setoff nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claims, equity interests, rights, and Causes of Action that the Debtors or the Reorganized Debtors may possess against any such Holder, except as specifically provided herein.

H.    Recoupment

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

I.    Release of Liens

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtor and its successors and assigns.

J.    Claims Paid or Payable by Third Parties

1.    Claims Paid by Third Parties

The Debtors or the Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor. Subject to the last sentence of this paragraph,

31

to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

2. Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3. Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

A.    *Prosecution of Objections to Claims*

The Debtors or the Reorganized Debtors, as applicable, shall have the exclusive authority, with the consent of the Backstop Parties with respect to any Claim settled in an amount equal to or in excess of $50,000, to File, settle, compromise, withdraw, or litigate to judgment any objections to Claims as permitted under the Plan. From and after the Effective Date, the Debtors and the Reorganized Debtors may, with the consent of the Backstop Parties, settle or compromise any Disputed Claim without approval of the Bankruptcy Court. The Debtors also reserve the right to resolve, with the consent of the Backstop Parties, any Disputed Claim outside the Bankruptcy Court under applicable governing law.

B.    *Allowance of Claims and Interests*

Except as expressly provided herein or any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim shall be deemed Allowed unless and until such Claim is deemed Allowed under the Bankruptcy Code, under the Plan, or the Bankruptcy Court enters a Final Order in the Chapter 11 Cases allowing such Claim under section 502 of the Bankruptcy Code. Except as expressly provided in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), the Reorganized Debtors after Confirmation will have and retain any and all rights and defenses the Debtors had with respect to any Claim as of the Petition Date. All Claims of any Entity that owes money to the Debtors shall be disallowed unless and until such Entity pays, in full, the amount it owes the Debtors.

32

C.      *No Distributions Pending Allowance*

Notwithstanding any other provision hereof, if any portion of a Claim is a Disputed Claim, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim, in whole or in part.

D.      *Distributions After Allowance*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim.

E.      *Estimation of Claims*

The Debtors (prior to the Effective Date) or Reorganized Debtors (after the Effective Date) may, at any time, and from time to time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim against any party or Entity, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors (prior to the Effective Date) or the Reorganized Debtors (after the Effective Date), may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, objected to, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.      *Discharge of Claims and Termination of Interests*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment or a termination of any employee or retiree benefit program (excepting the Wellman Plan and the Fiber Plan), regardless of whether such termination occurred prior to or after the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim or Interest based upon such debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan. Any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring. Nothing in this paragraph shall impair the police or regulatory powers of the United States of America or any Governmental

33

Unit thereof. The actions of the Securities and Exchange Commission that (1) are non-pecuniary, (2) do not relate to collection of a Claim, or (3) do not pursue injunctions that could be reduced to a monetary Claim, are not discharged under this Article VIII.A.

**B.      *Releases by the Debtors***

Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or the Plan Supplement, for good and valuable consideration, including the service of the Released Parties to facilitate the expeditious reorganization of the Debtors and the implementation of the restructuring contemplated by the Plan, on and after the Effective Date, the Released Parties are deemed released and discharged by the Debtors, the Reorganized Debtors, and the Estates from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors, the Estates, or their Affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan and Disclosure Statement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct (including fraud) or gross negligence.

**C.      *Releases by Holders of Claims and Interests***

As of the Effective Date, each Holder of a Claim or an Interest shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged the Debtors, the Reorganized Debtors, and the Released Parties from any and all Claims, Interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims, asserted on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Debtors' Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Plan and Disclosure Statement, or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than Claims or liabilities arising out of or relating to any act or omission of a Released Party that constitutes willful misconduct (including fraud) or gross negligence. Notwithstanding anything to the contrary in the foregoing, the release set forth above does not release any obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

**D.      *Exculpation***

Except as otherwise specifically provided in the Plan or Plan Supplement, no Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Claim, obligation, Cause of Action, or liability for any Exculpated Claim, except for gross negligence or willful misconduct, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Debtors, the Reorganized Debtors, and the Backstop Parties (and each of their respective Affiliates, agents, directors, officers, employees, advisors, and attorneys) have, and upon Confirmation of the Plan shall be deemed to have, participated in good faith and in

34

compliance with the applicable provisions of the Bankruptcy Code with regard to the distributions of the Securities pursuant to the Plan, including the Rights Offering, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the Rights Offering.

E.      *Injunction*

Except as otherwise expressly provided in the Plan or for obligations issued pursuant to the Plan, all Entities who have held, hold, or may hold claims or Interests that have been released pursuant to Article VIII.B or Article VIII.C, discharged pursuant to Article VIII.A, or are subject to exculpation pursuant to Article VIII.D are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Released Parties, or the Exculpated Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Confirmation Date, and notwithstanding an indication in a Proof of Claim or Interest or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.  Nothing in the Plan or Confirmation Order shall preclude any Entity from pursuing an action against one or more of the Debtors in a nominal capacity to recover insurance proceeds so long as the Debtors or Reorganized Debtors, as applicable, and any such Entity agree in writing that such Entity will:  (1) waive all Claims against the Debtors, the Reorganized Debtors, and the Estates related to such action and (2) enforce any judgment on account of such Claim solely against applicable insurance proceeds, if any.

Nothing in the Confirmation Order or Plan shall effect a release of any claim by the United States Government or any of its agencies or any state and local authority whatsoever, including without limitation any claim arising under the Internal Revenue Code, the environmental laws, the securities laws, or any criminal laws of the United States or any state and local authority against the Released Parties. Furthermore, nothing in the Confirmation Order or Plan shall enjoin the United States or any state or local authority from bringing any claim, suit, action or other proceedings against the Released Parties for any liability whatsoever, including without limitation any claim, suit or action arising under the Internal Revenue Code, the environmental laws, the securities laws, or any criminal laws of the United States or any state or local authority.  Furthermore, nothing in the Confirmation Order or Plan shall exculpate any party from any liability to the United States Government or any of its agencies or any state and local authority whatsoever, including any liabilities arising under the Internal Revenue Code, the environmental laws, the securities laws, or any criminal laws of the United States or any state and local authority against the Released Parties.

ARTICLE IX.
CONDITIONS PRECEDENT TO CONFIRMATION
AND CONSUMMATION OF THE PLAN

A.      *Conditions Precedent to Confirmation*

It shall be a condition to Confirmation of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C hereof:

1.      The Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably acceptable to the Debtors and the Majority DIP Lenders.

2.   The Bankruptcy Court shall have entered the Confirmation Order in form and substance acceptable to the Backstop Parties.

3.   The Confirmation Order shall:

(a)    authorize the Debtors and the Reorganized Debtors to take all actions necessary or appropriate to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

(b)    decree that the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent;

(c)    authorize Wellman Holdings to (a) issue the New Common Stock pursuant to the exemption from registration under the Securities Act provided by section 1145 of the Bankruptcy Code or other exemption from such registration or pursuant to one or more registration statements and (b) enter into the Plan Documents;

(d)    decree that the Confirmation order shall supersede any Bankruptcy Court orders issued prior to the Confirmation Date that may be inconsistent with the Confirmation Order.

(e)    authorize the implementation of the Plan in accordance with its terms; and

(f)    provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the plan of reorganization, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated by the plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax (including, without limitation, any mortgages or security interest filing to be recorded or filed in connection with the Convertible Notes).

4.   The Plan and each of the Plan Documents must be in form and substance acceptable to the Backstop Parties.

5.   Execution by the Debtors of PTA and EG Contracts on terms and conditions acceptable to the Backstop Parties.

6.   Each of the conditions to the effectiveness of the Backstop Agreement must be satisfied.

B.    *Conditions Precedent to the Effective Date*

It shall be a condition to the Effective Date of the Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C hereof:

1.   The Confirmation Order shall (a) have been entered in a form and in substance reasonably satisfactory to the Debtors and the Majority DIP Lenders, and (b) shall have become a Final Order.

2.   The Confirmation Order shall (a) have been entered in form and substance acceptable to the Backstop Parties, and (b) shall have become a Final Order.

3.   The final version of the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been Filed in form and substance acceptable to the Debtors, and the Backstop Parties.

4.   All actions, documents, certificates, and agreements necessary to implement this Plan, including documents contained in the Plan Supplement, shall have been effected or executed and delivered, as the case may be, to the required parties and, to the extent required, Filed with the applicable governmental units in accordance

36

with applicable laws; *provided, further,* that each document, instrument, and agreement must be acceptable to the Debtors and the Backstop Parties.

5. The Debtors shall have received all authorizations, consents, regulatory approvals, rulings or documents that are necessary to implement and effectuate the Plan.

6. The initial boards of directors, including the New Boards, of Wellman Holdings and the Reorganized Debtors shall have been appointed.

7. The Rights Offering shall have been fully consummated and the Debtors shall have received $90 million in total proceeds therefrom.

8. The aggregate amount of Cash required to pay Allowed General Administrative Claims shall not exceed $28 million.

C.      *Waiver of Conditions*

The conditions to Confirmation of the Plan and to Consummation of the Plan set forth in this Article IX may be waived only by consent of the Debtors and the Backstop Parties without notice, leave, or order of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

D.      *Effect of Failure of Conditions*

If the Consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any claims by or Claims against or Equity Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any Holders, or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders, or any other Entity in any respect.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.      *Modification and Amendments*

Except as otherwise specifically provided in the Plan, the Debtors, with the consent of the Majority DIP Lenders and the Backstop Parties, reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, each of the Debtors expressly reserves its respective rights to revoke or withdraw, or, with the consent of the Majority DIP Lenders and the Backstop Parties, to alter, amend, or modify the Plan with respect to such Debtor, one or more times, after Confirmation, and, to the extent necessary, with the consent of the Majority DIP Lenders and the Backstop Parties, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan. Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with this Article X. Upon its Filing, the Plan Supplement may be inspected in the office of the clerk of the Bankruptcy Court or its designee during normal business hours, at the Bankruptcy Court's website at www.nysb.uscourts.gov, and at the website of the Debtors' notice, claims, and balloting agent at http://www.kccllc.net/Wellman. The documents contained in the Plan Supplement are an integral part of the Plan and shall be approved by the Bankruptcy Court pursuant to the Confirmation Order.

*B.      Effect of Confirmation on Modifications*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.       Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.       Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.       Resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V, any Executory Contracts or Unexpired Leases to the list of Executory Contracts and Unexpired Leases to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.       Ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

5.       Adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.       Adjudicate, decide, or resolve any and all matters related to Causes of Action;

7.       Adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.       Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.       Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.      Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

38

11.     Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

12.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in Article VIII and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

13.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.J.1;

14.     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

15.     Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

16.     Enter an order or Final Decree concluding or closing the Chapter 11 Cases;

17.     Adjudicate any and all disputes arising from or relating to distributions under the Plan;

18.     Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

19.     Determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

20.     Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, the Distribution Trust, or the Rights Offering, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

21.     Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

22.     Hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

23.     Enforce all orders previously entered by the Bankruptcy Court; and

24.     Hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.     *Immediate Binding Effect*

Subject to Article IX.B and notwithstanding Bankruptcy Rules 3020(e), 6004(g), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions

described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

### B.    Additional Documents

On or before the Effective Date, the Debtors may file with the Bankruptcy Court such agreements and other documents in form and substance acceptable to the Backstop Parties as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors or Reorganized Debtors, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### C.    Preservation of Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code, but subject to Article VIII hereof and to the extent that such Causes of Action are not transferred to the Distribution Trust and except to the extent a Cause of Action has been contributed to the Distribution Trust, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against them. The Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors or the Distribution Trust, as applicable, reserve and shall retain the Causes of Action notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors, as the case may be. The applicable Reorganized Debtor, or the Distribution Trust, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

### D.    Preservation of Avoidance Actions

On and after the Effective Date, any and all Avoidance Actions shall be preserved and retained by the Reorganized Debtors or the Distribution Trust to the extent an Avoidance Action is transferred by the Debtors thereto, as applicable, which shall have the exclusive right, as applicable, to enforce, settle, release, abandon, or prosecute any such Avoidance Actions. Any recovery received on account of an Avoidance Action transferred to the Distribution Trust will be the sole property of the Distribution Trust and is subject to the terms and conditions of the Distribution Trust Agreement. Reorganized Wellman may offset any claim supporting an Avoidance Action against any payment or Distribution due to any Holder of a Claim under the Plan. In addition, if a Distribution is made in error, the Reorganized Debtors can bring an action pursuant to section 502(d) of the Bankruptcy Code to recoup such Distribution.

E.      *Section 1145 Exemption*

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of the New Common Stock as contemplated by Sections III.B.2(b)(i) and III.B.3(b)(i) of the Plan to Classes 2 and 3 shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution, or sale of Securities. In addition, under section 1145 of the Bankruptcy Code, such New Common Stock will be freely tradable by the recipients thereof, subject to the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with applicable securities laws and any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments and subject to any restrictions in the Shareholders Agreement. The offering, issuance and distribution of the Rights and the Convertible Notes in the Rights Offering as well as the New Common Stock issuable on conversion of the Convertible Notes shall be exempt from the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration pursuant to one or more exemptions from such registration including Section 4(2) of the Securities Act.

F.      *Section 1146 Exemption*

Pursuant to section 1146 of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax or other similar tax or governmental assessment, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee or governmental assessment.

G.      *Payment of Statutory Fees*

All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid by each Reorganized Debtor (or the Disbursing Agent on behalf of each Reorganized Debtor) for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or closed, whichever occurs first.

H.      *Dissolution of the Creditors' Committee*

On the Effective Date, the Creditors' Committee shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases.

I.      *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

J.      *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

K.      *Service of Documents*

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall be served on:

Wellman, Inc.
Attn: Keith R. Phillips
1041 521 Corporate Center Drive
P.O. Box 2050
Fort Mill, South Carolina. 29707

Kirkland & Ellis LLP
Attn: Jonathan S. Henes
153 East 53rd Street
New York, NY 10022

After the Effective Date, the Debtors have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

L.      *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

M.      *Entire Agreement*

Except as otherwise indicated, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

N.      *Exhibits*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the website of the Debtors' notice, claims, and balloting agent at http://www.kccllc.net/Wellman or the Bankruptcy Court's website at www.nysb.uscourts.gov. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

O.      *Nonseverability of Plan Provisions*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent; and (3) nonseverable and mutually dependent.

P.      *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under

the Plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors or Wellman Holdings will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan.

Q.    *Closing of Chapter 11 Cases*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

R.    *Waiver or Estoppel*

**Each Holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, the Agent or its counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.**

S.      *Conflicts*

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement, or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control.

T.      *Post-Confirmation Reporting*

The Reorganized Debtors and Disbursing Agent, as the case may be, shall file reports of their respective activities and financial affairs with the Bankruptcy Court on a quarterly basis, within thirty (30) days after the conclusion of each such period. Any such reports shall detail progress made toward consummation of the Plan, and be prepared substantially consistent with (both in terms of content and format) the applicable Bankruptcy Court and United States Trustee guidelines for such matters. The "Post-Confirmation Order and Notice" required by Bankruptcy Local Rule 3021-1(c) shall be tailored accordingly.

New York, New York
Dated: November 10, 2008

WELLMAN, INC., on behalf of itself and all of the other Debtors)

By:   /s/ Keith R. Phillips
Its:    Chief Financial Officer

44

# EXHIBIT B

# To Come

<u>EXHIBIT C</u>

REORGANIZED DEBTOR'S PROJECTIONS

These notes to the summary financial projections (the "Notes") should be read in conjunction with the Plan and the Disclosure Statement in their entirety.[1] Attached is a summary level projected consolidated income statement, which includes consolidated historical income statement information for Wellman for the year ended December 31, 2007 and a consolidated projected income statement (the "Projections") for Wellman and Reorganized Wellman for the five-year period from 2008 through 2012 (the "Projection Period"). The Projections assume an Effective Date of November 30, 2008, and, for the year 2008, include eight months of actual results and four months of projected results for Wellman and Reorganized Wellman, as the case may be (September through December).

THE PROJECTIONS HAVE BEEN PREPARED BY WELLMAN'S MANAGEMENT WITH THE ASSISTANCE OF LAZARD FRÈRES & CO. LLC ("LAZARD"), WELLMAN'S FINANCIAL ADVISORS. SUCH PROJECTIONS WERE NOT PREPARED TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS AND THE RULES AND REGULATIONS OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION. IN ASSISTING IN THE PREPARATION, LAZARD RELIED UPON THE ACCURACY AND COMPLETENESS OF FINANCIAL AND OTHER INFORMATION FURNISHED BY WELLMAN'S MANAGEMENT AND THIRD PARTIES, AS WELL AS PUBLICLY-AVAILABLE INFORMATION, AND PORTIONS OF THE INFORMATION HEREIN MAY BE BASED UPON CERTAIN STATEMENTS, ESTIMATES AND FORECASTS PROVIDED BY WELLMAN AND THIRD PARTIES WITH RESPECT TO THE ANTICIPATED FUTURE PERFORMANCE OF REORGANIZED WELLMAN. LAZARD DID NOT ATTEMPT INDEPENDENTLY TO AUDIT OR VERIFY SUCH INFORMATION. NEITHER WELLMAN NOR LAZARD CONDUCTED AN INDEPENDENT INVESTIGATION INTO ANY OF THE LEGAL, TAX OR ACCOUNTING MATTERS AFFECTING WELLMAN OR REORGANIZED WELLMAN AND, THEREFORE, NEITHER MAKES ANY REPRESENTATION AS TO THEIR IMPACT ON WELLMAN OR REORGANIZED WELLMAN FROM A FINANCIAL POINT OF VIEW. FURTHER, WELLMAN'S INDEPENDENT ACCOUNTANTS HAVE NEITHER EXAMINED NOR COMPILED THE ACCOMPANYING ACTUAL RESULTS AND PROJECTIONS AND, ACCORDINGLY, DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE PROJECTIONS, ASSUME NO RESPONSIBILITY FOR THE PROJECTIONS AND DISCLAIM ANY ASSOCIATION WITH THE PROJECTIONS. EXCEPT FOR PURPOSES OF THIS DISCLOSURE STATEMENT, WELLMAN DOES NOT PUBLISH PROJECTIONS OF ITS ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS.

THE PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE AND WILL BE BEYOND THE CONTROL OF REORGANIZED WELLMAN, INCLUDING THE IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, ACHIEVING OPERATING EFFICIENCIES, CURRENCY EXCHANGE RATE FLUCTUATIONS, EXISTING AND FUTURE GOVERNMENTAL REGULATIONS AND ACTIONS OF GOVERNMENT BODIES, NATURAL DISASTERS AND UNUSUAL WEATHER CONDITIONS AND OTHER MARKET AND COMPETITIVE CONDITIONS. HOLDERS OF CLAIMS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT

---

[1] Capitalized terms that are not otherwise defined herein shall have the meaning ascribed to them in the Plan or Disclosure Statement, as applicable.

1

GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND WELLMAN AND REORGANIZED WELLMAN UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

THE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY WELLMAN, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE AND WILL BE BEYOND REORGANIZED WELLMAN'S CONTROL. WELLMAN CAUTIONS THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE HISTORICAL FINANCIAL INFORMATION OR THE PROJECTIONS OR TO REORGANIZED WELLMAN'S ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT. MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THESE PROJECTIONS WERE PREPARED MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. WELLMAN AND REORGANIZED WELLMAN DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE THIS DISCLOSURE STATEMENT IS INITIALLY FILED OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS. THE PROJECTIONS, THEREFORE, MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS OR INTERESTS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE PROJECTIONS.

Creditors and other interested parties should see the section entitled "Risk Factors" of the Disclosure Statement for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtors.

The projections have been prepared based on assumption that the Effective Date of the Plan is November 30, 2008 and assume the successful implementation of Reorganized Wellman's business plan. Although Wellman presently intends to cause the Effective Date to occur as soon as practical following confirmation of the Plan, there can be no assurance as to when the Effective Date will actually occur given the conditions for the Effective Date to occur pursuant to the terms of the Plan.

The projections are based on, among other things, the following: (a) current and projected market conditions in each of Reorganized Wellman's respective markets; (b) the ability to maintain sufficient working capital to fund operations; (c) the execution of a Backstop Commitment (as described in the Disclosure Statement); and (d) confirmation of the Plan.

### Projected Summary Income Statement Assumptions

#### *Net Sales*

**PET Resin Revenue:** Reorganized Wellman will be producing PET resin at only one facility: the Pearl River facility located in Pearl River, Mississippi. The Projections assume Reorganized Wellman will operate at a level of capacity utilization slightly higher than the industry estimate for the years 2009 to 2012 based on Wellman's historical and current PET resin volumes. Projected volume for 2009 is 950 million pounds, which is below Wellman's 2007 volumes (1,195 million pounds). The Projections assume that Reorganized Wellman will operate at the Pearl River facility only. In addition, the projections contemplate that the Company will undertake a plan to de-

2

bottleneck the production lines at the Pearl River facility, which will require certain capital expenditures, to increase capacity from its current level.

Historical and projected plant capacities and projected sales volumes are as follows:

|  | Actual 2007 | Projected 2008 | Projected 2009 | Projected 2010 | Projected 2011 | Projected 2012 |
|---|---|---|---|---|---|---|
| Pearl River Capacity | 840 | 860 | 1,060 | 1,135 | 1,210 | 1,210 |
| PET Resin Volume |  |  | 950 | 1,000 | 1,050 | 1,050 |

*Gross Margin*

The Projections assume constant raw material margins, except for first-in-first-out ("FIFO") accounting effects with respect to inventory. Raw material cost assumptions for 2008 are based on estimates as of July, 2008 and include normal seasonal price changes. The Projections also assume some future raw material cost increases during the Projection Period.

The Projections assume that 50% of Pearl River only adjusted conversion costs increase at the rate of inflation and the balance remains constant.

*Selling, General and Administrative Expenses*

SG&A is expected to decrease from $44.4 million in 2007 to $27.6 million in 2008 and $15.0 million in 2009 due to cost savings initiatives and the consolidation of certain operational and administrative functions at the Pearl River facility.

Beginning in 2009, SG&A costs are projected to increase annually by approximately 3%.

3

**Projected Summary Income Statement**

|  | Actual 2007 | Projected 2008 | Projected 2009 | Projected 2010 | Projected 2011 | Projected 2012 |
|---|---|---|---|---|---|---|
| NET SALES | $  1,134 | $  941 | $  747 | $  817 | $  895 | $  895 |
| Cost of Sales | 1,120 | 934 | 695 | 761 | 836 | 840 |
| GROSS PROFIT | 14 | 7 | 52 | 56 | 59 | 55 |
| Sales, General and Administrative | 44 | 27 | 15 | 16 | 16 | 16 |
| Other Operating Income / (Loss) | (274) | (0) | – | – | – | – |
| OPERATING INCOME / (LOSS) | $  (305) | $  (20) | $  37 | $  40 | $  43 | $  38 |
| Memo: | | | | | | |
| Adjusted EBITDA [1] | $  29 | $  16 | $  41 | $  44 | $  46 | $  42 |

(1) As defined under the Prepetition Credit Agreement for periods prior to the Petition Date and the DIP Credit Agreement for the Postpetition Period.

4

**EXHIBIT D**

**VALUATION ANALYSIS**

**Estimated Reorganization Value**

The Debtors have been advised by their investment banker, Lazard Frères & Co. LLC ("Lazard"), with respect to the estimated range of hypothetical reorganization values (the "Reorganization Values") of the Reorganized Debtors. Lazard estimated the range of Reorganization Values of the Reorganized Debtors to be from approximately $176 million to approximately $213 million, with a midpoint of approximately $195 million. Reorganization Value consists of the theoretical enterprise value of the Reorganized Debtors through the application of various relative and intrinsic valuation methodologies. Lazard has estimated the Reorganization Values as of November 30, 2008, under the assumption that the underlying assumptions and conditions used to derive the Reorganization Values will not change materially from the date hereof through the assumed Effective Date of November 30, 2008.

The imputed reorganization equity value (the "Equity Value") of the Reorganized Debtors, on an as-converted basis for the Convertible Notes and as of the assumed Effective Date, is estimated to range from approximately $187 million to $224 million, with a midpoint of approximately $206 million. Additionally, the Equity Value assumes a return of trade credit 30 days after the Effective Date and the resulting increase in cash, less cash that will be needed to operate the business going forward. In the event that Wellman is unable to obtain this trade credit, the midpoint Equity Value will be reduced.

The foregoing estimates of the Reorganization Value of the Reorganized Debtors, and the resulting estimates of Equity Value of the Reorganized Debtors, as the case may be, are based on a number of assumptions, including a successful reorganization of the Debtors' business, the implementation and realization of the Reorganized Debtors' business plans, the achievement of the forecasts reflected in management's projections, the return of trade credit, and the Plan becoming effective on the assumed Effective Date.

In preparing its estimate of the Reorganization Value of the Reorganized Debtors, Lazard did, among other things, the following: (a) reviewed certain historical financial information of the Debtors for recent years and interim periods; (b) reviewed certain internal financial and operating data of the Debtors and financial projections relating to their business and prospects; (c) met with certain members of the senior management of the Debtors to discuss the Debtors' operations and future prospects; (d) reviewed publicly available financial data and considered the market values of public companies that Lazard deemed generally comparable to those of the Debtors as a whole or a significant part of their operations; (e) reviewed the financial terms of acquisitions of companies that Lazard believes to be generally comparable to those of the Debtors as a whole or a significant part of their operations; (f) considered certain economic and industry information relevant to the Debtors' operations; and (g) reviewed such other information and conducted such other analyses as Lazard deemed appropriate.

Although Lazard conducted a review and analysis of the Debtors' businesses, operating assets and liabilities and business plans, Lazard assumed and relied on the accuracy and completeness of all (a) financial and other information furnished to it by the Debtors and by other firms retained by the Debtors and (b) publicly available information. Lazard did not independently verify any financial projections prepared by management of the Debtors in connection with its estimates of the Reorganization Value. Lazard has assumed that such projections have been prepared reasonably, in good faith and on a basis reflecting the currently available estimates and judgments of the Debtors as to the future operating and financial performance of the Debtors. Such projections assume that the Debtors will operate the businesses reflected in the financial forecast and that such businesses will perform as expected in the financial forecast. To the extent that the Debtors operate at higher or lower capacity utilizations or have higher or lower raw material margins (i.e., margins in excess of the raw material purchase costs) during the period contemplated in the projections and to the extent that all or a portion of the businesses perform at levels inconsistent with those expected by management in the financial forecast, such adjustments may have a material impact on the projections and the valuations as presented herein.

Hypothetical valuation estimates reflect computations of the estimated Reorganization Values and Equity Value of the Reorganized Debtors through the application of various valuation techniques, including, among others, the following: (a) a comparable company analysis, in which Lazard analyzed the enterprise values of public companies that Lazard deemed generally comparable to all or parts of the operating businesses of the Debtors as a multiple of certain financial measures, including, but not limited to, earnings before interest, taxes, depreciation and amortization ("EBITDA") and then applied multiples derived from such analysis, among other statistics, to the projected EBITDA of the Reorganized Debtors; (b) a discounted cash flow analysis, in which Lazard, using a weighted average cost of capital, computed the present value of free cash flows and the terminal value of the Reorganized Debtors; and (c) a precedent transactions analysis, in which Lazard analyzed the financial terms of certain acquisitions of companies that Lazard believed were generally comparable to all or parts of the operating businesses of the Debtors, and then applied certain financial performance and other metrics provided by such analyses to the relevant metrics of the Reorganized Debtors.

An estimate of the Reorganization Values and Equity Value is not entirely mathematical but, rather, involves complex considerations and judgments concerning various factors that could affect the value of an operating business. Lazard made judgments as to the relative significance of each analysis in determining the Reorganized Debtors' Reorganization Value range. Lazard did not consider any one analysis or factor to the exclusion of any other analysis or factor. Lazard's hypothetical valuation must be considered as a whole, and selecting just one methodology or portions of the analyses, without considering the analyses as a whole, could create a misleading or incomplete conclusion as to the Reorganized Debtors' Reorganization Value. With respect to the analysis of comparable companies and the analysis of selected precedent transactions, no company utilized as a comparison is identical to the Reorganized Debtors, and no precedent transaction is identical to the reorganization of the Debtors. Accordingly, an analysis of publicly traded comparable companies and comparable business combinations is not mathematical; rather, it involves complex considerations and judgments concerning the differences in financial and operating characteristics of the companies relative to the Reorganized Debtors.

The value of an operating business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial conditions and prospects of such a business. As a result, the estimate of the Reorganization Values set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein. Because such estimates are inherently subject to uncertainties, none of the Debtors, Lazard or any other person assumes responsibility for their accuracy. Depending on the results of the Debtors' operations or changes in the financial markets, Lazard's valuation estimates as of the Effective Date may differ from those disclosed herein.

THE FOREGOING VALUATION IS BASED UPON A NUMBER OF ESTIMATES AND ASSUMPTIONS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTORS OR THE REORGANIZED DEBTORS. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE RANGES REFLECTED IN THE VALUATION WOULD BE REALIZED IF THE PLAN WERE TO BECOME EFFECTIVE, AND ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SHOWN HERE.

THE ESTIMATED CALCULATION OF ENTERPRISE VALUE IS HIGHLY DEPENDENT UPON ACHIEVING THE FUTURE FINANCIAL RESULTS AS SET FORTH IN THE DEBTORS' BUSINESS PROJECTIONS, AS WELL AS THE REALIZATION OF CERTAIN OTHER ASSUMPTIONS, NONE OF WHICH ARE GUARANTEED AND MANY OF WHICH ARE OUTSIDE OF THE DEBTORS' CONTROL.

THE CALCULATIONS OF VALUE SET FORTH HEREIN REPRESENT ESTIMATED REORGANIZATION VALUES AND DO NOT NECESSARILY REFLECT VALUES THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS.  THE EQUITY VALUE STATED HEREIN DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET VALUE.  SUCH VALUE, IF ANY, MAY BE MATERIALLY DIFFERENT FROM THE REORGANIZED EQUITY VALUE RANGES ASSOCIATED WITH THIS VALUATION ANALYSIS.  NO RESPONSIBILITY IS TAKEN FOR CHANGES IN MARKET CONDITIONS AND NO OBLIGATION IS ASSUMED TO REVISE THIS CALCULATION OF REORGANIZED WELLMAN'S VALUE TO REFLECT EVENTS OR CONDITIONS THAT SUBSEQUENTLY OCCUR.  THE CALCULATIONS OF VALUE DO NOT CONFORM TO THE UNIFORM STANDARDS OF PROFESSIONAL APPRAISAL PRACTICE OF THE APPRAISAL FOUNDATION.

## EXHIBIT E

## LIQUIDATION ANALYSIS

<u>Introduction</u>

Pursuant to section 1129(a)(7) of the Bankruptcy Code (often called the "best interests test"), Holders of Allowed Claims and Allowed Equity Interests must either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Plan's assumed Effective Date, that is not less than the value such non-accepting Holder would receive or retain if the Debtors were to be liquidated under chapter 7 of the Bankruptcy Code ("Chapter 7").

In determining whether the Best Interests Test has been met, the first step is to determine the dollar amount that would be generated from a hypothetical liquidation of the Debtors' assets under Chapter 7. The Debtors, with the assistance of their restructuring and financial advisors, have prepared this hypothetical liquidation analysis (the "Liquidation Analysis") in connection with the Disclosure Statement. The Liquidation Analysis reflects the estimated Cash proceeds, net of liquidation-related costs that would be available to the Debtors' creditors if the Debtors were to be liquidated pursuant to a Chapter 7 liquidation as an alternative to continued operation of the Debtors' business under the Plan. Accordingly, asset values discussed herein may be different than amounts referred to in the Plan. The Liquidation Analysis is based upon the assumptions discussed herein and in the Disclosure Statement. All capitalized terms not defined in this Liquidation Analysis have the meanings ascribed to them in the Disclosure Statement.

**UNDERLYING THE LIQUIDATION ANALYSIS ARE NUMEROUS ESTIMATES AND ASSUMPTIONS REGARDING LIQUIDATION PROCEEDS THAT, ALTHOUGH DEVELOPED AND CONSIDERED REASONABLE BY THE DEBTORS' MANAGEMENT AND ITS ADVISORS, ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, REGULATORY AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES BEYOND THE CONTROL OF THE DEBTORS AND THEIR MANAGEMENT. ACCORDINGLY, THERE CAN BE NO ASSURANCE THAT THE VALUES REFLECTED IN THE LIQUIDATION ANALYSIS WOULD BE REALIZED IF THE DEBTORS WERE, IN FACT, TO UNDERGO SUCH A LIQUIDATION, AND ACTUAL RESULTS COULD MATERIALLY DIFFER FROM THE RESULTS SET FORTH HEREIN.**

<u>Significant Assumptions</u>

Hypothetical recoveries to stakeholders of the Debtors in a Chapter 7 liquidation were determined through multiple steps, as set forth below.

The basis of the Liquidation Analysis is the Debtor's projected unaudited consolidated balance sheet as of November 30, 2008 (except as noted otherwise) as it relates to reorganized Wellman as outlined in the Plan, and assumes that the Debtors would commence a Chapter 7 liquidation on November 30, 2008 (the "Conversion Date"). As such, the liquidation analysis assumes that the accounts receivable and inventory for the polyester fiber and engineering resins business (at Palmetto and Johnsonville) have already been sold or collected, as the case may be, consistent with the Plan. For balance sheet items not directly affected by the operational changes contemplated in the Plan (i.e., property, plant and equipment and other current assets, among others), the Liquidation Analysis assumes the unaudited balance sheet as of August 31, 2008 is a proxy for the Conversion Date balance sheet. Further, the liquidation analysis reflects the fact that the Johnsonville Sale has closed.

The Liquidation Analysis also assumes that the liquidation of the Debtors would commence under the direction of a court-appointed Chapter 7 trustee. The Liquidation Analysis reflects the wind-down and liquidation of substantially all of the Debtors' remaining operations over a six-month period (the "Wind-Down Period"), during which time all of the Debtors' major assets would be sold and the cash proceeds, net of liquidation-related costs, would be distributed to satisfy Claims.

Estimate of Net Proceeds

Estimates were made of the Cash proceeds that might be received from the liquidation of the Debtors' assets listed on balance sheet. After consideration of the effects that a Chapter 7 liquidation would have on the ultimate proceeds available for distribution, including (i) the increased costs and expenses of a liquidation under Chapter 7 arising from fees payable to a trustee in bankruptcy and advisors to such trustee (see below) and (ii) the potential erosion in value of assets in a Chapter 7 case in the context of the expedited liquidation required under Chapter 7.

In this Liquidation Analysis, each operating facility is assumed to be shut down and marketed for sale separately. For certain assets, estimates of the liquidation proceeds were made for each asset individually. For other assets, liquidation values were assessed for general classes by estimating percentage recoveries of the gross book value of the asset that a Chapter 7 trustee might achieve through the disposition. Proceeds are net of holding costs, including insurance, taxes, utility, security and maintenance, which are assumed to be incurred until a sale is concluded.

The Liquidation Analysis does not reflect any potential recoveries that might be realized by the Chapter 7 trustee's potential pursuit of any avoidance actions, as the Debtors believe that any such potential recoveries are highly speculative in light of, among other things, the various defenses that would likely be asserted. Similarly, the Liquidation Analysis does not reflect any recoveries that might be realized from any current or future potential litigation initiated by the Debtors.

Estimate of Costs

Proceeds from a Chapter 7 liquidation would be reduced by administrative costs incurred during the wind-down of the operations, the disposition of assets and the reconciliation of claims. These costs included professional (including attorneys, financial advisors, appraisers and accountants) and trustee fees, commissions, salaries, severance and retention costs, certain occupancy costs, the estimated holding costs for each plant over the relevant period and the estimated costs of shutting down the plants. Actual administrative costs may exceed the estimate included in this Liquidation Analysis, particularly if the wind-down of operations, disposition of assets and reconciliation of claims takes longer than the Wind-Down Period.

Distribution of Net Proceeds Under Absolute Priority

The amount of Cash available would be the sum of the proceeds from the disposition of the Debtors' assets and the Cash held by the Debtors at the commencement of their Chapter 7 cases. Under the absolute priority rule, no junior creditor would receive any distribution until all senior creditors are paid in full, and no equity holder would receive any distribution until all creditors are paid in full. As such, prior to delivering any proceeds to Holders of General Unsecured Claims, available Cash and asset liquidation proceeds would first be applied to Secured Claims and amounts necessary to satisfy any Chapter 7 Administrative Expense Claims (including any incremental Administrative Expense Claims that may result from the termination of the Debtors' business and the liquidation of the Debtors' assets) and other Priority Claims under section 507 of the Bankruptcy Code as required under section 726 of the Bankruptcy Code. Any remaining Cash and asset liquidation proceeds after satisfaction of Secured Claims, Administrative Expense Claims and Priority Claims, to the extent they exist, would be available for distribution to Holders of General Unsecured Claims and Equity Interest Holders in accordance with the distribution hierarchy established by section 726 of the Bankruptcy Code.

As set forth in the Final DIP Order, the First Lien Lenders have first priority liens on Wellman's property, plant and equipment (the "PP&E"). The DIP Lenders have first priority liens on Wellman's accounts receivable, inventory, customer lists, patents, trademarks, goodwill and other intangibles (the "AR, Inventory & Intangibles") and second priority liens on the PP&E. The Second Lien Lenders have second priority liens on the AR, Inventory & Intangibles and third priority liens on the PP&E. Accordingly, the proceeds from the liquidation of the PP&E would be applied to satisfy the claims of the First Lien Lenders until such claims are paid in full and any remaining proceeds would be applied to the claims of the Second Lien Lenders. The proceeds from the AR, Inventory &

Intangibles would be applied to satisfy the claims of the DIP Lenders until such claims are paid in full and any remaining proceeds would be applied to the claims of the Second Lien Lenders.

The allocation of the liquidation proceeds from the PP&E and AR, Inventory & Intangibles to the DIP Lenders, the First Lien Lenders and the Second Lien Lenders in the attached distribution summary is based on the categorization of assets for accounting purposes. As such, the recoveries of the DIP Lenders, the First Lien Lenders and the Second Lien Lenders from the assets in which they have a security interest will likely differ from an allocation based on the asset categorization for accounting purposes.

After consideration of the effects that a Chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors, the Debtors have determined, as summarized in the charts below and the "Best Interest of Creditors" section of the Disclosure Statement, that Debtors' proposed Plan will provide creditors with a recovery that is not less than creditors would receive pursuant to a liquidation of the Debtors' assets under Chapter 7.

The following Liquidation Analysis should be reviewed with the accompanying notes.

## Hypothetical Liquidation Analysis

($ in millions)

| SUMMARY ASSET ANALYSIS BASED ON COLLATERAL SUPPORT | | | | |
|---|---|---|---|---|
| | | Book Value at Nov 30, 2008 (a) | Hypothetical Percentage Recovery | Estimated Liquidation Value |
| **AR, INVENTORY & INTANGIBLES (AS DEFINED)** | | | | |
| Assets | | | | |
| Cash and cash equivalents | (b) | $1.1 | 100.0% | $1.1 |
| Accounts receivable | (c) | 66.4 | 90.4% | 60.0 |
| Inventories | (d) | 35.3 | 59.3% | 20.9 |
| Prepaid expenses and other current assets | (e) | 17.4 | 10.6% | 1.8 |
| Current assets held for sale | | 0.0 | 0.0% | 0.0 |
| Other assets | (f) | 11.6 | 14.1% | 1.6 |
| Noncurrent assets held for sale | | 0.0 | 0.0% | 0.0 |
| | | $131.8 | | $85.5 |
| Less allocated fees and expenses | (g) | | | 6.9 |
| Net estimated liquidation proceeds | (h) | | | 78.7 |
| PRESENT VALUE OF LIQUIDATION PROCEEDS (i) | | | | $78.0 |
| **PP&E (AS DEFINED)** | | | | |
| Property, plant and equipment, net | (j) | $235.4 | 15.8% | $37.1 |
| Less allocated fees and expenses | (g) | | | 7.0 |
| Net estimated liquidation proceeds | (h) | | | 30.2 |
| PRESENT VALUE OF LIQUIDATION PROCEEDS (i) | | | | $29.9 |
| Memo: Allocated Fees and Expenses | | | | |
| Chapter 7 trustee fees and expenses | (k) | | | 1.8 |
| Chapter 7 professional fees and expenses | (l) | | | 5.0 |
| Employee expenses / wind-down costs | (m) | | | 7.0 |
| | | | | $13.8 |

*NOTES TO LIQUIDATION ANALYSIS*

### Note A - Book Values as of August 31, 2008 or as projected for November 30, 2008

The book values used in the Liquidation Analysis for Accounts receivable and Inventories for PET Resins are the projected book values as of November 30, 2008. The book values used in the Liquidation Analysis for Cash and cash equivalents, Prepaid expenses and other current assets, Current assets held for sale, Other assets, Noncurrent assets held for sale and Property, plant and equipment, net are based on the preliminary unaudited book values as of August 31, 2008, which are used as a reference point for the analysis and are assumed to be representative of the Debtor's assets as of the Conversion Date.

### Note B - Cash and Cash Equivalents

Cash and cash equivalents consist of all Cash or liquid investments with maturities of three months or less in banks or operating accounts and are assumed to be fully recoverable. All Cash is assumed to be collateral of the DIP Lenders as per the order of the Bankruptcy Court.

### Note C - Accounts Receivable

Estimated proceeds realizable from short-term and long-term accounts receivable are based on management's assessment of the ability of the Debtors to collect on their accounts, taking into consideration the credit quality and aging of the accounts. The Liquidation Analysis for accounts receivable is based on estimated recoveries of aging receivables using a declining scale of recoveries taking into account estimates of accounts receivable as of the assumed Conversion Date. These estimates take into account the inevitable difficulty in collecting receivables and any concessions that might be required to facilitate the collection of certain accounts receivable.

### Note D – Inventory

Estimated inventory recoveries are based on the stage of production and take into account estimates of inventory as of the assumed Conversion Date. This estimate assumes spoilage as well as diminished market demand for product volumes and a general discount for liquidation.

### Note E – Prepaid Expenses and Other Current Assets

Prepaid expenses and other current assets includes prepayments for materials, legal and professional fees, railcar leases, maintenance expenses, rent and other miscellaneous expenses and prepayments under raw material contracts, as well as debt issuance costs, deferred taxes, interest receivables and deposits. The Liquidation Analysis reflects a range of recovery rates based on specific types of assets and management's estimates of the likelihood of recovery on those assets.

### Note F – Other Assets

Other assets are comprised primarily of certain investments related to our Pearl River facility, deferred taxes, costs capitalized with respect to certain litigation and other long-term assets. The Liquidation Analysis reflects a range of recovery rates based on specific types of assets and management's estimates of the likelihood of recovery on those assets.

### Note G – Allocated Fees and Expenses

Chapter 7 trustee fees and expenses and professional fees and expenses are allocated between the AR, Inventory & Intangibles and the PP&E on a pro rata basis. Employee expenses / wind-down costs were allocated to the AR, Inventory & Intangibles and PP&E based on the estimates of direct employee and wind-down costs associated with the specific assets.

*Note H – Net Estimated Liquidation Proceeds*

As set forth in the Final DIP Order, the First Lien Lenders have first priority liens on the PP&E. The DIP Lenders have first priority liens on the AR, Inventory & Intangibles. The Second Lien Lenders have second priority liens on the AR, Inventory & Intangibles and the PP&E. Accordingly, the proceeds from the liquidation of the PP&E would be applied to satisfy the claims of the First Lien Lenders until such claims are paid in full and any remaining proceeds would be applied to the claims of the Second Lien Lenders. The proceeds from the AR, Inventory & Intangibles would be applied to satisfy the claims of the DIP Lenders until such claims are paid in full and any remaining proceeds would be applied to the claims of the Second Lien Lenders. Note that the proceeds in the Liquidation Analysis relating to PP&E and AR, Inventory & Intangibles, respectively, are based on the categorization of assets for accounting purposes.

*Note I – Present Value of Liquidation Proceeds*

The net estimated liquidation proceeds available for distribution are assumed to be recovered over a period of six months from the Conversion Date. The net estimated proceeds are assumed to be received at the midpoint of the Wind-Down Period and have been discounted to the present value as of the Conversion Date at a discount rate reflecting the 3-month LIBOR.

*Note J – Property, Plant and Equipment, Net*

Net property, plant and equipment includes (x) the sum of (i) land, buildings and improvements, (ii) machinery and equipment, including, among others, production lines, special purpose equipment, information systems, data handling equipment, furniture and fixtures, lift trucks, rail cars and railroad tracks, and (iii) construction in progress less (y) accumulated depreciation. The hypothetical percentage recovery rate across all fixed asset classes was based on recovery rates for *gross* book values. In addition, the hypothetical recovery may be reduced by contingencies or expenses related to closing a plant; there may also be certain holdbacks for future remediation.

*Note K - Trustee Fees & Expenses*

Compensation for the Chapter 7 trustee will be limited to fee guidelines in section 326(a) of the Bankruptcy Code. The Debtors' management has assumed trustee fees of 1.5% of the gross proceeds (excluding cash) in the liquidation, though such fees could be as high as 3.0% pursuant to section 326(a) of the Bankruptcy Code.

*Note L - Other Professional Fees & Expenses*

Compensation for the Chapter 7 trustee's counsel and other legal, financial and professional services during the Chapter 7 proceedings is estimated to be approximately $1 million per month beginning at the commencement of the liquidation proceedings throughout the Wind-Down Period.

*Note M - Employee Expenses / Wind-Down Costs*

The Debtors assume the Chapter 7 liquidation process will take six months to complete. Corporate payroll and operating costs during liquidation are based on the assumption that certain functions would be required during the liquidation process in order a orderly wind down of the business and the plants. Costs would include costs associated with shutting down the production lines as well as salaries of certain operating and maintenance employees, severance and bonus pay that would be incurred during a Chapter 7 liquidation.

**Distribution Summary**

($ in millions)

| HYPOTHETICAL LIQUIDATION RECOVERY OF CLAIMS ANALYSIS | | |
|---|---|---|

**SUPERPRIORITY ADMINISTRATIVE AND GENERAL SECURED CLAIMS:**

| Net Estimated Proceeds from AR, Inventory & Intangibles (as defined) | | $78.0 |
|---|---|---|
| DIP Facility Claim | (n) | $63.6 |
| Recovery Amount | | 63.6 |
| *% of Claim* | | *100.0%* |
| Second Lien Term Loan Claim | (o) | $265.0 |
| Recovery Amount | | 14.4 |
| *% of Claim* | | *5.5%* |

| Net Estimated Proceeds from PP&E (as defined) | | $29.9 |
|---|---|---|
| First Lien Term Loan Claim | (o) | $178.9 |
| Recovery Amount | | 29.9 |
| *% of Claim* | | *16.7%* |

**OTHER CLAIMS:**

| Net Estimated Proceeds for Payment of Admin., Priority and Gen. Unsecured Claims | | $0.0 |
|---|---|---|
| Administrative and Priority Claims | (p) | $64.8 |
| Recovery Amount | | 0.0 |
| *% of Claim* | | *0.0%* |
| General Unsecured Claims | (q) | $65.8 |
| Recovery Amount | | 0.0 |
| *% of Claim* | | *0.0%* |

| Net Estimated Proceeds for Payment of Equity Interests | | $0.0 |
|---|---|---|

*NOTES TO DISTRIBUTION SUMMARY*

### Note N - Superpriority Administrative Claims

The DIP Obligations, including the carve-out for professional and statutory fees of $9.0 million provided for in the Final DIP Order and letters of credit of $3.6 million, are an aggregate amount of $63.6. The distribution analysis assumes that the DIP Lenders would have recovery rights with respect to proceeds from all assets categorized on the balance sheet as accounts receivable, inventory and intangibles; some of the assets categorized as such may fall outside the scope of the security interest of the DIP Lenders and, similarly, the DIP Lenders may have a security interest in assets categorized on the balance sheet as property, plant and equipment.

### Note O - General Secured Claims

Secured Claims include $178.9 million ($185.0 million less $6.15 million from prior sales) of First Lien Term Loan Claims and $265.0 million of Second Lien Term Loan Claims. The distribution analysis assumes that the First Lien Lenders would have recovery rights with respect to proceeds from all assets categorized on the balance sheet as property, plan and equipment; some of the assets categorized as such may fall outside the scope of the security interest of the First Lien Lenders.

### Note P - Administrative and Priority Claims

Management estimates that administrative and priority claims are $64.8 million, of which approximately $40 million are 503(b)(9) claims as of November 30, 2008.

### Note Q - General Unsecured Claims

There are projected to be $65.8 million in general unsecured claims, which includes, among others, $38.1 million of pre-petition payables and other obligations, $24.0 million in unfunded pension liability based on a termination claim of the PBGC and $3.7 of other general unsecured claims. The foregoing estimate ascribes no amount for any potential claims for rejection of Executory Contracts and Unexpired Leases or other contingent, unliquidated claims. Such additional claims may be substantial.

**EXHIBIT F**

Wellman, Inc.
EBITDAR, as defined

   We have provided a non-GAAP measure, "EBITDAR, as defined," because our DIP Credit Agreement uses this measurement as a key component.  In accordance with our DIP Credit Agreement, we must maintain a certain EBITDAR for various months tested as of the last day of the applicable month, with a report due
on the fifteenth day after the end of each month, commencing with the first full month following the Petition Date.  We believe it is also an important measurement tool for (1) financial institutions that provide us with capital; (2) investors; and (3) our Board and management.  In each instance, we used EBITDAR, as defined because it excluded items that are not expected to impact the long-term cash flow of the businesses and are not an indication of our ongoing operating performance.  In addition, EBITDAR, as defined is a measure frequently used to value an enterprise and to enable investors to analyze the efficiency of our operations and to compare and/or rank use with other companies of differing capital structures.  Our Board of Directors, CEO (our chief operating decision maker), and our senoir management EBITDAR, as defined to evaluate the operating performance of our segments and determine incentive compensation for employees throughout the organization.  EBITDAR, as defined, under the DIP Credit Agreement is calculated by adding Earnings (loss) from continuing operations, income tax expense (benefit), interest expense, non-cash charges and non-recurring fees, cash charges, and other cash expenses made or incurred in connection with entering into the DIP Credit Agreement.

   The following table reconciles  Loss from continuing operations to EBITDAR, as defined for each month and the eight months ending August 31, 2008.

| | January 2008 | February 2008 | March 2008 | April 2008 | May 2008 | June 2008 | July 2008 | August 2008 | Year-to-Date August 2008 |
|---|---|---|---|---|---|---|---|---|---|
| **Loss from Continuing Operations** | $ (5,038) | $ (15,276) | $ (2,388) | $ (4,670) | $ (1,083) | $ (5,138) | $ (12,452) | $ (9,875) | $ (55,920) |
| Income Tax Expense (Benefit) | - | - | - | - | - | - | - | - | - |
| Interest Expense, Net | 4,675 | 5,505 | 925 | 903 | 999 | 1,065 | 1,166 | 1,084 | 16,322 |
| Depreciation & Amortization | 2,530 | 2,441 | 2,493 | 2,615 | 2,393 | 2,551 | 2,430 | 2,436 | 19,889 |
| Permitted Adjustments: | | | | | | | | | |
|    Reorganization Items | - | 3,349 | 2,798 | 3,098 | 2,583 | 2,390 | 3,877 | 2,244 | 20,340 |
|    Inventory Reserves | 310 | 802 | 27 | 1,130 | - | 27 | 3,530 | 1,666 | 7,492 |
|    Claims Accrual Non-cash | - | - | - | - | 353 | - | - | - | 353 |
|    Uncollectible Accounts | 144 | - | 65 | - | - | 599 | 62 | - | 870 |
|    Hurricane Katrina Costs | - | 63 | - | - | - | - | - | - | 63 |
|    Sale of Jville Assets | - | - | 48 | (232) | - | 19 | - | - | (165) |
|    Environmental Reserve | - | - | - | - | - | 615 | - | - | 615 |
|    Total permitted adjustments | 454 | 4,214 | 2,938 | 3,996 | 2,936 | 3,650 | 7,469 | 3,910 | 29,568 |
| **EBITDAR, as defined** | $ 2,621 | $ (3,116) | $ 3,968 | $ 2,844 | $ 5,245 | $ 2,128 | $ (1,387) | $ (2,445) | $ 9,859 |

   Despite the importance of EBITDAR, as defined, we recognize that this non-GAAP financial measure does not replace the presentation of our GAAP financial results and are not intended to represent cash flows or an alternative to net earnings (loss).  The EBITDAR, as defined information we provide is simply supplemental information and an additional measurement tool to assist our management and certain investors in analyzing our performance.