# **EXHIBIT G**

1

1

2   UNITED STATES BANKRUPTCY COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 08-10595-smb

5   - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   WELLMAN, INC.

9

10          Debtor.

11

12   - - - - - - - - - - - - - - - - - - - -x

13

14            United States Bankruptcy Court

15            One Bowling Green

16            New York, New York

17

18            August 5 2008

19            12:10 PM

20

21   B E F O R E:

22   HON. STUART M. BERNSTEIN

23   U.S. BANKRUPTCY JUDGE

24

25

2

1

2    HEARING re Closing Arguments on Motion on Valuation of

3    Collateral

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Lisa Bar-Leib

3

1

2    A P P E A R A N C E S :

3    KIRKLAND & ELLIS LLP

4         Attorneys for Debtors

5         Citigroup Center

6         153 East 53rd Street

7         New York, NY 10022

8

9    BY:  JONATHAN S. HENES, ESQ.

10        MATTHEW F. DEXTER, ESQ.

11        JOSEPH SERINO, JR., ESQ.

12

13   ROPES & GRAY LLP

14        Attorneys for the Official Committee of Unsecured

15         Creditors

16        1211 Avenue of the Americas

17        New York, NY 10036

18

19   BY:  MARK R. SOMERSTEIN

20

21

22

23

24

25

4

1

2    AKIN GUMP STRAUSS HAUER & FELD LLP

3         Attorneys for Wilmington Trust Co., as Second Lien Agents

4         590 Madison Avenue

5         New York, NY 10022

6

7    BY:  PHILIP M. ABELSON, ESQ.

8         ABID QURESHI, ESQ.

9         JAMIE L. BERGER, ESQ.

10

11   HAYNES AND BOONE, LLP

12        Attorneys for Bank of New York, as Successor

13         Administrative and Collateral Agents for the

14         First Lien Lenders

15        1221 Avenue of the Americas

16        26th Floor

17        New York, NY 10020

18

19   BY:  JONATHAN HOOK, ESQ.

20        LENARD M. PARKINS, ESQ.

21        JASON A. NAGI, ESQ.

22

23

24

25

5

PROCEEDINGS

1

2     THE COURT:  Please be seated.  Okay, Wellman.

3     MR. SERINO:  Good morning, Your Honor.

4     THE COURT:  Good morning -- or afternoon.

5     MR. SERINO:  Afternoon, I should say, yeah.

6     THE COURT:  Well, you got caught behind a longer

7  proceeding than I thought it would go.

8     MR. SERINO:  That's fine.  May I proceed?

9     THE COURT:  Sure.

10     MR. SERINO:  Joe Serino for the debtors.  Your Honor,

11  I'd like to begin by thanking the Court and the Court's staff

12  for making the courthouse so accommodating to all of us over

13  the last couple of days and for treating all of the

14  participants here with courtesy and professionalism.

15     THE COURT:  Really?  What did we do?

16     MR. SERINO:  Let us leave our stuff here.  Let us --

17     THE COURT:  Okay.  Oh.

18     MR. SERINO:  -- make home, set up shop here.  We

19  appreciate it.

20     THE COURT:  Well, you'll get the bill.

21     MR. SERINO:  I said at the opening, Your Honor, that

22  the parties agree on the standard here and the only problem was

23  they disagree on how it should be applied.

24     THE COURT:  As I recall, Mr. Henes said it was a very

25  narrow dispute.

6

1          MR. SERINO:  That's exactly right.

2          MR. HENES:  I still think it is.

3          MR. SERINO:  I'll tell you, though, after listening

4     to the opening statements of the first liens, I'm not sure that

5     that's really the problem.  I think the first liens know how

6     Rash is to be applied.  And I think the problem here is that

7     their counsel talked about the need to come up with a value for

8     a bare naked plan.  And I think that's probably fine.  I think

9     the problem is that the first lien's expert, Mr. Lerman, didn't

10    come up with a value for a bare naked plan.

11         THE COURT:  What are the components of the valuations

12    that are so different that they lead to different results?

13    You're essentially 113 million dollars --

14         MR. SERINO:  Yes.

15         THE COURT:  -- apart.  Why?

16         MR. SERINO:  Well, I think the biggest component,

17    Your Honor, is that Mr. Lerman, even in his technology

18    disconnection scenario, he said on cross-examination, I took

19    out for intellectual property but I still assume that the PP&E

20    was sold as part of a going concern.  I still did a going-

21    concern valuation.  So what Mr. Lerman did is he heaped on top

22    of that PP&E the value that comes from working capital and all

23    the intangible assets and all the going-concern value that the

24    first do not have a lien over.

25         THE COURT:  How did he do that?

7

1          MR. SERINO:  Because he never stripped out for it.

2    He never isolated out for it.  The only thing he isolated out

3    for was -- he took a business enterprise and the only thing he

4    took out for was the intellectual property.

5          THE COURT:  Right.

6          MR. SERINO:  He never took out for the other going-

7    concern attributes.

8          THE COURT:  Well, what else was that besides working

9    capital which he subtracted?

10          MR. SERINO:  All of the going-concerns, labor force,

11    the sales force, the customer force, the processes, the

12    systems.  All of that.

13          THE COURT:  But he assumed a delay.  As I understood

14    his worst case scenario, which was, I think, the 139 million

15    dollar valuation --

16          MR. SERINO:  Yeah.  138.6.

17          THE COURT:  He said if a buyer in the industry went

18    to the PP&E store and bought this stuff, this is what the

19    expense would be to get it up and running in sixty days.

20          MR. SERINO:  Mr. Lerman said that?

21          THE COURT:  That's what I understood his testimony to

22    be.

23          MR. SERINO:  I thought Mr. Lerman said is if a buyer

24    came to the table and had all the bundle of sticks and he had

25    all of the intangible assets --

8

1          THE COURT:  Well, I'm talking about his last

2     scenario.

3          MR. SERINO:  I thought it was the same thing for his

4     last scenario with the one exception is he tried to isolate out

5     the value of the intellectual property.  I still think that

6     he -- he testified on cross-examination that but for that, I'm

7     assuming the plant was being sold as a going concern.  I think

8     that's the fundamental problem here, Your Honor.  When he

9     assumed it was being sold as a going-concern, he assigned to

10    the PP&E lots of value that's associated with a going concern.

11         THE COURT:  What were the differences in his analysis

12    and Mr. Schmitt's analysis about the aggregate revenues for

13    instance that the companies would receive over the objection

14    period.

15         MR. SERINO:  Your Honor, I don't remember off the top

16    of my hand the differences in the revenues but I do remember

17    the differences in the total business enterprise value, if

18    that's helpful.  Mr. Schmitt came out at 273 million dollars --

19         THE COURT:  Right.

20         MR. SERINO:  -- through the DCF and the two market

21    approaches.  Mr. Lerman was anywhere from 366 million to 400

22    million --

23         THE COURT:  Well, let's take his middle approach

24    which is some technology but not all of it.  So what did he

25    come out with there?

9

1          MR. SERINO:  I think his -- I don't remember what his

2    business enterprise value was but I think his valuation of the

3    PP&E in that scenario, if that's what Your Honor wants --

4          THE COURT:  Well, no.  I'm asking about --

5          MR. SERINO:  -- was 181.8 million.

6          THE COURT:  Okay.  And what --

7          MR. SERINO:  But the problem there was he admittedly

8    incorporated certain patents, certain trademarks and certain

9    licenses that the firsts simply do not have a lien on.

10         THE COURT:  Um-humm.

11         MR. SERINO:  That was in his middle scenario.  In his

12   last scenario, the technology disconnection scenario, he tried

13   to correct for that.  But our point is he still didn't go far

14   enough.  His counsel stood up in the opening and said you got a

15   value of bare naked plant.  But he didn't value a bare naked

16   plant.  He valued a plant that was sold as part of a going

17   concern.  And he didn't strip out all those going-concern

18   elements of value.

19         THE COURT:  But doesn't -- and I asked this at the

20   beginning.  Doesn't the PP&E have more value simply because

21   it's a going-concern --

22         MR. SERINO:  And I think you're right, Your Honor.

23   I --

24         THE COURT:  -- than it would have if it was sitting

25   in an idle plant --

10

1           MR. SERINO:  I think --

2           THE COURT:  -- or it was being purchased for an idle

3  plant?

4           MR. SERINO:  I think that the latter is relevant,

5  yes.

6           THE COURT:  In other words, a hypothetical buyer is

7  going to spend more for an asset that they're going to use in

8  the business than for one they're going to put in a plant and

9  not use, aren't they?

10           MR. SERINO:  I think that's absolutely right, Your

11  Honor.

12           THE COURT:  So explain to me how you strip -- whether

13  you're supposed to strip out that additional value or how you

14  do it.

15           MR. SERINO:  Okay.  Well, I think there's no question

16  that a buyer who's going to use the equipment intuitively will

17  pay more than someone --

18           THE COURT:  Of course it's going to be used to

19  generate income or cash flow.

20           MR. SERINO:  Correct.

21           THE COURT:  Right.

22           MR. SERINO:  Okay.  And that's why I think Rash says

23  under the replacement value world, assume that the buyer comes

24  from the debtor's business trade or situation.  Now, but Rash

25  also says that you have to look at what the creditor has an

11

1   interest in.  You have to assume that the buyer is buying

2   that -- the buyer here -- the creditor here does not have an

3   interest in the whole going-concern.

4           THE COURT:  I understand that.  But again, I use the

5   analogy of someone in the business is going to the PP&E

6   store --

7           MR. SERINO:  Yeah.

8           THE COURT:  And they're going to buy that PP&E that

9   they'll stick in a plant and operate, they're going to be

10  willing to pay more for it than if they're just going to stick

11  it in a plant and let the plant sit idle.

12          MR. SERINO:  I think that's true, Your Honor.

13          THE COURT:  Okay.  So how do I --

14          MR. SERINO:  And that's what Mr. Schmitt did.  Mr.

15  Schmitt didn't look at --

16          THE COURT:  Tell me how he did that.  I really had a

17  lot of trouble following his testimony.

18          MR. SERINO:  He didn't look at an idle plant or a

19  liquidated plant.  He looked at a lights out plant.  And what

20  that means is he said if I can't give credit for the working

21  capital and I can't give credit for the intellectual property

22  and I can't give credit for the intangible assets, what I've

23  got is a lights out plant waiting for somebody to buy that bare

24  naked PP&E and hit the switch.  And I'm trying to figure out,

25  under Rash, what somebody will pay for that PP&E.

12

1        THE COURT:  I understand that.

2        MR. SERINO:  Okay.  And so what he said, Your Honor,

3  is that that's not a liquidation scenario.  And he was very

4  careful to say several times that he was not taking out of his

5  opinion the cost for any shutdown or maintenance in that

6  scenario.

7        And let me explain how he got to his number, Your

8  Honor.  He did both a bottoms up and a cost -- he did a bottom-

9  up cost approach and a top-down approach.  And we have on

10  Figure 3 is really his bottom-up approach.  And he started with

11  the CRN, cost of reproduction new, what it would cost to

12  rebuild this PP&E --

13        THE COURT:  Where in his testimony or his report did

14  he explain how he came up with that number?

15        MR. SERINO:  This is Figure 3 from page 48 --

16        THE COURT:  I know what it is.  But where does he

17  explain where that number comes from or how it's computed?

18        MR. SERINO:  I believe it's --

19        THE COURT:  In other words, Mr. -- in comparison, Mr.

20  Beaton --

21        MR. SERINO:  Yes.

22        THE COURT:  -- said I went to the historical cross-

23  records and I looked at it and then I -- I guess I increased it

24  by some inflation factor using the PPI and that's how I got to

25  that number.  Where is that --

13

1          MR. SERINO:  Mr. Schmitt said the exact same thing in

2     his testimony, Your Honor.  I can get you the pages.  But he

3     said, what I did is I looked at every single piece of equipment

4     and I applied different PPIs to that piece of equipment and I

5     concluded that in 2008 dollars, it would cost 1.5 billion

6     dollars to replace that equipment.  And then he said, I did a

7     similar analysis.  And I said, what would it cost to replace

8     the capacity with new equipment.  And he said, the cost was

9     only 754 million.  And so that was the starting point.  Nobody

10    was going to pay 1.5 billion --

11         THE COURT:  Where did that 778,000 dollar deduction

12    come from?

13         MR. SERINO:  That's the difference between the two.

14         THE COURT:  I understand that.  But where did it come

15    from?

16         MR. SERINO:  Well, he concluded that when he was

17    trying to figure out the cost approach to valuation here.

18    You're not going to use 1.5 billion 'cause no one's going to

19    pay 1.5 billion if they can duplicate the capacity by buying

20    brand new equipment for 754 million.

21         THE COURT:  But how did he reach the conclusion that

22    it was 754 million?

23         MR. SERINO:  By going out and pricing things, by

24    looking at what it would cost to buy the equipment you need

25    today with today's technology to produce the same kind of

14

1    capacity that Wellman currently gets from its existing

2    equipment.  It's as if he went out in 2008 and bought one

3    computer and said what do I need from this 2008 computer to get

4    from the old 2002 computer I was getting.  It was more

5    efficient.  The equipment's better.  The equipment has better

6    capacity.  He was able to do that for 754 million dollars.  So

7    that became his starting point in his analysis.  And then he

8    subtracted the physical and functional obsolescence.

9              THE COURT:  How did he compute those?

10             MR. SERINO:  The physical and functional

11   obsolescence?  Let me see if I can refer Your Honor to a page

12   on that.  Your Honor, I think in very general terms -- and I

13   don't have the page reference, I'm sorry.  But in very general

14   terms, what he did is he compared the age of the relative

15   equipment for its physical obsolescence.  Same thing Mr. Lerman

16   did.  Mr. Lerman took physical obsolescence as well.

17             THE COURT:  I understand that.

18             MR. SERINO:  And what he did is he said a ten year

19   old car is going to be worth less than a one year old car

20   'cause it's got some physical obsolescence and physical

21   deterioration.  And when he tried to do that for every piece of

22   PP&E --

23             THE COURT:  But how did he know?  What were the

24   assumptions he made?  How did he come up with the number he

25   came up with?  I understand the methodology.  I think

15

1   everybody, in their mind, had the same methodology.  But how

2   did he come up with the number he came up with?

3          MR. SERINO:  For physical obsolescence?

4          THE COURT:  For the two obsolescence deductions.

5   They aggregate 630 million or 640 million dollars.  It's a lot

6   of money.

7          MR. SERINO:  I admit I'm probably just not explaining

8   this well, Your Honor.  I know the methodology was that he

9   took --

10         THE COURT:  In other words, let me go back to Mr. --

11         MR. SERINO:  Yeah.

12         THE COURT:  He said he looked at computerized

13   valuation guides --

14         MR. SERINO:  Right.

15         THE COURT:  -- for every piece of equipment, at least

16   for the machinery and the equipment.  He did something

17   different from the real estate and that's the number he came

18   out with.  I don't recall Mr. Schmitt giving the same

19   testimony.  In other words, he said this was his result but he

20   didn't really -- I don't recall him explaining precisely how it

21   is he got to that result.

22         (Pause)

23         MR. SERINO:  And I think -- Mr. Dexter is giving me

24   some help.  His recollection is the same as mine is that what

25   he did -- what Mr. Schmitt, we thought, testified to, and we'll

16

1    try to get the transcript, is he compared the age of the actual

2    equipment, when he took the bottoms up approach and looked at

3    every single piece and then he prepared the value of that

4    equipment as is and then he tried to look at the value of that

5    equipment with its assumed useful life.

6            THE COURT:  What assumptions did he make regarding

7    useful life?  One of the problems I have here and I have it

8    with some of the other valuations is I'm just being given a

9    number and the methodology is being explained.  But there isn't

10   necessarily a clear explanation of what they assumed and how

11   they got to that number.  And obviously, following the same

12   methodologies, at least Lerman and Schmitt came up with wildly

13   disparate results.

14           MR. SERINO:  Right, Your Honor.  And I think one of

15   the reasons is maybe we skipped over some of that in the direct

16   exam because it's in that 350-page report.

17           THE COURT:  Well, you got to point me to it because

18   I'm not going to sit there and read a 350-page --

19           MR. SERINO:  I know.  And I'll start -- I'll --

20           THE COURT:  -- report, most of which is boiler plate.

21   But that's something else.

22           MR. SERINO:  I know.  And I'll dig that out.  But I

23   think the point I would make is you're absolutely right that

24   Mr. Lerman and Mr. Schmitt came out wildly at disparate ends of

25   the spectrum.  But Mr. --

17

1          THE COURT:  And that's why I started by asking you

2    what are the components of their analysis that caused this

3    disconnect?

4          MR. SERINO:  Well, what I was going to say, Your

5    Honor, is Mr. Schmitt and Mr. Beaton came out very close

6    together.  It was 74.3 million for Mr. Beaton --

7          THE COURT:  We'll get to Mr. Beaton later.

8          MR. SERINO:  -- 70.8 million for Mr. Schmitt.  And

9    what I was going to say is this is -- this Figure 3 is Mr.

10   Schmitt's answer to Mr. Beaton's bottom-up approach.  And I

11   think the approach was very similar.  What they did is they

12   looked at what it would cost to replace the capacity today,

13   they applied some penalty for physical and functional

14   obsolescence, they came up with an assumed earnings value of

15   the equipment.  And then Mr. Schmitt also did the same thing to

16   the real estate.  He came up with an assumed earnings value for

17   the real estate.  And then he needed to know whether that real

18   estate and that equipment would suffer from any economic

19   obsolescence, whether it should be penalized for external

20   factors.

21         THE COURT:  Explain to me how he computed that 62.29

22   percent --

23         MR. SERINO:  Okay.

24         THE COURT:  -- and what assumptions he made.

25         MR. SERINO:  Well, what he did, Your Honor, is this

18

1    is kind of the intersection between the bottom-up and the top-

2    down.  And what he did is he said let me do my top-down

3    analysis.  I come with a business enterprise value of 273.  I

4    subtract out 173 for working capital.  I subtract out 28.5 for

5    intangible assets and I add 170,000 for a Johnsonville

6    adjustment.  I get a replacement value of the PP&E of 70.8

7    million dollars.  And then he said I need to compare that

8    actual replacement value with the assumed earnings value that

9    I've gotten in my bottom-up approach.

10          And so he looked at the 70.8 million dollars and he

11   said, of that 70.8, 7.9 has already been taxed for economic

12   obsolescence.  7.9 of the valuation is being from external

13   sources where Mr. Schmitt could say it's like a blue book

14   value.  It's already been taxed for economic obsolescence.  So

15   he subtracts that out.  He subtracts -- from 70.8 he takes out

16   7.9.  That leaves him with actual PP&E replacement value of

17   about sixty-three million.  He compares that to the assumed

18   PP&E replacement -- assumed PP&E value of 166 million.  That's

19   the 120 -- it's the 120 for the machinery and equipment and

20   forty-six for real property.  And he says sixty-three million

21   minus 166 million of the assumed means a negative 103.  And to

22   put that into a percentage, he takes the negative 103, divides

23   it by the assumed earnings of 166 and says the economic

24   obsolescence is 62.29 percent.  He then takes that 62.29

25   percent economic obsolescence penalty, applies it to the

19

1     assumed machinery and equipment valuation, adds back the

2     portion of this that he had taken out before, the portion of

3     7.9, adds back 4.4 here, he adds back the balance on the real

4     estate side, the 3.5 on the real estate side, and he comes up

5     with 49.8 for replacement value of the equipment, 20.9,

6     replacement value of the real estate and 70.8, the total

7     replacement value.  This is the cost approach and it flips with

8     his top-down approach.

9           THE COURT:  Comes up with the exact same number.

10          MR. SERINO:  Your Honor --

11          THE COURT:  Was that a coincidence?

12          MR. SERINO:  You know, I don't think it is a

13     coincidence.  I think it's an indication of the reliability of

14     his work product.  And that's not the only indication.  I think

15     what we saw is when he did the top-down approach, he came up

16     with 273 million dollars, 260 for the chemical and thirteen for

17     Johnsonville.  Now, he did multiple valuations.  He did a DCF,

18     which was 245, he did a market guideline approach -- a

19     guideline public company approach, which came out at, I think,

20     260, and he did a -- 275.  He did a market -- M&A approach of

21     260.  Now they were all very close, Your Honor.  245, 260, 270.

22     They were all very close.  But it's not as if he had one

23     dependant on the other.  He did three separate analyses.  And

24     they all came out very close.  And I think that's an indication

25     of how reliable his work product is.  And that's not the only

20

1    indication.

2            THE COURT:  Well, you know, Mr. Lerman came out close

3    with two or three methods also.

4            MR. SERINO:  Well, we're going to --

5            THE COURT:  Is that an indication of the reliability

6    of his approach?

7            MR. SERINO:  Well, we're going to get to the

8    methodological errors in Mr. Lerman's approach that you didn't

9    hear about Mr. Schmitt.

10           THE COURT:  Okay.

11           MR. SERINO:  But, Your Honor, on this -- I think you

12   raise an excellent point about the results being consistent

13   because here's a good variable.

14           THE COURT:  They're identical; they're not

15   consistent.

16           MR. SERINO:  And here's a good variable to apply to

17   that, Your Honor.  Here's a good variable to apply to that.

18   There was testimony that in April and March of 2008, Wellman

19   received bids for this business from competitors where the

20   proverbial bundle of sticks.  And where do those bids come in

21   at?

22           THE COURT:  260 million dollars.

23           MR. SERINO:  Exactly right.  260 million dollars.

24   And Mr. Schmitt was right on the money but he did not bake

25   those bids into the equations.  He didn't use them in as

21

1   computative.  He was at 260 before he added in Johnsonville.

2   Right on the money.

3           So, is it a coincidence?  I don't know, Your Honor.

4   I think it's an indication of how reliable he is.

5           THE COURT:  Wasn't the debtor under a compulsion to

6   sell?

7           MR. SERINO:  No, Your Honor.  That's the insinuation

8   that the first liens are trying to drive home.  That's not what

9   the evidence is.  You remember Mr. Yearley from Lazard?  He

10  took the stand and he told us about that process.  And he said

11  forget about the debtors' perspective.  I can tell you that

12  from the buyer's perspective, there was a competitive and

13  exhaustive process.  Market participants were given all the

14  information they needed and they made a best and final bid.

15  And Mr. Yearley said not only that, Your Honor, the market

16  participants wanted those assets and, just as badly, they

17  wanted to make sure those assets didn't fall into the hands of

18  their competitors.  That's why this was not a distressed bid.

19  This was a very real bid and a final bid.

20          Mr. Yearley also said -- he had another answer to an

21  insinuation the first liens were making.  The first liens said

22  well, if this bid was so great, why didn't you take it,

23  Wellman.  And Mr. Yearley had an answer for that.  It's a red

24  herring.  Wellman never got to decide whether they were going

25  to take the bid or not because the creditors BKed it before it

22

1    got to that point.  The creditors told Wellman they wouldn't

2    support that bid.  And so Wellman had to make a bankruptcy, a

3    strategic bankruptcy decision to pursue reorganization rather

4    than the bid process.

5             Now, Your Honor, I suppose that the first liens are

6    going to argue that Mr. Schmitt made a mistake by doing the

7    lights-out approach, similar to the question Your Honor was

8    asking not too long ago.  And I want to address that because I

9    think it's important and maybe I've done a bad job of

10   articulating why his lights-out approach is perfectly

11   consistent with Rash.  He said the lights-out approach, which I

12   think is similar to the bare naked PP&E that the first liens

13   embraced in their opening and then Mr. Lerman ran from in his

14   analysis -- Mr. Schmitt said that the lights-out approach is

15   not a liquidated plant.  The lights-out approach is what you

16   get when you separate from the PP&E the working capital,

17   intellectual property and the intangible assets.  You're left

18   with bare naked PP&E.  There's nobody to run it.  There's no

19   capital to feed it.  There's no intellectual property to drive

20   it.  And that's why he did a lights-out approach.  But he was

21   very careful to say I didn't tax them for shut-down or

22   maintenance cost during that lights-out approach.  Mr. Schmitt

23   did that because he thought that's what Rash asks him to do.

24   Rash says you look here at the PP&E because that's what the

25   firsts have a lien in and nothing else.  Rash says you don't

23

1    give the creditor credit for modifications to their collateral

2    package if they don't have a lien on that.  And this was not

3    Mr. Schmitt reinventing the wheel.  He has done this.  This is

4    not novel for him to take away going-concern value from an

5    asset.  He's done it hundreds of times for asset-based lenders,

6    he had testified.

7            And that's exactly what he did here, Your Honor.  He

8    assumed that this PP&E would be bought by someone who wanted to

9    operate it.  But what he did that Mr. Lerman didn't do is he

10   tried to follow Rash by stripping out the going-concern value

11   and saying what is that bare naked PP&E worth.  That's what he

12   did and he's done it hundreds of times before.

13           THE COURT:  I have another question.  In the debtors'

14   disclosure statement, it valued, on a liquidation basis, the

15   PP&E at sixty-six million dollars.

16           MR. SERINO:  Correct.

17           THE COURT:  And Mr. Schmitt is valuing the PP&E on a

18   going-concern basis at seventy or seventy-one million dollars.

19   That sounds awfully close.

20           MR. SERINO:  It does, Your Honor, but Mr. Schmitt had

21   an answer for that, too.  If you'll recall, Mr. Schmitt

22   testified -- I think the liquidation value is sixty-five or

23   sixty-six million.  And Mr. Schmitt said, well, first of all,

24   that's apples to oranges.  I did not do a liquidation analysis.

25   But then he said --

24

1          THE COURT:  What's the difference?  What assets are

2    included or excluded from the liquidation analysis that are in

3    his analysis?

4          MR. SERINO:  It was a different valu -- it was

5    similar assets; a different valuation approach.  Mr. Schmitt

6    used replacement valuation.  But it was not a sixty-six to

7    seventy comparison.  Remember, Mr. Schmitt said that sixty-six

8    or sixty-five isn't taking into account ten million dollars in

9    costs.

10          THE COURT:  Yeah, but we don't care about the costs

11    in a going-concern value --

12          MR. SERINO:  Well, in a go

13          THE COURT:  -- cause those are liquidation costs,

14    aren't they?

15          MR. SERINO:  They were liquidation costs that need to

16    be subtracted from that sixty-six to see what the company's

17    real liquidation value is.

18          THE COURT:  Why?

19          MR. SERINO:  And it ended up to be fifty-five.  That

20    was Mr. Schmitt's testimony.

21          THE COURT:  If there were no selling costs then the

22    liquidation value is sixty-six million.  Why doesn't that

23    compare to the seventy million which doesn't have liquidation

24    costs?

25          MR. SERINO:  I mean, all I can tell you, Your Honor,

25

1    is what Mr. Schmitt's answer to that was.

2              THE COURT:  Yeah, but --

3              MR. SERINO:  His answer was that the premise of

4    liquidation has to assume that there's selling costs involved.

5    And that ten million dollars, he said, you take that out of the

6    sixty-five million, you get fifty-five million.  Now you're

7    fifteen million dollars, or twenty-five percent, less in his

8    replacement value analysis.

9         (Pause)

10             THE COURT:  Go ahead.

11             MR. SERINO:  I think the other thing the first liens

12   may make a point of, Your Honor, and you've covered most of

13   them already, is that --

14             THE COURT:  I have questions for them, too.

15             MR. SERINO:  -- is the impairment write-down.  I

16   think the first liens have insinuated that Mr. Schmitt's

17   valuations can't be trusted because they are still

18   significantly less than Wellman is carrying the PP&E on its

19   books after the impairment write-down.  But, again, this is an

20   apples to oranges comparison.  Let me explain what I mean.

21   You'll recall Mr. Phillips, the CFO of Wellman, testified and

22   he said two things that are critical here:  one, the company's

23   definition of PP&E on its financial statements is much broader,

24   much more inclusive than the collateral package of the first

25   liens' PP&E.  And, two, he said, what drove the impairment

26

1   write-down was the trading value of the debt and the equity as

2   of December 31, '07.  What Mr. Schmitt's doing is the

3   replacement value of the PP&E not as of December 31, '07 but as

4   of September 30, 2008.

5           Let me, Your Honor, just address Mr. Lerman's

6   opinions because I think Your Honor's got to figure out which

7   of these valuation opinions is the most reliable and which is

8   most close to Rash.  And you've raised some questions about Mr.

9   Schmitt.  Let's talk about Mr. Lerman.  I've already talked

10  about why I think he deviated from Rash and why I think he

11  credited the PP&E with going-concern elements that they do not

12  have a lean on.  But severe methodological errors.  He

13  testified that his DCF model was his best model.  It's the one

14  he has the most confidence in and the most reliance on.  Yet,

15  let's review some of the errors he made there, some of the

16  errors.  He said that his numbers and projections were more

17  conservative than Wellman's.  Yet we saw that he projected

18  gross profit margins in 2008 that were ten to sixteen times

19  Wellman's historical margins from 2007.  And he projected gross

20  profit margins in a terminal year into perpetuity that were two

21  to three times what Wellman was projecting.  Greatly overstated

22  the gross profit margins that Wellman could be expected to

23  earn.

24          Mr. Lerman assumed a three percent growth rate from

25  2012 through perpetuity despite the fact he had to admit that

27

1   at that rate, Pearl River would exceed capacity in about eight

2   years.  He's got them add in another three percent above

3   capacity for the rest of --

4           THE COURT:  But in the end of the day, Mr. Schmitt, I

5   think, projected higher level of net income over the four or

6   five-year period than Mr. Lerman did.  And so the question is,

7   how did Mr. Lerman wind up with a higher cash flow and

8   therefore a higher valuation.

9           MR. SERINO:  Well, I think, first of all, Mr. Schmitt

10  relied on the company's projections; Mr. Lerman did not.  And I

11  think the reason why Mr. Lerman ended up with a higher cash

12  flow is because he didn't deduct for any corporate overhead

13  expense, he didn't assume any state income taxes.  But the big

14  one was he assumed a forty-two million dollar depreciation for

15  the terminal year into perpetuity against capital expenditures

16  of only two million dollars.

17          THE COURT:  Um-humm.

18          MR. SERINO:  It was a forty-million dollar delta

19  there.  And he said that's my assumption.  And I said, well,

20  what if the book value of those depreciable assets is only two

21  forty.  Won't they be gone in six years?  He said yes.

22          THE COURT:  Well, one of the things that Mr. Schmitt

23  assumed over the four or five-year period is almost an eighty

24  million dollar negative change to net working capital.  What

25  was the basis for that assumption?  That had an enormous effect

28

1    on the difference in the valuations.

2            MR. SERINO:  I think that that assumption -- it was

3    due to the fact, Your Honor, that Mr. Schmitt was assuming

4    growth --

5            THE COURT:  Right.

6            MR. SERINO:  -- and Mr. Lerman wasn't, additional

7    capital expenditures, and the need to assume for additional

8    working capital.

9            THE COURT:  This wasn't capex.  This was just a

10   change in, I guess, an increase in the accounts receivable --

11           MR. SERINO:  And I thought that was just a function

12   of Mr. Schmitt's assumption that there will be continued growth

13   in the terminal year through perpetuity.

14           THE COURT:  That's a big number.  And that has a

15   drastic effect on the valuation.  And that's an add-back for a

16   cash flow --

17           MR. SERINO:  Hang on a second, Your Honor.

18           THE COURT:  -- or a subtraction in this case.

19      (Pause)

20           MR. SERINO:  I was getting some help from the

21   Wellman --

22           THE COURT:  Okay.

23           MR. SERINO:  -- CFO because these numbers, again,

24   that Mr. Schmitt used came from Wellman.  And what Mr. Phillips

25   tells me is that Wellman increased its projections because

29

1    prices were going up and because inflation, five percent.  And

2    so they brought up the cost of their inventory --

3            MR. PHILLIPS:  Inventory receivables.

4            MR. SERINO:  Inventory receivables.

5            THE COURT:  Okay.  Go ahead.

6            MR. SERINO:  Your Honor, and I did want to -- I

7    wanted to stay with Mr. Lerman on this problem he had where he

8    had depreciation exceeding capital expenditures and perpetuity

9    because not only was that inconsistent with the book value of

10    the assets but you remember Mr. Qureshi put one of the treaties

11    in front of him on valuation.

12            THE COURT:  Treatises.

13            MR. SERINO:  Treatises.  I think it was Mr.

14    Hitchner's treatises that said that this situation where you

15    have depreciation that exceeds capital expenditures, Mr.

16    Hitchner said is "a common mistake" and is "an obviously

17    impossible situation".  And you'll notice, Your Honor, that Mr.

18    Lerman's errors were confined to the DCF model.  There were

19    also errors on his market approach model as well.  We heard

20    that, for instance, he assumed the same useful life for

21    Palmetto and Pearl River, thirty-five years, even though Pearl

22    River was three times older than Palmetto at the time.

23            We heard that Mr. Lerman did not get to see the bids

24    that Wellman received in March or April, the 230 to 260 million

25    dollar bids despite asking first liens' counsel for the same.

30

1  And those bids were hundreds of millions of dollars less than

2  his business enterprise value.

3          And most importantly, Your Honor, we heard that Mr.

4  Lerman sat down and thought about economic obsolescence and

5  concluded that there would be none.  He thought that there

6  would be no external factors that would create any economic

7  obsolescence, not the rising cost of raw materials, not the

8  rising cost of energy, nothing.  Zero.  He didn't tax for any

9  economic obsolescence.  And so we said, what's your basis for

10  that?  And he said, well, I read a contract or two in Wellman's

11  data room.  And then we said, well, what other facts did you

12  see.  Did you see the fact that Wellman's historical cost of

13  sales percentage had been going up?  Yes, I did.  Did you see

14  the fact that Wellman's price paid for raw materials had been

15  going up?  Yes, I did.  Did you see the fact that Wellman's

16  historical gross margins were going down?  Yes, I did.  Did you

17  read every single contract for every customer?  No, I didn't.

18  And yet that confluence of factors never caused Mr. Lerman any

19  doubt in his assumption that Wellman could pass on a hundred

20  percent of its cost, as raw material cost, to customers.  And

21  Mr. Phillips testified the fact of the matter is, Wellman

22  cannot pass on its raw material increased cost to seventy

23  percent of its sales.

24          Now, Mr. Lerman never asked that question, Your

25  Honor, and that's troubling.  That means, he either didn't

1    figure it out or he didn't want to know the answer.  He didn't

2    want to know that those one or two contracts were not

3    indicative of the entire business and that some economic

4    obsolescence might be appropriate.  And if you started to hit

5    his numbers with thirty, forty, fifty percent economic

6    obsolescence, it would fall down dramatically.

7         And that brings me to another issue about Mr.

8    Lerman's testimony, Your Honor, and that's credibility.  He

9    testified that his DCF model was his most confident.  He

10   testified that he never relied on Wellman's projections.  Yet,

11   every time he got into a tough spot on cross-examination about

12   that DCF model, he said, well, those numbers came from Wellman

13   or Wellman didn't give me the numbers I needed.  Now, if that's

14   the case, Your Honor, how can this model be the one he's most

15   confident in?  If that's the case, how come he testified, at

16   page 184 of his deposition, that "Wellman provided me with

17   great detailed information and I mean a lot of information".

18   If that's the case, how come the other two experts who were

19   given access to identical information didn't have this problem?

20   And most importantly, Your Honor, ask yourself this.  If that's

21   really the case, how come Mr. Lerman did a valuation report,

22   two supplements to that report, sat through a day and a half

23   deposition, sat through a two-hour direct examination and never

24   mentioned this issue until cross-examination.

25        I don't think that adds up, Your Honor.  But even if

32

1    you credit Mr. Lerman at face value, that he didn't get the

2    information he thinks he needed or he got the wrong the

3    information, it just means his work is not reliable.  Maybe

4    it's not even through any fault of his own.  But he should have

5    spoken up before cross-examination.  If he's saying I didn't

6    get the right numbers or I got the wrong numbers or I didn't

7    get the information, it means he doesn't have confidence in his

8    result.

9            And, Your Honor, that's really the bottom line here.

10    And I will -- if you want us to brief this more to answer those

11    specific questions, I'm happy to do it because I know that's

12    important.  But I think, high level, if you look at it, three

13    appraisers went out and they were given the exact same

14    standard, they were given the exact same information and they

15    were asked to apply that standard to the same PP&E.  Two of

16    them came back within shouting distance of each other:  Mr.

17    Schmitt at 70.8 independently; Mr. Beaton at 74.3.  And one of

18    them came back at 136.8, Mr. Lerman, the outliner.  And I don't

19    think that's a coincidence, Your Honor.

20            It's not a coincidence that Mr. Schmitt and Mr.

21    Beaton have the highest credentials one can get in the American

22    Society of Appraisers.  Mr. Lerman's not even recognized by the

23    ASA.  It's not a coincidence that before this trial Mr. Lerman

24    had never been qualified to testify as an expert witness while

25    Mr. Beaton and Mr. Schmitt had been qualified many times.  We

33

1   brought that up for a reason.  Not to pile on to Mr. Lerman but

2   to show that it was his lack of experience, his lack of

3   credentials, his lack of qualifications that manifested

4   themselves here in these common errors, in these misassumptions

5   that he made in his valuation projections.  And that's why,

6   Your Honor, at the end of the day, you can't rely on his 136.8

7   million conclusion of value.  The right answer has got to be

8   either Mr. Schmitt's 70.8 million dollar conclusion of value or

9   Mr. Beaton's 74.3 million dollar conclusion of value.  Thank

10  you, Your Honor.

11            THE COURT:  Thank you.

12            MR. QURESHI:  Good afternoon, Your Honor.  For the

13  record, Abid Qureshi, Akin, Gump, Strauss, Heller & Feld on

14  behalf of Wilmington Trust as the second lien agent.

15            Your Honor, if I may hand up a couple of

16  demonstrative exhibits for closing, I think it would be

17  helpful in terms of --

18            THE COURT:  Sure.  Thank you.

19            MR. QURESHI:  Now, Your Honor, what I propose to do

20  in closing is really three things.  First and foremost, answer

21  the Court's questions beginning with the question that actually

22  began my opening argument with; second, to explain Mr. Beaton's

23  testimony and why we think he did it the right way; and third,

24  to revisit, again without repeating too much of what you heard

25  from Mr. Serino, Mr. Lerman's failings.

34

1            Now, Your Honor, what I'd like to start with is the

2    very first demonstrative exhibit in the tabs that I just handed

3    up to you which is Mr. Beaton's triangle.  That's tab 1.  Your

4    Honor --

5            THE COURT:  I think it's a pyramid.

6            MR. QURESHI:  Pyramid.  And as Your Honor may recall,

7    that is the pyramid that Mr. Beaton drew on the board during

8    his direct examination.  Now, Your Honor asked at opening and

9    asked Mr. Serino again now, isn't it the case that this PP&E is

10   worth more to somebody who is going to operate it than it is to

11   somebody who is not.  And that is absolutely the right question

12   to ask.  And the answer is --

13           THE COURT:  That's what you told me the last time,

14   too.

15           MR. QURESHI:  That is what I told you last time.

16           THE COURT:  At least you're consistent.

17           MR. QURESHI:  And the answer, Your Honor, is yes,

18   that that person is going to value it more now.  I think --

19           THE COURT:  And how do we -- let me -- you know, a

20   lot of this is that you can't -- in the going-concern value,

21   you have to strip out the elements that they don't have a lien

22   in.  On the other hand, a going concern, from what you've just

23   said and what other question I asked, enhances the value of any

24   particular asset 'cause it's going to generate income in an

25   operating business.  So how do you separate those two?

35

1          MR. QURESHI:  Your Honor, I think one needs to

2    distinguish between going-concern value and valuing assets on a

3    going-concern basis.  Recall that Mr. Beaton explained his

4    premise of value when conducting his analysis was valuing these

5    assets on a going-concern basis.

6          If you look at the pyramid with PP&E on the bottom,

7    working capital and general intangibles, we take it all

8    together.  When all of those pieces are operating together,

9    that generates going-concern value.  In other words, the sum of

10   the three things independently is not going to be the whole.

11   The whole will be more.  We cited a bunch of cases in our

12   opening brief for the proposition that going-concern value is

13   an intangible asset.  I don't think there's any dispute there.

14   I have not seen a case to the contrary --

15          THE COURT:  But what does that mean in terms of

16   valuing PP&E that's going to be used in a going concern?

17          MR. QURESHI:  What that means, Your Honor, is that

18   when all three of the elements of this pyramid are operating

19   together they are generating going-concern value, that value

20   belongs to the second lien holders.  But when the PP&E on its

21   own is being valued on a going-concern basis, which everybody

22   agrees is the right approach, you're not liquidating and not

23   foreclosure but going-concern basis, what that means is, again,

24   how Mr. Beaton assumed it.  He assumed that the hypothetical

25   buyer would come with all of these pieces --

36

1          THE COURT:  Right.

2          MR. QURESHI:  -- with the working capital, with the

3     general intangibles and would, in fact, operate.  And so, he

4     valued it on that basis.  Now that gives the first lien holders

5     the benefit of a going-concern premise of value.

6          Now, distinguish that from a liquidation approach.

7     Mr. Beaton explained that in his going-concern premise of

8     value, there is an assemblage of assets.  It's all together;

9     it's all in the same location.  It's going to stay there.  And

10    this equipment is going to continue to make the very same

11    product that Wellman is making today.  That is a completely

12    different universe from a liquidation.  In a liquidation, one

13    assumes that that equipment is going to get broken down.  It's

14    going to get sold in bits and pieces.  Those pieces that can be

15    moved might have more value than those pieces that can't be

16    moved.  Mr. Beaton called it separating marketable from semi-

17    marketable from nonmarketable.  And the nonmarketable

18    essentially is sold for scraps.

19         Now, Your Honor also asked Mr. Serino, well, isn't it

20    troubling that you have the conclusion of value of either Mr.

21    Beaton or Mr. Schmitt of seventy to seventy-four and a

22    liquidation value by Lazard of sixty-six depending on the

23    number.  And I agree with Mr. Serino on this point, Your Honor.

24    And that is that the right comparison -- for purposes of

25    inquiring into Your Honor's question, which is shouldn't I be

37

1    troubled that the liquidation value is so close to the

2    replacement value that these experts found, the right

3    comparison is not sixty-six.  Page 55 -- because if there was a

4    liquidation, if these assets were liquidated, there's no

5    question that costs would be incurred.  And Lazard has

6    estimated those costs at approximately eight million dollars so

7    that the right comparison is in fact fifty-five million.

8              THE COURT:  I agree with you that that would be the

9    proceeds of the liquidation.

10             MR. QURESHI:  Right.

11             THE COURT:  But in terms of the value of the PP&E,

12   somebody is still valuing it for liquidation purposes before

13   costs at sixty-six.  And why isn't that the appropriate

14   comparison?

15             MR. QURESHI:  Your Honor, I think --

16             THE COURT:  Let me ask you.  Assuming that it is the

17   comparison, should I be troubled by it?

18             MR. QURESHI:  I don't think you should be troubled at

19   all.

20             THE COURT:  Tell me why I shouldn't be troubled.

21             MR. QURESHI:  Why you shouldn't be troubled is

22   because going-concern value, that is, if -- again, you're going

23   to take this pyramid and keep it all together functioning today

24   with all the benefits, the intangible benefits that that

25   creates, again, under our going-concern value, it would lead to

38

1   a higher value than Mr. Beaton's conclusion.  And the

2   difference between that value and liquidation would be much

3   greater.

4          THE COURT:  I don't think I understand that.  It

5   sounds to me like what you're saying is that someone who's in

6   the business and not going to use the equipment would pay the

7   same as someone who is not in the business and -- I'm sorry,

8   someone who's in the business and will use the equipment is

9   going to pay the same as someone who's not in the business and

10  won't use the equipment.

11         MR. QURESHI:  No, Your Honor.  I agree that somebody

12  who's in this business is going to pay more for these assets

13  than somebody who's not.  There's no question about that.

14  What --

15         THE COURT:  But based on the evidence in this case,

16  it appears that it's only going to be about eight million

17  dollars what your expert --

18         MR. QURESHI:  Eight million dollars over the total

19  liquidation.

20         THE COURT:  Yeah.

21         MR. QURESHI:  Well, Your Honor, I think the way to

22  approach it is this.  So, everybody agrees that all we're

23  trying to place a number on is the PP&E.

24         THE COURT:  That's all we're trying to do.

25         MR. QURESHI:  That's all we're trying to do.

39

1          THE COURT:  That sounds pretty simple.

2          MR. QURESHI:  And so, again, Mr. Beaton did that

3   assuming that these other elements would exist.  They would be

4   held by the buyer.  This would be the buyer in the industry who

5   is going to have intangibles, who is going to bring working

6   capital.  There are costs to doing that, Your Honor.  Again,

7   because the first lien holders are not entitled to the benefit,

8   to the value of the intangible assets that belong to the second

9   lien holders.  There is going to be a cost associated with

10  taking the PP&E value -- on a going-concern basis on the bottom

11  of this pyramid and layering on top of it working capital and

12  layering on top of that all of the intangibles that you need to

13  run the business.  And this is where we get into Mr. Beaton's

14  various deduction factors.  What he tries to do is isolate what

15  that cost is.  And again, the reason he has to do that is

16  because if you just value the whole thing then the first lien

17  holders gets the benefit of our collateral because the whole

18  thing captures going-concern value.

19          THE COURT:  But he didn't do that.  Or at least he

20  didn't purport to do that.

21          MR. QURESHI:  That's correct.  He did not do that.

22  He, again, just valued the PP&E for that very purpose so that

23  he wouldn't attribute to the first lien holders value that

24  attaches to intangibles.  And so, again, the two pieces on the

25  top of pyramid that the hypothetical buyer needs to layer on,

40

1    there's a cost involved in that.  There's a cost, as Mr. Beaton

2    explained, with customer contacts, prior relationships, work

3    force, software, which is also a subject of the second lien

4    holders' liens, all of those things take time and cost money.

5    And that's what goes into the deduction factors that Mr. Beaton

6    applied to arrive at this concluded value.

7         THE COURT:  Well, let's talk about his specific

8    economic deduction, his deduction for selling at holding costs

9    which, in the aggregate, it was seventy-five percent of his

10   depreciated replacement costs.  He said that it was

11   unscientific.  He said it was somewhat subjective.  Why

12   seventy-five percent?  Why not sixty percent?  Why not forty

13   percent?

14        MR. QURESHI:  Your Honor, I think --

15        THE COURT:  It makes a big difference.

16        MR. QURESHI:  It makes a very large difference, no

17   question about that.  And in his -- for each of those two

18   specific obsolescence categories, it was fifty percent for each

19   one and I think a total of -- in the range of 200 million

20   dollars deduction.

21        THE COURT:  Seventy-five percent of the depreciated

22   replacement cost.

23        MR. QURESHI:  That's correct, Your Honor.  And every

24   valuation expert, at various stages in the process, apply

25   subjective judgment.  Mr. Lerman, I think, did it more than

41

1    others because his subjectivity is in the numbers themselves.

2    But what Mr. Beaton did is -- and, Your Honor, the slides that

3    you have before you, Slide 3 to Slide 4, set out the various

4    categories and information that he considered. But Your Honor

5    is absolutely right. Mr. Beaton was clear. There is no

6    mathematical formula. Sure, he could have said my economic

7    obsolescence is 48.79 percent. That would have been no more

8    based on a mathematical formula than the fifty percent that he

9    arrived at. At the end of the day, to borrow a phrase that Mr.

10   Beaton used, this is where appraisers earn their dollars. It

11   is the application of their judgment and their experience in

12   considering all of these factors through which they arrive at a

13   specific deduction. And we cannot hide from the fact, Your

14   Honor, that there is no mathematical formula. And none of the

15   experts here arrived at their conclusions purely through the

16   application of a mathematical formula. There is judgment at

17   all points.

18          I think what Your Honor should focus on is the extent

19   in which those judgments are based on and supported by

20   objective information or based on diligence that was conducted

21   or based on marketed information. And I think that's what Mr.

22   Beaton did to arrive at his deduction factors.

23          Does Your Honor has any specific questions about that

24   that I can answer?

25          THE COURT: Did Mr. Beaton have to value the

42

1    intellectual property or the intangibles?

2           MR. QURESHI:  He did not.

3           THE COURT:  Okay.  But if you look at his selling and

4    holding costs, everything that he's backing out looks like it

5    fits his definition of intangibles.

6           MR. QURESHI:  What he's backing out of here, Your

7    Honor, is the costs that the hypothetical buyer would incur in,

8    again, looking back at the pyramid, bringing these two elements

9    on top --

10          THE COURT:  But isn't that another way of saying,

11   he's valuing the intangibles?

12          MR. QURESHI:  I don't think so, Your Honor.  He did

13   not -- there are --

14          THE COURT:  I know he didn't use that phrase.

15          MR. QURESHI:  Right.

16          THE COURT:  But isn't that what he's doing?

17          MR. QURESHI:  I don't think that is what he's doing,

18   Your Honor.  Again, these are certified appraisers.  He did his

19   work in accordance with the USPAP guidelines.  And those

20   guidelines have a very specific way of how you value

21   intangibles, how you value a royalty streamer on a patent, how

22   you value trademarks, how you value customer relationships, how

23   you value --

24          THE COURT:  But he didn't use any of these.

25          MR. QURESHI:  He didn't do any --

43

1          THE COURT:  He just used an assumption.

2          MR. QURESHI:  He didn't do any of that.  And so he,

3     again, did not support the value of the intangibles at all.  He

4     said the most direct approach to get to my numbers for the PP&E

5     doesn't require that I do that.  But these factors --

6          THE COURT:  But didn't he really do that when he

7     backed -- what I'm saying is look, he backed out key selling

8     costs and he essentially -- the selling and holding costs, most

9     of which are the intangibles, which come out to seventy-four

10    million dollars on his analysis.  Actually, if he backed them

11    out first, it would have been 148 million.  But --

12         MR. QURESHI:  I --

13         THE COURT:  None of the other experts valued the

14    intangibles at that amount.

15         MR. QURESHI:  Well, again, I think, Your Honor,

16    they're coming at it from two different perspectives.  The

17    other experts both purported to value the intangibles which is

18    something that Mr. Beaton did not do.  Now, what he is trying

19    to capture --

20         THE COURT:  What I'm saying is I disagree with you.

21         MR. QURESHI:  I understand that.

22         THE COURT:  I think he did do that indirectly.

23         MR. QURESHI:  Then let me try to explain why --

24         THE COURT:  Okay.

25         MR. QURESHI:  -- I don't think he did, Your Honor.

44

1    And it's this.  That what he's selling at holding costs are

2    really trying to capture is not value but cost.  And so for

3    example, he testified that some amount of time would be

4    required for a buyer from the day that they purchased the PP&E

5    until it's up and running.  Well, they own the plant at that

6    point so they laid out a bunch of money to buy the PP&E and

7    it's not very -- there are costs associated with hiring a bunch

8    of people to reinstall software, to reprogram machines because,

9    again, the software doesn't belong to the first lien lenders,

10   and there's, most significantly, lost profit for a period of

11   time.  Now the experts differ as to what is that period of

12   time.  The first lien said anywhere from zero time to sixty

13   days.  And Mr. Beaton has testified that it would be a little

14   longer than that, in his estimation somewhere from three to six

15   months.

16        THE COURT:  I thought he -- Mr. Lerman testified that

17   after Hurricane Katrina -- I don't remember which one of the

18   plants it was but it was up and running in sixty days.

19        MR. QURESHI:  Oh.  Sure.  That was the Johnsonville

20   or the Pearl River plant.

21        THE COURT:  Well, whatever it was.

22        MR. QURESHI:  Whatever plant it was.  And no dispute

23   there.  But, Your Honor, rebuilding the bricks and mortar which

24   is what happened when that plant was destroyed by the hurricane

25   has nothing to do with what's going to happen here because --

45

1                    THE COURT:  And losing the labor force?

2                    MR. QURESHI:  Well, losing the labor force certainly

3      would be one component.  But, Your Honor, here what we're

4      talking about -- I mean, customer relationships, supplier

5      relationships, software.  I mean, we have a lien on the

6      software.  There's no dispute that we have a lien on that.  And

7      even the first liens' expert agrees that there's going to be

8      time and delays involved in getting engineers and some

9      technicians into these plants to reinstall that software or to

10     reprogram the machine.  There was also testimony, Your Honor,

11     that Wellman operates these machines in a different way from

12     its competitors.  They don't take a production line from

13     Buehler or from Zimmer and just plug it in and press go.  It

14     operates through their know-how and through the know-how of

15     their engineers and the expertise of their engineers.  And

16     again, that's all something that when you assume that the

17     intangibles are going to be gone, there's a cost and a time

18     element involved in that.

19                    So, to come back to your question which is didn't

20     Beaton really value the intangibles, I really think, Your

21     Honor, that he comes out from the other side which is the cost

22     and not the value of the two.

23                    Now, Your Honor, just a few more points on what Mr.

24     Beaton did do, if I may.  So again, he began his analysis with

25     every single piece of equipment in every building in every one

46

1    of those plants.  I think he testified that there's more than

2    6,000 individual pieces of equipment in total.  So, yes, it is

3    the case that his specific deduction factors are not based on a

4    mathematical formula but there is a lot of objective data that

5    went into Mr. Beaton's analysis.  And I don't think that can be

6    said equally for Mr. Lerman.

7            So, unless Your Honor -- does Your Honor have any

8    more questions about Mr. Beaton's approach?

9            THE COURT:  Yeah.  One of the other things that

10   struck me is he made a distinction between kind of general

11   economic obsolescence and specific economic obsolescence and he

12   said that they were two different things.  I'm trying to find

13   your chart where you have the definition.  If you look at the

14   definition of the general deductions, which is your tab 2 in

15   your demonstrative exhibits, general obsolescence includes

16   things like competition and the costs or the increased cost of

17   raw materials, doesn't it?

18           MR. QURESHI:  I'm sorry, Your Honor  I'm just trying

19   to find the --

20           THE COURT:  It's your tab 2.

21           MR. QURESHI:  Okay.  Your Honor, the general

22   obsolescence factors -- recall that those deductions were

23   arrived at by Mr. Beaton through his application of --

24           THE COURT:  I understand that.  And they include,

25   though, among other things, competition and the cost of raw

47

1   materials, don't they?

2          MR. QURESHI:  Your Honor, only on a general basis.

3          THE COURT:  Okay.  Then if you look at his specific

4   economic deductions, which are tab 3, they also include the

5   high cost of raw materials.  And when I see things like

6   globalization, I think of competition.  So what are the

7   differences between the two?

8          MR. QURESHI:  Your Honor, I think that the

9   fundamental difference is this:  that the first category is a

10  general deduction.  Those just assume that it's this machinery

11  anywhere in the United States in any industry in the United

12  States.  It's not specific to --

13         THE COURT:  I understand that's what he testified to.

14  But what's the difference, say, between the general increase in

15  raw materials and the specific increase that he assumed?

16         MR. QURESHI:  I think the difference, Your Honor, is

17  that when he talked about, under the general category, this

18  piece of equipment being located in no particular place --

19         THE COURT:  Right.

20         MR. QURESHI:  -- in the United States and in no

21  particular market condition in the United States.  I think

22  there would be general inflationary pressures that would cause

23  some raw material increase.  And then you look at the specific

24  which is here's the plant in Palmetto.  Here are the supply

25  contracts for raw materials for this plant in Palmetto.  Here's

48

1    the fact that seventy percent of those contracts don't have raw

2    materials pass-through provisions in them, raw material price

3    increase provisions there.  That gets to the specifics.

4              THE COURT:  Well, why am I considering things

5    specific to Wellman if I'm trying to figure out what a

6    hypothetical buyer would pay for these assets?

7              MR. QURESHI:  Because, Your Honor, the hypothetical

8    buyer is going to buy these assets where they're presently

9    located and operating in the manner that they are presently

10   operating.  We're not assuming that the hypothetical buyer here

11   is going to take the plant at Palmetto and move it to

12   Louisiana.  We're assuming that the hypothetical buyer is going

13   to step into that plant, as it is today, and operate that

14   plant.  And so, one therefore needs to analyze these specific

15   obsolescence factors that affect that plant where it's located

16   and the manner in which it is presently operating.

17             Your Honor, again, unless there's more questions on

18   Mr. Beaton, I think I'll move on to --

19             THE COURT:  Okay.

20             MR. QURESHI:  -- the comments about Mr. Lerman's

21   approach.  And, Your Honor, I said in my opening statement that

22   the cross-examination of Mr. Lerman would show that his

23   methodology is fundamentally unreliable.  And I think, Your

24   Honor, that it did -- to the point that I would submit, Your

25   Honor, there is no value left from the first liens that Your

49

1    Honor could have, with any support, rely on.  And it's a long

2    list.  I don't want to belabor it.  And, frankly, I don't know

3    where to begin.  I'll start with the DCF because the DCF

4    approach is, again, one that Mr. Lerman relied on the most,

5    said it was his best, his best value.  Start with the fact that

6    it was twenty million dollars higher than his other approaches.

7    But even that aside, Your Honor, it was truly remarkable that

8    Mr. Lerman testified that he only knows of one way to calculate

9    a terminal value.  Truly remarkable.  His own textbook that he

10   cites in his report and every textbook that Your Honor could

11   possibly find on valuation tells you that there are two ways to

12   calculate the terminal value.  And the terminal value here

13   accounts for a huge portion of his computed value.  And those

14   textbooks all say either the perpetuity method, also known as

15   the Gordon Growth method, or the exit multiple method.  Mr.

16   Lerman testified that he had never heard of the exit multiple

17   method.  Well, why is that important?  One of the treatises

18   that we impeached him with, which is from Professor Pratt, a

19   well-known expert in the valuation field, talks about how

20   typically both methods are calculated and both are analyzed as

21   a cross-check on one another.  If the results are wildly

22   inconsistent, this is, again, a way to ensure that there's more

23   reliability to support --

24            THE COURT:  Did Mr. Schmitt use both methods?

25            MR. QURESHI:  Mr. Schmitt, I believe, did use both

50

1  methods.

2           THE COURT:  Okay.

3           MR. QURESHI:  And Mr. Lerman never even heard of it.

4  But more severely, and, Your Honor, I would direct you to the

5  last tab in the book of demonstratives and -- I don't know,

6  does Your Honor have a copy of Mr. Lerman's expert report

7  handy?

8           THE COURT:  Yes, I do.

9           MR. QURESHI:  So let's go to page 97, which we spent

10  a great deal of time on, and -- actually, a couple of related

11  points that he made from looking at this one page.  So if Your

12  Honor takes 2012 as an example, on page 97, we're looking at

13  the depreciation line and then the deduction for capital

14  expenses, the first that Your Honor will notice is that it's

15  almost all of the after-tax net cash flow is generated as a

16  depreciation expense.  That, in fact, I believe that for 2012

17  it's more than a hundred percent that comes from depreciation.

18           THE COURT:  But isn't it a wash?  He's taking a large

19  depreciation expense as a deduction to reduce the net income

20  and then he's just adding it back.

21           MR. QURESHI:  Your Honor, I --

22           THE COURT:  It's essen -- putting aside the tax

23  ramifications, it's just a wash, isn't it?

24           MR. QURESHI:  I don't think it's a wash because of

25  the way he applies his DCF here.  He takes, through the

51

1    application of such large depreciation numbers, he generates a

2    very large after-tax net cash flow.

3            THE COURT:  I'm saying, if he had a smaller

4    depreciation, he'd have a higher net income by the same amount,

5    though, wouldn't he?

6            MR. QURESHI:  If he had a smaller --

7            THE COURT:  In other words, if taking ten million

8    instead of nineteen million, he'd have ten million dollars more

9    in net income before taxes.

10            MR. QURESHI:  That is true, Your Honor.

11            THE COURT:  What I'm saying is it's just a wash for

12    cash flow purposes, isn't it?

13            MR. QURESHI:  I don't think it's a wash.  In your

14    limited example, Your Honor, I think Your Honor is right.

15            THE COURT:  It affects taxes but otherwise it's a

16    wash.

17            MR. QURESHI:  If Your Honor looks at a single year, I

18    think that's right.  It is a wash.

19            THE COURT:  But every year he's adding back the same

20    amount of depreciation that he's deducted in computing the net

21    income.  That's -- by definition, that happens every year.

22            MR. QURESHI:  For each individual year, Your Honor, I

23    think that's right.  But where it becomes a very severe error

24    in this analysis is because he takes those cash flows, he

25    assumes perpetuity growth rate, which, in this case, is three

52

1     percent.  And this gets to the quote that is on the

2     demonstrative which is from his own book, Professor Hitchner.

3     And they characterize it as this, as a common mistake.  It

4     doesn't make sense, Your Honor, to assume growth into

5     perpetuity when you've assumed such large depreciation numbers

6     that that asset is going to be gone in five years.  That's the

7     only thing he did.  That's his only methodology for calculating

8     his DCF.  And his own textbook says not only that you shouldn't

9     do it but it calls that method a common mistake.  And every

10    other textbook that Your Honor will find on valuation will tell

11    you that that is a fundamental misapplication of the Gordon

12    Growth method.  Now, if Mr. Lerman had also calculated through

13    the application on an exit multiple, a terminal value, then

14    maybe there would be one leg for his DCF left to stand on.  But

15    he didn't.  That's all he did.

16          And so, Your Honor, because of that failing, I truly

17    believe that there's simply no basis to rely on his number.

18          Now, Mr. Lerman also characterized his assumption,

19    his projection, as conservative.  And, again, Mr. Serino

20    touched on a couple of these and I won't belabor it.  He used a

21    few examples in cross-examination.  Natural gas prices,

22    electricity prices frozen back in 2007 bear no relationship to

23    the reality that are very significant given the high portion of

24    Wellman's costs that come from its energy expense.

25          Overhead.  Mr. Lerman argues that the hypothetical

53

1    buyer here, because they're in the business, they're going to

2    have a CFO, they're going to have a CEO, they're going to have

3    a court restructure in place.  And therefore, he assumes zero

4    overhead.  He doesn't say --

5              THE COURT:  Well, he said there would be additional

6    people at the plant.

7              MR. QURESHI:  Absolutely.  But he assumes zero costs

8    for -- and his DCF showed a zero on that line.

9              THE COURT:  I thought that was added to the projected

10   labor expenses.

11             MR. QURESHI:  I think Your Honor might be referring

12   to one of his analyses where he takes a deduction for certain

13   costs.  But in his DCF model, he does not deduct from cash

14   flow, a line item for SG&A costs for overhead.  Now --

15             THE COURT:  Well, he has labor costs in here.  I

16   mean, there are costs there that he deducts.

17             MR. QURESHI:  And those costs, Your Honor, don't even

18   come close to what Wellman actually incurs.  Your Honor,

19   Wellman's own forecast shows that Wellman incurs average --

20   average annual SG&A costs of thirty-five million dollars.  Mr.

21   Lerman has, in his report, averaged EBITDA of sixty-one million

22   dollars.  Now if he deducted from that EBITDA number the actual

23   overhead costs that Wellman incurs today, it's quite obvious

24   what the effect would be on his DCF.

25             THE COURT:  But wasn't his point that a hypothetical

54

1    buyer will at least have some of these elements in place.  When

2    J.P. Morgan took over Chase, you didn't have two CEOs, you

3    didn't have two CFOs.  You probably didn't have two accounting

4    departments.  You eliminated a lot of the overhead.

5              MR. QURESHI:  Absolutely.  And there absolutely would

6    be some synergies that would benefit the hypothetical

7    purchaser.  And, Your Honor, I completely agree that there is

8    absolutely an argument to be made that the hypothetical buyer

9    here might not have SG&A costs as high as Wellman's.  Wellman,

10   again, thirty-five million dollars a year -- the buyer might be

11   able to do it for less.

12             THE COURT:  Well, how do you determine the

13   incremental costs of SG&A?

14             MR. QURESHI:  I'm sorry?

15             THE COURT:  How would one determine the incremental

16   costs of SG&A?

17             MR. QURESHI:  Well, Your Honor, I'm certainly not an

18   appraisal expert so I couldn't walk Your Honor through every

19   step in that.  But I will say this.  Mr. Lerman was clear in

20   his testimony and his report that he takes no deduction for

21   this overhead.  Now, he also agrees that the hypothetical buyer

22   will incur costs.  They're going to have to run these plants.

23   They're going to have to have an infrastructure in place.

24             THE COURT:  Well, I thought he testified that there

25   would be additional people at each of the plants.

55

1          MR. QURESHI:  Well, Your Honor, in his DCF, I don't

2    see the line item deduction that one normally does --

3          THE COURT:  Well, there's labor costs amongst the

4    expenses.  And I thought he testified that that included --

5          MR. QURESHI:  Your Honor, that's --

6          THE COURT:  Let me finish.  To the extent necessary,

7    an additional person or people at each of the plants.  That

8    would be the incremental overhead.

9          MR. QURESHI:  Your Honor -- if Your Honor's referring

10   on page 96 in his direct labor line item --

11         THE COURT:  Well, it's a labor item.  I don't whether

12   it's operating expense or salaries, but I do remember him

13   testifying to that.

14         MR. QURESHI:  Well, certainly, I don't believe, Your

15   Honor, that any of these labor categories that he has listed as

16   fixed expenses at the plant level involved overhead costs at

17   the corporate level.  They're all plant specific.  And Your

18   Honor may also recall that Mr. Lerman testified --

19         THE COURT:  Well, so what overhead at headquarters,

20   to distinguish from the plant, would a buyer have to incur that

21   it wasn't already incurring being in the business?

22         MR. QURESHI:  Most significantly, SG&A, selling,

23   general and administrative expenses.

24         THE COURT:  But like what if it's in the business

25   already?  There are certain economies of scale, I would think.

56

1          MR. QURESHI:  Absolutely, there are certain economies

2    of scale.  Your Honor, they're going to have go out and find

3    customers.  They may have customers for their existing product.

4    But, as Mr. Beaton explained, just like Wellman isn't going to

5    rely for all of its raw materials on a sole sort of supplier,

6    so, too, the customers, are not going to rely just on Wellman

7    for all of their products.  So depending on what customers that

8    hypothetical buyer has and how much overlap there is with

9    Wellman's existing customers in a market where customers are

10   very concentrated and very few, there will be an expense

11   associated with that.  But just generally, on the day to day

12   operation of the business, there's three new tenants.  And

13   they're making millions and millions of pounds of this product

14   every year and that product has to be sold, that there are

15   accounts to be managed, there are raw material supply chains to

16   be managed.  And all of those functions currently at Wellman

17   are in the corporate overhead number.  That's what that thirty-

18   five million dollars --

19          THE COURT:  But wouldn't a buyer -- I understand that

20   there's more work.  I'm not arguing with you.  But wouldn't a

21   buyer have a sales force and have a force to manage production

22   already?

23          MR. QURESHI:  A buyer would have those things.  But

24   to suggest that a buyer could take these three plants and all

25   of Wellman's production and at zero incremental cost go out and

57

1    operate the business?  It's unrealistic to think --

2         THE COURT:  I don't think that was what Mr. Lerman

3    testified to in the end.  Because, as I said, he did identify

4    some additional labor costs.

5         MR. QURESHI:  To the extent he did, I don't think

6    they come close to approximating the true --

7         THE COURT:  Okay.

8         MR. QURESHI:  -- costs that would be incurred by the

9    hypothetical buyer.

10        And, Your Honor, again, continuing with the theme of

11   can Mr. Lerman's report be relied upon and against their review

12   of the DCF, his discount rate, obviously a very critical piece

13   of his analysis -- virtually every valuation expert that I have

14   seen, Your Honor, calculates a specific company specific

15   discount rate applied to the company that that expert is

16   attempting to value and does it currently.  His first approach,

17   Mr. Lerman's first report, took the 2007 Morgenstar yearbook

18   which had data only through March of 2007 and everything else

19   in that book is through 2006.  He took that industry discount

20   rate and applied it to the full projection period of Wellman's

21   earnings, through 2012.

22        THE COURT:  Well, assuming that was a starting point,

23   how should it have been modified in order to make it company

24   specific?

25        MR. QURESHI:  Well, Your Honor, I would start with

58

1    page 5 of Morningstar, which is his source book.  It says right

2    in here "it is our position that the models utilized in this

3    book provide cost of capital statistics will be useful when

4    applied on a uniform basis to the industry as a whole.  On an

5    individual company basis, the models utilized in this book may

6    provide information that is inaccurate or misleading."  That's

7    what he did.  There are well recognized methodologies for

8    calculating the cost of capital for this specific company.  Now

9    I don't know if Mr. Lerman just doesn't know how to do it.

10   There's a distinct possibility that that's the case given that

11   he doesn't know how to calculate an exit multiple.  But he

12   didn't do that here.  He just took an industry.  And an old one

13   at that when the book tells him not to do it, his source book.

14   The same source book that, by the way -- I mean, he had no idea

15   even what companies were looked at in this source book to

16   arrive at that industry discount rate.  He didn't know --

17             THE COURT:  Was that the Morningstar book you're

18   talking --

19             MR. QURESHI:  This is the Morningstar book.  He

20   didn't know whether the comparable companies were included.  I

21   asked him the question at his deposition, Your Honor, and he

22   said I'd have to phone Morningstar to find out.  He didn't even

23   look in the appendix.  It's right here.  And so, one really has

24   to question whether Mr. Lerman, with all due respect, knows

25   what he's done.  I don't think he does in the DCF.  I think

59

1   it's fundamentally unreliable.

2           So, Your Honor, unless the Court has any other

3   questions, I think I will rest.

4           THE COURT:  Thank you.

5           MR. QURESHI:  Thank you.

6           MR. PARKINS:  Your Honor, may I hand you some

7   demonstrative exhibits, please?

8           THE COURT:  Sure.  Thank you.

9           MR. PARKINS:  Page 43.  Your Honor, before I get into

10  my prepared argument, I just want to answer a couple of your

11  questions, if I may.

12          THE COURT:  Sure.

13          MR. PARKINS:  If we look, Your Honor, at page 75 of

14  volume 3 of the Schmitt report --

15          THE COURT:  This is Mr. Schmitt's report.

16          MR. QURESHI:  -- in the Business Enterprise Valuation

17  section, Your Honor --

18          THE COURT:  75?

19          MR. PARKINS:  Yes, Judge.

20          THE COURT:  Okay.  If you go down to the last

21  paragraph on the page there, Mr. Schmitt says he used the

22  Gordon constant profile.

23          THE COURT:  Um-humm.

24          MR. PARKINS:  You asked the question what he used and

25  counsel said he used both.  That wouldn't be true.  He used the

60

1    Gordon cost approach model.

2            THE COURT:  I'm sorry.

3            MR. PARKINS:  I'm sorry?

4            THE COURT:  What does that refer to?

5            MR. PARKINS:  The growth model for calculating the

6    terminal year.  You asked what Mr. Schmitt did and I think

7    counsel he did both.  And Mr. Schmitt did one on the same one

8    that Mr. Lerman did.

9            On the second point, Your Honor, with respect to

10   discount rates when Mr. Lerman got the new book from

11   Morningstar, he used discount rates that were higher than those

12   he used by Mr. Schmitt, which is reflected two paragraphs up,

13   Your Honor, which means --

14           THE COURT:  So how come he wound up with such a

15   higher number?

16           MR. PARKINS:  Well, I'm going to get to that.

17           THE COURT:  Okay.

18           MR. PARKINS:  I'm going to get to that.  Your Honor,

19   one of the questions you asked earlier today was should you be

20   concerned about the fact that the liquidation value in the

21   debtors' disclosure statement was 65.8 million dollars and Mr.

22   Schmitt's number was 70.8 million dollars and Mr. Beaton's

23   number was seventy-four million dollars.  Well, before I really

24   get into the nuts and bolts of what I'm going to talk about,

25   I'd like to remind you that on direct examination when Mr.

61

1    Schmitt testified about a check he did on his seventy million

2    dollar number, he said well, seventy-nine or seventy, within

3    the range, they're the same basically.  I think you can recall

4    that testimony.  So what we have here is the numbers by the

5    seconds and the company being in the range of liquidation.

6    This is what it is.  It's the same numbers.

7            But let me, if I may, Your Honor, really get to the

8    heart of some of the issues here and I'd like to talk about

9    some of the other numbers which I think you should be concerned

10    about with respect to Mr. Schmitt's report.  And if you'd look

11    with me, Your Honor, at the tab number 1 and tab number 5 --

12    I'm sorry, tab number 6.  I'm sorry, I'm wrong.  I was right.

13    Tab number 5 and tab number 1, one of the fundamental issues

14    that we chased during the entire hearing, Your Honor, if I may,

15    was the enterprise value.  There's a 273 million dollar

16    enterprise value which appeared on counsel's same page 43.

17    That's this figure number here, this 273 million dollar number.

18    Interestingly enough, Your Honor, what we have here is that Mr.

19    Schmitt's number of 273 million dollars was presented in his

20    expert report on July 3rd.  On July 25, and then for a hearing

21    set the day before the valuation hearing was set, the debtor

22    filed a supplemental disclosure statement and disclosures --

23            THE COURT:  Hold on for a minute.  Can everybody hold

24    it down so I can Mr. Parkins?  Go ahead.

25            MR. PARKINS:  Supplemental disclosure statement and

62

1   supplemental disclosures.  And if you look with me at Exhibit

2   number 5, Your Honor, it's the valuation analysis, which is

3   Exhibit D to the disclosure statement, which Your Honor found

4   had contained adequate information.  What you have here is the

5   fact that Lazard, the debtors' investment --

6          THE COURT:  By the way, my copy has yellow

7   highlighting.

8          MR. PARKINS:  Yes.  I did.

9          THE COURT:  I assume that the other copies -- okay.

10          MR. PARKINS:  Everyone has yellow highlights.  The

11   colors, the highlighting, is shared everywhere, Your Honor.

12          THE COURT:  Okay.

13          MR. PARKINS:  Shows that the Lazard get an enterprise

14   valuation and Lazard's midpoint of its enterprise valuation is

15   337 million not an enterprise valuation of 273 million.  Now,

16   Lazard had this 273 million dollar number for three weeks

17   before it presented its enterprise valuation to the Court in

18   its disclosure statement for the debtor and it rejected the 273

19   million dollar number --

20          THE COURT:  Why didn't you ask Mr. Yearley about that

21   on cross-examination?

22          MR. PARKINS:  He didn't bring it up.  I was waiting

23   for this.  I didn't bring it up, Your Honor, because I didn't

24   want to affect the numbers that are already in the disclosure

25   statement.  I didn't want to ask him questions.

63

1          THE COURT:  Okay.

2          MR. PARKINS:  This is his numbers.  But this is in

3    evidence.

4          THE COURT:  Correct.

5          MR. PARKINS:  This is BNY number 1.  So what we have

6    here is the debtors' statement that the enterprise value, and

7    it uses this term "enterprise value" of the debtor as of

8    September 30, the same date that Mr. Schmitt picked is 337

9    million dollars.  So what I'm going to ask before I go up to

10   the board and say are these apples to apples comparisons, I

11   ask, Your Honor, maybe not today but in consideration of

12   whether these are apples to apples comparisons to determine

13   whether or not the effect of what I'm going to say here is

14   true, is look with me at the beginning of page 74 of the

15   Schmitt report.

16         THE COURT:  Which volume?

17         MR. PARKINS:  It was the page we looked at before.

18   It's volume 3, Judge, page 74.  And if you look there, his

19   business enterprise valuation where he tried to determine the

20   enterprise valuation and he goes through the discounted cash

21   flow methodology, guideline publicly traded methodology,

22   etcetera, to reach his 273 million dollar number.  When you

23   read the discussion by Lazard, and if you turn the page to the

24   second page of this tab 5, and you look at the second full

25   paragraph there -- the first full paragraph that begins

64

1    "Hypothetical evaluation estimates", you will see that Lazard

2    did the same thing as Mr. Schmitt did.  But Lazard had Mr.

3    Schmitt's enterprise valuation for three weeks and rejected it.

4    And we submit, Your Honor, that you should, too, because what

5    this does, what this does when you use Lazard's midpoint, Your

6    Honor, is if you put Lazard's number here for -- the

7    methodology he used is deduct, deduct, deduct.  If you put

8    Lazard's number -- the debtor is an investment banker.  He

9    knows it's going to be for nine months not someone hired to

10   just do the project.  If you put here 337, you get down to not

11   our number, seventy million, you get down to a number 134

12   million if you use Lazard's enterprise value.  And I submit,

13   Your Honor, if you study these, the valuations and Mr.

14   Schmitt's valuations as to getting to his enterprise value,

15   you'll see that the methodology is the same but the company

16   that really knew this company, then considered these

17   opportunities, knew and concluded that the midpoint of the

18   valuation of the enterprise value was 337 million dollars.

19        What that does, Your Honor, is it said we have chased

20   because no one checked before Mr. Schmitt put his evidence on

21   the record that there is possibly a difference between the two

22   experts for the debtor, Lazard and Mr. Schmitt, the enterprise

23   valuation was approximately 60,000 dollars higher.  That's

24   60,000 dollars and there's immediately on the record for my

25   client, Bank of New York.  And I say if you're troubled, as we

65

1    were troubled, by looking at these numbers which are in

2    evidence, you should be troubled by the fact that the Lazard

3    enterprise valuation that everyone relies on here for the case

4    for the debtor busts Mr. Schmitt's numbers by sixty million

5    dollars, all of which are generous to Bank of New York.

6         Now, if you go back with me to tab 1, Your Honor, of

7    my handout, tab 1 reflects in yellow here, we tried to build

8    this, page 1 of 4 going through page 4 of 4, sort of

9    incremental growth of the evidence as presented in the various

10   documents and testimony.

11        If you look at page 1, you see BNY Number 1 of

12   Exhibit D, the number we just went through, the 337 million

13   dollar number in evidence, debtor's PP&E book value of 630, 237

14   million.  These are all annotated for Your Honor to go and

15   verify where these came from.  You have the PP&E valuation,

16   which is what I just did here, which is what Mr. Schmitt takes

17   to determine the seventy million dollars to validate that every

18   scenario that he went with, Mr. Chase's seventy million dollar

19   number, this number was wrong because it was our identified

20   valuation.  It's sixty million dollars higher.

21        And then you have the debtor's, Lazard's, PP&E

22   liquidation value of 6/30/08, of 65.8 million dollars, which we

23   talked about.

24        One thing I would like to point out, Judge, when you

25   study the Lazard analysis of value and Mr. Schmitt's, they're

66

1    both done as of September 30.   So they're apples-to-apples date

2    using the same methodology.

3              If we go to page 2 of 4, Judge, we add the increment

4    of the Grant Thornton and the AccuVal valuation, and they're in

5    the red there.   And they're added as increments here for the

6    Court to see as we build upon this to see where the numbers

7    actually fall out.

8              If we go to page 3 of 4, we see the Lerman numbers.

9    And you'll see the Lerman numbers, the high value of 197, 181

10   and 136.   Amazingly, when you use the appropriate enterprise

11   value that was argued determined as the right enterprise value,

12   we see the two valuations of the raw PP&E coming together, the

13   lowest numbers, the minimum, between the correct calculation

14   using Lazard's identified value with Mr. Lerman's low number

15   calculation.   They come together.   They are a subtraction of

16   the working capital.   They are a subtraction of the enterprise

17   value.   They come together in the same numbers.   Interesting.

18   Not a coincidence, Your Honor.

19              And then, as you turn the page, Your Honor, what we

20   did in here is we took those existing numbers and we put in

21   purple here what we believe is the overzealous penalizing done

22   by AccuVal and Grant Thornton, much of which you questioned

23   about here.   And we deducted, for example, from AccuVal, the

24   103 million dollar -- this number here, unquantifiable,

25   undefinable 103 million dollar number.   You can't quantify it.

67

1     You have plenty of line items.  We took that out.

2            And then with respect to Mr. Beaton and Grant

3     Thornton, we took out one of his double hits.  Instead of

4     making it seventy-five percent, or seventy-five million

5     dollars, we said since there's no quantification, what if it

6     was only half?  And the numbers show up here.

7            So what you see at the end of 4 of 4 here is sort of

8     the aggregation of the numbers.  The purple ones are the ones

9     we think are erroneous and overstate the penalties that both

10    Mr. Schmitt and Grant Thornton have put in their numbers.  But

11    the rest are actually numbers that are in evidence with Your

12    Honor, are calculated from the correct Lazard enterprise value.

13           Now, if you go, Your Honor, with me to tab number 2,

14    I think tab number 2 and tab number 4, tab number 2 is a time

15    line we put together.  And you can see it's annotated for the

16    evidentiary documents which support where we got this time

17    line.

18           What's important about this, Your Honor, is a couple

19    things.  Number one, what it shows is that when Lazard started

20    its effort to try to market the companies back in November of

21    last year, Your Honor, the EBITDA projections for '08 and '09

22    are eighty-three and eighty-nine million dollars.  If you turn

23    with me, Your Honor, to tab number 4, you'll see that by

24    February, indications of interest had been generated from three

25    bidders.  And based on these numbers, these are the only

68

1   numbers that were presented to these people, as testified,

2   okay?  You see that the offers that were being discussed -- not

3   offers.  I'll call them indication of interest because there

4   were no bids.  The indications of interest, at this time with

5   the EBITDA numbers presented by the company, Your Honor, were

6   400 million dollars or higher with cash.

7           Now, what happened after this date?  Go back to my

8   time line.  After this date, the company filed bankruptcy.

9   This is tab number 2.  The company filed bankruptcy, and the

10  DIP budget showed an EBITDA projection of thirty-five.  We all

11  sat here on the first day of court and we know what the lender

12  said had to be done and where to get DIP financing.  They said

13  you had to go sell.  Let's not kid ourselves.  We had to sell.

14  I remember Your Honor ruling there was no choice and had to go

15  sell.  There wasn't a reorganization alternative.

16          I remember you arguing that the debtor should have

17  the leeway to use the tools of bankruptcy, and the lender said

18  no.  So they had to go sell.  What happened is offers came in,

19  and sure enough, offers came in with lower EBITDA numbers of

20  250, 260 million dollars.

21          But, voila, what happened now, Your Honor?  What

22  happened now is that in May, the debtors projections for 2009

23  and 2010 come out, and those numbers appear in evidence.

24  They're Exhibit Number 22, which I think is tab 7 in this

25  booklet here.  The EBITDA numbers go up.  The EBITDA numbers go

69

1    up projected for '09 of sixty-nine million dollars and

2    projected for '10 -- I think it's seventy-four million dollars.

3           And, Your Honor, it is no coincidence when the EBITDA

4    numbers go up the Lazard's enterprise value is 337 million

5    dollar midpoint.  Shocking, isn't it?  No wonder the offers of

6    250 million dollars were not accepted.  No wonder they were too

7    low.  It is not shocking that we have a 337 million dollar

8    enterprise value and don't accept an offer that's 90 million

9    dollars less.  Why would you?  And it's also, Your Honor, clear

10   that the sales efforts stopped when these numbers became

11   published.

12          So what we have here, Your Honor, is at the same time

13   that the EBITDA numbers go up and the enterprise value goes to

14   337 million dollars, clearly sort of approaching the 400

15   million dollar number, but if you start back in October, these

16   numbers were an EBITDA of eighty-five.  Eighty-five million

17   dollars, eighty-three million dollars and ninety-million

18   dollars less than the four hundred million dollar cash offers

19   but approaching them again because EBITDAs are going up.

20          At the same time, you have the AccuVal report.  At

21   the same time the new EBITDA numbers come out, the AccuVal

22   report says the value of the PP&E is seventy.  Well, Judge, we

23   have here the enterprise value of 337 and 870.  It's 134

24   million dollars.  Just not right.  It doesn't fit.

25          THE COURT:  But you've been talking about the Lazard

70

1    valuation.  What about the Lerman val?

2          MR. PARKINS:  The difference between Lerman's

3    valuations and the numbers we've been talking about are

4    threefold.  Number one, Lerman did valuations of the plants.

5    Lerman did not do valuations of the company.  Lerman was given

6    information with regard to the plants' P&Ls, the plant costs,

7    the plant equipment, plant margins, etcetera.

8          So, Lerman, as he said on the stand, said this is an

9    asset play.  Questions raised by counsel for the second lien

10   holders that SG&A is not included, it would depress the cash

11   flows, of course wouldn't be included for the same reasons Your

12   Honor asked the questions.  If I have a big sales force or

13   buying force, having one more or two more plants is not going

14   to require me to incur dramatic SG&A.  In fact, it probably

15   wouldn't be anyway because the customers in the universe are

16   identified, and the suppliers in the universe are also

17   identified.

18         THE COURT:  Getting back to Mr. Lerman --

19         MR. PARKINS:  Yes.

20         THE COURT:  -- I recall him saying at least ten

21   times, when asked a question on cross-examination, well, I

22   didn't have the information, the debtor didn't give it to me.

23         MR. PARKINS:  Right.

24         THE COURT:  I'm not blaming him for that but doesn't

25   that undercut the probative value of his report?  If he didn't

71

1    have the information that he apparently thought he needed to do

2    the valuation --

3              MR. PARKINS:  It undercuts probative value if you

4    believe that the corporate overhead and corporate numbers,

5    okay, would be probative of the value of the plants.  It

6    doesn't undercut necessarily -- what it did is he couldn't

7    validate the corporate numbers with respect to going out the

8    years with respect to the depreciation, but it doesn't undercut

9    the fundamental numbers with respect to the productive and

10   earning capacity of the plants.  That didn't change whatsoever.

11             What he didn't have is numbers to validate how the

12   company was going to take, I think he said, depreciation,

13   didn't have whether or not they were going to use the, for

14   taxable purposes, use the book value or some other value for

15   determining depreciation.  Didn't have that, and that's where

16   the numbers come ajar.

17             But the fundamental economics of the plan do not come

18   ajar, and he was valuing the fundamental economics of the

19   plant.

20             THE COURT:  Well, he also assumed, I think, the same

21   useful life, the equipment that Palmetto and Pearl River --

22             MR. PARKINS:  Correct.

23             THE COURT:  -- and I forget, one was only nine years

24   old and one was -- some of the equipment was as much as

25   thirty --

72

1          MR. PARKINS:  Ten years old.

2          THE COURT:  Well, some of the equipment was as much

3     as thirty-five years old --

4          MR. PARKINS:  Correct.

5          THE COURT:  -- in the other plant.  Yet, he assumed

6     that, in both cases, the useful life would be thirty-five

7     years.

8          MR. PARKINS:  Correct.

9          THE COURT:  Isn't there a sort of a disconnect there?

10         MR. PARKINS:  No.  Not really.  The issue of

11    maintaining these -- these plants had fifty, sixty year lives.

12    As he said, one refinery is a hundred years old and continues

13    to operate full throttle.

14         THE COURT:  Well, wouldn't the plant with the newer

15    equipment have a longer useful life, then?

16         MR. PARKINS:  A plant with newer equipment will have

17    more efficient life.  A plant with older equipment maintained

18    will continue to, as Mr. Lerman said, continue to perform at

19    capacity.  In fact, Mr. Schmitt -- under cross-examination, I

20    asked him do you have any reason to believe these plants, as

21    maintained, with all the spare parts that exist, would not be

22    able to produce at full capacity?  And the answer is no.

23    There's no reason to believe they wouldn't be able to operate

24    at full capacity.  And there's no reason to believe that these

25    plants would not be able to continue to have a useful life so

73

1    long as there's demand.  Plants continue to operate in

2    perpetuity until they're shut down because there's no demand

3    for them.  They are gigantic capital expenditures.  Refineries

4    are very expensive, and they perform until their demand is no

5    longer necessary.

6           So I think, in his experience, which he brings

7    industry experience to the table, not appraisal experience,

8    industry experience, companies use these plants until the

9    demand stops.  They have a useful life.  They do have a useful

10   life that goes on and on.  And there's no doubt.  And his

11   example was you see a refinery was a hundred years old, I

12   think.  It continues to perform full-blown today.  Depreciated

13   probably to zero, I would surmise, but it continues to perform

14   fully today because there's demand.

15          THE COURT:  Part of the evidence is also that he

16   assumed, apparently wrongly, that the debtor could pass along

17   all the increases in raw material cost.  How does that affect

18   his analysis?

19          MR. PARKINS:  I have an answer to that question.

20          THE COURT:  Okay.

21          MR. PARKINS:  The answer to that question, Your

22   Honor, is in tab number 7, and I've highlighted the pages.  I

23   think it's page 6, page 10 and 11.  This is information that

24   Mr. Lerman was given, but this is borne out by the projections

25   provided by the debtor.

74

1          You recall the big issue that's been raised here is

2     that these raw material costs can't be passed on and that, in

3     fact, there will be a squeeze on margins.  Remember?  There'll

4     be a squeeze on the margins --

5          THE COURT:  Um-hum.

6          MR. PARKINS:  -- because it can't be passed on.

7     Well, as we look at the debtor's numbers and the debtor's

8     assumptions in its business plan, Your Honor, you have to look

9     prospectively, not just historically.  And I think Mr. Beaton

10    said historically there hasn't been any -- the margins have

11    constricted.  Mr. Lerman agreed.  But what do you have in the

12    projections of the debtors?  You have projections of the

13    debtors of cost at raw margins, not squeezed raw margins.  Raw

14    material cost assumptions were based on estimates of April

15    2008, future cost assumptions based on five percent increase.

16         And then if you go with me, Judge, to pages 10 and

17    11, from the debtor's own projections, and you look beginning

18    in year 9, 10 and 11, for example, gross profit percent margin,

19    you take select income statement, items go down.  That's sales

20    gross profit percent margin, Your Honor.  See it with me?

21         THE COURT:  Which -- well, there are a lot of --

22         MR. PARKINS:  The first yellow line.

23         THE COURT:  The gross profit percentage margin?

24         MR. PARKINS:  Right.  The gross profit margin.  Those

25    profit margins are constant, which means, contrary to what Mr.

1   Beaton testified, contrary to, quote, "the economic

2   obsolescence" that people testified to, the company doesn't

3   believe there's any economic obsolescence and its margins

4   collapsing over the next years.  And, therefore, using their

5   own projections, which Lazard relied on, which the company is

6   putting forward in support of its plan of reorganization, it

7   would be an error to say that there's constriction of the

8   margins, and these costs couldn't be passed through because the

9   company doesn't show any penalty here.  None.

10          So Mr. Lerman did accurate -- to argue otherwise may

11   be history but it's not tomorrow.  It would be incorrect.  So

12   the answer is in the company's own numbers and the assumptions

13   that were given.

14          Let me talk about one other thing that you talk

15   about, these huge numbers of functional obsolescence that were

16   put in as penalties.  As penalties.  Mr. Lerman, if you recall,

17   testified that yes, there's depreciation for age, which he

18   took.  And I think it's in his report.  I think.  Let me find

19   it here.  Depreciation for age and depreciation for what he

20   called functional obsolescence, physical deterioration and

21   functional obsolescence, which he discussed.

22          But being an engineer rather than being not an

23   engineer going in to appraise this, he went and peeled the

24   onion back.  If you recall his testimony, he said to the

25   Wellman people what is the obsolescence you're going to suffer

76

1    in your equipment today versus the new equipment?  And what it

2    was, Your Honor, was the cost of power of the cooling system,

3    the heating system he talked about, which he said Wellman said

4    was one cent per pound of product.  Rather than saying there is

5    a universal functional obsolescence, he said what is it, how do

6    I measure that?  And he measured it and he came out with

7    functional obsolescence numbers, very high deductions of cost.

8    Here it's table 15 in his report, Your Honor.

9            THE COURT:  What page?

10           MR. PARKINS:  It's on page 40, Judge.  Rather than

11   just do -- I'm sorry.  You have it?

12           THE COURT:  Is this the --

13           MR. PARKINS:  Yes.

14           THE COURT:  You're talking about the Huron report?

15           MR. PARKINS:  Correct.

16           THE COURT:  Okay.

17           MR. PARKINS:  Pearl River and Palmetto.  What he did

18   is he took physical deterioration because they're old, okay?

19   And then he had functional obsolescence, twenty percent.  What

20   is that number?  That number reflects the cost per pound of the

21   difference in energy cost, which he asked Wellman, he's

22   testified, was the functional obsolescence they saw.  Rather

23   than a broad spectrum antibiotic number without support, he

24   went and peeled the onion back and said what's the cost

25   negative going to be to burden this company?  And these were

77

1    put into his calculus.

2           Now, let's talk about some more things about, if I

3    could, Your Honor, talk about more things about Mr. Schmitt,

4    that the fundamental underpinnings of Mr. Schmitt's

5    calculation, the enterprise value of Lazard, underpins and

6    undercuts his entire calculus, chasing the seventy million

7    dollar number.

8           Now, one of the things you asked about, and one of

9    the things we never got an answer for, if I can just here

10   approach, is before using Lazard's numbers, just using his

11   numbers, where did he get this 103 million dollar number?

12   That's an enormous number.  You pointed out where did he get

13   it?  The answer is if you use the 337, it would be 60 million

14   dollars less if you try to plug it into the other numbers he

15   used.  But the answer is it's a plugged number.  It's the

16   amount you have to get to in order to support the seventy

17   million dollar number, which he reached from various

18   methodologies.

19          One of the methodologies he used, for example, and I

20   ask you to turn to the last tab, Your Honor, to try to validate

21   his numbers, interestingly enough, I think tab 9, Exhibit 13,

22   the merger and acquisition method.  It's the second page of

23   that tab, yes.

24          THE COURT:  Okay.

25          MR. PARKINS:  If you look at Exhibit 13, the merger

78

1   and acquisition method, Your Honor, if you recall, this is Mr.

2   Schmitt's comps, so to speak, for M&A, which he generated a

3   selected multiple for.  And what was the one he gave the most

4   reliance to, the most weight to?  Number 7, the Reliance

5   Industries USA transaction/purchase of this old, closed,

6   shuttered fiber plant, okay, which he gave the most comparable

7   to because, Your Honor, what he is assuming for the purposes of

8   valuing the Wellman facility is an idled shut plant.  That's

9   why he gave the most weight to it.

10          Interestingly enough, Grant Thornton rejected this as

11   a comparable saying this is a liquidation on the ground.  Mr.

12   Lerman rejected it as this is a liquidation on the ground.  Mr.

13   Schmitt relied on it most, in error.  And from that error, what

14   he did is he selected multiples for capacity and, in his other

15   valuation methodologies, took the low end as every multiple, as

16   you recall, the low end of every multiple for his Guideline

17   Public Companies' EBITDA, revenue, and not only the low end of

18   his multiple but below the chart to try to drive the values

19   down to achieve the seventy million dollars, which was his

20   effort to try to strip the going-concern value out of the PP&E.

21          But he always comes back to how do I validate this?

22   And I validate this by my business enterprise value, being

23   seventy, targeting seventy throughout his calculus.  Well, that

24   enterprise value is wrong, and that number was 133 million

25   dollars.

79

1          Now, let's talk about Grant Thornton for just a few

2     minutes.  What Grant Thornton did, Mr. Beaton did is as

3     follows:  He assumed it would be a lights-out scenario.  No

4     doubt about it.  He said yes.  And why is it a lights-out

5     scenario?  Because he valued, instead of going concern, as Mr.

6     Schmitt tried to do, this kind of calculus using -- is the

7     wrong number but now the number, we know, is 337 million

8     dollars?  Mr. Beaton didn't do that.  He tried to build it from

9     the bottom up.

10          Now, what did he do?  He went and priced 6,500 parts.

11     Six thousand five hundred parts.  He didn't price a plant.  He

12     went, and what we have is a catalog.  If you went through the,

13     quote, "reams" of paper he said he didn't bring to court, what

14     we have is the catalog of used parts of Wellman with a price on

15     them.  That's what we have as a starting point.

16          And he puts that data into the Marshall Valuation

17     Service Software, and that Marshall Valuation Software

18     automatically, as Your Honor picked up, takes a deduction for

19     economic obsolescence and takes a deduction for physical and

20     functional obsolescence, the physical and functional

21     obsolescence for Palmetto.  And if you have the Grant Thornton

22     report with you, just going to page 35 of that -- I have an

23     extra copy here if you want.

24          THE COURT:  I have it.

25          MR. PARKINS:  You have it?  Okay.  If you just go to

80

1    page 35, Judge, and that's the example that was used in his, I

2    think, direct examination, what you see here is the first input

3    in his testimony was that, using the Marshall Valuation

4    Service, you have a deduction of fifty-three percent and

5    twenty-five percent.  And this was done -- do you see that?

6            THE COURT:  Well, that's for the real property.

7            MR. PARKINS:  Yeah, but they did this for the -- he

8    testified he did it for all the assets.  And then what you

9    have -- he did it for everything, the 6,500 pieces of assets,

10   real property, personal property, put it in the Marshall

11   number, outcomes is -- what goes into a twenty-five percent

12   economic obsolescence versus, you asked, Your Honor, the

13   specific obsolescence?  Nobody knows.  Nobody knows what those

14   numbers are.  It just comes out a number and it includes

15   twenty-five percent economic obsolescence.  Nobody knows.

16           THE COURT:  But you didn't put in any evidence

17   challenging the Marshall valuation method.  Are you contending

18   that it's inaccurate?

19           MR. PARKINS:  No, we didn't but he just testified

20   it's a software program used by appraisers.  But still we don't

21   know the answer as to how much "double-dipping", so to speak,

22   there is in economic obsolescence, general or specific

23   obsolescence.  We can get the exhibit.

24           THE COURT:  Well, what does the evidence show about

25   that?

81

1          MR. PARKINS:  Well, we can get to the specific

2    obsolescence for sure, okay.  We can get to the specific

3    obsolescence, for example, if we look at counsel's tab number

4    3.  We can go through them right now.  And, Your Honor, this

5    economic specific obsolescence is a fifty percent number.  If

6    you look at the machinery and equipment number on page 35, it

7    is a fifty-four million dollar deduct number, without any

8    justification.  There was evidence that there was no economic

9    empirical calculus for this number in his judgment.

10          Well, let's look through these line items and see if

11   they're reasonable for a second.  First one is historical

12   inability of PP&E to generate positive cash flow due to factors

13   such as Wellman's financial condition.  We submit, Your Honor,

14   that Wellman's financial condition, other than being low-lying

15   fruit available to be plucked for a low price, has nothing to

16   do with a buyer in the marketplace and, therefore, it is not an

17   economic obsolescence factor.  It makes you a target but not

18   economic obsolescence for the buyer.

19          Globalization:  The buyers in this industry, Alpha,

20   M&G, others, are part of that globalization.  They're not going

21   to look at that as an obsolescence.  They are spending money

22   today building new capacity.  The opportunity to get new

23   capacity is something they want to do.  That ties into

24   oversupply.  Mr. Lerman testified within the industry the

25   trends of how the chemical industry looks at the timing of

82

1   expending more capital.  At slow times, they know that there's

2   going to be a rebound, he testified.  And therefore, they start

3   building plants.  Why?  Because it takes three years to get

4   them online.  You know it's going to turn.  They cycles are

5   going to turn.  It's going to be coming back.

6         So the oversupply is not a negative for a buyer.  The

7   oversupply is indicative of when, today, you're going to spend

8   more money, put more capacity in when that oversupply and that

9   curve meets demand going forward.  And, in fact, as Mr. Lerman

10   testified and as the examples were shown by Mr. Schmitt and

11   others, a lot of money is going into new plants.  It is not an

12   economic obsolescence factor to be considered.

13         High raw materials costs:  We've dispensed with that.

14   The company shows no constriction in its margins.  Now, we

15   don't know what the third party buyers' margins are but we do

16   believe -- I think it's a reasonable inference to draw that a

17   third buyer who's not in bankruptcy, who's doing better than

18   Wellman is not going to suffer constriction in its margins just

19   as Wellman was a weaker player.

20         And Wellman's projections are they're not suffering

21   constrictions in their gross profit margins.  Why would you

22   assume that a stronger player in the marketplace would do it?

23         And the last one here, which is truly quite

24   interesting, personal property, an integral part of the real

25   property, relocation costs and logistics will be significant.

83

1    I still can't figure out what that means because these plants

2    aren't going anywhere.  Why is there going to be an incremental

3    cost?

4           Reliance is building a plant near where the South

5    Carolina plant of Wellman is.  The other plant, Pearl River,

6    the new plant, is on the Mississippi River, close to

7    transportation, close to sources of selling and buyers of

8    materials.  There's no incremental cost going to be incurred

9    here with respect to that.

10           And, Your Honor, the other thing that's important is

11    that my partner, Mr. Flores, had Mr. Beaton, on cross-

12    examination -- it was interesting that during his deposition

13    testimony, I think you recall, we talked about the fact that

14    Mr. Beaton didn't distinguish between items that he called

15    selling a holding cost and economic obsolescence.  He put them

16    in the same list and said they were.  And his testimony at

17    trial was you're right, my report was wrong and my testimony is

18    wrong and I'm clearing it up today.

19           So when asked fresh, before preparation, in his

20    deposition what the difference was, he couldn't find any.  Only

21    when he got to trial in his cross-examination and prepared for

22    trial did he draw a distinction.

23           But let's look at these that he drew here.  Selling

24    and holding costs, tab number 4.  Customer relationships:

25    Well, every expert testified that every player in the industry

84

1  who does PET resin has customer relationships.  There are a

2  limited number of customers.  Everybody knows it.  Everybody

3  knocks on their to sell them product.  That's the way it goes.

4        Supplier relationships:  The supplier for raw

5  materials are limited.  BP's the largest one.  Others are in

6  the industry but everybody buys from the same supplier.

7        Intellectual property:  What Mr. Schmitt testified

8  about since counsel says that Mr. Beaton didn't value

9  intellectual property --

10       THE COURT:  But didn't Mr. Beaton testify that you

11 had to back out these costs simply because everybody in the

12 industry had these same assets and they weren't going to pay

13 for them.

14       MR. PARKINS:  Mr. Beaton said that if I come into a

15 transaction as a buyer, I'm not going to pay you value for what

16 I already have.

17       THE COURT:  Right.

18       MR. PARKINS:  But, Your Honor, what I am going to buy

19 is the PP&E, and the PP&E, if you remember, is -- pyramid, is

20 the foundation of the business, is the PP&E.

21       And so what people are coming into buy is the

22 foundation of the business.  And while they're not going to pay

23 for what they already have, they are going to pay for their

24 foundation.  And usually you start the foundation first.  But

25 they're coming in as a willing buyer and willing seller,

85

1  selling industry, who has, as I started out my first argument

2  opening day, the bundle of sticks, is going to be looking for a

3  PP&E plan.

4       One thing's for sure:  It's not liquidation value.

5  One thing for sure, as you look at tab 1, it's not the

6  aggregation of the liquidation value.  One thing we know for

7  sure is what Wellman thinks it is because of their enterprise

8  value.  The calculus is 134 million dollars.  That's the number

9  because no one challenges the deduction.  Neither Wellman

10 didn't challenge, obviously, I'm not an expert, and the second

11 group challenged the deductive method here we're reaching the

12 replacement value of PP&E because this is what's left after you

13 deduct it from the enterprise value.

14      One thing I will add, Your Honor, is that in cross-

15 examination of Mr. Schmitt, when asked in his report and his

16 testimony what's the value of the intellectual property of

17 Wellman, he said very low.  The testimony was very low.  He put

18 twenty-eight million dollars for his value but the question is

19 not twenty-eight million dollars for the bucket of all the

20 patents and all the trademarks, as Mr. Lerman did.  Again,

21 knowing what to do, peeled the onion back.

22      Mr. Lerman, in his assumptions, said what is a buyer?

23 Do I have to buy in order to put these plants into operation?

24 I don't have to buy the entire patent portfolio of Wellman.  If

25 I needed to buy it, what I have to buy is the patents necessary

86

1    to put the plants in operation.  And that is the number you see

2    in Lerman's exhibit, scenario number 3, of what I have to pay

3    to put these plants in operation.  Not the entire patent

4    portfolio.

5            So what we have here, Your Honor, is the specific

6    cost that Mr. Lerman believed would have to be incurred,

7    including lost profits for sixty days of having to buy the

8    intellectual property, since I already had all the other bundle

9    of sticks, buy the intellectual property to put these plants in

10   operation.

11           And Your Honor asked one other question, I think, to

12   one of the counsel.  Didn't, I think, you raise the issue of

13   wasn't it going to take sixty days to put the plants back in

14   operation?  It was Mr. Lerman who used the Katrina example

15   because he testified when he was at the plant at Pearl River

16   that they were destroyed.  It was down to bare bones, and they

17   put it back in sixty days.

18           He also used the example that he had personal

19   knowledge of an asphalt plant on the Gulf of Mexico that was

20   down, and it took them sixty days to reprogram their operations

21   and get back running full-steam.

22           So sixty days is a realistic number, as Mr. Lerman

23   testified.  The crews work around the clock to get it up and

24   running.  And, therefore, it is not a more protracted number.

25           Going back, Your Honor, and it's amazing because your

1  first question of the day was my last point of the day, and my

2  last point of the day in my tabs is tab number 8, which is your

3  questions on opening statements by Mr. Serino first day of the

4  hearing.  And it was the question you started again with today:

5  Isn't it intuitively correct that the value of this plant is

6  worth more to someone who's going to operate the plant than

7  someone who's not?

8        The first question by the debtor and answer is,

9  "Difficult for me to say, Your Honor.  It's difficult for me to

10  say."  The Court, intuitively, "Doesn't that seem right?"  Mr.

11  Serino, answer, "To -- it seems right but it's not right.  It's

12  divorced from the standard of Rash.  Rash said you don't think

13  about what the buyer is going to do with the business."  Your

14  Honor, I submit that the definition of Rash and what a willing

15  buyer in the debtor's business trade or situation will pay a

16  willing seller is a fundamental part of what Rash mandates.

17  And the position of the debtor, trying to strip out what a

18  willing buyer brings to the table, what a willing buyer would

19  do with the business is a wrong interpretation of Rash.  It was

20  the way that the debtor started out but said it didn't apply.

21  I submit, Your Honor, that when you look at tab number 1 and

22  you see the confluence, tab 4 of 4, and you see the confluence

23  of values provided in tab number 4 of the first tab, you will

24  see here, as I conclude, that the three bottom numbers here are

25  basically liquidation value.  We have it.  They can't escape

88

1    it.  The debtor can't walk away from the fact that they've gone

2    in their disclosure statement, said these are liquidation

3    values.

4         And Mr. Schmitt testified that seventy and seventy-

5    nine are within the range.  So this is all liquidation value.

6    You can't get away from it.  When you put the correct Lazard

7    enterprise value in, the bottom numbers, the minimum numbers

8    for your own technology, PP&E, and Lazard's numbers are quite

9    close:  134.7 and Huron's 136.8.  Very close because, Your

10   Honor, at the worst scenario taken by Mr. Lerman, the

11   deductions made here come out almost in tandem, the debtor's

12   number and Mr. Lerman's base number.

13        And one other thing that was testified about in Mr.

14   Lerman's direct examination, Your Honor, that he didn't use the

15   same growth factor.  Your Honor caught it and said there's less

16   cash flow in Mr. Lerman's numbers for the first four years than

17   the other examples.  That's true.  Mr. Lerman tempered the

18   growth in his numbers, and therefore when you look at this

19   number here, Mr. Lerman's numbers are lower than what the

20   debtor's numbers would have generated under Mr. Lerman's

21   calculus, okay, but they run tandem to the debtor's numbers.

22        In conclusion, the motion of the debtor, Your Honor,

23   to value the PP&E at seventy must fail.  It's a liquidation

24   value.  The debtor's enterprise valuation numbers, based on new

25   EBITDA projections, based on what they've put in the disclosure

89

1    statement, what they're going after the creditors with, says

2    the midpoint of their enterprise value is 337 million dollars.

3    Even now, the math is 140 million dollars.  The motion for

4    seventy must fail.  Thank you.

5              THE COURT:  Thank you.

6              MR. SERINO:  Your Honor, may I have a brief rebuttal,

7    please?

8              THE COURT:  Very brief.

9              MR. SERINO:  Thanks.

10             THE COURT:  Don't repeat anything he said.

11             MR. SERINO:  Okay.  Well, let me just address where

12   Mr. Parkins left off about the opening statements.  He takes

13   them out of context a little bit because if you read the rest

14   of the opening statement --

15             THE COURT:  What's the significance of the Lazard

16   valuation with a midpoint of 337?

17             MR. SERINO:  Sure.

18             THE COURT:  What should I do with that?

19             MR. SERINO:  I think you should take it for what it's

20   worth.  And what it is --

21             THE COURT:  What do you think it's worth, the

22   disclosure in the disclosure statement?

23             MR. SERINO:  Well, it's an apples-to-oranges-pears

24   comparison.

25             THE COURT:  You talk a lot about fruit but --

90

1          MR. SERINO:  Yeah.  Well, let me think -- well, okay.

2     Let me tell you that Lazard did a going-concern valuation.

3          THE COURT:  Well, it came up with an enterprise value

4     of 337.

5          MR. SERINO:  Correct, on a going-concern basis.

6          THE COURT:  Right.

7          MR. SERINO:  All right?  The other one we saw from

8     the disclosure statement --

9          THE COURT:  Didn't -- well --

10         MR. SERINO:  -- was the book value.  No.  That's what

11    I want to get to.  This is not going concern.  This is a

12    business enterprise value on a replacement value basis.

13         THE COURT:  What did he do differently than you would

14    do if you did a going-concern valuation?

15         MR. SERINO:  He did all the pieces separately and

16    built them up.  He used the pyramid.  He did not put them all

17    and say one plus one plus one is four.

18         THE COURT:  I thought he did a discounted cash flow

19    analysis.

20         MR. SERINO:  He did do a discounted cash flow

21    analysis, Your Honor, but he did it on a replacement value

22    basis.  This is not a going concern.  Here's the proof.

23         THE COURT:  So what's the difference in the analysis?

24    That's what I'm asking you.

25         MR. SERINO:  The difference in the analysis is the

91

1    Lazard number's a going concern.

2          THE COURT:  Correct.

3          MR. SERINO:  Okay.  It includes assets that are

4    going-concern attributes, that the firsts don't have a lien on.

5          THE COURT:  I understand that but isn't that 273

6    million number use the same methodology?  It just comes out

7    with sixty million less.

8          MR. SERINO:  No.  No, because the 337 million dollar

9    number looks at the business as a whole.

10         THE COURT:  Right.

11         MR. SERINO:  Okay?  It doesn't look at each piece --

12         THE COURT:  Right.

13         MR. SERINO:  -- and see what each piece is worth.

14   And when you take the business as a whole, there's some

15   synergistic effect.  There's value to that, and going-concern

16   value.

17         Mr. Schmitt had to do something harder.  He had to

18   look at each piece of the business on a replacement value

19   basis.

20         THE COURT:  Yeah, but first -- but didn't --

21         MR. SERINO:  All I have to sell is this.

22         THE COURT:  -- but didn't he first value the business

23   and then subtract out the working capital and the intellectual

24   property, or the intangibles?

25         MR. SERINO:  But even when he valued the business, he

92

1   did it on a replacement value basis.

2        THE COURT:  What did he do differently than what

3   Lazard did?  Or what did anybody doing a discounted cash flow

4   valuation do?  That's all.

5        MR. SERINO:  Your Honor, maybe here's a good example.

6   I'll try to show it, okay?  I'm trying to say that what Mr.

7   Schmitt did was use the replacement value.

8        THE COURT:  I understand what you're saying.

9        MR. SERINO:  And I know --

10        THE COURT:  I'm just asking what he did differently

11   than someone who's doing an enterprise valuation with it.

12        MR. SERINO:  When he's building up, with his

13   replacement values, he came up with 173.

14        THE COURT:  The buildup I understand --

15        MR. SERINO:  Okay?

16        THE COURT:  -- the bottom-up approach.  But he also

17   did a top-down approach, and that's what that is, that 273

18   million dollar result.

19        MR. SERINO:  He did a top-down approach --

20        THE COURT:  Right.

21        MR. SERINO:  -- and if you bear with me, hopefully

22   this will become clear.

23        THE COURT:  Okay.

24        MR. SERINO:  If this is his top-down --

25        THE COURT:  Right.

93

1          MR. SERINO:  -- 273, you take out 173, okay?  You

2     have 273 replacement value business enterprise.  You take out

3     173 replacement value working capital.  Now, if you were going

4     to going concern, even Mr. Lerman tells you that the going-

5     concern value of the working capital is not 173, it's 195 if

6     you look at Mr. Lerman's report on page 34, okay?  That's a

7     difference.  It's almost --

8          THE COURT:  And you're saying that that twenty

9     million dollar difference is attributable to what?

10         MR. SERINO:  It's a going concern.  It's a going

11    concern.

12         THE COURT:  It sounds like he just used a different

13    number.  Everybody used different numbers in those valuations.

14         MR. SERINO:  Your Honor, what he basically did is

15    this:  Mr. Schmitt had to figure out the replacement value of

16    the business.  So the first thing he had to do was try to strip

17    away the going-concern additives to the business.  That's this

18    outer shell.  He strips away the going concern, okay?  This is

19    Lazard's 337.  It's the big building.  It's the big circle.

20    Right there.  Mr. Schmitt's 273 is inside.  It's the business

21    enterprise value net of going concern.  Mr. Schmitt builds that

22    up.  Then he has a slice that's attributable to intellectual

23    property and tangible assets, a slice that's attributable to

24    working cap and a slice that's attributable to PP&E.

25         THE COURT:  He didn't come up with that 195 million

1   dollar number through anything other than looking at Wellman's

2   historical balance sheet.  And I'm looking at page 34.  That's

3   where he got the number from.

4            MR. SERINO:  You're talking about Mr. Lerman's

5   number?

6            THE COURT:  Yeah.

7            MR. SERINO:  Mr. Lerman's number --

8            THE COURT:  It's a balance sheet number.

9            MR. SERINO:  I think we're saying it is -- but it is

10  the going-concern value of the working capital.

11           THE COURT:  You implied that the difference between

12  the 174 million, approximately, that Schmitt had for working

13  capital and the 195 or 196 million that Lerman had had

14  something to do with this going-concern concept.  And all I see

15  is that Lerman picked his number off the balance sheet.

16           MR. SERINO:  Your Honor, that is what I'm saying.  I

17  guess what I'm trying to say is if you had to buy all three

18  elements of this business separately, use your analogy, there's

19  three stores.  One store's the working capital store, and I go

20  and buy that.  Another store's the intangible assets store, and

21  I go and buy that.  And another store's the PP&E store and I

22  buy that.  I'm going to pay a certain price for those three

23  pieces.  I think, at the end of the day when I get all those

24  pieces together and I put them all together, I think it's going

25  to be worth more than the sum of my three costs.  And I think

95

1    that's the difference between the 195 and the 173 here.

2            THE COURT:  I don't see that.

3            MR. SERINO:  I think that's the difference between

4    the 337 and the 273.

5            THE COURT:  First of all, Lerman deducted a higher

6    number.  So it should decrease.  It works to Wellman's benefit

7    because it decreases the leftover that's going to be

8    attributable to property, plant and equipment.

9            MR. SERINO:  But what Lerman did is when he went into

10   that store and he saw the PP&E, and instead of saying batteries

11   not included it said IP not included, intangible assets not

12   included, working capital not included.  He didn't take that

13   into account.  He didn't assume that the buyer with the bundle

14   of sticks is not going to go in that store and just take the

15   PP&E but pay for the working capital, the intellectual property

16   and the intangible assets.

17           THE COURT:  Look, all I'm saying is he made a working

18   capital deduction the same way that Schmitt did that used

19   different numbers, but I don't see how anything has to do with

20   a long methodology of valuation.  They picked different numbers

21   because they looked to different sources.  That's all.

22           MR. SERINO:  It is the wrong methodology, Your Honor.

23   Here's why.

24           THE COURT:  You keep using that word "going concern",

25   and I just don't understand really the distinction you're

96

1    making.

2              MR. SERINO:  The reason I use it is because of Rash.

3              THE COURT:  I understand what Rash said.  Okay.  Go

4    ahead.

5              MR. SERINO:  Let me try this example, Your Honor.

6              THE COURT:  Go ahead.

7              MR. SERINO:  Maybe this works.  First, you got a car

8    rental business, and the firsts have a lien on one of those

9    cars.

10             THE COURT:  Right.

11             MR. SERINO:  That car has a Blue Book value of twenty

12   thousand bucks.  Do we all agree that the replacement value of

13   that car is twenty thousand dollars?

14             THE COURT:  Go ahead.

15             MR. SERINO:  No.  Let's say we didn't have that Blue

16   Book value.  You had to figure out an income approach to the

17   valuation approach.  And you look at the car rental price and

18   say it's a hundred dollars per day.  There's 300 days in the

19   year.  The income for the year is 30,000 dollars.

20             Now, that's an income approach that gives us a going-

21   concern valuation, something that is clearly more than the

22   replacement cost of that car.  And the difference is --

23             THE COURT:  Well, it may or not but --

24             MR. SERINO:  It may or not --

25             THE COURT:  -- but in your example, the car's an

97

1    income-earning asset, and there is information that you could

2    use to figure out what you could earn from it.  It's not

3    necessarily true PP&E.

4              MR. SERINO:  Well, I think PP&E is an income-earning

5    asset.

6              THE COURT:  When combined with the other intangibles.

7              MR. SERINO:  Well, that's the problem, though, Your

8    Honor.  The firsts don't have a lien on those other

9    intangibles, and Rash says we have to value what they have a

10   lien on.

11             THE COURT:  But they do have a lien on the increased

12   value of the PP&E because someone who's operating the business

13   would be willing to pay more for it?

14             MR. SERINO:  No, Your Honor.

15             THE COURT:  Okay, I --

16             MR. SERINO:  No.  You can't expect a buyer to come to

17   the table and pay the seller for something that the buyer

18   already has or that the buyer's not getting in the transaction.

19             THE COURT:  So you think that someone who is

20   operating or is in the business --

21             MR. SERINO:  Um-hum.

22             THE COURT:  -- and wanted to buy this plant would pay

23   the same thing as somebody who's not in the business and wants

24   to buy the plant and just let it sit idle?

25             MR. SERINO:  No.  I don't think I agree with that,

98

1    Your Honor.  I think --

2              THE COURT:  Well --

3              MR. SERINO:  I think it's worth more.

4              THE COURT:  I would hope you wouldn't.

5              MR. SERINO:  But I think the difference is -- the

6    difference could be as simple as replacement value versus

7    liquidation value.  It may have a greater value.  That plant

8    may have a greater value to someone who's going to use it than

9    someone who's going to liquidate it.  But it doesn't mean that

10   that buyer is going to overpay for that plant and is going to

11   pay for things that they have on their own and that they're not

12   getting the transaction.  It doesn't mean that when they walk

13   in that store, they're going to say well, I've got the working

14   capital, I've got the IP, I've got the intangible assets at

15   home, let me pay for it anyway.  They're not going to do that.

16             And that's the fundamental difference between Lerman

17   and Schmitt.  Lerman assumed that for one reason or another a

18   buyer's not going to be economically rational.  A buyer's going

19   to come and say look, I got all the bundle of sticks, so I'm

20   going to pay you for that even though you're not giving that to

21   me, and that's going to boost up my PP&E value.  That's what

22   Lerman assumes.

23             And, Your Honor, there's also just a couple of more

24   tic points.  The remaining useful life discussion was

25   interesting.  If this were actuarial tables, the position

99

1    counsel would be taking is that a nine-year girl has an

2    expected remaining life equal to a thirty-four old woman.  It's

3    just not going to happen, right?  And counsel says well, it's

4    very expensive, you can maintain plants for a hundred years,

5    it's very expensive.  Well, try to do that on two million

6    dollars of capital expenditure.  That's what Mr. Lerman asked

7    us to do.

8              We also saw, Your Honor, that they did what we

9    thought they would do.  They attack the bids that came in in

10   March and April of 2008.  They attack the fact that Wellman

11   didn't hit those bids, so to speak.  But it's all it is, is an

12   attack.  They had Mr. Yearley on the stand.  He testified about

13   why those were real bids, about why Wellman never made a

14   decision whether he hit the bids or not.  They could have asked

15   that question.  They could have cross-examined him.

16             THE COURT:  And he said it.  It's in evidence.  They

17   can refer to the valuation, the business valuation.

18             MR. SERINO:  They can refer to the valuation, Your

19   Honor, but when you're comparing evidence, on the one hand,

20   with inference and insinuation, on the other hand --

21             THE COURT:  It's evidence.  That's what it says.

22   It's in evidence.

23             MR. SERINO:  From what?  Schmitt's report?

24             THE COURT:  No.  Well, Schmitt's report is in

25   evidence but the valuation that Lazard described for the

100

1    enterprise.

2           MR. SERINO:  No, no.  I'm talking about the bids, the

3    230 to 260 million dollar bids that counsel wants us to

4    discount because he says well, those are distress bids, and

5    Wellman didn't hit those bids.  The only evidence on that is

6    what Mr. Yearley said.  They could have asked questions.  They

7    chose not to.  And that's the point there, Your Honor.

8           And another point, on Mr. Lerman's Exhibit 9, the DCF

9    model, I think I asked the wrong question.  But Your Honor's

10   question --

11          THE COURT:  Exhibit 9 that was given today or Exhibit

12   9 of his --

13          MR. SERINO:  Oh, no.  It's Exhibit 9 in his full

14   report.  I think it's page 97.

15          THE COURT:  Okay.

16          MR. SERINO:  And something Your Honor asked today --

17   I'm sure you were talking to Mike and me, and that was you said

18   well, even if the depreciation goes down, you get what you

19   want, doesn't that just wash through the tax flow adjustment?

20   I think Your Honor is probably right there but our point, and I

21   didn't do a good job of asking, our point was this:  Assume the

22   depreciation stays where it is but the capital expenditures go

23   up and meet or exceed the depreciation.  On page 97.  You've

24   got depreciation of 20.5 million dollars.  See it on page 97,

25   Your Honor?

101

1          THE COURT:  Right.

2          MR. SERINO:  Depreciation of additional appreciation?

3     You've got capex of one million bucks.  If the capex goes up to

4     meet depreciation by 19.5 million dollars, it wipes out his

5     adjusted after-tax cash flow of 19.1 million dollars in the

6     term of a year.

7          THE COURT:  But there's no testimony that they're

8     going to spend twenty million dollars a year on capex.

9          MR. SERINO:  There's no testimony that they're going

10    to be able to spend forty million dollars a year in

11    depreciation forever, and Mr. Pratt, the newsletter that Mr.

12    Qureshi put in from Mr. Pratt said in a three percent growth

13    model, you should assume that capital appreciation meets --

14    capital expenditures, rather, meet depreciation and exceed it

15    by fifteen percent.  I'm saying forget the exceed by fifty --

16         THE COURT:  All right.  So if he's wrong in the

17    depreciation, the net income is higher and the depreciation --

18    the add-back to the depreciation is lower.  That's all.  What

19    difference does it make?

20         MR. SERINO:  The difference it makes it is, one, it

21    shows how implausible and how impossible his assumptions are,

22    where he can live in a world where you're going to depreciate

23    forty million dollars a year for perpetuity against capex of

24    two million dollars a year.  And the proof is in the pudding

25    because you say well, let's say that's not reasonable, let's

102

1   say it should be one-to-one.  If it's one-to-one, this business

2   has no earnings.  Then what happens to his valuation?

3             THE COURT:  Why would the business have earnings?

4             MR. SERINO:  It has no --

5             THE COURT:  Then you'd only have a one million dollar

6   depreciation deduction and you'd have another eighteen million

7   dollars in income.

8             MR. SERINO:  Fair enough.  I was saying that if he

9   wants to stay with his forty million dollar depreciation and he

10  wants to pay all his capital expenditures with that

11  depreciation, he's going to wipe out his adjusted after-tax

12  cash flow.

13            THE COURT:  Okay.

14            MR. SERINO:  Gone.  Zero.

15            MR. PARKINS:  Can I respond to that point, Judge?

16            THE COURT:  Is there anybody else --

17            MR. PARKINS:  Yeah, the answer is, Your Honor --

18            MR. SERINO:  And --

19            MR. PARKINS:  -- it's very simple.  I'm sorry.

20            THE COURT:  Oh, I sort of -- okay.

21            MR. PARKINS:  No, I'm sorry.  I just want to check

22  something.

23            THE COURT:  I think we can wrap this up pretty soon.

24            MR. PARKINS:  Yup.

25            MR. SERINO:  I guess the only point I wanted to make,

103

1    Your Honor, was the opening statements that counsel referred

2    to -- I talked about you don't look at what the buyer's going

3    to do with the business.  If you read the rest of that

4    sentence, what I meant is you don't look at improvements that

5    the buyer's going to make to the business.  And that's what

6    Rash says.  You don't look at the -- the creditor doesn't get

7    the benefit of modifications to the equipment.  If the creditor

8    has --

9              THE COURT:  Modifications that aren't subject --

10             MR. SERINO:  To his lien.

11             THE COURT:  -- to his lien.

12             MR. SERINO:  Right.

13             THE COURT:  But somebody's going to spend more for it

14   because they can modify it to be more productive.  Why can't

15   you consider that?

16             MR. SERINO:  Because the firsts don't have a lien on

17   that.  And Rash says you got to value the car, and if you put a

18   lien on the car and then thereafter the car's modified with a

19   new sound system, a radar, a new engine, the first doesn't have

20   a lien on all of those elements.

21             THE COURT:  Okay.  Mr. Serino, I just think we're

22   talking at cross purposes.

23             MR. PARKINS:  Your Honor, I just have thirty seconds.

24             THE COURT:  Thirty seconds.  I'm timing you.

25             MR. PARKINS:  Your Honor, if taking Mr. Serino's

104

1  example of increasing the capital expenditures and would wipe

2  out the depreciation, that's nonsense because you increase

3  capital expenditures to drive more money.  You spend more money

4  to get more money.

5          THE COURT:  Yeah, but you can't depreciate your

6  property beyond what you spend for it.  And you can't spend --

7          MR. PARKINS:  No, but if you spend more money for

8  capital expenditures, you would always have more value to

9  depreciate going forward.  His scenario was if you brought

10 capital expenditures up, you'd wipe out the cash flow.  No.

11 You bring capital expenditures up is to drive more cash flow

12 because you're enhancing the business.

13         THE COURT:  All he's saying is you cannot spend a

14 million dollars on equipment and depreciate nineteen million

15 dollars forever.  The numbers don't --

16         MR. PARKINS:  That is true.

17         THE COURT:  We're agreed on that.

18         MR. PARKINS:  Thank you, Your Honor.

19         THE COURT:  Give you the last word.

20         MR. QURESHI:  Thank you, Your Honor.  I've got three

21 points, and I promise they are very quick.

22         THE COURT:  All right.  I'm counting.

23         MR. QURESHI:  First point:  going-concern value.

24 Confusion about going-concern value versus premises value as a

25 going concern, what Mr. Beaton did.

105

1    THE COURT:  I didn't think it was confusing until I

2    listened to Mr. Serino.

3    MR. QURESHI:  Your Honor, the statement by counsel

4    for the first liens that to the extent that the Lazard number

5    is sixty million dollars higher on a going-concern basis, that

6    that's their value, no, it's not.  That's going-concern value.

7    That's what we're talking about.  It isn't intangible.  We have

8    case after case after case in our pleading that says that

9    going-concern value isn't intangible assets.

10    Now, Your Honor's specific back-and-forth with Mr. --

11    THE COURT:  Okay.  So if you assume that the number

12    is 273, and I think that Mr. Schmitt used the same method for

13    determining enterprise valuation that business value is

14    generally used, we're putting the name replacement value on it

15    but that's what he did.  And if you came up with 337 and you

16    backed out the 174 for working capital and the 28 for

17    intangibles, what's left is the PP&E, right?

18    MR. QURESHI:  Well, Your Honor, I think that's coming

19    at it from the wrong direction.  You have to start at the

20    bottom of this.

21    THE COURT:  That's a different valuation.  What

22    you're telling me is you cannot accept a top-down valuation --

23    MR. QURESHI:  What I'm telling you --

24    THE COURT:  -- either the debtor's or Lazard's or Mr.

25    Lerman's.  That's what you're saying.

106

1          MR. QURESHI:  That's right.  What I'm saying is if

2      you take Mr. Beaton's approach, you don't have to go through

3      all this.  Just start at the bottom.  And that's why he gets it

4      but when the firsts say going-concern value inures to him, no,

5      it doesn't.  And, Your Honor, the specific point Your Honor was

6      asking about, which is the premium that somebody pays when

7      they're buying a going concern, we cite a case in our brief,

8      SRJ Enterprises, which deals with exactly that point.  And in

9      SRJ Enterprises, Your Honor, it was a Northern District of

10     Illinois decision, the Court said that that extra value, that

11     belongs to the lien holder who has a lien on general

12     intangibles, which is exactly what we have here.  So that case

13     in on point, deals directly with the question that Your Honor

14     answered.  And I think it provides the answer here as well.

15     That's my first point.

16          My second point, Your Honor, deals with the

17     suggestion that what Mr. Beaton did here was value a catalog of

18     used parts.  That would be a liquidation.  Again, Mr. Beaton

19     assumed an assemblage of assets staying in place where it is

20     today being operated in the business it is today.  That is a

21     textbook definition of a going concern in terms of value.

22     Liquidation assumes the assets are not going to stay in place,

23     they're not going to stay together and there will be value

24     piece by piece, broken down, some just for scrap value.  That's

25     not what he did.

107

1          Final point, Your Honor:  I think it's telling that

2    in the closing you heard from counsel to the first liens, there

3    was no defense of Mr. Lerman's DCF approach.  And it's simple

4    as to why:  There isn't any.  Thank you, Your Honor.

5          THE COURT:  Thank you.  Come back at 3:30.  I'll

6    rule.

7        (Recess from 2:23 to 4:08 p.m.)

8          THE COURT:  Please be seated.  The debtor, Wellman,

9    Inc., has moved for a determination of the replacement value of

10   its plants, property and equipment, or PP&E, for the purpose of

11   fixing the amount of the allowed secured claim held by the Bank

12   of New York as successor agent under the first lien senior

13   credit agreement dated as of February 10, 2004, hereinafter

14   "BNY".

15         The Court conducted a two-day evidentiary hearing at

16   which it heard the testimony of five witnesses, including three

17   experts.  The Court also received other documentary evidence

18   relating to value.  The Court finds, from the evidence

19   presented, that the replacement value of the PP&E is 140

20   million dollars.

21         Wellman is engaged in the business of producing

22   polymers and fibers.  It operates the Pearl River plant in Bay

23   St. Louis, Mississippi, the Palmetto plant in Darlington, South

24   Carolina and the Johnsonville plant in Johnsonville, South

25   Carolina.

108

1          Wellman produced polyethylene terephthalate, or PET,

2     resin at Pearl River and Palmetto.  It also produces polyester

3     staple fiber at Palmetto.  According to the draft disclosure

4     statement received in evidence as BNY Exhibit 1, the products

5     produced at Palmetto and Pearl River comprise Wellman's

6     chemical segment and account for approximately ninety-five

7     percent of its overall sales.

8          Finally, Wellman produced nylon engineering resin at

9     the Johnsonville plant.

10         The real estate and other physical property located

11    at the three plants comprise Wellman's PP&E.  Wellman also owns

12    some physical property located at a corporate headquarters, but

13    none of the experts ascribed any material value to these

14    assets.

15         Wellman owes approximately 185 million dollars to

16    BNY.  BNY is secured by a first lien on the PP&E.  BNY does not

17    have a lien in Wellman's other assets, including its working

18    capital and general intangibles.

19         Wellman has proposed a plan under which it will

20    obtain the PP&E and use it in connection with its post-

21    confirmation operations.  Anticipating that BNI will reject the

22    plan and Wellman will need to cram it down, Wellman has moved,

23    pursuant to Federal Bankruptcy Rule 3012, to value BNY's

24    collateral.

25         As noted, the Court conducted a two-day hearing.

109

1    Wellman's expert, Richard Schmitt of AccuVal Associates,

2    testified that the PP&E had a replacement value of

3    approximately 70.8 million dollars.  BNY's expert, David Lerman

4    of Huron Consulting Group, opined that the replacement value

5    ranged between 136.8 million and 189.4 million, depending on

6    what intellectual property and other intangibles were included

7    in computing the value.

8         Finally, Neil Beaton of Grant Thornton LLP was

9    retained by Wilmington Trust Company, a second lien term loan

10   agent ("Wilmington").  He stated that the replacement value of

11   the PP&E was 74.3 million.

12        The Court received other possible indications of

13   value during the hearing.  Wellman had attempted to sell its

14   assets both before and after the petition date.  Toward that

15   end, it retained Lazard Freres & Co. to manage the sale

16   process.

17        According to Andrew Yearley of Lazard, the highest

18   and best offer that Wellman received was 260 million for all of

19   its assets.

20        In addition, Keith Phillips, Wellman's CFO, testified

21   that Wellman took an "impairment loss" in March 2008 pursuant

22   to FAS 144.  As a result, Wellman wrote down the value of its

23   net PP&E from approximately 525 million dollars to 242 million

24   dollars.

25        Lastly, Wellman's disclosure statement described a

110

1   total enterprise value between 298 million and 373 million and

2   valued the PP&E, for liquidation purposes, at 65.8 million

3   dollars, exclusive of the cost of liquidation.

4          The Court has jurisdiction over this proceeding

5   pursuant to 28 U.S.C. Sections 1334(b) and 157(a) and the

6   standing order of reference signed July 10, 1984.  Venue was

7   proper under 28 U.S.C. Section 1409(a).  This is a court

8   proceeding pursuant to 28 U.S.C. Section 157(b)(K), (L) and

9   (O).

10         Section 1129(b)(2) of the Bankruptcy Code permits a

11   plan proponent to cram a plan down over a rejection by a class

12   of secured claims.  Where the debtor proposes to retain the

13   collateral for post-confirmation operations, the debtor can

14   cram down the plan by paying the secured creditor the allowed

15   amount of the secured claim as of the effective date.

16         This means that if the debtor pays over time, it must

17   also pay interest.  If the secured creditor makes the Section

18   1111(b) election, the aggregate amount of the payments must

19   equal the full amount of the total claim, both secured and

20   undersecured.

21         In either case, it is necessary to determine the

22   allowed amount of the secured claim as of the effective date,

23   which the parties have assumed to be September 30, 2008.

24         Under Section 506(a), the amount of the secured claim

25   depends on the value of the creditor's interest in the debtor's

111

1    interest in the property that secures the claim, that is, by

2    the value of the collateral.

3          Furthermore, the Court must determine the value in

4    light of the purpose of the valuation and the proposed

5    disposition or use of the collateral.

6          Where the debtor proposes to retain the collateral

7    for use in its post-confirmation operations, the appropriate

8    measure is the collateral's "replacement value".  See

9    Associated Commercial Corp. v. Rash, 520 U.S. 953, 960 (1997).

10    The replacement value is "the price a willing buyer in the

11    debtor's trade, business or situation would pay to obtain like

12    property from a willing seller," id., and corresponds to the

13    "fair market value."  See id., at 959, note 2.  This involves a

14    valuation on a going concern rather than a liquidation basis.

15    All parties agree that this is the appropriate standard, and it

16    is the standard that the experts attempted to apply.

17          The evidence showed that valuation is not a science

18    but an art, and a very subjective one at that.  While the

19    experts in this case testified honestly and candidly, their

20    conclusions were greatly affected by the assumptions that they

21    made.

22          The evidence revealed two general approaches to the

23    valuation of the PP&E.  Under the top-down approach, the entire

24    enterprise's value, using one or more of the generally accepted

25    techniques, primarily the income and market approaches,

112

1    Wellman's counsel contended, at closing argument, that

2    Schmitt's top-down methodology somehow differed from Lazard's

3    and implied that they were measuring different enterprise

4    values.  Yet, the Schmitt report and the disclosure statement

5    described the respective methodologies for determining

6    enterprise value in substantially the same manner.

7         The enterprise value consists of three elements:  the

8    PP&E, or the physical assets; the working capital, or financial

9    assets; and the intangibles.  The intangibles include the

10   customer and supplier relationships, the workforce, the patents

11   and trademarks and the intellectual property.

12        Under the top-down approach, the appraiser must

13   compute the value for the entire enterprise and then value and

14   back out the working capital and intangibles which do not

15   collateralize BNY's debt.

16        This approach has obvious drawbacks.  It requires the

17   expert to value all of the assets when the focus is the PP&E.

18   As a result, it multiples the analysis and a host of

19   assumptions regarding value.  These can lead to wildly

20   disparate results, as made evident by the comparison of the

21   reports and testimony provided by Wellman's and BNY's experts

22   and Lazard's conclusions in the disclosure statement.

23        Wellman's experts fixed the enterprise value at 273

24   million dollars.  Using similar methodology, BNY estimated an

25   enterprise value of 366 million, under one of its scenarios, or

113

1    113 million more than Wellman.   Lazard found a range of values

2    with a midpoint of 337 million.

3         The second approach values the PP&E from the bottom

4    up.  Using the company's books and records, the appraiser first

5    determines the original cost of the PP&E.  Here, Wellman

6    maintained accurate historical cost records for all of its

7    physical assets.  The appraiser must then make a series of

8    adjustments that take into account the physical condition of

9    the equipment and external factors and other costs in delay.

10   Under this approach, it is unnecessary to value the enterprise

11   or the working capital or the intangibles.

12        After considering the testimony and the reports of

13   the experts, I conclude that the bottom-up cost approach is the

14   more reliable indicator of the value of the PP&E, at least up

15   to a point.

16        As noted, Wellman and BNY offered wildly divergent

17   results, and their experts' analyses often strain credibility.

18   For example, Lerman responded to several questions during

19   cross-examination to the effect that he did not have all the

20   information he needed to conduct his valuations because Wellman

21   refused to provide it.  Although I don't blame Lerman for this

22   shortcoming, the lack of necessary information undercuts the

23   probative value of his opinion.

24        More specifically, Lerman's discounted cash flow

25   analysis assumed depreciation into perpetuity that vastly

114

1   exceeded the project capital expenditures.  At this rate,

2   Wellman would exhaust its depreciation deduction in a few years

3   well short of perpetuity.

4          In addition, he assumed the same thirty-five year

5   useful life for the equipment at Pearl River and Palmetto, even

6   though the equipment at one of the plants was only nine years

7   old and the equipment at the other was as much as thirty-five

8   years old.

9          Finally, Lerman assumed that the price of natural

10  gas, an important component of Wellman's costs, would not

11  increase.  The evidence at trial showed that it had already

12  increased substantially.

13         Schmitt's opinion also raised some credibility

14  concerns.  He consistently picked low ratios, such as under the

15  Guideline Public Company Method, which had the effect of

16  depressing Wellman's enterprise value.

17         Furthermore, while Lerman was criticized for failing

18  to properly compute the terminal value under his discounted

19  cash flow analysis, Schmitt did the same thing.

20         Moreover, Schmitt's enterprise value came in far

21  below Lazard's, who was not valuing Wellman for litigation

22  purposes.

23         In contrast to the top-down approach, the bottom-up

24  approach is more straightforward.  It requires fewer subjective

25  judgments and assumptions compared to the top-down approach.

115

1          Beaton applied this approach exclusively.  Wellman's

2     expert also applied a bottom-up methodology, among several, but

3     his testimony was less credible.  His conclusion regarding

4     value turned on a substantial reduction attributable to an

5     economic penalty in the aggregate amount of more than 128

6     million dollars.  Neither his testimony nor his report

7     adequately explained a deduction of this magnitude, and it

8     appears to have been selected to make the top-down and bottom-

9     up valuations match exactly.

10          Beaton's testimony and report were far more precise

11     and helpful in terms of explaining the methodology and the

12     conclusions and, accordingly, I rely on it for the balance of

13     this decision.

14          As noted, Beaton began by first determining Wellman's

15     historical cost for its PP&E.  He then determined what it would

16     cost to buy the same equipment new by using generally accepted

17     price indices to take into account changes in costs.

18          Since the PP&E is not new, Beaton then had to reduce

19     the PP&E to its depreciated replacement cost.  He did this by

20     making deductions for functional and economic obsolescence.

21     Functional obsolescence refers to the loss of value or

22     usefulness caused by the inefficiencies or inadequacies of the

23     property itself and also takes into account the development and

24     deployment of more efficient and less costly replacement

25     property.

116

1          Economic obsolescence refers to the loss of value

2     external to the property and may include the economics of the

3     industry, the availability and/or increased costs of financing,

4     labor and raw materials, legislation, reduced demand, increased

5     competition and similar factors.

6          In the case of the machinery and equipment, Beaton

7     used valuation software to determine the offsets resulting from

8     general functional and economic obsolescence.  He used

9     comparable sales to determine the current value of Wellman's

10    real estate and then made further obsolescence deductions.

11         Beaton concluded that the aggregated depreciated

12    replacement cost for all of Wellman's PP&E was approximately

13    296 million dollars.  No one has mounted a serious challenge to

14    his computations to this point, and it represents the ceiling

15    of replacement value.

16         None of the parties, however, contend that a willing

17    buyer would spend this much for Wellman's PP&E.  With all of

18    the analysis that has already accounted for the physical

19    condition of the equipment and certain general obsolescence,

20    the value of the PP&E at bottom is determined by its ability to

21    generate income to the hypothetical buyer and the time and

22    effort it will take to do so.

23         Like book value, the depreciated replacement cost

24    does not necessarily reflect the fair market value or

25    replacement value of the asset.  Hence, it is necessary to

117

1    reduce the depreciated replacement cost to reflect what Beaton

2    termed physical and economic obsolescence specific to Wellman's

3    PP&E.

4            This is the point at which Beaton's analysis became

5    highly speculative.  Beaton reduced the depreciated replacement

6    cost by an aggregate of seventy-five percent through two

7    additional deductions.  First, he reduced it by fifty percent

8    to account for what he termed specific economic obsolescence.

9    According to Beaton, specific economic obsolescence referred to

10   the historical inability of the PP&E to generate positive cash

11   flow to Wellman's financial condition, globalization,

12   oversupply and high raw material costs.  It also included the

13   relocation cost that the hypothetical buyer would have to

14   incur.

15           Second, he reduced that result by another fifty

16   percent based on selling and holding costs.  These consisted of

17   the delay that the hypothetical buyer would face in introducing

18   the intangible assets, customer and supplier relationships,

19   intellectual property to assemble a work force that give the

20   PP&E its value.

21           The selling and holding costs also included the cost

22   of achieving a state of installation, such as construction,

23   installation, engineering, financing and start-up costs.

24           As Beaton himself conceded, the two, fifty percent

25   deductions were unscientific and subjective, although I suspect

118

1    that BNY might call them arbitrary.

2             Based on these assumptions and the corresponding

3    deductions, Beaton opined that the replacement value of the

4    PP&E equaled 74.3 million dollars, or 25 percent of the

5    depreciated replacement cost.

6             I reject this conclusion because the admittedly

7    subjective fifty percent reductions suffered from some obvious

8    flaws.  First, the specific economic obsolescence was based on

9    Wellman's historical inability to generate positive cash flow

10   with the PP&E.  The evidence indicated that there were numerous

11   competitors in the industry that operated at substantially

12   higher profit margins than Wellman.  For example, Wellman's

13   gross operating profit margin in 2007 was 5.4 percent.

14   According to Exhibit 7 in the Huron report at page 91,

15   Wellman's competitors had an average gross operating profit

16   margin of 16.8 percent in 2007.  In other words, the

17   hypothetical buyer in Wellman's industry generates more profit

18   with comparable assets.

19            Second, there was an overlap between the general

20   economic obsolescence considered in reaching the depreciated

21   replacement cost and the specific economic obsolescence that

22   Beaton applied after he computed the depreciated replacement

23   cost.

24            For example, both the general and specific

25   obsolescence included considerations of competition, supply and

119

1    demand and the cost of raw materials.  Although Wellman

2    attempted to distinguish between the general and specific

3    factors of competition, supply and demand and raw materials, I

4    cannot discern the difference from this record.  Hence, there

5    appear to be some double-counting.

6            Third, many of the factors that Beaton identified

7    under the rubric of selling and holding costs correspond to the

8    definition of intangibles.  Beaton assumed that the delay in

9    reintroducing customer and supplier relationships, workforce,

10   IP and the like would severely impact the replacement value.

11   The selling and holding deduction accounted for a 74 million

12   dollar drop in replacement value, although if Beaton had

13   applied this 50 percent deduction first instead of second, it

14   would have resulted in a 148 million dollar decline.

15           In any event, this is just another way of saying that

16   the intangibles in place make up as much as fifty percent of

17   the replacement value of the PP&E.  Neither of the other

18   experts ascribe this magnitude of value to Wellman's

19   intangibles.

20           Moreover, the hypothetical buyer is already operating

21   in Wellman's industry and would bring some of these same

22   intangibles to the table.

23           Furthermore, Beaton's direct approach was supposed to

24   avoid the need to compute and back out the value of the other

25   components of enterprise value.  Yet this is precisely what he

120

1    did indirectly with the intangibles.

2         Fourth, although I would not characterize it as

3    double-dipping, there was some overlap between the specific

4    economic obsolescence and the selling and holding factors.  At

5    his deposition, Beaton identified many of the same factors as

6    comprising economic obsolescence, on the one hand, and selling

7    and holding costs, on the other.

8         Although he attempted to draw a sharper distinction

9    at trial, both deductions still included, to varying degrees,

10   the cost of installing the PP&E at the new location and getting

11   it up and running.

12        Fifth, Beaton assumed that it would take a

13   hypothetical buyer three to six months to get the new PP&E up

14   and running.  The Pearl River plant was destroyed by Hurricane

15   Katrina in 2005 but was back up and running in sixty days.

16   Thus, the three to six-month delay during which the assets

17   would not generate any income appears to be overly

18   conservative.

19        Sixth, Beaton's and Schmitt's going-concern

20   valuations were nearly equal to the liquidation value that

21   Wellman ascribed to the PP&E.  According to Wellman's proposed

22   disclosure statement, the PP&E would be worth approximately

23   sixty-six million at liquidation, exclusive of liquidation

24   expense.  This was approximately 5 million dollars less than

25   Schmitt's valuation and 8.5 million dollars less than Beaton's

121

1    valuation.  It also reflected twenty-seven percent of the book

2    value, the same approximate ratio that existed between Beaton's

3    depreciated replacement costs and the replacement value.

4        The going-concern value is presumably greater than

5    the liquidation value.  Cf. In re: BFP, 511 U.S. 531 at 538-39

6    (1994) (stating that the "fair market value" was the

7    "antithesis" of the forced-sale value).  If it were not, it

8    would mean that the PP&E is incapable of generating cash flow

9    beyond its scrap value.  The proponents of the lower valuations

10    have not offered a cogent explanation of how the liquidation

11    and going-concern values for income-producing PP&E can be

12    virtually the same.

13        In short, I conclude that the evidence does not

14    support the magnitude of deductions that Beaton took for the

15    specific economic obsolescence and selling and holding costs.

16    Accordingly, I reject these deductions that aggregate seventy-

17    five percent of the depreciated replacement cost.  Instead, I

18    find that these deductions should be limited to a single fifty

19    percent deduction with some further modification.

20        Applying the single fifty percent reduction, the

21    replacement value of the PP&E would be 148 million.  This sum

22    will be reduced to 140 million, which is consistent with the

23    result that would be reached if Lazard's midpoint enterprise

24    value is substituted for Schmitt's.

25        Finally, I do not find that Phillips' or Yearley's

122

1    testimony assists in determining the replacement value of the

2    PP&E.  The asset impairment reduction reflected accounting

3    considerations.  The relationship between the reduced book

4    value of the PP&E, for accounting purposes, and the replacement

5    value that a hypothetical buyer would pay for the PP&E has not

6    been demonstrated.

7            Yearley's testimony regarding Wellman's sales efforts

8    indicated that Wellman was under severe financial and time

9    pressures to sell.  Although Yearley testified that the

10   relatively accelerated selling effort did not affect the price,

11   the evidence showed that the "expressions of interest" dropped

12   substantially after the petition date when the Court entered a

13   DIP financing order containing a drop-dead sale date.

14           Wellman was under a compulsion to find a buyer.  It

15   wasn't merely a willing seller; it was an overanxious one.  For

16   this reason, the bids that Wellman obtained should not be

17   considered an accurate measure of the PP&E's replacement value,

18   as that term is defined in Rash.

19           In summary, I conclude that the replacement value of

20   the PP&E is 140 million dollars.  The foregoing constitutes the

21   Court's findings of fact and conclusions of law.  Settle an

22   order on notice.

23           MR. SPEAKER:  Thank you.

24           THE COURT:  Thank you for a well-tried case.

25           ALL:  Thank you, Your Honor.

123

1          THE COURT:  Good luck.

2      (Whereupon these proceedings were concluded at 4:33 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

124

1

2                          I N D E X

3

4                        R U L I N G S

5    DESCRIPTION                              PAGE      LINE

6    Court finds replacement value of the debtors'

7     PP&E is 140 million dollars and directs counsel

8     to settle an order on notice

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

125

1

2                     C E R T I F I C A T I O N

3

4       I, Lisa Bar-Leib, certify that the foregoing transcript is a

5       true and accurate record of the proceedings.

6       Lisa Bar-Leib    Digitally signed by Lisa Bar-Leib
                         DN: cn=Lisa Bar-Leib, c=US
                         Reason: I am the author of this
                         document
7       _____ Date: 2008.08.06 11:37:20 -04'00'

8       LISA BAR-LEIB

9

10      Veritext LLC

11      200 Old Country Road

12      Suite 580

13      Mineola, NY 11501

14

15      Date:  August 6, 2008

16

17

18

19

20

21

22

23

24

25