```
UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
In re:                                          :
                                                :        Chapter 11
        WELLMAN, INC., et al.,                  :        Case No. 08-10595 (SMB)
                                                :
                Debtor.                         :
-------------------------------------------------------X
```

### MEMORANDUM DECISION SUSTAINING
### OMNIBUS OBJECTIONS TO REDUCE AND
### ALLOW POST-PETITION SEVERANCE CLAIMS

**A P P E A R A N C E S:**

KIRKLAND & ELLIS LLP
Attorneys for Debtor
Citigroup Center
153 East 53rd Street
New York, New York 10022-4611

> Jonathan S. Henes, Esq.
> Michael A. Cohen, Esq.
>     Of Counsel

MICHAEL BERMISH
Claimant Pro Se

**STUART M. BERNSTEIN**
**Chief United States Bankruptcy Judge**

       Wellman, Inc. and its debtor-affiliates (collectively, "Wellman") ran three plants, a corporate headquarters and a small office in New York. Prior to closing one of the plants, the headquarters and the New York office, Wellman changed its existing severance plan to reduce the benefits to the employees that were eventually terminated. A substantial number of these former employees filed claims for benefits under the old severance plan, and Wellman interposed three Omnibus Objections to those claims. (ECF Doc. ## 687, 688, 689.) Following an evidentiary hearing, the Court concludes that the Omnibus Objections should be sustained.

## BACKGROUND

Wellman filed these chapter 11 cases on February 22, 2008. As of the petition date, Wellman maintained the Wellman Inc. Severance Pay Plan for Salaried Employees (the "Old Severance Plan").[1] The Old Severance Plan was an employee welfare benefit plan as defined by section 2(1) of the Employee Retirement Income Security Act of 1974 ("ERISA"). (See Old Plan Summary, at § 6.1, at p. 5.) Wellman distributed a copy of the Old Severance Plan to its employees when they were hired, and made it available for viewing on Wellman's intranet site.

The length of service formed a significant component under the formula for computing the amount of the benefit. An eligible employee was entitled to receive one month's pay, plus one week for each completed year of service. (Old Plan Summary, at § 6.3, at p. 3.) By order dated April 10, 2008, the Court authorized but did not direct Wellman to make payments to salaried employees under the Old Severance Plan. (See Final Order Authorizing, But Not Directing, Debtors To Pay Certain Prepetition (I) Wages, Salaries, Bonuses And Other Compensation, (II) Reimbursable Employee Expenses And (III) Employee Medical, Retirement And Similar Benefits)(ECF Doc. # 192.)

The Old Severance Plan did not create any specific entitlement to severance pay, and afforded Wellman ample discretion. It provided that "[n]o one under any

---

[1] A copy of the summary of the Old Severance Plan (the "Old Plan Summary") was annexed to each Omnibus Motion as Exhibit B. The Old Plan Summary contains several immaterial errors. It is divided into several numbered sections, and the numbered subsections correspond to the section number. For example, section 1.1 is the first subsection in Section 1. Subsection 1.2, however, is misnumbered as 6.3. (See Old Plan Summary, at p. 2.) Subsection 2.1 is also misnumbered as 6.3. (See id., at p. 3.) In addition, a correctly numbered subsection 6.3 is included in the Old Plan Summary. (See id., at p. 7.) To avoid confusion, I will refer to the subsection (as "§") and the page whenever necessary.

circumstances is automatically entitled to a severance benefit. Wellman, Inc. has the sole discretion to determine eligibility and ineligibility under the Plan." (Old Plan Summary, at § 1.4.) It also gave Wellman the sole discretion to withhold benefits if warranted by its financial situation:

> Severance benefits may not be available in the event of the Company's insolvency, liquidation, or bankruptcy reorganization, or in the event the cost of providing severance benefits would lead to the preceding events or have a detrimental impact on the financial condition of the Company, as determined in the Company's sole discretion.

(Old Plan Summary, at § 1.2.)

Finally, Wellman had an unfettered right to amend or terminate the Old Severance Plan:

> Wellman, Inc. reserves the right in its sole discretion to alter, amend, modify or terminate this Plan at any time and for any reason, in whole or in part, and without prior notice to anyone, by written instrument signed by the President of Wellman, Inc.

(Old Plan Summary, at § 5.1.)

Following unsuccessful efforts to prosecute plans that would have allowed all of the plants and offices to continue to operate, Wellman decided in August 2008 to shut down two of its production facilities and its administrative headquarters. As a consequence, it issued WARN Act termination notices to approximately 750 of its employees.[2]

Prior to terminating the affected employees, Wellman's board of directors modified the Old Severance Plan on September 11, 2008. The amendment (the

---

[2] Wellman subsequently sold its plant in Johnsonville, South Carolina as a going concern. Many if not all of those employees were not terminated by Wellman.

3

"Amended Severance Plan") eliminated the benefit component based on the length of service.[3] It also limited each eligible employee to one month's salary based on the lesser of (a) the employee's actual salary or (b) an annual salary of $100,000. (See Amended Plan Summary, at § 2.1.) Wellman retained the discretion to adjust the benefits upward or downward, (id.), but absent a discretionary upward adjustment, no employee could receive more than $8,333.33, even if the employee received a salary that exceeded $100,000 per year.

Wellman notified its employees of the Amended Severance Plan on September 16, 2008. (See Omnibus Objections, Ex. D.) In a letter to "all Employees" on that day, Wellman explained that

> [D]ue to our cash flow constraints and tight availability of funds, we have been forced to reduce our severance benefit significantly. We have made every effort to provide a fair and equitable severance benefit for all of our employees within the cash budget we were given by our DIP lenders. Due to the complexity of the changes, we will be providing you a separate notification of the new severance policy and what it means for each of the affected employees.

The Court subsequently received numerous letters from disgruntled former employees regarding the changes in severance benefits. As a consequence, the Court established November 17, 2008 as a bar date to allow those severance claimants aggrieved by the Amended Severance Plan to file claims. Wellman received 243 timely claims and an additional 6 claims after the bar date.

---

[3] A copy of the summary of the Amended Severance Plan (the "Amended Plan Summary") is annexed to each Omnibus Objection as Exhibit C.

4

On December 2, 2008, Wellman filed three identical Omnibus Objections to the severance claims.[4] One severance claimant, Michael Bermish, appeared pro se on the return date.[5] He made several arguments regarding why Wellman should honor the Old Severance Plan, and made one argument that it must. The Old Severance Plan could only be changed "by written instrument signed by the President of Wellman, Inc." (Old Plan Summary, at § 5.1.) The Amended Severance Plan was signed by Mark Ruday, and the title listed under his name was Chief Executive Officer. (See Omnibus Objection, Ex. D ("Salaried Severance Plan Revision")("Revision").) According to Mr. Bermish, the Chief Operating Officer could not authorize the amendment, and there was no President of Wellman who could.

The Court scheduled an evidentiary hearing to consider whether the Chief Executive Officer could sign the amendment if the office of President was unoccupied. The evidentiary hearing went forward on January 12, 2009. The evidence showed that at a meeting held on May 20, 2008, the Wellman Board of Directors elected Mr. Ruday as President and Chief Executive Officer. (Debtor Ex. 1.) Thus, when he signed the Amended Severance Plan, he occupied the office of President even if that title was not listed beneath his signature. The Court also heard testimony from Mr. Bermish regarding his claim. His specific situation is discussed below.

---

[4]   The debtor filed three objections because each omnibus objection was limited to no more than 100 claims. FED. R. BANKR. P. 3007(e)(6)

[5]   The objection to Mr. Bermish's claim was included in the First Omnibus Objection.

5

**DISCUSSION**

An employee's right to severance benefits under a plan does not vest unless an employer offers vested severance benefits through the terms of the plan itself. Hooven v. Exxon Mobil Corp., 465 F.3d 566, 574-75 (3d Cir. 2006). Furthermore, ERISA does not create any substantive entitlement to benefits, and "[e]mployers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans." Curtiss-Wright Corp. v. Schoonejongen, 514 U.S. 73, 78 (1995); see Reichelt v. Emhart Corp., 921 F.2d 425, 430 (2d Cir. 1990)("Since severance benefits are welfare benefits and an employee's interest in a welfare benefit plan is not vested, the employer has no continuing obligation to provide severance benefits; under ERISA, the employer has the right at any time to amend or terminate a severance pay plan."). The plan must, however, "provide a procedure for amending such plan, and for identifying the persons who have authority to amend the plan." 29 U.S.C. § 1102(b)(3).

The Old Severance Plan did not provide vested benefits to any employee, a fact made clear by its express language. Moreover, it alerted employees that benefits might not be available if Wellman was in bankruptcy or Wellman exercised its discretion not to pay benefits in the light of financial constraints. Finally, it unambiguously permitted Wellman to amend it at any time through a written instrument signed by the President.

Even absent an amendment, Wellman could have reduced the amount of severance benefits. It was already in bankruptcy reorganization. In addition, Wellman suffered from "cash flow restraints and tight availability of funds." In short, the terms of the Old Severance Plan did not offer an absolute assurance that Wellman would pay severance benefits to its employees.

The Amended Severance Plan offered even less assurance, eliminating the length of service from the computation of the benefit. At the initial hearing, Mr. Bermish argued that the amendment did not comply with the requirements of the Old Severance Plan. It was signed by Mr. Ruday as the Chief Executive Officer rather than by Wellman's President. In fact, he suggested – and Wellman did not dispute – that there was no President to sign the amendment.

At the evidentiary hearing, however, Wellman demonstrated that Mr. Ruday was elected President and Chief Executive Officer of Wellman at the same time. That the Revision included the title Chief Executive Officer but omitted the title of President under Mr. Ruday's name did not alter the fact that it was signed by the President of Wellman. This is all that the Old Severance Plan required, and accordingly, it was properly amended.

The foregoing disposes of the Omnibus Objections except for the particular circumstances surrounding Mr. Bermish's claim. Mr. Bermish worked in Wellman's small New York office and served both as Director of Investor Relations and Director of Strategic Planning. He testified, in substance, that during the chapter 11, Wellman published upbeat communications regarding the status of the case and its outlook, and led him to believe that he would retain his severance benefits. On the petition date, Wellman issued a press release and wrote to employees stating that it had received a commitment for up to $225 million in debtor-in-possession ("DIP") financing that it intended to use, among other things, to pay post-petition employee obligations. (Bermish Ex. A.) In an April 7, 2008 email, Wellman advised the employees that the Court had authorized the continuation of employee benefits, including the severance program. (Id.) Finally,

7

during a July 2008 telephone presentation to Mr. Bermish and another New York employee, Mr. Ruday made an upbeat presentation relating to the general outlook of Wellman.  (Transcript of hearing held Jan. 12, 2009, at 20)("Tr.")(ECF Doc. # 775.)  Mr. Bermish had no inkling that the severance benefits would be changed until Wellman advised the employees in September.  (See id. at 20-21.)

As a result, Mr. Bermish expected that his employment would continue.  And while he recognized that it might not, and even had some general discussions with others about another job, he felt comfortable that his eight to nine months of severance benefits (under the Old Severance Plan) would tide him over until he found another job. (Id. at 22-23.)  Relying on this expectation and the assurance of ample severance benefits, he did not make a serious effort to look for another job during the chapter 11 case.  (Id. at 23.)

Mr. Bermish's testimony and evidence invoked the principles of estoppel:

> Under federal law, a party may be estopped from pursuing a claim or defense where: 1) the party to be estopped makes a misrepresentation of fact to the other party with reason to believe that the other party will rely upon it; 2) and the other party reasonably relies upon it; 3) to her detriment.

Kosakow v. New Rochelle Radiology Assocs., P.C., 274 F.3d 706, 725 (2d Cir. 2001); accord Veltri v. Bldg. Serv. 32B-J Pension Fund, 393 F.3d 318, 326 (2d Cir. 2004).

Mr. Bermish failed to establish that Wellman misrepresented a fact.  Although Wellman issued upbeat reports, the factual statements it made were true: it had received a commitment for up to $225 million in DIP financing, it did intend to use the funds to pay employee obligations, and it eventually procured an order that authorized (but did not direct) Wellman to continue its employee benefits programs, including severance pay.  In

8

addition, if Mr. Ruday was upbeat about Wellman's prospects in July 2008, I do not conclude that his "optimism" was misplaced, or that he or Wellman intended to change the severance program at that time. Finally, Wellman never represented (or promised) that it would maintain the existing severance program regardless of what might occur in the future. (Tr. at 26.) Unfortunately, Wellman's prospects grew worse, and by the end of summer 2008, its financial and cash flow restraints required it to modify the severance plan.

Mr. Bermish also failed to show that he reasonably relied on anything he heard or was told. He acknowledged that the Old Severance Plan was available on Wellman's website, (id. at 25), and he admitted that he understood that Wellman might change the severance plan. (Id. at 23.) He knew or should have known that severance benefits were at risk, even under the Old Severance Plan, and could be reduced or eliminated through an amendment. Accordingly, Mr. Bermish failed to establish that Wellman should be estopped from denying the benefits available under the Old Severance Plan.

Mr. Bermish made other points during his presentation that essentially come down to a question of fairness. For example, he suggested that the creditors might "ante up" the amounts needed, or Wellman could fund the increased severance benefits using an anti-dumping rebate or the money generated by operations. (Id. at 18-19.) The Court cannot compel creditors to fund the severance payments, and none have volunteered. Furthermore, Wellman had the right but not the obligation to maintain the Old Severance Plan. It chose, in the exercise of its business discretion, to reduce the benefits. Although this particular decision fell hardest on the terminated employees, the Court has no legal basis to second-guess Wellman's business judgment.

9

In conclusion, Wellman's Omnibus Objections are sustained, and the severance claims are allowed in the amounts set forth in those objections. The foregoing constitutes the Court's findings of fact and conclusions of law. Submit orders.

Dated: New York, New York
January 23, 2009

/s/ *Stuart M. Bernstein*
STUART M. BERNSTEIN
Chief United States Bankruptcy Judge